## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## Greenbelt Division

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| NC GAS HOUSE GANG, LLC, | ) Case No.: 23-18766 LSS |
|  | ) Chapter 11 |
| Debtor. | ) |
|  | ) |

### EMERGENCY MOTION OF CITY OF GASTONIA FOR AN ORDER (I) COMPELLING THE IMMEDIATE REJECTION OF EXECUTORY AGREEMENTS OR, (II) IN THE ALTERNATIVE, MODIFYING THE AUTOMATIC STAY TO ALLOW THE CITY TO EXERCISE ITS STATE LAW RIGHTS AND REMEDIES

City of Gastonia, a North Carolina municipal corporation (the "City"), by and through its undersigned counsel, hereby moves this Court for an order: (i) compelling the immediate rejection of the Agreements (defined below) pursuant to Sections 365(b) and (d)(2) of title 11 of the United States Code (as amended, the "Bankruptcy Code"),[1] or, (ii) in the alternative, modifying the automatic stay, pursuant to 11 U.S.C. §§ 105(a) and 362(d), to allow the City to pursue its state-law rights and remedies with respect to the Property (defined below) and Agreements (defined below) (the "Motion"). In support of the Motion, the City respectfully states as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).

4. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 365(b), (d)(2), 105(a), and 362(d).

---

[1] Unless otherwise specified, all statutory references to a "Section" are to the Bankruptcy Code.

**BACKGROUND**

5. On or around December 1, 2023 (the "Petition Date"), NC Gas House Gang LLC ("Tenant" or "Team" or "Debtor") filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

6. The City is the record owner of the real property located at 800 W. Franklin Blvd., Gastonia, North Carolina 28052 and identified by the Gaston County Tax Office as parcel number 301025 and PIN# 3545571938 (the "Real Property"). On the Real Property, the City constructed and owns a multi-use sports and entertainment facility with a fixed seating capacity for approximately 2,000 attendees (the "Stadium" and together with the Real Property, the "Property").

7. In contemplation that a professional baseball team sanctioned by the Atlantic League of Professional Baseball Clubs, Inc. (the "Atlantic League") would operate a full-season schedule in the Stadium and that Debtor would manage and be responsible for the Stadium and the Property, on or around June 23, 2020, the City and Debtor entered into an Exclusive Use Area Lease Agreement (the "Lease Agreement") as well as a Use and Operating Agreement (the "Operating Agreement" and together with the Lease Agreement, the "Agreements").

8. The Lease Agreement governs the lease terms for the portions of the Stadium to which Debtor has the exclusive right to occupy and use, and expressly incorporates the Operating Agreement in full. A true and correct copy of the Lease Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

9. The Operating Agreement governs the management and operation of the Stadium. A true and correct copy of the Operating Agreement is attached hereto as Exhibit B and is incorporated herein by reference.

10. Upon information and belief, up to and until November 13, 2023, Debtor operated a member team of the Atlantic League, called the Gastonia Honey Hunters.

11. Upon information and belief, during the weekend of December 8, 2023, Debtor has, at a minimum, two (2) events hosting in excess of 100 attendees at the Property, including the Stadium (the "Weekend Events").  Upon information and belief, during the Weekend Events, Debtor will be providing open bars that will be serving free alcohol to all attendees of the Weekend Events.  Further upon information and belief, as detailed below Debtor does not have commercial general liability insurance or umbrella excess liability insurance.

12. Prior to the Petition Date, Debtor materially breached and defaulted upon both of the Agreements.

*Debtor's Membership Defaults*

13. Debtor represented in the Operating Agreement that it held a membership with the Atlantic League or otherwise was working towards that end.

14. Where the Operating Agreement refers to the "Sanctioning Association," it is referring to the Atlantic League.

15. Pursuant to Section 7.17 of the Operating Agreement, Debtor has a continuing obligation to remain a member of the Atlantic League and to "play all Team Games and any all-star games awarded to the [Debtor] by the Sanctioning Association at the Stadium."  Operating Agreement at § 2.2(g); *see also*, Operating Agreement at § 4.9.

16. Pursuant to Section 7.25 of the Operating Agreement, Debtor is required "at all times" to "own and *maintain in good standing* a Team that (a) is *a full season minor league baseball team* in a recognized professional baseball league, and (b) is *authorized by the Sanctioning Association* to play its home games at the Stadium."  (emphasis added).

17. Pursuant to Section 11.3(f) of the Operating Agreement, it is an Event of Default if Debtor "fail[s] to maintain approval and good standing by a Sanctioning Association of the Team . . . ."

18. Upon information and belief, the Atlantic League sent a letter dated August 28, 2023 to Debtor's managing member and president, Brandon Bellamy ("Mr. Bellamy"), detailing how Debtor was in violation of the Atlantic League Bylaws and League Affiliation Agreement. This letter concluded with the following caution to Debtor: "In summary, if [Debtor] does not immediately undertake good faith efforts to cure its defaults and improve its financial and operating integrity, the Atlantic League will have little choice but to consider strategic alternatives, including revocation of [Atlantic League] Membership."

19. Upon information and belief, Mr. Bellamy also received a letter dated September 11, 2023, regarding a Notice of Default of Amended Secured Promissory Note, stating in relevant part "NC Gas House Gang LLC is in default of the Note for failure to pay principal and interest under the terms of the [Amended Secured Promissory] Note."

20. Upon information and belief, the Amended Secured Promissory Note is for the membership fee agreed to be paid to the Atlantic League by Debtor. Upon information and belief, Debtor is in arrears $1.1 million of the original $2.45 million Note. *See* Docket No. 1-2.

21. Upon information and belief, on November 13, 2023, the Atlantic League terminated Debtor's membership to the Atlantic League.

22. Upon information and belief, Debtor cannot cure the Atlantic League's termination of the membership.

23. Upon information and belief, Debtor is not a full season minor league baseball team in any recognized professional baseball league and is not authorized by the Sanctioning Association to play its home games at the Stadium.

24. The Debtor's failure to maintain its membership to the Atlantic League, both pre-petition and post-petition, is an Event of Default under the Agreements entitling the City to terminate the Agreements. Operating Agreement at § 11.3(b) and (f), Lease Agreement at § 14(a)(iv).

*Debtor's Monetary Defaults*

25. Debtor has a history of violating the Operating Agreement, particularly as it pertains to its financial obligations thereunder and maintenance of the Stadium. This troubled history makes the irreparable harm to the City by the uncurable "Membership Default" by Debtor even more certain.

26. Pursuant to the Operating Agreement, Debtor is required to pay an annual payment to the City for Naming Rights. Operating Agreement at § 4.3. Payment for the Naming Rights was due for the previous season on October 31, 2022, and was only finally paid on August 3, 2023.

27. This year, again, Debtor has defaulted on its Naming Rights obligation and is currently delinquent. This year's annual payment was due on or before October 31, 2023 and has not been made, indicating further that Debtor has no intent in honoring its obligations under the Operating Agreement. Failure to timely pay the Naming Rights' fee or any other monetary obligations under the Agreements constitutes an Event of Default under the Operating Agreement.

28. Through the Final Notice, the City put Debtor on notice of this additional Event of Default.

29. Before Debtor's 2023 regular season began and continuing well into the season, Debtor was in arrears in making its Initial Term Rental payment under the Lease Agreement. Like the aforementioned delinquent Naming Rights payment, the $35,808 due for the Initial Term payment was also paid on August 3, 2023. The lease payment was nearly six months in arrears when finally paid.

30. Under Section 7.27 of the Operating Agreement, Debtor is required to "arrange for and pay or cause to be paid when due all charges for telephone, internet and gas (if any) for the Stadium."

31. Upon information and belief, Debtor has failed to pay when due for the utilities for which it is responsible. By way of example, in August 2023, upon information and belief, there was a gas service interruption at the Stadium due to Debtor's failure to make payment. Upon information and belief, as a direct result of the gas supply being shut-off, the emergency generator at the Stadium malfunctioned. The City incurred necessary costs for a repair and diagnostic service call related to the emergency generator.

32. Each of Debtor's failure to meet its financial obligations under the Agreements, both pre-petition and post-petition, is an Event of Default entitling the City to terminate the Agreements. Operating Agreement at § 11.3(a)-(b), Lease Agreement at § 14(a)(iv).

*Debtor's Stadium Maintenance Defaults*

33. Pursuant to Section 6.1.4 of the Operating Agreement, Debtor is obligated to "maintain the Stadium in accordance with Comparable Facilities subject to normal wear and tear. . . ."

34. More specifically, Section 7.1 of the Operating Agreement requires that Debtor "shall, at its sole cost and expense, perform all Operational Maintenance required to keep,

maintain, and operate Premises, including the interior and exterior, structural . . . and nonstructural portions of the improvements, in as good repair as exists on the Commencement Date . . . and generally consistent with the operation and maintenance practices of . . . Comparable Facilities, subject to ordinary wear and tear . . . ."

35. The Operating Agreement defines "Operational Maintenance" broadly so as to emphasize that the maintenance of the Property is the responsibility of Debtor.

36. Finally, pursuant to Section 7.8 of the Operating Agreement, the Debtor "agree[d] to operate and maintain the Premises throughout the Term in a condition necessary to conduct the permitted uses . . . with the general quality of operations at Comparable Facilities."

37. Operational Maintenance at the Stadium is an "absolute and unconditional" obligation of Debtor under the Operating Agreement.

38. Failure to perform all Operational Maintenance is a default of the Agreements. Operating Agreement at § 11.3(b), Lease Agreement at § 14(a)(iv).

39. Debtor has regularly failed to meet its maintenance obligations. Indeed, as the result of its annual facility and operational assessment of the Property earlier this year, the City noted that "the current lack of regular/routine maintenance is already shortening said life expectancy of the Facility and its amenities and equipment" and that "[t]he entire facility is in desperate need of a major cleaning, as well as regular, on-going cleaning throughout the calendar year."

40. The City inspection earlier this year noted that the upkeep of the restroom facilities as "extremely poor," including the "toilets urinals, sink, walls, stall, and other fixtures," as well as there being a failure to clean the windows.

41.     This is not a cosmetic criticism, but rather a troubling pattern of improper maintenance which will diminish the life expectancy and value of the premises.

42.     For example, prior to that inspection, in a memorandum to Debtor officials on September 12, 2022, the City specifically noted that "the majority of the [50%] rise in . . . utility costs is related to toilet fixtures left 'running'," and calling on Debtor to inspect restroom fixtures daily to ensure "proper operation of these facilities . . . ."

43.     The City inspection also revealed maintenance issues in, for example, "the kitchen cooking equipment, concourse concrete, concession equipment, keg and reach-in coolers . . . storage rooms, premium level bar area, windows and doors, elevator, and the seating bowl," with "[t]he most egregious area" being "the kitchen/cooking equipment" with the concern again being life expectancy of this equipment.

44.     Further, there were "[w]eeds . . . growing through the Facility's concrete/hard surfaces and around the turf perimeter." Repairs were also noted as being needed behind the first base dugout and "excessive trash" was noted to have "accumulated behind the ADA lifts in both dugouts."

45.     There was also an unattended leak in the First Aid Room where mold was discovered. Mold remediation on the Property would be a costly consequence for Debtor where simple maintenance could prevent these issues from arising to begin with.

46.     In sum, virtually every public-facing or public-use component of the Property was in woeful condition after what appears to have been months of maintenance neglect in the offseason, to say nothing of ongoing issues arising during the season.

47. The Debtor's failure to perform its maintenance obligations, both pre-petition and post-petition, is an Event of Default under the Agreements entitling the City to terminate the Agreements. Operating Agreement § 11.3(b); Lease Agreement at § 14(a)(iv).

### *Debtor's Insurance Defaults*

48. Pursuant to Section 8.1 of the Operating Agreement, Debtor is required to "maintain throughout the Term of this Agreement Commercial General Liability coverage . . . umbrella excess liability . . . [and Debtor] will name City as additional insured on the commercial general liability and umbrella policies . . . [and Debtor] shall maintain property insurance on all assets owned by [Debtor] within the [Property]."

49. Pursuant to Section 11.3(b) it is an Event of Default if Debtor fails to maintain the required insurance policies with the City named as an additional insured. *See*, Operating Agreement at § 11.3(b).

50. Upon information and belief, Debtor does not have any commercial general liability insurance or umbrella excess liability insurance and, to the extent it previously had such insurance, it did not name City as an additional insured.

51. The Debtor's continued failure to maintain commercial general liability insurance and umbrella excess liability insurance with the City named as an additional insured, both pre-petition and post-petition, is an Event of Default of the Agreements. Operating Agreement at § 11.3(b), Lease Agreement at § 14(a)(iv).

### *The City's Rights Upon an Event of Default*

52. If any Event of Default occurs, the Operating Agreement provides that "in addition to its other remedies at law or in equity," the City has the right to issue a "notice . . . of the [City's]

intention to terminate this Agreement . . . [and] ***terminate the [Debtor's] right of possession of the Premises*** . . . ." Operating Agreement at §§ 11.4 and 11.5 (emphasis added).

53. On November 15, 2023, the City, by and through undersigned counsel, issued via certified mail return receipt requested, the Final Notice contemplated by Section 11.5 of the Operating Agreement. A true and accurate copy of the Final Notice is attached hereto as Exhibit C and is incorporated herein by reference.

54. An Event of Default under the Operating Agreement is an "Event of Default" under the Lease Agreement. Lease Agreement at § 14(a)(iv). An Event of Default under the Lease Agreement provides the City with the remedy of "institu[ing] any and all proceedings or claims permitted by law or equity to recover all unpaid sums and amounts then due and payable by [Debtor] under this Lease, and any and all amounts necessary to compensate City for all the damage proximately caused by [Debtor's] failure to perform its obligations under this Lease; and/or…" preliminary and permanent injunctive relief "or other equitable relief…to compel [Debtor] to comply with or refrain or cease from breaching or violating the terms, covenants, and conditions of this Lease." *See*, Lease Agreement at § 14(b).

55. The Lease Agreement further provides that it "***shall terminate automatically*** upon the termination of the [Operating] Agreement." Lease Agreement at § 2(c) (emphasis added).

56. While the Operating Agreement provides for a ninety day cure period in the Event of Default, given the uncurable nature of Debtor's defaults (as more particularly described below), the injunctive and equitable relief contemplated in the Agreements, the City turns to the Court to intervene and prevent the irreparable harm to the City if it is not able to terminate the Agreements and the Debtor's right of possession of the Property with immediate effect.

**RELIEF REQUESTED**

57. By this Motion, the City respectfully requests the entry of an order: (i) compelling immediate rejection of the Agreements, pursuant to 11 U.S.C. §§ 365(b) and (d)(2) or, (ii) in the alternative, modifying the automatic stay, pursuant to 11 U.S.C. § 362(d), to allow the City to pursue its state law rights and remedies under the Agreements.

**LEGAL ARGUMENT**

*Debtor Should be Required to Immediately Reject the Agreements*

58. Section 365 of the Bankruptcy Code authorizes the debtor-in-possession, with court approval, to assume or reject any executory contract of the estate. 11 U.S.C. § 365(a). If the debtor has defaulted, the contract may only be assumed if the debtor cures such defaults or provides adequate assurance that such defaults will be promptly cured, together with compensation for any actual pecuniary losses resulting from any defaults, and adequate assurances of future performance under the contract. 11 U.S.C. § 365(b).

59. Section 365(d)(2) of the Bankruptcy Code generally allows a debtor-in-possession to defer assumption or rejection of an executory contract until confirmation of a plan of reorganization. Section 365(d)(2) provides, however, that a court may, on the request of a non-debtor party to such contract, shorten the time period within which the debtor must make a decision to assume or reject. 11 U.S.C. § 362(d)(2) (providing that "the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease"); *see also In re A.H. Robins Co., Inc.*, 68 B.R. 705, 709 (Bankr. E.D. Va. 1986); *In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006). Thus, "[p]arties who wish to know where they stand may, pursuant to 11 U.S.C. § 365(d)(2), seek to compel an early election . . . ." *In re El Paso Refinery, L.P.*, 220 B.R. 37 (Bankr. W.D. Tex. 1998) (quoting *In re Public Service Co. of New Hampshire*, 884 F.2d 11, 14–15 (1st Cir. 1989)).

60. The legislative history of section 365(d) indicates that the purpose of this section is to "prevent parties in contractual or lease relationships with a debtor from being left in doubt concerning their status vis-a-vis the estate." H. REP. No. 95-595, 95th Cong. 1st Sess. at 348 (1977); S. REP. No. 989, 95th Cong., 2d Sess. at 59 (1978); *see also, In re Univ. Med. Ctr.*, 973 F.2d 1065, 1078-79 (3d Cir. 1992).

61. When deciding whether to set a deadline for assumption or rejection, courts weigh "the nature of the interests at stake, the balance of hurt to the litigants, the good to be achieved, and the safeguards afforded those litigants." *In re St. Mary Hosp.*, 89 B.R. 503, 513 (Bankr. E.D. Penn. 1988). Courts will also consider the "damage that the non-debtor will suffer beyond the compensation available through the Bankruptcy Code" if a deadline were not set. *In re Teligent*, 268 B.R. 723, 738–39 (Bankr. S.D.N.Y. 2001). In exercising its discretion to compel assumption or rejection, a court must balance the interests of the non-debtor party to the contract against the bankruptcy estate's interest. *In re Physician Health Corp.*, 262 B.R. 290,292 (Bankr. D. Del. 2001). Here, a balancing of the relevant factors supports a ruling that Debtor must assume or reject the Agreements immediately.

62. As an initial matter, it does not appear that Debtor intends to cure its numerous defaults under the Agreements. Prior to the Petition Date, Debtor defaulted under the Agreements and, post-petition, remains in default under the Agreements for, among others, its failure to (a) maintain its membership to the Atlantic League; (b) maintain its status as a minor league baseball team in any recognized professional baseball league; (c) maintain required insurance; (d) name the City as an additional insured under the required insurance; (e) perform its maintenance obligations; and (f) perform its financial obligations. Previously, Debtor committed similar or identical defaults under the Agreements and expressed no desire, motivation, urgency, or ability to cure the

same. Now that Debtor has lost its membership in the Atlantic League, a Promissory Note has been declared in default, and the City has sent its Final Notice, Debtor has even less incentive to meet its "absolute and unconditional" obligations under the Agreements.

63. Moreover, even if Debtor expressed a desire to cure its defaults under the Agreements, it cannot do so. Namely because it cannot cure the defaults related to its membership to the Atlantic League or a recognized professional baseball league. Consequently, the Agreements will inevitably be deemed rejected at the earlier of 120 days after the Petition Date or the date of entry of an order confirming a plan. *See* 11 U.S.C. § 365(d)(4)(A).

64. Similarly, Debtor has not and cannot (for the reasons stated above) comply with Section 365(d)(3) of the Bankruptcy Code. 11 U.S.C. 365(d)(3) Section 365(d)(3) requires Debtor to timely perform all of its obligations under the Lease Agreement from and after the Petition Date *until the Lease Agreement has been assumed or rejected*. In other words, Debtor must timely perform its obligations or reject the Lease Agreement. Since the Petition Date, Debtor has not (a) maintained its membership to the Atlantic League; (b) has not maintained its status as a minor league baseball team in any recognized professional baseball league; (c) has not maintained the required insurance; (d) has not named the City as an additional insured under the required insurance; (e) has not performed its maintenance obligations; and (f) has not performed its financial obligations. As such, the Debtor has failed to timely fulfill its post-petition obligations under the Agreements in violation of Section 365(d)(3) of the Bankruptcy Code and the Agreements must consequently be rejected.

65. Finally, any delay in rejecting the Agreements will result in immediate and irreparable loss and harm to the City for which there is no adequate remedy at law. The primary purpose of the Agreements is "to locate and operate a an Atlantic League team in the City at the

Stadium" to "help spur economic development in the downtown core, create new jobs, and to enhance the quality of life for [the City's] citizens." Consequently, it is critical that the City secure a successor manager and operator for its Stadium with sufficient time to prepare for the Atlantic League 2024 baseball season, with opening night scheduled for April 25, 2024. If the City is to do so, the Stadium cannot be left in disrepair for months by the defaulted and exiting Debtor. The City must be able to secure the Property, including the Stadium, terminating or suspending Debtor's right of possession with immediate effect and obtain a successor manager and operator to provide sufficient time for such successor to enter into all necessary contracts, secure employees, and undertake rebranding for the baseball team and Stadium, necessary due to the irreparable harm caused to the baseball team brand by Debtor's defaults. Without immediate relief, the City's ability to obtain a successor manager and operator for the 2024 season will be greatly diminished, which would result in the loss of an entire baseball season and associated events at the Stadium. The unique nature of Stadium operation and management greatly limits the number of qualified successors, which also increases the need for immediate relief. Furthermore, the Debtor's failure to maintain commercial general liability insurance and umbrella excess liability insurance with the City named as an additional insured necessitates immediate relief. Because Debtor has failed to maintain adequate insurance on the Property, the Property and City are at extreme risk of property load and/or liability to attendees of the Weekend Events.

66. Permitting Debtor to retain the Property solely to have the Agreements rejected serves no benefit to Debtor, its unsecured creditors, or the City. Indeed, Debtor has no use for the Property as it is no longer a member of the Atlantic League or any other professional baseball league and, consequently, has no ability or need to pay professional baseball games at the Stadium. On the other hand, as thoroughly detailed above, delaying rejection of the Agreements will not

only harm the City but, especially, will harm unsecured creditors as Debtor will incur significant additional interest, fees, and other charges as well as administrative expenses and other costs and damages under the Agreements thereby diluting the recoveries to existing creditors.

67. Based on the foregoing, a balancing of interests indicates that Debtors should be required to immediately reject the Agreements.

### *In the Alternative, Relief from the Automatic Stay Should Be Granted*

68. The City is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d). "A decision to lift the automatic stay under section 362 of the Code is within the discretion of the bankruptcy judge and this decision may be overturned on appeal only for abuse of discretion." *In re Lee*, 461 F. App'x 227, 231 (4th Cir. 2012) (quoting *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992)).

69. Under 11 U.S.C. § 362(d)(1), the Court shall grant relief from the automatic stay for cause if a creditor lacks adequate protection of its interest in the property. "Because the statute does not define cause, 'courts must determine when discretionary relief is appropriate on a case-by-case basis.'" *Id.* (quoting *In re Robbins*, 964 F.2d at 345). "Courts have consistently found that a debtor-creditor relationship with a history of non-payments is sufficient to show a lack of adequate protection." *In re McCullough*, 495 B.R. 692, 696 (W.D.N.C. 2013). Moreover, courts "consider the debtor's *failure to maintain insurance on property as a significant factor* when finding that the was a lack of adequate protection." *Id.* (collecting cases) (emphasis added); *R&J Contractor Servs., LLC v. Vancamp*, 652 B.R. 237, 242 (D. Md. 2023) (collecting cases); *In re Fisher*, No. 14-61076, 2014 WL 5799592, at *5 (Bankr. W.D. Va. Nov. 7, 2014) (granting relief from the automatic stay where the debtor had no equity in the creditor's property and the debtor failed to maintain insurance on the same). The burden of proving a lack of adequate protection is on the movant; however, once it establishes a series of defaults, the burden shifts to the debtor to

show why relief should not be granted. *In re McCullough*, 495 B.R. at 695 (citing 11 U.S.C. § 362(g)).

70.  In this case, cause exists to grant relief from stay because the City lacks adequate protection of its interests in the Property.  Prior to the Petition Date, Debtor defaulted under the Agreements and, post-petition, remains in default under the Agreements for, among others, its failure to (a) maintain its membership to the Atlantic League; (b) maintain its status as a minor league baseball team in any recognized professional baseball league; (c) maintain required insurance; (d) name the City as an additional insured under the required insurance; (e) perform its maintenance obligations; and (f) perform its financial obligations.  These defaults remain post-petition.  Now that Debtor has lost its membership in the Atlantic League, a Promissory Note has been declared in default, and the City has sent its Final Notice, Debtor has even less incentive to meet its "absolute and unconditional" obligations under the Agreements.  Moreover, even if Debtor expressed a desire to cure its defaults under the Agreements, it cannot do so because it cannot revive its former membership to the Atlantic League.  Consequently, the Agreements will inevitably be deemed rejected at the earlier of 120 days after the Petition Date or the date of entry of an order confirming a plan.  See 11 U.S.C. § 365(d)(4)(A).  Moreover, any delay in granting relief from stay will result in immediate and irreparable loss and harm to the City for which there is no adequate remedy at law.

71.  In addition, under 11 U.S.C. § 362(d)(2), the Court may grant relief from the automatic stay if the debtor does not have equity in the property and the property is not necessary for an effective reorganization because (a) Debtor leases the Property from the City and (b) has no ability to operate the Property - as it has repeatedly shown during the course of its tenure - because its membership to the Atlantic League has been revoked.

72. Based on the foregoing reasons, good cause exists to lift the automatic stay.

73. In connection with the requested relief, the City respectfully requests that the 14 day stay of Bankruptcy Rule 4001(a)(3) not apply.

**WHEREFORE**, the City requests that this Court:

A. Compel Debtor to immediately reject the Agreements pursuant to 11 U.S.C. § 365(b) and (d)(2) or, in the alternative, terminate the automatic stay pursuant to 11 U.S.C. §§ 105(a) and 362(d) as to the Property and the Agreements and waive Fed R. Bankr. P. 4001(a)(3) to allow the City to immediately enforce and implement this order granting relief from stay; or, in the alternative,; and

B. Grant such other and further relief as this Court deems appropriate.

Dated: December 7, 2023

        */s/ Brent C. Strickland*
        Brent C. Strickland, Esq. (Bar No. 22704)
        WHITEFORD, TAYLOR & PRESTON LLP
        111 Rockville Pike, Suite 800
        Rockville, Maryland 20852
        Phone: (410) 347-9402
        bstrickland@wtplaw.com

        and

        Ashley Edwards, Esq.
        PARKER POE ADAMS & BERNSTEIN LLP
        620 South Tryon Street, Suite 800
        Charlotte, NC 28202
        Phone: 704.335.6632
        ashleyedwards@parkerpoe.com

        *Counsel to the City of Gastonia, North Carolina*

**CERTIFICATE OF SERVICE**

   I hereby certify that on December 7, 2023, I reviewed the Court's CM/ECF system and it reports that an electronic copy of the foregoing Motion will be served electronically by the Court's CM/ECF system on the following parties:

- Marc E. Albert     marc.albert@stinson.com, porsche.barnes@stinson.com
- Ronald J Drescher     ecfdrescherlaw@gmail.com, ron@clegolftour.com,ecf2drescherlaw@gmail.com,ecf@drescherlaw.com,myecfdrescher@gmail.com,284@notices.nextchapterbk.com,heather@propelparalegal.com,propel@drescherlaw.com
- L. Jeanette Rice     Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- Lisa Yonka Stevens     lisa.y.stevens@usdoj.gov
- US Trustee - Greenbelt     USTPRegion04.GB.ECF@USDOJ.GOV

I hereby further certify that on December 7, 2023, a copy of the foregoing Motion was also served by first-class mail, postage prepaid, on the attached service list.

                */s/ Brent C. Strickland*
                Counsel