**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Baltimore**

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| NC GAS HOUSE GANG LLC, | * | Case No. 23-18766 LSS |
| | * | Chapter 11 (Subchapter V) |
| Debtor. | * | |
| | * | |
| *    *    *    *    *    * | * | *    *    *    *    *    * |

**DEBTOR'S SECOND AMENDED CHAPTER 11**
**SUBCHAPTER V PLAN**

NC GAS HOUSE GANG LLC, the above-captioned debtor and debtor-in-possession (the "Debtor"), proposes the following Plan under § 1190 and § 1191 of Title 11 of the United States Code (the "Bankruptcy Code"). A brief history of the Debtor's business operations is attached hereto as **Appendix A**.

All creditors and equity security holders should refer to Articles III through VII of this Plan for information regarding the precise treatment of their claims or interests. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.) This Plan is a proposal by the Debtor and subject to court approval after opportunity for objections and a hearing.**

Article I.  Source of Payments

During the term of this Plan, the Debtor shall submit the disposable income (or value of such disposable income) necessary for the performance of this plan to the Subchapter V Trustee (the "Trustee") and shall pay the Trustee the sums set forth herein. If the Plan is confirmed consensually then Debtor shall remit payment directly to creditors. If Debtor is incapable of paying any amount from its disposable income then payments will be derived from sums deposited by Brandon Bellamy.

Article II.  Plan Term

The Debtor proposes to pay all Class 1 and Class 2 claims within thirty days after entry of an order confirming this Plan. Thereafter, Debtor will make a series of quarterly payments of $15,249.81 each beginning on the 15th day of the first July, October, January and April after the effective date until all sums due to the holders of allowed Class 3 claims are paid in full.

1

Article III.  General Distributions Under Plan

The value of the property to be distributed under the Plan during the term of the Plan is not less than the Debtor's projected disposable income for that same period.  Unsecured creditors holding allowed claims will receive distributions, which the Debtor has valued based on the treatment of each class. The Plan also provides for the payment of secured, administrative, and priority claims in accordance with the Bankruptcy Code.

Article IV.  Classification and Treatment of Claims and Interests

1. The Debtor has classified all claims and interests in accordance with §§ 1122, 1123, and 1190 of the Bankruptcy Code.  A chart detailing each class of claims or interests under the Plan, and the Debtor's proposed treatment for each is attached hereto as **<u>Appendix B</u>**.

2. All parties claiming administrative expense priority (including unsecured claims) pursuant to § 507(a)(2) of the Bankruptcy Code but not already treated as such under this plan, shall file an application to approve their respective asserted administrative claim priority status no later than thirty (30) days after the Effective Date.  Any claim that is granted administrative expense priority shall receive the treatment set forth in **Appendix B**.

3. <u>Disputed Claims</u>:

   a. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order and, either:

      i. A proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

      ii. No proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent or unliquidated.

   b. <u>Delay of Distribution on a Disputed Claim</u>:  No distribution will be made on a disputed claim unless the claim is allowed by a final non-appealable order.

   c. <u>Settlement of Disputed Claims</u>:  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019.

Article V.  Payments to Creditors Under Plan

Unless otherwise provided in this Plan or indicated on Appendix B, funds received by the Trustee or otherwise included in this Plan but not specifically disbursed to a secured creditor under this Plan, shall be used to pay the following claims in the priority indicated:

1. Except as provided in § 1191(e) of the Bankruptcy Code, all claims entitled to priority under § 507 of the Bankruptcy Code shall be paid in accordance with § 1129(a)(9) of the Bankruptcy Code and as set forth on **Appendix B**.

2. Pursuant to § 1191(e) of the Bankruptcy Code, the payment of claims entitled to priority under § 507(a)(2) and § 507(a)(3) of the Bankruptcy Code shall be paid under the Plan as set forth on **Appendix B**.

3. All secured claims shall be paid in accordance with § 1129(b)(2)(A), § 1191(b), and § 1191(c) of the Bankruptcy Code, as set forth on **Appendix B**.

4. After payment of the foregoing claims, sums received by the Trustee or disbursed by the Debtor shall be paid, on a pro-rata basis, to allowed general unsecured claims. **See Appendix B**.

5. In accordance with § 1191 of the Bankruptcy Code and the terms of this Plan, the Debtor's equity security holders shall retain their interests in the Debtor as set forth on **Appendix B**.

## Article VI.  Secured Claims Generally

The term "secured claim" as used in this Plan shall be consistent with § 506 of the Bankruptcy Code, and shall mean an allowed claim in an amount equal to the present value of the applicable creditor's interest in the Debtor's interest in the property, or in the amount subject to setoff, as may be established by this Plan, the Confirmation Order, or separate Order of the Court.

Debtor does not believe there are any secured claims in this case, although BKK Sports LLC filed proof of claim no. 10 in the amount of $1,100,000 secured by Debtor's membership interest in The Atlantic League of Professional Baseball Clubs, Inc.

## Article VII.  Trustee Compensation

The Trustee shall be paid for services rendered in this Chapter 11 case an administrative and/or priority claim under § 507 of the Bankruptcy Code and pursuant to Article IV of this Plan, as set forth on **Appendix B**.  All fees and expenses requested by the Trustee, including those on Appendix B, are subject to review and approval by the Court under §§ 329 and 330 of the Bankruptcy Code.

## Article VIII.  Attorney Compensation

The Debtor's attorney, _Ronald J. Drescher_,    _10999 Redrun Blvd Suite 205, Owings Mills, MD 21117_, shall be paid for the services rendered to the Debtor herein as an administrative and/or priority claim under § 507 of the Bankruptcy Code and pursuant to Article IV of this Plan, as set forth on **Appendix B**.  All fees and expenses requested by the Debtor's attorney, including those

on Appendix B, are subject to review and approval by the Court under §§ 329 and 330 of the Bankruptcy Code.

Article IX.  Liquidation Analysis

Attached hereto as **Appendix D** is the Liquidation Analysis required by § 1190(1)(B) of the Bankruptcy Code and the Local Rules of this Court.

Article X.  Debtor's Disposable Income and Plan Funding

An exhibit describing (i) the Debtor's projected disposable income as defined by § 1191(d) of the Bankruptcy Code is attached as **Appendix E**.

Article XI.  Executory Contracts and Unexpired Leases

12.01 Rejection.  Pursuant to § 365 of the Bankruptcy Code, the Debtor rejects each executory contract and unexpired lease listed on **Appendix F**, effective upon the effective date of this Plan. Debtor will be deemed to have assumed all executory contracts and unexpired leases unless specifically stated otherwise.

Article XII.  Property Vests in Debtor Free and Clear

Except as provided in this Plan or the order confirming this Plan, all of the property of the estate, pursuant to §§ 1141(b) and 1141(c) of the Bankruptcy Code, vests in the Debtor as of the Effective Date free and clear of any claim or interest of any creditor provided for by this Plan.

Article XIII.  Confirmed Plan Binding on Debtor and Creditors

Except as provided in §§ 1141 or 1192 of the Bankruptcy Code, as applicable, the provisions of this Plan shall, upon confirmation, bind the Debtor, each and every creditor of this estate and each party in interest, whether or not the claim of such creditor or party is provided for by the Plan and whether or not such creditor or party has accepted or has rejected the Plan.

Article XIV.  Discharge

Discharge.  After completion of all payments due under the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1192 of the Bankruptcy Code, but the Debtor will not be discharged of any debt imposed by this.

Article XV. (Omitted)

4

## Article XVI.  Miscellaneous

16.01 Definitions and Rules of Construction.  The definitions and rules of construction set forth in § 101 and § 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

16.02 Effective Date of Plan.  The effective date of this Plan is the first business day following the date that is fourteen days after the entry of the order of confirmation.  If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay of the confirmation order expires or is otherwise terminated.

16.03 Severability.  If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

16.04 Binding Effect.  The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

16.05 Appendices.  The Appendices attached to the Plan are incorporated into the Plan by reference as if the same were fully rewritten herein.

16.06 Captions.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

16.07 Controlling Effect.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Maryland govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

## Article XVII.  Plan Proposed in Good Faith

The Debtor represents that it is within Debtor's ability to carry out this Plan, and the Plan is submitted in good faith.

## Article XVIII.  Retention of Jurisdiction

The Court shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any

inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

DATED: <u>March 15, 2024</u>                    NC Gas House Gang LLC, Debtor

<u>/s/Ronald J. Drescher</u>
Ronald J. Drescher
Drescher & Associates, P.A.
10999 Red Run Blvd. Suite 205
PMB 224
Owings Mills, MD 21117
Counsel for Debtor

**Appendix A**
(Debtor's Business History)


A.  Nature and History of the Debtor's Business or Commercial Activities:

NC Gas House Gang, LLC (the "Debtor"), was started in 2020 for the purpose of owning and operating a minor league baseball team under the banner of The Atlantic League of Professional Baseball Clubs, Inc. (the "League") in a new stadium constructed in and owned by the City of Gastonia (the "City"). The stadium is located on 800 W. Franklin Blvd., Gastonia, North Carolina 28052 (the "Stadium").

The Debtor obtained a twenty year lease of the Stadium pursuant to a number of agreements between Debtor and the City, including: an Exclusive Area Lease Agreement dated June 23, 2020 and Use and Operating Agreement dated June 23, 2020 (collectively, the "City Agreements").

Under the City Agreements Debtor intended to generate revenues from (1) operation of a minor league baseball team; (2) entertainment spectator events to be held at the Stadium; and (3) private events to be held at the Stadium. Debtor entered into an agreement to host these events under the auspices of the Momentous Group LLC, also wholly owned by Brandon Bellamy. Debtor began operations in the Stadium in 2021 and continued through the fall of 2023.

As a startup beginning operations during the COVID-19 worldwide pandemic, Debtor struggled to become profitable. Attached hereto is Debtor's profit & loss statement from 2021 through 2023. This statement reports a loss for each of the three years of Debtor's operations.


B.  Ownership Structure of the Debtor's Business or Commercial Activities:

Debtor is wholly owned by NC Gas House Gang Holdings, LLC, which is wholly owned by Brandon Bellamy.


C.  Description of the Performance of the Debtor's Business or Commercial Activities in the Three Years Before the Bankruptcy Filing and the Events Leading to the Debtor's Bankruptcy Filing:

From the beginning of its operations Debtor failed to operate profitably and by the fall of 2023 had exhausted its cash supply. Absent any access to cash, Debtor failed to pay obligations owed to many vendors, employees, its insurance vendor, the City and the League. As a result both the City and the League asserted that the Debtor was in default and took action to cause the Debtor to lose its rights under the City Agreement and the League. Accordingly, on November 13, 2023 the League voted to terminate Debtor's interest in the League. Days later, on November 15, 2023, the City issued a termination notice to Debtor and on November 17, 2023 the City caused an action

7

to be filed in the Gaston County Superior Court seeking, *inter alia*, to terminate Debtor's rights under the City Agreement. To stay this proceeding Debtor commenced this Chapter 11 case on December 1, 2023.

Attached hereto are a year to date profit and loss statement (through 11/1/2023) and balance sheet as of 11/1/2023.

 D.  Postpetition Events

Immediately upon the filing of the Chapter 11 petition the City, citing the lapse in insurance coverage and alleged maintenance issues at the Stadium, took control over the Stadium by changing the locks and excluding the Debtor from possession. As a result the Debtor needed to cancel all of the events scheduled in the Stadium from December forward. The City also filed for emergency relief asking the Bankruptcy Court to compel immediate rejection of the City Agreements or for relief from the automatic stay to permit the City to enforce its rights and remedies in the Gaston County Superior Court. Dkt no. 19. (the "City Stay Motion").

In an effort to move the case forward on December 8, 2023, Debtor filed its Motion to Assume the League interest. Dkt no. 23. Following a hearing held on January 10, 2024, the Court denied the Motion to Assume.

The Court promptly, on December 8, 2023, set a hearing on the City's Stay Motion and ordered Debtor to immediately obtain insurance in conformity with the City Agreements, absent which the Court would lift the automatic stay in favor of the City. Dkt no. 30 (the "Insurance Order") The Debtor did obtain some insurance, although not sufficient to fully meet the requirements under the Insurance Order. At that time the Court declined to enter an Order lifting the automatic stay and proceeded with a hearing to consider the City Stay Motion.

Following an evidentiary hearing on December 18, 2023, the Court issued an oral ruling indicating that the Court would grant the City Stay Motion and authorize the City to pursue its nonbankruptcy remedies under the City Agreements. The oral ruling was formally entered in writing on December 21, 2023. Dkt no. 62.

Immediately upon entry of this Order, on December 22, 2023 the Debtor obtained permission from the City to tour the Stadium with vendors to assess the Stadium's condition. Moreover, the Debtor removed the City's action in Gaston County Superior Court to the United States District Court for the Western District of North Carolina.

Despite its best efforts, by January 8, 2024 Debtor still had not been able to procure insurance in conformity with the City Agreements. Accordingly, on that date the Office of the U.S. Trustee filed a Motion to Dismiss or Convert the Case to Chapter 7. Dkt no. 79. Having finally obtained insurance that Debtor believes is in conformity with the City Agreements, Debtor opposed this Motion on January 22, 2024, and a hearing was scheduled for February 12, 2024. At this hearing the Office of the U.S. Trustee introduced a document obtained in discovery that purported to be a written agreement between Debtor and the Momentous Group LLC (and other related Momentous entities). The U.S. Trustee raised questions about the propriety of this document and the Court continued the hearing on the Motion to Dismiss to a time to be set upon discussion

between the Debtor and the U.S. Trustee. No further hearing has been set.

Moreover, on January 8, 2024, the City delivered to counsel for Debtor a letter indicating the City's position that due to the filing of the bankruptcy case and the entry of the Order granting the City Stay Motion, that the City Agreements had been terminated (the "Ipso Facto Letter"). Debtor strongly disagreed that the Ipso Facto Letter had effected a termination of the City Agreements.

Regarding the insurance issue, Debtor obtained a certificate of insurance indicating the amount of coverage, the insurance companies, and that while the Momentous Group LLC was the named insured, both the Debtor and the City of Gastonia were named as additional insureds. Debtor has been assured by multiple insurance professionals that this insurance was in conformity with the City Agreements.

Accordingly, believing that the City's delivery of the Ipso Facto Letter, and Debtor's procurement of insurance and the touring of the Stadium were watershed events, Debtor sought to revive this Chapter 11 case by filing a number of motions:

(1) motion for turnover of the premises identified as 800 W. Franklin Blvd., Gastonia, North Carolina 28052 (dkt 101); (2) Motions for 2004 Examinations of the City of Gastonia (dkt 102) and The Atlantic League of Professional Baseball Clubs, Inc. (dkt 103); (3) the Motion for an Order Authorizing and Directing Case Trustee to Investiage Condition of Stadium (dkt 104); and (4) a Motion to Vacate the Order granting the City Stay Motion (dkt 100) ("Motion to Vacate").

Debtor filed these Motions with an eye towards re-entering the Stadium, hosting non-baseball events, and conducting a sale process of its baseball operations. Debtor believed that success in these Motions would have allowed Debtor to potentially pay all creditors in full.

Accordingly, to preserve its rights under both the League membership and the City Agreements Debtor also, relying upon the procurement of insurance and its belief that it had obtained funding to address all maintenance issues at the Stadium, filed both a Motion for Reconsideration of the Order denying the Motion to Assume the League Membership (dkt no. 95) and a Motion to Assume the City Agreements (dkt no. 115).

After an evidentiary hearing held on February 20, 2024, the Court disagreed that the procurement of insurance and the Debtor's report following the tour of the Stadium were sufficient to justify vacating the Order granting the City Stay Motion and so denied the Motion to Vacate. (Dkt no. 140). The Court also denied the Motion for Reconsideration (Dkt no. 143). In light of these orders, the Debtor withdrew the (1) motion for turnover of the premises identified as 800 W. Franklin Blvd., Gastonia, North Carolina 28052 (dkt 101); (2) Motions for 2004 Examinations of the City of Gastonia (dkt 102) and The Atlantic League of Professional Baseball Clubs, Inc. (dkt 103); (3) the Motion for an Order Authorizing and Directing Case Trustee to Investiage Condition of Stadium (dkt 104). As of the date of this Plan the Court has not resolved Debtor's Motion to Assume the City Agreements.

Moreover, in addition to denying the Motion to Vacate, in the Court's oral ruling the Court found that the Ipso Facto Letter had not terminated the Debtor's rights under the City Agreement.

9

After removing the City's Gaston County litigation to federal court, Debtor has filed an Answer, a Counterclaim against the City, and third party complaints against both the League and its president, Rick White. In these actions Debtor alleges that the City and the League wrongfully acted in concert to strip valuable rights from the Debtor and its creditors for an improper purpose, namely installing their preferred baseball operator for the 2024 and subsequent baseball seasons. Debtor believes it is possible, through the North Carolina Litigation, that Debtor may preserve its rights under the City Agreements and the Stadium. In the alternative, Debtor believes it is entitled to an award of damages due to the alleged misconduct by the City and the League. To prosecute this litigation Debtor has obtained an Order from the Bankruptcy Court appointing Trevor Fuller as special litigation counsel.

Finally, Debtor has commenced an adversary proceeding against the League seeking to avoid a pre-petition transfer of the League membership interest and to recover its value from the League. The League has filed a Motion to Dismiss this adversary proceeding, but as of the date of this Plan Debtor's response is not yet due.

**Appendix B**

(Classification and Treatment of
Claims and Interests)

| Class No. | Description of Claims or Interests in Class | Total Amount of Claims or Interests in Class | Proposed Treatment Under Plan (including whether impaired) | Estimated Percentage Recovery |
|---|---|---|---|---|
| 1 | Administrative Expense Priority Claims | $100,000 | Payment in full | 100% |
| 2 | Statutory Priority Claims 11 USC § 507(a)(4)(Employee wages) | $45,965.37 | Payment in full | 100% |
| 3 | Statutory Priority Claims 11 USC § 507(a)(8)(Taxes) | $242,039.21 | Payment in full over 60 months at 9.5% interest; estimated payment is $5,083.27) | 100% |
| 4 | All other allowed unsecured claims | | Pro Rata payment from litigation proceeds | Unknown |

NOTES:

1. Administrative expense priority claims estimated to be primarily those of Subchapter V Trustee, Marc Albert, counsel for Debtor, Ronald J. Drescher of Drescher & Associates, PA, and special litigation counsel, Trevor Fuller

Although Debtor believes it remains possible that the North Carolina Litigation may result in an Order permitting Debtor to resume operations in the Stadium, because such outcome is dependent on success in contested litigation Debtor does not at this time project to have disposable income from post-confirmation operations. However, Debtor has initiated the North Carolina Litigation and the Maryland Litigation and believes that there may be substantial recoveries, up to $3,000,000 or more, from either or both of those lawsuits, although this outcome is also uncertain.

While the Debtor is pursuing those lawsuits payments to holders of claims in Classes 1, 2 and 3 will be derived from funds advanced to the Debtor by Brandon Bellamy (collectively, the "Plan Funder").

Any recoveries from the North Carolina Litigation and the Maryland Litigation will be disbursed in the following order:

A. First, to reimburse the Plan Funder for any sums paid on behalf of holders of Class 1, 2 or 3 claims
B. Second, to the holders of unpaid Class 1, 2 or 3 claims until such claims are paid in full;
C. Third, to the holders of unpaid Class 4 claims, pro rata;
D. Fourth, to Debtor's equity security holder(s).

11

**<u>Appendix C</u>**
(Claims Being Modified Under Section 1190(3))

Not applicable

**Appendix D**
(Liquidation Analysis)

At this time, property of the estate includes no meaningful physical assets such as inventory, furnitures, fixtures and equipment, or other machinery. Moreover, Debtor's management believes that none of the accounts receivable are collectible.

Furthermore, to the extent that Debtor had valuable rights in the City Agreements or the League membership, such rights are the subject of litigation pending in the United States District Court for the Western District of North Carolina, case no. 23-cv-00892 (the "North Carolina Litigation"); and in the United States Bankruptcy Court for the District of Maryland, adv. no. 23-00306 (the "Maryland Litigation").

The North Carolina Litigation seeks damages against both the City and the League based on allegations that both entities, *inter alia*, conspired to wrongfully strip the Debtor of the valuable assets represented by the League membership and the City Agreements.

The Maryland Litigation seeks to avoid the alleged involuntary transfer of the League Membership interest to the League following the vote of the League's Board of Directors on November 13, 2023, and to recover the value of the membership interest in the approximate amount of $3,000,000.

Debtor believes that a Chapter 7 trustee may pursue the rights in both the North Carolina Litigation and the Maryland Litigation. However, any Chapter 7 trustee would be entitled to recover both attorneys' fees and a considerable trustee commission; such commission would not be paid upon the prosecution of this Litigation under the Plan. Accordingly, Debtor believes that Creditors would receive more under the Plan than under a Chapter 7 liquidation.

## **Appendix E**
(Projected Disposable Income)

Upon the filing of the Chapter 11 case the City assumed control over the Stadium and the Bankruptcy Court lifted the automatic stay to allow the City to pursue its rights and remedies under the City Agreements. Although Debtor does not believe that the City Agreements have yet been terminated, and Debtor believes it remains possible that the North Carolina Litigation may result in an Order permitting Debtor to resume operations in the Stadium, because such outcome is dependent on success in contested litigation Debtor does not at this time project to have disposable income from post-confirmation operations.

**<u>Appendix F</u>**

(Assumed Executory Contracts and
Unexpired Leases)

None