**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NC Gas House Gang LLC, | ) | Case No. 23-18766 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**THE CITY OF GASTONIA'S MOTION TO CONVERT CASE TO CHAPTER 7**

The City of Gastonia, a North Carolina municipal corporation (the "City"), by and through its undersigned counsel, hereby moves this Court (the "Motion") pursuant to 11 U.S.C. § 1112(b) to convert this bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In support of its Motion, the City states as follows:

**PRELIMINARY STATEMENT**

1. It is clear that conversion is in the best interests of creditors and the estate. There is no ongoing business to conduct, no ongoing source of income, and the only thing remaining to do in this case is to recover and liquidate assets and pay creditors. Brandon Bellamy's ("Bellamy") control of the Debtor's bankruptcy estate provides no benefit to creditors and is a substantial hindrance.

2. As set out in extensive detail below and in the City's *Motion to Disqualify the Fuller Law Firm and Disgorge Fees* [Dkt. No. 261] (the "Motion to Disqualify and Disgorge"),[1] (a) Bellamy has been accused of causing the Debtor to divest its bankruptcy estate of the Properties (defined below), the EDA (defined below), and potentially other valuable assets, while simultaneously saddling the Debtor with Bellamy's personal liabilities, (b) the Debtor has been accused of failing to pursue potential recoveries from Bellamy and/or his entities and business

[1] The City incorporates the Motion to Disqualify and Disgorge as if fully set forth herein.

partners and shielding such potential claims from disclosure through a complete lack of disclosure and overt misrepresentations, (c) Bellamy and certain of his entities have been accused of using the Debtor as a pawn in negotiations of non-Debtor liabilities in an effort to gain leverage for themselves, (d) Bellamy has employed clearly conflicted counsel representing the interests of both the Debtor and potential targets of estate claims, and (e) Bellamy has used the Debtor and this bankruptcy to benefit himself, his business partners, and their related entities. Moreover, Bellamy has been shown to intentionally misrepresent and/or secrete information and alter documents in connection with the Debtor's bankruptcy and, more recently, to attempt to frustrate legitimate investigation into insider transfers and possibly recoverable assets. Bellamy, either individually or through the Debtor, has not provided *any* sworn testimony disputing those facts.

3. Most recently, the Debtor wholly failed to comply with the *Consent Order for Appointment of Plan Administrator* [Dkt. No. 337] (the "Consent Order") resolving a prior motion to convert this case to Chapter 7, as it failed to pay even the initial monthly retainer payment required by the Order to the Plan Administrator, who subsequently resigned without being able to conduct any meaningful investigation into claims that the Debtor may have against Bellamy and his associated parties. It is clear that Bellamy cannot be left in charge of liquidating the assets of the estate and pursuing recovery of transfers to parties that, according to Bellamy's own testimony, are controlled by and effectively one-and-the-same with Bellamy. Conversion is necessary to fully investigate and recover transfers that may only be recoverable through this Bankruptcy Case

## BACKGROUND

### A. The Insider Entities

3. The Debtor is wholly owned by NC Gas House Gang Holdings, LLC, which is wholly owned and controlled by Bellamy. *See* Appendix A to Dkt. No. 211. At all times relevant

to this case, Bellamy has been and is now in control of the Debtor. As a result, the acts and omissions attributed to the Debtor as the bases of the relief requested by the City are those of Bellamy.

4. The Debtor is one of many businesses that Bellamy exclusively owns and controls (collectively, the "Bellamy Entities"). In addition to the Debtor, the Bellamy Entities include, among others, **Fuse Gastonia LLC** ("Fuse"); **Momentous Hospitality Group, LLC**; Gastonia Hospitality LLC; VM Hospitality Manager, Inc; Velocity Companies Inc.; **Velocity Capital, LLC** ("Velocity"); Velocity Arc Ventures, LLC; Pace Development Corporation; Republic Real Estate Group, LLC; NC Gas House Baseball Operating Manager, LLC; NC Gas House Gang Funding Manager, LLC; NC Gas House Gang Funding, LLC; NC Gas House Holdings Manager, LLC; and various unknown other companies that Bellamy has affirmatively represented are not "involved in the business activities" of the Debtor. *See* **Exhibit A**, Ver. Statement of Brandon Bellamy in Response to October 7, 2025 Subpoena at ¶ 11.

5. In addition to the Bellamy Entities, Bellamy co-owns and co-manages additional related entities with his business partner, Robert Ambrosi ("Ambrosi"). **Exhibit B**, Transcript of August 26, 2024 Hearing at 28 ("We're partners on various deals."). Indeed, according to the Debtor, Ambrosi and Bellamy have worked "on numerous projects, amounting to approximately $250 million." **Exhibit C**, Transcript of February 14, 2023 hearing at 131. The entities co-owned and co-managed by Bellamy and Ambrosi (collectively, the "Jointly Owned Entities") include, among others **Gastonia Airline LLC** ("Gastonia Airline") and **Veltrust, LLC** ("Veltrust"). *See* **Exhibit A**, Ver. Statement of Brandon Bellamy in Response to October 7, 2025 Subpoena at ¶ 11.

6. In addition to the Jointly Owned Entities, Ambrosi owns and manages additional entities which are related to the Debtor (each, an "Ambrosi Entity" and collectively, the "Ambrosi

Entities" and together with the Bellamy Entities and the Jointly Owned Entities, the "Insider Entities"). Upon information and belief, the Ambrosi Entities include, among others, ***Gastonia Airline Arch, LLC*** ("Arch"); ***Gastonia Airline APL LLC*** ("APL"), and ***ARCTRUST III, Inc.*** ("Arc").

7. The Insider Entities not only share common ownership, management, and principal places of business, but also have engaged in numerous transactions which have transferred the most valuable assets from the Debtor to other Insider Entities while simultaneously saddling the Debtor with the personal obligations of Bellamy through guarantees of his personal debts. Namely, (a) the EDA (defined below) and the rights thereunder were assigned by the Debtor to Gastonia Airline for no consideration;[2] (b) the Debtor had the Properties (defined below) transferred to Gastonia Airline, rather than itself, for no consideration;[3] and (c) the Debtor guaranteed debts solely owed by Bellamy to APL.[4] Upon information and belief, there are other transfers and liabilities exchanged between the Debtor and Insider Entities.

8. Despite these plainly obvious fraudulent conveyances (and likely others), the Debtor failed to pursue any investigation or recovery, and now refuses to do so on the basis that it let the applicable statute of limitations run. Instead, the Debtor and Bellamy have fiercely opposed a meaningful investigation and pursuit of these conveyances. This is not surprising as Bellamy is not likely to sue or enable others to sue himself or his business partners. Because Bellamy is hopelessly conflicted, conversion is necessary to empower a Chapter 7 Trustee to fully investigate and, if appropriate, recover assets for the benefit of the Debtor's legitimate creditors.

## B. The EDA

[2] *See infra* note 5 and accompanying text.
[3] *See infra* ¶ 13.
[4] *See infra* ¶¶ 22-23.

9. On or around June 23, 2020, the City and the Debtor entered into that certain Economic Development Agreement (the "EDA"). *See* **Exhibit D**, Case No. 3:23-cv-00892-RJC-SCR, Dkt. No. 41 at ¶ 17 ("On or about June 23, 2020, NC Gas House Gang entered into an Economic Development Agreement ("EDA") . . . ."). Pursuant to the EDA, the City agreed to convey certain properties (the "Properties") to the Debtor or its assigns. *See* **Exhibit E**, EDA at ¶ 7. In return, the Debtor agreed to, among other things, develop the Properties. *See* **Exhibit D**, Case No. 3:23-cv-00892-RJC-SCR, Dkt. No. 41 at ¶¶ 19-20. A true and correct copy of the EDA is attached hereto as **Exhibit E**, and is incorporated herein by reference.

10. On or around October 12, 2020, the Debtor assigned the EDA, including all of the Debtor's rights, title, and interest to the Properties and all obligations and liabilities under the EDA to Gastonia Airline. *The Debtor received no consideration from Gastonia Airline for the assignment*.[5] A true and correct copy of the Assignment and Assumption of Economic Development Agreement is attached hereto as **Exhibit F**, and is incorporated herein by reference.

11. As a consequence of the assignment, the Debtor no longer has any rights under the EDA as to the City. Although Bellamy has caused the Debtor to divest itself of any possible claims or causes of action under the EDA, the Debtor may still have claims for indemnification, reimbursement, or breach of contract against the assignee, Gastonia Airline. More importantly, the Debtor may have claims against Bellamy and/or Gastonia Airline with respect to the conveyance of the EDA for no consideration.

---

[5] The City's Subpoena to Bellamy requested "[d]ocuments sufficient to show any real or personal property received by NC Gas House Gang LLC from Gastonia Airline LLC in consideration of the Assignment and Assumption of Economic Development Agreement dated October 12, 2020." Bellamy's January 7, 2026 response indicated he was "reviewing the request with counsel and intends to provide relevant, non-privileged documents responsive to this request." However, to date, Bellamy has produced no documents in response to this request.

12. Again, however, Bellamy has demonstrated that he will not investigate and sue himself and his business partners. Indeed, Bellamy has taken the position that there are no claims and there is nothing to investigate because he has allowed purported deadlines to expire.[6] Because Bellamy is conflicted, conversion is necessary to empower a Chapter 7 Trustee to fully investigate and, if appropriate, recover assets and pursue claims for the benefit of the Debtor's legitimate creditors.

**C. <u>The Properties</u>**

13. On or around December 18, 2020, the City, at the request of Bellamy (via Gastonia Airline) and consistent with its obligations under the EDA, transferred the Properties to Fuse via that certain North Carolina General Warranty Deed recorded in Book 5187, Page 1595 of the Gaston County Register of Deeds (the "<u>Deed to Fuse</u>"). *Although the Debtor was entitled to receive and own the Properties, the Debtor received no consideration from Fuse Gastonia in exchange for the Property*. A true and correct copy of the Deed to Fuse is attached hereto as **<u>Exhibit G</u>** and is incorporated herein by reference.

14. Two (2) minutes after receiving title to the Properties, as security for the Ambrosi Loan (defined below), Fuse executed that certain Deed of Trust in favor of APL recorded in Book 5187, Page 1598 of the Gaston County Register of Deeds (the "<u>Ambrosi DOT</u>"). A true and correct copy of the Ambrosi DOT is attached hereto as **<u>Exhibit H</u>** and is incorporated herein by reference.

15. Given that Fuse is owned by Bellamy and APL is owned by Ambrosi, Bellamy effectively caused the Debtor to transfer properties to which it was entitled - namely, the Properties - while simultaneously granting the Properties as security for a loan given by Ambrosi to Bellamy - namely, the Ambrosi Loan (defined below).

[6] The City denies that any such deadlines have expired and reserves all rights to argue in opposition of the same.

16. Approximately thirty (30) minutes after encumbering the Properties with the Ambrosi DOT, Fuse transferred the Properties to Gastonia Airline via that certain North Carolina Special Warranty Deed recorded in Book 5187, Page 1662 of the Gaston County Register of Deeds (the "Deed to Gastonia Airline"). Upon information and belief, *Fuse received no consideration from Gastonia Airline for the conveyance*. Likewise, the *Debtor received no consideration from Gastonia Airline for the conveyance*. A true and correct copy of the Deed to Gastonia Airline is attached hereto as **Exhibit I** and is incorporated herein by reference.

17. Had the Properties remained with the Debtor, the Debtor could have monetized the properties in various ways. Most simply, the Debtor could have charged for parking in connection with baseball games and other events at the baseball stadium. Alternatively, the Debtor could have developed the property and leased it. However, as a result of Bellamy's transfer of the Properties for no consideration, the Debtor was unable to realize on this critical revenue stream which could have funded payments to creditors outside and/or inside this bankruptcy.

18. On or around July 21, 2025, Gastonia Airline offered to sell the Properties to the City for the price of $2,500,000.00. *See* Dkt. 261-12 at 2 ("Gastonia Airline is prepared to return ownership of all three parcels to the City, along with the Aloft franchise (pending approval by Marriott), in exchange for a one-time, lump sum payment in the amount of $2.5 million").

19. In summary, the Debtor was entitled to own the Properties but, instead, Bellamy caused the Properties to (a) be conveyed to an entity owned and controlled by Bellamy and Ambrosi and (b) be encumbered by a deed of trust in favor of Ambrosi securing repayment of a debt owed by Bellamy to Ambrosi. In return, the Debtor received no payment, received no real property or other personal property, and was left owning no tangible assets of any value.

20. The valuable Properties may be recoverable as an avoidable transfer and thereafter liquidated for the benefit of the Debtor's estate and its creditors. More specifically, the transfer of the Properties may be avoidable on the grounds set forth in 11 U.S.C. § 544(b), 28 U.S.C. § 3304(a)(1). The Debtor also may have other claims against the Insider Entities and/or Bellamy arising from or related to the Properties.[7]

21. Again, however, Bellamy is unlikely to investigate and sue himself and his business partners. Indeed, Bellamy has taken the position that there are no claims and there is nothing to investigate because he allowed purported deadlines to expire. *See* **Exhibit J**, NC Gas House Gang, LLC's Objections and Responses to Amended First Request for Admissions to NC Gas House Gang, LLC, ¶¶ 19-20 ("Among other difficulties, the deadline to commence chapter 5 actions has past. . . .). Because Bellamy is conflicted, conversion is necessary to empower a Chapter 7 Trustee to fully investigate and, if appropriate, recover assets and pursue claims for the benefit of the Debtor's legitimate creditors.

## D. The Ambrosi Loan

22. On or around July 24, 2020, Bellamy, in his individual capacity, obtained a loan from APL in the original principal amount of $500,000.00 (the "Ambrosi Loan"). **Exhibit A,** Ver. Statement of Brandon Bellamy in Response to October 7, 2025 Subpoena at ¶ 11. The Ambrosi Loan was evidenced by a Loan Agreement and Note dated July 24, 2020 executed by Bellamy, in his individual capacity, in favor of APL. *Id*.; *see also* Proof of Claim No. 16-1.

23. To secure the Ambrosi Loan, Bellamy caused the Debtor to execute an unconditional guaranty dated July 24, 2020 (the "Guaranty"), pursuant to which the Debtor

[7] To the extent any Insider Entity alleges that any statute of limitations has expired, the Insider Entities knowingly allowed such statute of limitations to lapse while the Debtor was under their control and therefore should be estopped from asserting any such defenses, and the Court should equitably toll the applicable limitations period.

unconditionally guaranteed all amounts due with respect to the Ambrosi Loan. *See* POC No. 16-1. As set forth above, Bellamy also caused the Properties to serve as collateral for the Ambrosi Loan via the Ambrosi DOT. Nevertheless, the Debtor did not receive the proceeds from the Ambrosi Loan. *See* Dkt. No. 261-12 at 2 ("It is accurate to say, however, that NC Gas House Gang . . . incurred all of the start-up costs associated with putting the team on the field on an accelerated schedule.").

24. Despite Ambrosi's clear connections to and involvement with the Debtor (via the Ambrosi Loan, the Guaranty, the Ambrosi DOT, receipt of the Properties, payment of attorneys' fees for The Fuller Law Firm, P.C., and apparent control of the North Carolina litigation), Bellamy has repeatedly denied Ambrosi's involvement with the Debtor. Indeed, when asked "is Mr. Ambrosi a partner on any deals related to -- on any deals related to Gas House Gang," Bellamy testified that he is not. **Exhibit B,** Transcript of August 26, 2024 Hearing at 28. When asked a second time, Bellamy doubled down and confirmed that Ambrosi is not related to the Debtor and its Case. *Id*. at 55.

25. It is clear that the Ambrosi Loan is simply a loan between business partners - namely, a loan from Ambrosi to Bellamy. While the Personal Loan was made by APL, APL is wholly owned by Arch, which is wholly owned by Ambrosi. Also now evident is that *APL (Ambrosi) has not sought to recover from Bellamy nor has it sought to foreclose the Properties via the Ambrosi DOT*. Instead, Ambrosi has continued to loan money to fund the Debtor's litigation strategy. *See* **Exhibit B,** Transcript of August 26, 2024 Hearing at 27 ¶¶ 4-7; **Exhibit A,** Ver. Statement of Brandon Bellamy in Response to October 7, 2025 Subpoena at ¶ 9 (noting that of the $113,000 worth of retainer payments to Trevor M. Fuller, $70,000 was paid by Veltrust); Dkt No

286-1 at 2 ("Third-Party Payor will deposit $150,000 into the Firm's client trust account for fees that have been and will be incurred in the representation.").

26. In exchange for Ambrosi's forbearance, it appears that this case has been conducted to further the interests of Ambrosi to the detriment of the Debtor's third-party creditors. *See* **Exhibit C,** Transcript of February 14, 2023 at 131 ("So Arc and Brandon have an excellent relationship. And Arc, at Brandon's request, said it would pay off -- it would buy the note. It did not want to pay off the note, it wanted to buy the note so that it would -- Brandon would still be obligated to him -- to Arc as opposed to just –").

27. Although Bellamy has caused the Debtor to incur debts for which it is not responsible and navigate this bankruptcy for the benefit of Bellamy and Ambrosi, the Debtor may have claims against Bellamy, Ambrosi, the Insider Entities, and others. Again, however, Bellamy is unlikely to investigate and sue himself and his business partners, and has taken the position that there are no claims and there is nothing to investigate because he allowed purported deadlines to expire. Because Bellamy is conflicted, conversion is necessary to empower a Chapter 7 Trustee to fully investigate and, if appropriate, recover assets and pursue claims for the benefit of the Debtor's legitimate creditors.

## E. The Debtor's Disclosures and Misrepresentations

28. On December 1, 2023 (the "Petition Date"), the Debtor filed a petition with this Court under Chapter 11 of the Bankruptcy Code.

29. On December 12, 2023, the Debtor filed its Schedule A/B [Dkt. No. 71]. In Part 11 of its Schedule A/B, the Debtor affirmatively represents that it does not have any interest in executory contracts and unexpired leases not previously reported in Schedule A/B. Critically, the Debtor does not disclose any interest whatsoever in the EDA.

30. Similarly, in Part 11 of its Schedule A/B, the Debtor affirmatively represents that it does not have any causes of action against third parties or other claims or causes of action.

31. Consistent with these representations, in Part 12 of its Schedule A/B, the Debtor affirmatively represents having $0.00 worth of other assets - including executory contracts and causes of action.

32. On December 12, 2023, the Debtor filed its Schedule G [Dkt. No. 71]. Schedule G identifies only one executory contract or unexpired lease with the City - namely, the "Ballpark Lease." The Debtor's Schedule G does not identify the EDA.

33. On February 29, 2024, the Debtor filed its Chapter 11, Subchapter V Plan [Dkt. No. 145] (the "First Plan"). The First Plan does not identify the EDA, the Properties, or any causes of action related to the same. The First Plan does not identify any assets with value aside from its purported claims in the North Carolina and Maryland litigation.

34. On March 1, 2024, the Debtor filed its First Amended Chapter 11 Subchapter V Plan [Dkt. No. 147] (the "First Amended Plan"). The First Amended Plan does not identify the EDA, the Properties, or any causes of action related to the same. The First Amended Plan also does not identify any assets with value aside from its purported claims in the North Carolina and Maryland litigation.

35. On March 15, 2024, the Debtor filed its Second Amended Chapter 11 Subchapter V Plan [Dkt. No. 156] (the "Second Amended Plan"). The Second Amended Plan does not identify the EDA, the Properties, or any causes of action related to the same. The Second Amended Plan also does not identify any assets with value aside from its purported claims in the North Carolina and Maryland litigation.

36. On May 28, 2024, the Debtor filed its Third Amended Chapter 11 Subchapter V Plan [Dkt. No. 179] (the "Third Amended Plan"). The Third Amended Plan does not identify the EDA, the Properties, or any causes of action related to the same. The Third Amended Plan also does not identify any assets with value aside from its purported claims in the North Carolina and Maryland litigation.

37. On September 13, 2024, the Debtor filed its Fourth Amended Chapter 11 Subchapter V Plan [Dkt. No. 211] (the "Fourth Amended Plan"). The Fourth Amended Plan does not identify the EDA, the Properties, or any causes of action related to the same. The Fourth Amended Plan also does not identify any assets with value aside from its purported claims in the North Carolina and Maryland litigation.

38. To date, the Debtor has not disclosed in this bankruptcy any interest in the EDA or the Properties. This is because the Debtor has recently taken the position that it was not and is not a party to the EDA. *See* **Exhibit J,** NC Gas House Gang, LLC's Objections and Responses to Amended First Request for Admission at ¶¶ 8, 17, 18. This of course contradicts the Debtor's representations in its Answer with Counterclaims. *Compare* **Exhibit J,** NC Gas House Gang, LLC's Objections and Responses to Amended First Request for Admission at ¶ 17 ("The EDA was in the name of Project Velocity") *with* **Exhibit D,** Case No. 3:23-cv-00892-RJC-SCR, Dkt. No. 41 at ¶¶ 17 ("On or about June 23, 2020, NC Gas House Gang entered into an Economic Development Agreement ("EDA") under N.C. Gen. Stat. § 158-7.1, along with the EUALA and UOA.") *and* 19 ("Also part of the EDA was the development of certain parcels meant to catalyze other development in the Fuse District."). The Debtor either is or is not a party to the EDA. It either does or does not have rights and claims under the EDA. The Debtor cannot have it both ways. Given that the Debtor has conceded assignment of the EDA, it no longer has rights against

the City pursuant to the EDA (although, it likely has rights against Gastonia Airline and/or Bellamy).

39. Similarly, the Debtor has not identified or pursued any Chapter 5 avoidance claims. The Debtor's reason for not doing so - it let the relevant statutes of limitations run. *See* **Exhibit J,** NC Gas House Gang, LLC's Objections and Responses to Amended First Request for Admission at ¶¶ 19-20. Although, if such claims exist(ed), the Debtor admits that its special counsel "would have an actual conflict of interest" if it sought to pursue the claims because special counsel also represents Bellamy and other parties related to the Debtor in their personal capacities in matters related to this case. *Id.* at ¶¶ 22-23. But the Debtor's position that it has no claims against Bellamy, Ambrosi, or the Insider Entities because Bellamy chose not to pursue them and chose not to disclose them does not absolve Bellamy, Ambrosi, or the Insider Entities from liability.

40. The Debtor has also previously misrepresented the existence of contracts in this Case. Specifically, the Debtor represented it had contracts with certain Momentous entities owned and controlled by Bellamy. *See* Dkt. 156 at 7 ("Debtor entered into an agreement to host these events under the auspices of the Momentous Group LLC, also wholly owned by Brandon Bellamy."); Dkt. No. 112-17 at 4; **Exhibit K,** Transcript of February 12, 2024 Hearing at 39-44. Ultimately, it turned out that the Debtor *did not* have a contract with the Bellamy Entities and Bellamy had simply back-dated a new contract (which was not approved in this Case) to create the appearance of an existing contract. *Id.* at 48-49 ("But now that it's been brought to the Court's attention that documents were created in a fashion that would allow for misinterpretation, I can't let the hearing continue . . ."). In light of Bellamy's testimony about the Momentous contracts, the Court noted its "very serious concerns about the current management of the debtor." *Id.* at 39.

41. In addition to misrepresenting its insider contracts, the Debtor has taken concerning positions as to its other assets. For example, the Debtor's Petition represents that the Debtor owns FF&E worth $581,062.00. *See* Dkt. No. 1-3. However, the Debtor's Schedule A/B indicates that the FF&E is only worth $8,615.00. *See* Dkt. No. 71 at 5. Making things even more confusing, on February 26, 2025, the Debtor took the position that the FF&E is worth over $30,000.00. *See* Dkt. No 261-8 at 7 (noting that, in addition to other personal property owned by the Debtor, the Debtor needed to retrieve assets including, but not limited to, a camera ($6,000.00), a lens ($4,600.00), a grip ($475.00), and a pitch clock ($20,000.00 +)). Even more concerning, when faced with abandonment of the FF&E under the Consent Order Rejecting Leases and Executory Contracts [Dkt. No. 244], the Debtor then took the position that it didn't own the FF&E as it was owned instead by Momentous Hospitality Group LLC. *See id*. at 1. Given the multitude of self-serving and constantly-changing positions and the competing personal interests, it is impossible to know what assets the Debtor owns, what assets the Debtor previously owned, what assets the Debtor transferred to Insider Entities, and whether any assets can be liquidated for the benefit of creditors.

42. Most recently, to avoid conversion of this case to Chapter 7 on the basis of Bellamy's numerous conflicts, the Debtor consented to entry of the Consent Order. *See* Dkt. No. 337. Under the Consent Order, the Debtor agreed to appointment of Zvi Guttman as plan administrator ("the "Plan Administrator") to "investigate all claims and causes of action of the Debtor and the bankruptcy estate existing prior to or at any time during the pendency of the Debtor's bankruptcy case . . . ." *Id*. Upon completion of this investigation, the Debtor agreed to empower the Plan Administrator to "bring any and all claims and causes of action available under applicable law that he believes are in the best interest of the bankruptcy estate to pursue." *Id*. To fund the Plan Administrator's investigation and pursuit of available actions, the Debtor was

required to deposit $2,500 monthly into a litigation fund, with the first such deposit to be made no later than March 12, 2026. *Id*. The City relied on the Consent Order, and specifically the appointment of the Plan Administrator, in good faith and agreed to resolve its joinder to the then-pending motion to convert this case.

43. Nevertheless, the Debtor (controlled by Bellamy) failed to deposit any funds whatsoever into the litigation fund and the Plan Administrator promptly resigned. *See* **Exhibit L** ("Thus far, the Debtor has paid $0.00."), Notice of Resignation of Plan Administrator. Upon information and belief, the Plan Administrator did not conduct any meaningful investigation into the Debtor. *Id.* ("Although the Plan Administrator has reviewed various documents and communicated with counsel for the City of Gastonia, no report has been prepared.").

44. The Debtor's actions, under Bellamy's control, in connection with Consent Order is further evidence that Bellamy is conflicted and, while in control of the Debtor, will do everything in his power - including entering into the Consent Order with no intent to actually perform - to avoid a meaningful investigation and the pursuit of claims for the benefit of the Debtor's legitimate creditors.

45. Given the litany of bad acts recited above, conversion is necessary to empower a Chapter 7 Trustee to fully investigate and, if appropriate, recover assets and pursue claims for the benefit of the Debtor's legitimate creditors.

**F. Remaining Creditors**

46. There are, practically speaking, four (4) creditors remaining in this bankruptcy - namely, the Atlantic League of Professional Baseball (the "League"), the City, the Internal Revenue Service (the "IRS"), and APL.

47. Other than the claims of the four (4) remaining creditors, the League has purchased nearly all other claims in the bankruptcy and, as a consequence, holds a claim against the Debtor in the amount of no less than $901,242.57. *See* Claim No. 8-2. The City asserts a claim in the amount of no less than $100,000.00, plus the City's attorneys' fees and costs. *See* Claim No. 17-1. Should the Debtor prevail in the North Carolina litigation, where the League and the City are the defendants, League and the City would receive no benefit from any recovery on these claims. The result for the League is the same in the Maryland Litigation, where it also is the defendant, as it also will receive no net benefit if the Debtor prevails. The Plan is clearly not for the benefit of these two creditors.

48. The only creditors that potentially could benefit from the Plan are the IRS and APL. But both of these creditors have independent sources of recovery from co-obligors.

49. The IRS asserts a claim in the amount of $191,342.36. *See* Claim No. 5-7. ***Upon information and belief, both the Debtor and Bellamy owe this debt jointly and severally***. Bellamy has represented to the Court that he and Ambrosi (via Veltrust) will pay the IRS claim regardless of the outcome of the North Carolina and Maryland litigation. *See e.g.,* Dkt. No. 317 ("if necessary, the Debtor's principals will arrange for payment of any payment to the Internal Revenue Service that the Court determines are overdue."). The IRS therefore receives no benefit from further pursuit of the North Carolina and Maryland litigation, or from any bankruptcy relief at all.

50. APL asserts a claim in the amount of $1,451,932.78 based upon the Debtor's guarantee of the Ambrosi Loan. *See* Claim No. 16-1. As stated above, APL is owned or controlled by Ambrosi. Thus, ***the Debtor and Bellamy are jointly and severally liable to APL for the full amount***. Moreover, as a result of the Ambrosi DOT, the Properties secure repayment of this claim. Given that APL may proceed with recovery against Bellamy and/or the Properties (which,

according to Gastonia Airline, are worth $2,500,000.00 and leave APL oversecured), APL does not need to seek recovery via the North Carolina and Maryland litigation. However, given the overlapping ownership, intercompany debts, and ongoing business relationships between Ambrosi and Bellamy, it appears that APL has no intention of enforcing its rights as to Bellamy or the Properties while Bellamy remains in control of the Debtor. Instead, it appears that APL (Ambrosi) prefers to accept repayment through this bankruptcy – to the detriment of the Debtor's other legitimate creditors - rather than seek payment through Bellamy.

51. The Debtor's actions in this Case have been focused on (a) paying APL and the IRS through sources other than Bellamy's personal assets and (b) ensuring that Bellamy maintains smooth business relations with Ambrosi. Accordingly, no legitimate creditors stand to gain anything from Bellamy's further control and involvement with the Debtor and its estate. This case should not be allowed to continue in chapter 11 solely to benefit the personal interests of Mr. Bellamy and his business partners. *See* **Exhibit B**, Transcript of August 26, 2024 Hearing at 75 ("We're just saying, look, Mr. Bellamy, he's willing to pay for the privilege of controlling the litigations. That's really what's going on.").

G. **The Motion to Disqualify and Disgorge**

52. On October 7, 2025, the City filed its Motion to Disqualify and Disgorge [Docket No. 261] seeking to disqualify Trevor M. Fuller and The Fuller Law Firm, P.C. (collectively, "The Fuller Firm") from representing the Debtor and the disgorgement of all compensation received by The Fuller Firm in connection with its employment by the Debtor.

53. The record of this case and the limited discovery received to date in connection with the Motion to Disqualify and Disgorge clearly demonstrate that The Fuller Firm: (i) has an actual conflict of interest because it has admitted that it is actively and simultaneously representing

the Debtor as well as related parties Gastonia Airline and Veronica Jeon in connection with this case[8]; (ii) failed to disclose its connections with Gastonia Airline and Veronica Jeon prior to its employment by the Debtor[9]; (iii) openly attempted to leverage the Debtor's claims in the North Carolina litigation to also settle claims of Gastonia Airline and Veronica Jeon in an improper self-described "global resolution"[10]; (iv) entered into undisclosed and unapproved fee arrangements between the Debtor, Veltrust, and Velocity Capital[11]; (v) entered into an unapproved and undisclosed contingency fee arrangement with the Debtor[12]; and (vi) received $113,000 between December 2023 and December 2025 on account of its work for the Debtor without such amounts being approved pursuant to a fee application or by other order of the Court.[13] The Motion to Disqualify and Disgorge remains pending.

**G. <u>Discovery</u>**

54. On December 9, 2025, the Court entered its Order Resulting from Discovery Hearing [Dkt. No. 294] (the "Discovery Order") in connection with the City's Motion to Disqualify and Disgorge. In pertinent part, the Discovery Order (a) denied Bellamy's motion to quash, (b) denied the Debtor's motion to quash, (c) directed the Debtor and Bellamy to "provide

---

[8] The Fuller Firm admitted its representation of Gastonia Airline and Veronica Jeon in connection with this case after-the-fact at Docket No. 286, ¶ 7.

[9] These connections were not disclosed in either The Fuller Firm's initial employment application [Docket No. 93] or its amended employment application [Docket No. 111].

[10] The Fuller Firm's "global" settlement proposal is outlined in its demand letter included at Docket No. 261, Exhibit L.

[11] The Fuller Firm admitted its fee arrangements after-the-fact at Docket No. 286, ¶¶ 10 and 12.

[12] The unapproved contingency fee arrangement is confirmed by The Fuller Firm's modification to its engagement agreement filed at Docket No. 286, Exhibit A.

[13] The Fuller Firm admitted receiving these payments after-the-fact at Docket No. 286, ¶¶ 10 and 12.

complete discovery responses to the City's discovery requests within 21 days," and (d) held the remaining requests as to The Fuller Firm, P.C. in abeyance.

55. As set forth below, Bellamy is flouting this Court's order by (a) failing to timely produce all responsive documents and (b) asserting blanket claims of privilege as to the responsive documents that were produced.

56. Despite formal meet-and-confers (and numerous emails), Bellamy's production remains incomplete.

57. By way of example, Bellamy has not produced any communications regarding (a) the negotiations for the transfer of the Properties, (b) the purpose(s) for the transfer of the Properties, (c) Bellamy's ownership and/or control over the Properties, (d) the creation of lien(s) against the Properties, and (e) the assignment, assumption, and/or transfer of any rights, liabilities, or obligations with respect to the Properties.

58. Bellamy has also not produced any communications concerning or related to the Ambrosi Loan. Of the documents produced related to the Ambrosi Loan, many of the documents were electronically signed via Docusign; however, Bellamy refuses to provide the Docusign certificates evidencing the date in which the documents were signed - which is necessary to know given Bellamy's prior misrepresentations and post-dating of insider contracts. *See* **Exhibit K,** Transcript of February 12, 2024 Hearing at 48-49 ("But now that it's been brought to the Court's attention that documents were created in a fashion that would allow for misinterpretation, I can't let the hearing continue . . .").

59. Of the few documents produced, nearly all documents are completely redacted on the basis of attorney-client privilege except for communications received from the City. Gastonia Airline asserted attorney-client privilege 76 times, the Debtor asserted attorney-client privilege 20

times, Gastonia Airline and the Debtor asserted a joint privilege 1 time, Gastonia Airline and its "common interest parent" or "corporate parent" asserted privilege 8 times, and 2 redacted documents fail to identify who the privilege is asserted by.[14] Moreover, the majority of the "privileged" documents include individuals who own, manage, or work for (a) creditors of the Debtor or (b) recipients of the Properties and EDA. Bellamy and the Debtor are using the attorney-privilege to avoid any meaningful inquiry on behalf of the Debtor into these potential claims and causes of action. A Chapter 7 Trustee who controls the Debtor's privilege would avoid this clear conflict of interest.

60. Finally, in an effort to preserve its ability to claim the attorney-client privilege notwithstanding the presence of third parties on communications, the Debtor now has asserted that David Woody and Veronica Jeon were employed by the Debtor post-petition. This assertion contradicts the Debtor's repeated testimony and filings representing that the Debtor had no employees. Indeed, when asked whether Veronica Jeon had a relationship to NC Gas House Gang," Bellamy testified "[s]he doesn't have one." **Exhibit K**, Transcript of February 12, 2024 Hearing at 39. Likewise, David Woody testified that he was employed as counsel for Bellamy - not the Debtor.[15] *See* **Exhibit C**, Transcript of February 14, 2023 Hearing at 131.

61. Bellamy's response to the Subpoena is not only deficient but also serves as further evidence of his inability to act as a fiduciary to the Debtor's estate. Bellamy cannot be trusted to produce documents, communications, and information that may give rise to claims against himself, his business partners, and the Insider Entities. He is making every effort to prevent disclosure of

[14] The City reserves the right to seek to compel Bellamy's compliance with the Subpoena and Discovery Order and expressly reserves the right to contest all assertions of privilege.

[15] Further evidencing Bellamy's use of the Debtor as his personal piggy bank is the fact that the Debtor scheduled a claim by David Woody in the amount of $100,000.00 even though Woody testified he was employed by Bellamy personally. *See* Dkt. No. 71 at 17.

meaningful information. Appointment of a Chapter 7 Trustee is necessary to fully review the Debtor's assets, its transactions, and any misdeeds protected from discovery under the guise of the attorney client privilege.

**<u>THE DEBTOR'S CASE SHOULD BE CONVERTED TO CHAPTER 7</u>**

62. Section 1112(b)(1) of the Bankruptcy Code provides, in relevant part, that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ."

63. The language of section 1112(b)(1) is mandatory such that, if cause is found, the Court must convert or dismiss the case unless unusual circumstances can be established that demonstrate the conversion or dismissal is not in the best interests of the estate. 11 U.S.C. § 1112(b)(1) and (b)(2); *see In re Modanlo*, 413 B.R. 262, 271 (Bankr.. D. Md. 2009); *In re Skeen, Goldman LLP*, No. 07-10535-JS, 2007 WL 4556683, at *3 (Bankr. D. Md. Dec. 20, 2007); *In re Gregory & Parker, Inc.*, No. 12-01382-8-SWH, 2013 WL 2285671, at *4 (Bankr. E.D.N.C. May 23, 2013).

64. Cause pursuant to 11 U.S.C. § 1112(b)(4), includes the failure to comply with an order of the court, failure to timely provide information requested by the United States trustee, a substantial or continuing loss to or diminution of the estate, and the absence of a reasonable likelihood of rehabilitation. However, it is well recognized that the list of examples contained in Section 1112(b)(4) is "illustrative, not exhaustive." *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997). Moreover, the presence of any one of the examples of cause is sufficient on its own to warrant dismissal or conversion. *See In re KLMKH, Inc.*, No. 22-30232, 2022 WL 4281478, at *5 (Bankr. W.D.N.C. Sept. 14, 2022).

65. "While conflict of interest is not listed among the delineated 'causes' in 11 U.S.C. § 1112(b)(4), courts have determined that cause is established where the debtor in possession has a conflict of interest." *In re Ghatanfard,* 666 B.R. 14, 24 (S.D.N.Y. 2024) (collecting cases); *In re Duling Sons, Inc.*, 650 B.R. 578, 582 (Bankr. D.S.D. 2023) (cause where debtor's principal may have engaged in self-dealing by converting debtor's assets); *In re Hampton Hotel Invs., L.P.*, 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001) ("Here, factors '(4),' '(5)' and '(8)' are applicable, but the last of them dwarfs the others in importance. As noted in the factual findings above, the Court finds gross misconduct in numerous respects, and probable cause to suspect it in others, and the Court considers it beyond serious question that the creditors are in need of a chapter 7 trustee to protect their interests."); *In re No Rust Rebar, Inc.,* 641 B.R. 412, 423 (Bankr. S.D. Fla. 2022) (cause where debtor's principal would have to investigate and, if necessary, sue himself and his own entities); *In re Picacho Hills Util. Co., Inc.*, 518 B.R. 75, 82 (Bankr. D.N.M. 2014) (cause where debtor's principal transferred assets to insiders, had not made a proper investigation into the transfers, and was not credible when explaining the purpose of the transfers); *In re First Connecticut Consulting Grp., Inc.*, 579 B.R. 673, 683 (Bankr. D. Conn. 2018) ("Willful failure to meet his [fiduciary] obligation, including self-dealing, constitutes cause for conversion under Section 1112(b)."); *In re Seaview Ests., Inc.*, 213 B.R. 427, 432 (Bankr. E.D.N.Y. 1997) ("Conversion is also justified based on the possibility that assets of the Debtor may have been diverted, unadministered assets may not have been collected, and some possible cause of action may be available against third parties pursuant to the Debtor's claim of damage to the estate."); *In re Consol. Pioneer Mortg. Entities,* 264 F.3d 803 (9th Cir. 2001) (The Ninth Circuit upheld post-confirmation conversion based on liquidating corporation's fiduciary duty breaches and failure to provide adequate accounting).

66. The Debtor continues to pursue a path that is designed to benefit one person - namely, Bellamy. The Debtor, with Bellamy at the helm, (a) is conflicted, (b) is at odds with its major third-party creditors, (c) has unnecessarily delayed administration of its case, (d) has no ongoing business or operations, (e) has incurred untold administrative fees and purported claims for priority "reimbursement" to Bellamy and the Jointly Owned Entities in connection with their failed efforts to pursue claims for which they have conceded are not theirs, with the promise to incur more fees in connection with continued failed efforts,[16] (f) intentionally let critical deadlines pass, (g) has employed clearly conflicted counsel, (h) has incurred loans without Court approval, (i) has entered into and/or modified attorney fee arrangements without Court approval, (j) has paid conflicted counsel's attorneys' fees without Court approval, and (k) has not acted, and is not acting, in the best interests of its estate.

67. The Debtor refuses to acknowledge, investigate, or pursue assets that have real value to the estate. The only real assets of the Debtor are the causes of action it could and should pursue against Bellamy, his business partners, and other insiders and affiliates. Yet, the Debtor and Bellamy insist on opposing discovery and investigation into these transactions and transfers - which on its face evidences the significant conflict of interest. Indeed, the Debtor and Bellamy blatantly failed to comply with the Consent Order by refusing to fund even the initial payment to the Plan Administrator, thus causing his immediate resignation and frustrating the entire purpose of the Consent Order. The Debtor's failure to comply with the Consent Order alone is sufficient cause to justify conversion to Chapter 7. *Bayramov v. Vetter*, No. 1:25-CV-144 (PTG/WBP), 2026 WL 754016, at *5 (E.D. Va. Mar. 17, 2026) (noting that the failure to comply with a single court order is sufficient to warrant conversion regardless of whether the failure is willful or the product

[16] The Debtor's plan provides for repayment "[f]irst, to reimburse the Plan Funds for any sums paid on behalf of holders of Class 1, 2, or 3 claims." Dkt. No. 211 at 12.

of bad faith or fraud); *Hormozi v. U.S. Tr.*, No. 24-CV-02129-LKG, 2025 WL 1615447, at *7 (D. Md. June 6, 2025), *reh'g denied*, No. 24-CV-02129-LKG, 2025 WL 2323144 (D. Md. Aug. 12, 2025) (finding cause where debtor failed to comply with scheduling order); *In re Spenlinhauer*, 592 B.R. 1, 7 (D. Mass. 2018) (holding that debtor's failure to comply with court order alone was sufficient to sustain bankruptcy court's order converting case); *In re Ford Steel, LLC*, 629 B.R. 871, 888 (Bankr. S.D. Tex. 2021) (collecting cases). It is clear that these claims will not be pursued while Bellamy is in charge of the Debtor. Accordingly, there is overwhelming cause for conversion to Chapter 7.

68. There is no question that conversion to Chapter 7 is an appropriate remedy. In fact, conversion to Chapter 7 and the investigation and, if appropriate, recovery of assets and pursuit of claims by a Chapter 7 Trustee may be the only source of recovery for legitimate creditors. The parties have already attempted to resolve Bellamy's conflicts via appointment of a third-party neutral, the Plan Administrator. However, the Debtor knowingly and intentionally failed to comply with the Consent Order - suggesting that the Debtor's negotiations and entry into the Consent Order was done in bad faith to cause delay and avoid accountability. It is clear that conversion is necessary. Conversion permits the Chapter 7 Trustee to step into the shoes of its chosen creditor and pursue claims that its chosen creditor could pursue. *See* 11 U.S.C. § 544. For example, a Chapter 7 Trustee could step into the shoes of the IRS and use the fraudulent transfer provisions of the Federal Debt Collection Procedures Act (the "FDCPA") for the basis of recovering transfers. *See e.g.*, *In re Gaither*, 595 B.R. 201, 210 (Bankr. D.S.C. 2018) (trustee may step into the shoes of the IRS to utilize longer limitations periods provided under FDCPA); *In re CVAH, Inc.*, 570 B.R. 816, 844 (Bankr. D. Idaho 2017) (permitting trustee to step into the shoes of the IRS to utilize transfer avoidance provisions of FDCPA and, thereby, extend the limitations

period beyond what was permitted under Idaho's fraudulent transfer statute). Under the FDCPA, the question is whether a transfer is fraudulent as to *any creditor* (such as the IRS or the League). If the answer is yes, the Chapter 7 Trustee is empowered to avoid that transfer and recover the asset for the benefit of the estate. The FDCPA also affords the IRS (and, therefore, the Chapter 7 Trustee) a six (6) year look back period which would permit recovery of the Properties and likely many other unknown assets. Outside of bankruptcy, these assets are likely unrecoverable and Bellamy and the Insider Entities will receive a windfall - which is entirely inequitable under these circumstances. Conversion is thus in the best interest of the Debtor's creditors. There is no ongoing business, there is nothing to reorganize, and there is no creditor that could possibly be harmed by conversion.

69. Moreover, conversion will allow an independent chapter 7 trustee to evaluate the North Carolina and Maryland litigation and determine whether such claims have any actual merit or likely value, though the Debtor's concession that a chapter 7 trustee likely would abandon such litigation is telling. *See* Docket No. 317 at 1 ("Putting this litigation in the hands of a Chapter 7 trustee without resources or background in this case is a recipe for either abandonment or nuisance value settlement of that litigation."). Further, Bellamy is independently obligated to pay the IRS and APL claims, and Velocity (a Bellamy entity) and Veltrust (a joint Bellamy and Ambrosi entity) are independently obligated to pay the Debtor's attorneys' fees. The Debtor's insistence on pursuing this litigation, which is only for the benefit of Bellamy and Ambrosi, itself suggests a conflict of interest which is further cause for conversion. *See In re Pinnacle Foods of California LLC*, No. 24-11015-B-11, 2025 WL 951650, at *5 (Bankr. E.D. Cal. Mar. 27, 2025) ("Though it may be true that the Debtors or their principal want to pursue rights they have available, that cannot be done without consideration of the creditors' and the estates' interests."). Reviewing all of the

facts and circumstances of this case, there is no ongoing business, there is nothing to reorganize, and there is no legitimate creditor that could possibly be harmed by conversion.

70. Because Bellamy is conflicted, has caused the gross mismanagement of the Debtor's estate, and has permitted substantial and continuing loss to the Debtor's estate, conversion is necessary to empower a Chapter 7 Trustee to fully investigate and, if appropriate, recover assets for the benefit of the Debtor's legitimate creditors.

## CONCLUSION

71. For the foregoing reasons, the City respectfully requests that the Court grant this Motion and enter an converting this case to Chapter 7.

Dated: August 14, 2026

*<u>/s/ David W. Gaffey</u>*
Phillip M. Fajgenbaum (N.C. Bar No. 52128)
Daniel E. Peterson (N.C. Bar No. 41251)
**PARKER POE ADAMS & BERNSTEIN LLP**
620 South Tryon Street, Suite 800
Charlotte, NC 28202
Telephone: (704) 372-9000
Facsimile: (704) 334-4706
E-mail: phillipfajgenbaum@parkerpoe.com
E-mail: danielpeterson@parkerpoe.com

and

David W. Gaffey (MD Fed. Bar No. 31947)
**WHITEFORD, TAYLOR & PRESTON LLP**
3190 Fairview Park Drive, Suite 800
Falls Church, VA 22066
Phone: (703) 280-3374
Email: dgaffey@whitefordlaw.com

*Counsel to the City of Gastonia, North Carolina*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, a true and correct copy of the foregoing was served electronically by the Court's CM/ECF system on the following parties:

- Ronald J Drescher ecfdrescherlaw@gmail.com, ron@clegolftour.com,ecf2drescherlaw@gmail.com,ecf@drescherlaw.com,myecfdrescher@gmail.com,284@notices.nextchapterbk.com,heather@propelparalegal.com, propel@drescherlaw.com
- Justin Philip Fasano jfasano@mhlawyers.com, jfasano@ecf.courtdrive.com;tmackey@mhlawyers.com;mevans@mhlawyers.com; cmartin@mhlawyers.com;Fasano.JustinR92003@notify.bestcase.com
- Ashley N Fellona ashley.fellona@saul.com, janice.mast@saul.com
- Trevor M Fuller tmfuller@thefullerlawfirm.com
- David W. Gaffey dgaffey@whitefordlaw.com
- Rick M Grams rgrams@mcneeslaw.com
- Zvi Guttman zvi@zviguttman.com, zviguttman@gmail.com,zviguttman@outlook.com,MD55@ecfcbis.com
- Courtney L. Morgan courtney.l.morgan@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- John Albert Mueller jmueller@lippes.com
- Janet M. Nesse jnesse@mhlawyers.com, jfasano@mhlawyers.com;cpalik@mhlawyers.com;jnesse@ecf.inforuptcy.com; tmackey@mhlawyers.com;cmartin@mhlawyers.com;kfeig@mhlawyers.com; BKrell@mhlawyers.com
- Janet M. Nesse jnesse@mhlawyers.com, DC0N@ecfcbis.com;jmnesse@ecf.axosfs.com;jfasano@mhlawyers.com;cpalik@mhlawyers.com;tmackey@mhlawyers.com;Nesse.JanetR92003@notify.bestcase.com;kfeig@mhlawyers.com;BKrell@mhlawyers.com;bkrell@ecf.courtdrive.com
- Justin Akihiko Redd jredd@kg-law.com, cgill@kg-law.com
- L. Jeanette Rice Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- Angela L. Shortall ashortall@3cubed-as.com, md70@ecfcbis.com
- Brent C. Strickland bstrickland@whitefordlaw.com, mbaum@whitefordlaw.com;brent-strickland-3227@ecf.pacerpro.com
- US Trustee - Greenbelt USTPRegion04.GB.ECF@USDOJ.GOV

*/s/ David W. Gaffey*
Counsel