**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 23-18766-LSS |
| | ) | Chapter 11 |
| NC GAS HOUSE GANG LLC, | ) | |
| | ) | 6500 Cherrywood Lane |
| | ) | Greenbelt, Maryland 20770 |
| | ) | |
| | ) | August 26, 2024 |
| Debtor. | ) | 11:23 a.m. |

TRANSCRIPT OF (179) CHAPTER 11 PLAN SMALL BUSINESS SUBCHAPTER V FILED BY DEBTOR NC GAS HOUSE GANG LLC; (192) OBJECTION FILED BY U.S. TRUSTEE U.S. TRUSTEE–GREENBELT; (193) OBJECTION TO CONFIRMATION OF THE PLAN FILED BY CREDITOR CITY OF GASTONIA, A NORTH CAROLINA MUNICIPAL CORPORATION; (194) OBJECTION FILED BY INTERESTED PARTY ZAWYER SPORTS, LLC (195) OBJECTION FILED BY CREDITOR ATLANTIC LEAGUE OF PROFESSIONAL BASEBALL; (196) LINE FILED BY CREDITOR CITY OF GASTONIA, A NORTH CAROLINA MUNICIPAL CORPORATION
BEFORE THE HONORABLE LORI S. SIMPSON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For NC Gas House Gang LLC: | Law Office of Ronald J. Drescher<br>By: RONALD J. DRESCHER, ESQ.<br>10999 Red Run Boulevard, PMB 224<br>Suite 205<br>Owings Mills, MD 21117 |
| For Marc E. Albert, Subchapter V Trustee: | Stinson LLP<br>By: MARC E. ALBERT, ESQ.<br>1775 Pennsylvania Ave., NW<br>Suite 800<br>Washington, DC 20006 |
| Operator: | Gloria Bellman, Courtroom Deputy to the Honorable Lori S. Simpson |
| TRANSCRIPTION SERVICE: | TRANSCRIPTS PLUS, INC.<br>435 Riverview Circle<br>New Hope, Pennsylvania 18938<br>Telephone: 215-862-1115<br>e-mail CourtTranscripts@aol.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:
(continued)

| | |
|---|---|
| For the U.S. Trustee's Office: | U.S. Trustee's Office<br>By: LISA Y. STEVENS, ESQ.<br>6305 Ivy Lane, Suite 600<br>Greenbelt, MD 20770 |
| For the Atlantic League of Professional Baseball: | McNees Wallace & Nurick<br>By: RICK M. GRAMS, ESQ.<br>600 Washington Avenue<br>Suite 300<br>Towson, MD 21204 |
| For City of Gastonia, a North Carolina Municipal Corporation: | Whiteford Taylor & Preston, L.L.P.<br>By: DAVID W. GAFFEY, ESQ.<br>7 St Paul Street, Suite 1900<br>Baltimore, MD 21202<br><br>Parker Poe Adams & Bernstein LLP<br>By: DANIEL PETERSON, ESQ.<br>PHILIP M. FAJGENBAUM, ESQ.<br>620 South Tryon Street<br>Suite 800<br>Charlotte, NC 28202 |
| For Zawyer Sports, LLC: | Kramon & Graham, P.A.<br>By: JUSTIN AKIHIKO REDD, ESQ.<br>750 E. Pratt Street, Suite 1100<br>Baltimore, MD 21202 |

***

**INDEX**


| **DEBTOR'S WITNESSES** | **PAGE** |
|---|---|
| BRANDON BELLAMY | |
| Direct Examination by Mr. Drescher | 8 |
| Cross-Examination by Mr. Peterson | 19 |
| Cross-Examination by Ms. Stevens | 35 |
| Cross-Examination by Mr. Grams | 49 |
| Cross-Examination by Mr. Albert | 61 |

| **DEBTOR'S EXHIBITS** | | **ID** | **EVID** |
|---|---|---|---|
| 1 | Plan | 9 | 10 |
| 2 | Bank statement (TD Bank) | 10 | 13 |
| 3 | Proof of Claim (IRS) | 17 | 17 |
| 4 | Document (Re money owed Sub V Trustee) | 17 | 18 |

COURTROOM DEPUTY: All rise. The United States Bankruptcy Court for the District of Maryland is now in session. The Honorable Lori S. Simpson presiding.

Please be seated and come to order. On the 11 o'clock docket, the case of NC Gas House Gang LLC, Case Number 23-18766.

Counsel, please come to the podium and identify yourself and your client for the record.

MR. DRESCHER: Good morning, Your Honor. Ronald Drescher appearing on behalf of the debtor, NC Gas House Gang LLC. With me at counsel table is the debtor's principal, Brandon Bellamy.

THE COURT: Good morning to both of you.

MR. ALBERT: Good morning. Marc Albert, Subchapter V Trustee.

THE COURT: Good morning, Mr. Albert.

MS. STEVENS: Good morning, Your Honor. Lisa Stevens on behalf of the United States Trustee.

THE COURT: Good morning.

MR. PETERSON: Good morning, Your Honor. Daniel Peterson from the State of North Carolina on behalf of the City of Gastonia.

THE COURT: Good morning.

MR. PETERSON: Good morning.

MR. FAJGENBAUM: Good morning, Your Honor. Phil

Fajgenbaum on behalf of the City of Gastonia. I have here with me local counsel, David Gaffey.

THE COURT: Good morning.

MR. GRAMS: Good morning, Your Honor. Rick Grams on behalf of the Atlantic League of Professional Baseball, Incorporated.

THE COURT: Good morning.

MR. REDD: Good morning, Your Honor. Justin Redd, Kramon & Graham, on behalf of Zawyer Sports, LLC.

THE COURT: Good morning.

All right. We are here for confirmation, I believe.

MR. DRESCHER: Thank you, Your Honor. Ronald Drescher on behalf of the debtor.

What’s -- trying to pair down the issues before Your Honor so that we can rapidly move through this hearing, I’m going to focus a little bit on the objections that have been filed, because the plan is a simple plan. Mr. Bellamy is going to pay the employees on the effective date, which is $45,000. And he’s going to deposit those sums in my escrow account upon entry of an order confirming the plan.

He’s going to pay the Subchapter V Trustee upon entry of an order approving his fees. But upon entry of an order confirming this plan Mr. Bellamy is going to put another $25,000 into my escrow account to cover Mr. Albert’s fees.

It is my understanding that that agreement is

sufficient for the U.S. Trustee to support the plan, although that may not be true because we are in a rapidly developing environment.

So, generally what I do when I get up here at a confirmation hearing is I go through the requirements of Section 1129(a), and we talk about evidence as is needed. What I'd like to do, in order to streamline the proceedings is proceed by a proffer of Mr. Bellamy, although he's certainly ready, willing, and able to take the witness stand if, at the end of the day, Your Honor believes that that would be more efficient.

THE COURT: Well, I guess it depends upon what the City of Gastonia, and Zawyer, and Atlantic League and the U.S. Trustee have in mind in terms of cross-examination. I've always found that the cross-examination isn't as helpful if there's been a proffer. It might be easier to have him testify, and then allow those parties to do the cross-examination.

MR. DRESCHER: That's fine, Your Honor; whatever works out. But I need to say, as a preliminary matter, I oppose Zawyer -- Zawyer certainly can be here, it's a public hearing. But Zawyer is not a party in interest in this case, and I don't understand why Zawyer would have any right to cross-examine.

THE COURT: Well, I'll leave that for when the time

comes. I don't I don't know whether they will or they won't. I just think that it would be better for Mr. Bellamy to testify, and then allow the opposing counsel who filed objections, or whoever wants to cross-examine him, do so.

MR. DRESCHER: All right. Then what I'd like to do is have Mr. Bellamy take the stand.

THE COURT: Does anybody else have anything by way of opening, or are you happy with going forward with having Mr. Bellamy take the stand?

MR. FAJGENBAUM: Your Honor, Phil Fajgenbaum on behalf of the City. Your Honor, we're happy to forego opening statements. It's the debtor's burden. We think that it's going to show he cannot meet his burden today. And we just reserve the right to argue at the conclusion of the presentation.

THE COURT: Thank you. All right, call your first witness.

MR. DRESCHER: All right. I call Mr. Brandon Bellamy to the stand.

BRANDON BELLAMY, DEBTOR'S WITNESS, SWORN

COURTROOM DEPUTY: Thank you. Please be seated and state your full name and business address.

THE WITNESS: Sure. Brandon Bellamy, 9183 Central Avenue, Capitol Heights, Maryland 20743.

COURTROOM DEPUTY: Thank you.

THE COURT: Your witness.

MR. DRESCHER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DRESCHER:

Q Mr. Bellamy, what's your role with NC Gas House Gang LLC?
A Owner.
Q All right. And will you continue in that role if the Court confirms this plan?
A Yes.
Q And will you have any compensation?
A No.
Q Are there any other insiders that are employed by the debtor at this point?
A No.
Q All right. So is there anybody else that is likely to receive compensation by the debtor following entry of an order confirming the plan?
A No.

MR. DRESCHER: Are the exhibits with the witness?

COURTROOM DEPUTY: Yes.

MR. DRESCHER: All right.

Q I'd like you to turn to the Exhibit 1.

MR. PETERSON: Your Honor, if I just may interpose an objection quickly. We were only handed these exhibits today. I believe the Court's rule is setting forth to opposing counsel

seven days in advance. And I'd just like to note our objection -- standing objection to the exhibits being presented today.

MR. GRAMS: And the Atlantic League joins in that objection.

THE COURT: All right. The Court will overrule the objection. It looks like Exhibit 1 is the debtor's plan that was on the docket.

MR. DRESCHER: Thank you, Your Honor.

BY MR. DRESCHER:

Q Have you seen this document before?

A Yes.

Q All right. Did you help in the preparation of this document?

A I had good counsel who wrote it.

Q Did you provide information to counsel?

A Yes, I did.

Q All right. And did you review the document before it was filed?

A Yes.

Q All right. And is all of the information contained in the document true and accurate, to the best of your information and belief?

A Yes.

MR. DRESCHER: Your Honor, I would move to admit Exhibit 1 into evidence.

THE COURT: I will admit it over objection of counsel.

(Debtor's Exhibit 1 in evidence)

MR. DRESCHER: Thank you, Your Honor.

BY MR. DRESCHER:

Q All right. I'd like you to turn to Exhibit 2, which is the TD Bank bank statement. Have you seen this --

MR. PETERSON: Your Honor, I'm sorry. I just want to interpose our objection again for the same grounds, but also anticipated hearsay on this issue.

MR. GRAMS: And the Atlantic League joins in that objection -- those objections.

THE COURT: All right. I will overrule as to the prior filing, and I'll wait until there is hearsay to make a ruling on that, if there is any.

MR. DRESCHER: All right.

Q Have you seen this Document Number 2 before?

A Yes.

Q All right. And what is this document?

A Bank statement.

Q And it's a bank statement from Veltrust LLC?

A Correct.

MR. PETERSON: Objection; hearsay.

THE COURT: He said it's a bank --

MR. DRESCHER: Your Honor, I move to exclude this

gentleman from the courtroom if he's going to have continuing -- objecting to every question.

MR. PETERSON: Your Honor, if -- I'm sorry --

THE COURT: I'd like to hear you on the -- so far all I've heard him say is it's a bank statement. Mr. Drescher said it's a bank statement of Veltrust. And so --

MR. PETERSON: I'll back off, Your Honor. My apologies.

THE COURT: Okay.

MR. PETERSON: Thank you, Your Honor.

THE COURT: All right. Go ahead, ask your question.

MR. DRESCHER: All right.

BY MR. DRESCHER:

Q And is this a bank statement for Veltrust LLC?

A Yes.

Q And what is Veltrust LLC?

A It's a company.

Q All right. Are you connected to that company?

A Yes.

Q How are you connected to that company?

A Owner and manager.

Q All right. And -- this document appears to show -- well, let me ask you this. How did you obtain this document?

A I got it from the bank.

Q All right. And the document tends to -- seems to show

that on 8/19/2024, $198,000 was deposited, is that correct?

A Yes.

Q All right. And were you aware of that deposit at the time it was made?

A Yes.

Q All right. And then on the back page, it looks like there's another $2,000 deposit on the same day, do you see that?

A Yes.

Q All right. And were you aware that that money was deposited on the same day?

A Yes.

Q All right. And could you tell us why these funds were deposited into this bank account?

A To create the operations of Veltrust and take care of different bills that we may have as a company moving forward and to take care of the deposits that will be needed for this case.

Q Okay. So do you have control over this money?

A Yes.

Q And are you prepared to use this money to fund the obligations under the plan?

A Yes.

MR. DRESCHER: Your Honor, I move to admit Document 2 into the -- into evidence.

THE COURT: Document -- Debtor’s Exhibit Number 2 will be admitted into evidence.

(Debtor’s Exhibit 2 in evidence)

THE COURT: And I note the objection about timing for the record.

MR. PETERSON: Thank you, Your Honor.

MR. DRESCHER: By the way, just to say, Your Honor, I did a copious search of the Local Rules, and I did a copious search of Your Honor’s scheduling order, and I did not find anywhere that it said that documents needed to be prefiled for this kind of hearing.

THE COURT: It’s on the protocols. There’s been some -- I haven’t been terribly strict because the protocols were just published. And there’s been some confusion among the bar since the rule on exhibits was eliminated from the Local Rules. So now, every judge is doing it a little bit differently. But the goal is to direct parties to our judges’ web pages for exhibit information.

MR. DRESCHER: Thank you, Your Honor. It was never an intent to hide the ball.

BY MR. DRESCHER:

Q All right. Have you read the amended complaint that NC Gas House Gang filed against the League of -- the Atlantic League of Professional Baseball Clubs and Zawyer Sports, LLC?

A Yes.

Q And did you provide to counsel the information that's contained within that document?
A Yes.
Q And is all the information contained in that document true and correct, to the best of your knowledge?
A Yes.
Q Why did you file this bankruptcy case for NC Gas House Gang LLC?
A In the beginning?
Q Yes.
A The City filed a -- they sent me a court notice and said that there was a final termination of our agreement. And I didn't have any time to deal with the cure period, so I filed a Chapter 11 reorganization.
Q Prior to the filing of the case, did you make an effort to sell the debtor's interest in the Atlantic League?
A Yes.
Q All right. Did you receive -- did you receive offers?
A Yes.
Q What's the best offer you received?
A $4 million.
Q Did that sale close?
A No.
Q Why didn't it close?
MR. GRAMS: Your Honor, I'm going to object to this

line of questioning on the grounds of relevance. I don't know what --

MR. DRESCHER: Well, there's a good faith objection to the case. The case -- there's an objection that the case is being -- was not filed or is not being maintained in good faith. So I believe that it's relevant to talk about why the case was filed and why it continues.

THE COURT: I'll overrule the objection.

A In a meeting with the Atlantic League, they told the buyer that he needed --

MR. GRAMS: Objection.

THE WITNESS: I'm sorry.

MR. GRAMS: That's hearsay.

THE WITNESS: I'm sorry.

MR. DRESCHER: Well --

THE WITNESS: I'm sorry. I will not answer the question.

MR. DRESCHER: Well, the Atlantic League filed an objection. How could -- they're a party to this case.

THE COURT: How can it -- how can it be hearsay if it's your client's statement who's a party to the case?

MR. GRAMS: Noted, Your Honor; thank you.

THE COURT: Okay. All right, go ahead.

A I -- in the meeting with the Atlantic League, they told the buyer -- they gave the buyer choices to put up all the

money in basically five days. And the buyer -- that was -- thought that was unreasonable and the buyer backed out.

Q Is NC Gas House Gang currently in possession of the baseball stadium that's kind of the heart of this case?

A No.

Q All right. And why is that?

A We were locked out and the keys were -- we don't have keys and -- and -- and, yeah.

Q So is it fair to say that there are no projected operations of NC Gas House Gang at this time?

A No, there's no operations.

Q I want to go back to the -- to Exhibit 2. Now, this is the TD Bank bank statement.

A Um-hum.

Q Now, this -- are you going to absolutely use this money to pay the -- let me back up on that. Are there unpaid claims of employees in this case?

A Yes.

Q About how much, if you know?

A $45,000.

Q Okay. And is it your intent to pay those amounts upon confirmation?

A Yes.

Q And are you willing to personally guarantee that those amounts get paid?

A Yes.
Q I'd like you to look at Exhibit 3.
A Yes, sir.
Q All right. Now, Exhibit 3 is a proof of claim that was filed by the Internal Revenue Service. Do you see that?
A Yes.
Q Do you see on the third page it shows that a priority claim of $77,284.56 is there?
A Yes.
Q Is it -- is it your intent to have NC Gas House Gang pay that claim over a series of periodic payments?
A Yes.

MR. DRESCHER: Your Honor, I'd move to Exhibit 3 into evidence.

MR. PETERSON: No objection, Your Honor.

THE COURT: Okay. Exhibit 3 will be admitted.

(Debtor's Exhibit 3 in evidence)

BY MR. DRESCHER:
Q I'd like you to turn to Exhibit 4.
A Okay.
Q Did you receive this document from me?
A Maybe one that looks like it. Yeah, I think so.
Q So this document would appear to indicate that there's $30,662.12 owed to the Subchapter V Trustee. Do you see that under the pro forma totals?

A I do.

Q All right. And have you already paid $5,000?

A Yes.

Q And are you willing to personally guarantee that you will pay the remainder of the $30,000 into my escrow account upon the entry of an order confirming this plan?

A Yes.

MR. DRESCHER: Your Honor, I would move to Exhibit 4 into evidence.

MR. PETERSON: The same general objection, Your Honor.

THE COURT: On -- as to timing?

MR. PETERSON: Yes, Your Honor.

THE COURT: All right. And I'll overrule the objection. Debtors Exhibit 4 is admitted into evidence.

(Debtor's Exhibit 4 in evidence)

BY MR. DRESCHER:

Q Are you prepared to move forward with the litigation against the League?

A Yes.

Q Are you prepared to finance the attorney's fees and the other costs of that litigation?

A Yes.

Q Why? I don't think what they did was right. And I have responsibilities and I'm trying to take care of them.

MR. DRESCHER: All right. Your Honor, I have no further questions.

THE COURT: All right; thank you.

Mr. Peterson?

MR. PETERSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PETERSON:

Q Good morning, Mr. Bellamy.

A Good morning.

Q We haven't met before in person, but I'm Daniel Peterson. I'm -- I've been admitted in this courtroom for today, and I'm also the counsel of record in the lawsuit between the City of Gastonia and NC Gas House Gang in North Carolina, the Federal District in North Carolina. So, it's nice to meet you.

A Good morning.

Q You talked about your commitment to paying the money from Veltrust to employees, I think, and to the Trustee, is that correct?

A Yes. I'm committed to paying the employees and the bills.

Q Does Gas House Gang and Veltrust have a written agreement memorializing that commitment?

A No.

Q When was -- taking a look at Exhibit 2, when was this bank account created -- or opened, rather?

A I don't see the date for that, but -- you know what? It

was actually 8/19.
Q So --
A The same day the deposit was made.
Q And how long has Veltrust been in operation?
A Probably just a few days before that.
Q A few days before that?
A Um-hum.
Q All right.
MR. PETERSON: Pardon me.
(Pause)
Q What -- what state is Veltrust a registered business entity in?
A I actually think it’s Delaware, I think.
Q It’s Delaware, okay. And so it is not a Maryland entity?
A I think it’s registered to do Maryland -- registered to do business in Maryland, D.C., and one other state. I have to check that.
Q Are you familiar with the address 2433 Countryside Drive in Silver Spring, Maryland?
A No.
Q Okay. I -- just because we’re -- I was just looking at a Maryland Secretary of State results for a Veltrust LLC --
MR. DRESCHER: Your Honor, I object.
Q -- registered in the State --
A I don’t --

MR. DRESCHER: This is hearsay. This is classic hearsay.

THE COURT: It is hearsay, but I'm going to overrule the objection. I want to see -- give him a little leeway to ask the questions about Veltrust.

MR. PETERSON: Thank you, Your Honor. And I do acknowledge, I just wanted to kind of give some context as to why I was asking about an address in Silver Spring, Maryland.

BY MR. PETERSON:

Q And so what -- what business is Veltrust engaged in, or do you anticipate will it be engaged in?

A Real estate, real estate investment, and general investments.

Q Okay. And where did this money put into the bank account of Veltrust here on 8/19, where did this come from?

A Investment partners.

Q Please identify the investment partners for the Court.

MR. DRESCHER: I object, Your Honor. I think this implicates all sorts of privacy problems. I mean, we're really two steps removed now from the estate.

THE COURT: What privacy issues?

MR. DRESCHER: Privacy of the individual investors in Veltrust who are not players in this bankruptcy case at all.

THE COURT: What's the basis for saying they have a right to privacy with respect to identifying who the investors

are?

MR. DRESCHER: I think everybody has a right to such privacy that their names not be brought up into a public record for which they are not available to defend themselves or participate, nor should they be reasonably expected to defend themselves or participate. This is a case involving the NC Gas House Gang and the creditors of NC Gas House Gang. I -- I -- there is no reason to disclose investors in an entity that's really fundamentally unrelated.

THE COURT: Except that it's going to fund the NC Gas House Gang plan.

MR. DRESCHER: Well, he's going to fund the NC Gas House Gang plan from money that he -- he testified that it may or may not come from Veltrust. But still, it doesn't really matter who the owners of Veltrust or who the investors of Veltrust are. Money is money. It's sitting there fungibly in a bank account.

MR. PETERSON: Your -- Your --

THE COURT: Mr. Peterson?

MR. PETERSON: Yes, thank you, Your Honor. There's several questions, I mean, about who -- we don't have an agreement between Gas House Gang and Veltrust committing those funds. We -- I haven't asked this question, but I'm not sure if there's an agreement between Mr. Bellamy and Gas House Gang. And he is the manager/member of Gas House Gang to pay those

things. We have -- we don't really have anything committed here. And we've got some questions about whether investors know how their monies are being used. And we have a right to know, as this Court has already mentioned, where this money is coming from. It's been presented -- it has been presented and -- as an exhibit just handed to us this morning, for an entity created about a week ago, I think we have a right to know who the investors are.

MR. DRESCHER: Your Honor, let's step back for a minute and let's look at why the City of Gastonia is here. Is the City of Gastonia here because they want more money out of this estate? Because as creditors, they believe there's a better deal from them? No, that's not why they're here.

We all know that there's only one reason they're here, which is to gain an advantage in the litigation that's pending down in North Carolina. That is the only reason they are here. They are not here in good faith as a damaged creditor trying to get the best possible deal from a Chapter 11 estate. That's not why they're here. That's not why the League is here. That's not why Zawyer is here. They're here because they've been sued. And they don't want to be sued. So they want to do as much as they possibly can to poke a finger in the eye of the debtor so that somehow we're convinced that the debtor's litigation should not proceed against those players.

Your Honor, every question that Mr. Peterson is asking is designed for only one reason. That's to impede the North Carolina litigation, and indirectly the Maryland litigation. And, Your Honor, all of these questions -- and, frankly, Mr. Peterson should not even be allowed to ask questions of this debtor because he's obviously acting from an improper motive. He's not acting from a motive, again, of trying to enhance and optimize the return of the distribution on account of a claim against an estate. He is asking because he's a defendant in a litigation. He wants that litigation to go away.

And, therefore, I object to each and every one of these questions. And for him to say that he should -- that we have a right to know about Veltrust, he's got no right to know about Veltrust. That -- he doesn't have the single bit of right to know about anything having to do with it. Because also, the reason we're here, and the reason that this piece of paper is even relevant, is the feasibility.

Now, a feasibility issue -- and I'm getting into argument -- is a low bar. It's not like this great high bar. It's a pretty low bar, all right? And for a defendant in a litigation to say, I need to know who the investors of an unrelated entity for whom has been deposited of money needed to satisfy obligations under the plan is absurd, it's irrational, and it's inappropriate.

And for that reason I object, Your Honor.

THE COURT: Mr. Peterson?

MR. PETERSON: Thank you, Your Honor. I've -- I would -- I'm not used to being accused of operating in bad faith like that, so my pardons, Your Honor. But this does go to the feasibility issue. For one thing, the City of Gastonia is a plaintiff in the North Carolina litigation, not a defendant. It is a counterclaim defendant. But we instituted the action, Your Honor, which includes a claim for damages.

And I am here asking -- and part of this hearing, generally speaking, one, on behalf of the City of Gastonia, as my colleague who more regularly practices bankruptcy, is -- well, and I've Mr. Fajgenbaum here as an associate, I've got esteemed local counsel here, but I've also got Ms. Edwards, who was here, and is going to be eminently sitting on our bench in the Western District of North Carolina. And so I'm here, one, generally on behalf of the City. But, two, to speak when argument comes up and also to cross-examine Mr. Bellamy on issues related to the feasibility of a litigation, which is a major, if not the only, component spelled out in their plan that's up for confirmation today, Your Honor.

THE COURT: All right. I'm going to caution both of you. This confirmation hearing isn't a substitute for discovery for the litigation matters.

That said, we need to know that the plan is feasible,

that the money that's in the account is going to be used, that there's some -- is more money going to be needed? How will the litigation be funded? But I do not want to delve into discovery issues. But I am more than happy to allow questions to go forward on the issue of feasibility, because that is a big question in this particular case, because the nature of the plan is relying on litigation, which litigation by its very nature is, you know, it's not a certainty, right? There's some speculation involved in it.

So, as long as we understand what the ground rules are, I'm happy to hear questions about feasibility and, you know, what happens if this money runs out, who's funding, or something like that. But I don't want to get into discovery or anything that would, quite frankly, prejudice either side in the litigation that's going forward.

MR. PETERSON: Thank you, Your Honor, for that admonition,

THE COURT: Thank you.

MR. PETERSON: Thank you. And I'm sorry, what was the ruling on the objection?

THE COURT: So the objection is overruled with caution --

MR. PETERSON: Yes, Your Honor.

THE COURT: -- to make sure that your questions are tailored to the elements necessary to confirm or deny

confirmation of the plan in front of us.

MR. PETERSON: Thank you, Your Honor.

BY MR. PETERSON

Q Mr. Bellamy, the last question I had posed was, who were the investment partners that funded Veltrust in this bank account?

A Robert Ambrosi.

MR. PETERSON: Apologies, Your Honor. Let me just gather my thoughts here for a moment.

(Pause)

Q And do you have a --

MR. PETERSON: Well, withdrawn. Withdraw that.

Q You testified earlier, sir, that the -- that you were locked out and didn't have the keys from the stadium, do you recall that?

A I do.

Q Are you aware of the offer from the City to collect the keys in early December?

A We never collected the keys.

Q You never collected --

A They were never brought to us either.

Q Okay. So the answer to that would be, you're not -- you are aware of that offer?

A My answer is that we never received the keys from the City.

Q Okay. And going back to Mr. Ambrosi, I mean, I've -- you know, in preparing for this hearing, I've seen Mr. Ambrosi's name on a few documents. What is your -- what is your relationship -- business relationship with Mr. Ambrosi?

A We're partners on various deals.

Q Okay. And what are --

MS. STEVENS: I'm sorry; I didn't hear that.

THE WITNESS: We're partners on various deals.

Q And are you -- is Mr. Ambrosi a partner on any deals related to -- on any deals related to Gas House Gang?

A No.

Q He's not, okay. Is the amount deposited in the Veltrust account -- the portion that's coming from you, is that from your personal bank account? Or your --

MR. DRESCHER: Your Honor --

MR. PETERSON: I'll tighten, Your Honor. I --

MR. DRESCHER: Yeah, that assume some facts that aren't in evidence.

MR. PETERSON: I didn't --

THE COURT: Okay.

MR. PETERSON: I didn't intend to -- my apologies.

THE COURT: Sustained. Go ahead.

MR. PETERSON: Thank you, Your Honor.

Q Where are -- where is the source of the funding from your end, not Mr. Ambrosi, but where is the source of the funding

from your money?

MR. DRESCHER: Your Honor, I object. He did not testify that any of the money came from his personal fund.

THE COURT: Well, I think he can -- I guess that's what's trying to be cleared up. Is it part his, part --

A No, I didn't --

THE COURT: -- investor or --

A I didn't -- I didn't make that initial investment.

Q Okay, thank you. And is Mr. Ambrosi aware of how you intend to use that initial investment?

A He's aware.

Q Okay. And when did you make him aware of that?

A I don't have a date in mind, but we would talk pretty regularly.

Q Okay. Is there a written agreement pertaining to committing to use these funds in the way it's been described to the Court today?

A No.

Q There's not?

A No.

Q Okay. And insofar as the personal -- I think I heard you testify that you've made a personal guarantee if Veltrust does not pay this, is that correct?

A The U.S. Trustee asked me to make a personal guarantee to the payment of the employees of $45,000 and to the payment of

the legal for the Trustee, Mr. Marc, and I agreed to do that.
Q And where would the source of the $45,000 come from, if it came from you personally and not Veltrust?
A It could come from me or any of my other accounts, or it may come from Veltrust. But Veltrust is there specifically to send that money. And I agreed to do that on the effective date, which I think is October the 1st.
Q And so Veltrust was created for purposes of this -- of funding this plan, is that fair to say?
Q I didn’t say that.
Q Okay. What -- what was Veltrust created for?
A It’s a real estate company. It’s going to be investing in real estate, various other opportunities.
Q I’m sorry. I just thought I heard you testify that the reason for Veltrust was this plan.
A I --
Q That’s what I thought I heard you say.
A No, I didn’t say that, sir.
Q All right. $45,000 from other accounts. What -- what -- are we talking about business accounts or are we talking about your personal bank accounts?
A I haven’t made that decision, but the dollars are here in this Veltrust account to make sure that the money gets paid October 1st, which is what I personally agreed to do.
Q And when did you make that agreement with the U.S.

Trustee?

A About 40 minutes ago.

MS. STEVENS: Objection; we don’t actually have an agreement.

THE WITNESS: Oh, sorry.

MS. STEVENS: I would just like to kind of put that on the record.

THE COURT: Sustained, yes.

THE WITNESS: Oh, I’m -- I’m sorry. I didn’t understand.

BY MR. PETERSON:

Q I was just going off of your testimony, sir.

A I --

Q So, it’s --

A I -- I apologize. I thought that that was the arrangement. I apologize.

Q Okay, great; thank you. And so you haven’t made a decision then on where this -- the source of this funding to pay the employees would come from?

A It could come from another source, but I made sure that these dollars are available to be paid toward that.

Q With respect to the payment -- the administrative payment with respect to the Trustee, will -- does this plan, do your -- is your understanding of Exhibit 1, your plan, also to pay various administrative fees, including your attorney’s fees in

this plan?

A Yes, sir.

Q And is that -- is any of this money going towards -- from Veltrust, committed to going towards that payment, those administrative payments?

A It could.

Q I think I remember from the plan that it's $100,000 was the proposed amount.

A Yes, sir.

Q Is that the current amount of legal fees incurred, or is it the future amount?

A Yeah, actually, I don't know if that's the current amount. I think that's what it is right now.

Q And how then does the debtor propose to pay any future legal fees?

A Various revenue and other income that we have from other personal investments and things that I have, depending on, you know, how much it -- you know, how longer [sic] the litigation may go.

Q And insofar as you're talking about personal investments, where the various sources are from your personal again?

A Other -- yeah, other businesses.

Q But do you have any -- can you offer any names of those businesses that that funding would come from, to give the Court some evidence or some indication of where this money is coming

from?

A Like, the money in the Veltrust account?

Q Well, other than the Veltrust account, sir. Any others? Any other entities?

A Well, I could, but I think it’s covered right here in the Veltrust account.

Q And, again, there’s no written guarantee from Veltrust to commit these funds, is that correct?

A Well, I am the owner and manager of the Veltrust account, so I could --

Q And what about Mr. Ambrosi?

A He’s my partner in the Veltrust account.

Q And when you say “partner in the Veltrust account,” is he an owner and operator of Veltrust?

MR. DRESCHER: Your Honor, I object. I believe that Mr. Peterson has exceeded Your Honor’s guidance.

THE COURT: I’ll sustain the objection.

MR. PETERSON: I’m sorry, Your Honor.

THE COURT: The funds are in the account. No apologies necessary. The funds are there and --

MR. PETERSON: I’ll move on. Thank you, Your Honor. I appreciate it.

BY MR. PETERSON:

Q If the plan is confirmed by the Court today, how would you propose paying those -- the -- any extra legal fees in

connection with Gas House Gang's litigation?
A I don't understand the question.
Q If -- if --
A That are not --
Q Through --
A Do you mean that are not --
Q Right.
A -- included in what we've already talked about?
Q Yes, sir.
A The same -- the same way. I would be funding them from various sources.
Q Okay. And where are those sources?
A You know, I have other -- other businesses, other revenue. That's how I pay payroll and other -- other things. I don't really know how to answer that question; I'm not sure.

MR. PETERSON: I was just looking for a little more specificity, but that's okay, Your Honor. I think I've exhausted my avenues here, and thank you for the Court's indulgence.

THE COURT: Thank you, Mr. Peterson.

Ms. Stevens?

MS. STEVENS: Can I have a copy of the Exhibit 2?

(Pause)

MS. STEVENS: I'm just --

CROSS-EXAMINATION

BY MS. STEVENS:

Q Thank you, Mr. Bellamy. I’m Lisa Stevens. I’m with the Office of the United States Trustee. So, I have a couple questions to ask you along the lines of the funding of the sources of the plan. Do you recall in this case that the debtor filed their first plan that was filed -- I don’t even know when it was filed -- let’s see -- in February. On February 29th, the debtor filed its first Subchapter V plan. Are you familiar with that?

A Yes.

Q And you assisted Mr. Drescher in the preparation of that plan. And do you remember under the -- and I’ll call that the original plan, who the funding source would be for the plan at that time?

A I think the original plan that you’re talking about had the name Robert Ambrosi.

Q And who else?

A Brandon Bellamy.

Q Okay. So, under the first plan, it was Mr. Ambrosi and you, and then there was the second plan that was filed on March 15th.

A Um-hum.

Q And do you remember who the source of payment was under the second plan?

A Brandon Bellamy.

Q Okay, right. So, under the plan that's in front of you here today, if you'll look on Page 1, under the Source of Payments, it's under Article 1, Exhibit 1, Page 1.
A Yes.
Q And if you go to -- I think it's the second to the last line, what were the source of payments to be under the plan in this current version?
A A line of credit.
Q A line of credit to be obtained by you personally, correct?
A Yes.
Q And did you obtain a line of credit in this case?
A No.
Q Did you attempt to obtain a line of credit in this case?
A I didn't need to.
Q Why?
A Because I was able to come up with the capital without doing that.
Q No, you didn't come up with the capital. Veltrust came up with the capital, is that correct?

MR. DRESCHER: Your Honor, I object. There's no grounds for an argument from the U.S. Trustee. An arm of the United States government to fight with a witness? This is outrageous, Your Honor. I object.

THE COURT: Mr. Drescher, she hasn't come close to

fighting with the witness. Let her finish her question, then we'll see if there's a legal basis for an objection.

MS. STEVENS: I don't even remember what the question was; I was attacked so viciously. I'm -- I don't even -- I said --

(Pause)

BY MS. STEVENS:

Q Why are the funds in Veltrust LLC's name and not in your name?

A I don't know how to answer that question. I don't know how to answer that question.

Q Does Veltrust have an obligation to fund the plan?

A I'm an owner and manager of the entity.

Q No, the --

A It's going -- it's going to be making various investments, and part of what it's able to do is pay these fees. There will be other dollars that will be invested in this account, as well. But to make sure --

Q Could --

A But to make sure that all of the dollars needed for the plan are available they are in this account, to which I'm the owner and I'm making a personal guarantee to pay per our conversation.

Q Okay. Those are two separate things.

A I don't --

Q So, let's tease those out.
A Okay.
Q So Veltrust is a legal entity unto its own. It has -- you have a fiduciary obligation as its owner --
A Correct.
Q -- to do things in the best interests of that company.
A Yes, ma'am.
Q So let's say that company has creditors that have to be paid --

MR. DRESCHER: Objection, Your Honor; speculation. That's just a hypothetical now. I don't know how we got down this road.

THE COURT: Okay. I'm going to sustain the objection.

Rephrase the question. Let -- so that -- I think she needs to figure out where the funding is coming from. This -- it's feasibility.

MR. DRESCHER: Your Honor, I know I'm a little over the top today.

THE COURT: You are a little over the top of today, Mr. Drescher.

MR. DRESCHER: And -- and --

THE COURT: And it's not like you.

MR. DRESCHER: Well, it's because -- it's because there is something about this case that everybody hates, and

she said it. She said it outside. And another thing is, I thought that we did have an agreement whereby the U.S. Trustee was going to support confirmation if Mr. Bellamy said the things that he just said on the witness stand. Now I'm getting all sorts of really hard questions on cross-examination, which creates a trust problem. All right? And that's why I'm a little over the top, because I got all those guys over there that just don't want to get sued. All right?

Then I got the United States government standing over here, and I can't trust that she's going to live up to the terms of a deal that we made outside. So I'm a little bit hot, and I apologize.

MS. STEVENS: So, Your Honor, first of all, we did not have an agreement, and that's why we walked back in here.

I am not going to continue to be attacked like this. And I also want it to be made clear that, again, we're here to try to understand if these sources are real. They're illusory because when it came to put the money on the table, they walked.

MR. DRESCHER: Your Honor, I move to strike. Her statement --

MS. STEVENS: Well, I move to strike what he's saying about our conversations, too.

THE COURT: Okay. Both --

MR. DRESCHER: -- that the funds are illusory is a

factual statement.

THE COURT: Both of you, stop. Stop. We are here on confirmation of the debtor's plan. If the debtor representative cannot testify to information sufficient to meet the elements, then guess what happens? The plan doesn't get confirmed.

But, Mr. Drescher, we have the exhibit that there's $198,000 sitting in a bank account in the name of an entity called Veltrust. Let Ms. Stevens ask a couple of questions about how is the money committed. Is there -- we need to find out -- right now, it's sitting in the name of an entity that this debtor has no control over. I recognize Mr. Bellamy is the owner of both entities. But that presents him with another set of issues, as well.

So, I'm going to allow her some leeway to question this information.

MR. DRESCHER: Your Honor --

THE COURT: Okay?

MR. DRESCHER: -- candidly, I think that justice would be best served by Your Honor asking all of these questions that are of importance to Your Honor and allowing this cross-examination party to --

THE COURT: I didn't file an application to be employed and my rates are far too high to handle this case. So, I'm going to let Ms. Stevens continue.

BY MS. STEVENS:

Q Mr. Bellamy, is there any obligation for Veltrust LLC to pay the $198,000?

A What do you mean by “obligation”?

Q Is there any legal reason that Veltrust LLC would have to pay this money to the debtor?

MR. DRESCHER: Your Honor, I object asking a --

A I just don’t know how to --

MR. DRESCHER: The reason --

A I just don’t know how to answer the question.

MR. DRESCHER: -- asking a lay witness to make a legal opinion.

A I -- I want to answer your question.

Q So -- okay, let me ask it --

A I’m trying to --

Q Let me ask it this way.

A I’m trying to --

Q Could Veltrust say, “No, I don’t want to pay the $198,000"?

A That would be me saying no. I don’t -- I don’t -- I don’t know how to answer the question. I’m not --

Q So, Mr. --

A -- saying no.

Q Mr. Bellamy, is it at your discretion, your sole and absolute discretion, whether Veltrust pays the $198,000?

A I -- I really don't know how to understand [sic] -- I don't know if I understand the question. You're -- if you're asking me, do I control the entity, can I write checks from the entity? Am I going to pay from this entity the funds that you're talking about? The answer is yes. If you're asking me if I'm -- if I'm going to send $45,000 from this Veltrust account to you based on the conversation we had in the hallway, that's exactly what I'm going to do. And then if you said to me that I had to sign a personal liability for that, that's exactly what I'm going to do.

I apologize if I just don't understand enough about it. I think I'm answering your question. I'm trying to. I'm not trying to hide anything. I'm literally just trying to answer your question. So I don't know what else I could say.

Q So you're saying here today that you are personally going to commit the $198,000 from --

A That is not what I said.

Q --Veltrust LLC to --

Q That is not what I said. What I just said was I was going to send 45 -- well, now $75,000, or whatever that total amount is, from this Veltrust account to -- to pay for the employees and to put the money in the escrow account based on the conversation we just had outside. That's what I -- that's what -- that's what we just discussed.

Q So you're only willing to commit the 45,000?

A That's not what I'm saying. I'm answering the question that you asked me. And I'm saying to you from this Veltrust account is exactly where I'm going to send that money that we just agreed to outside.
Q Well, but the plan has agreed to other funds being paid.
A Okay.
Q Right? So there are the administrative costs of the case.
A Okay.
Q Which are the professionals.
A Okay.
Q Which you said that you're going to pay the Subchapter V Trustee's fees.
A That was already part of the discussion that we had outside.
Q Right.
A That I'm going to send to his escrow account.
Q And that's the $25,000, correct?
A Yes, ma'am.
Q So at this point, you've committed $45,000 --
A Yes, ma'am.
Q -- to pay the -- wait. Is forty-five what is due to the employees?
A Yes.
Q And then twenty-five to Mr. Albert?
A That is correct.

Q But under the plan, you're to fund the remaining sources. And I think you testified here that they will come from various other sources, is that correct?
A Yes.
Q But you haven't identified what those sources will be?
A Well, number one, there's still capital remaining in Veltrust. We have other -- I -- it's a -- it's a question on how much, and when, Right? I have a basic idea of the budget, I think. And I think we're covering most of it right now. But if there are additional sources that are needed, I would fund it the same way this money is here now.
Q But you don't have an obligation to fund it. It's at your discretion, correct?
A I don't -- I don't understand what you mean.
Q If, at some point, you don't have the funds, you could say no, correct?
A If I die, I won't be able to pay them either. So I don't really know what you mean. I'm committing to paying them. The money is here. I don't know about future bills that I haven't seen, but I think I have an understanding of what it's going to be. I have other -- other businesses and other income. I will pay them then. This is also serving as a backstop. I --
Q So --
A I don't know what else to say.
Q So, if you have these other sources of income, and they're

sitting at $198,000 right here right now --
A Okay.
Q -- why haven't you paid the employees?
MR. DRESCHER: Your Honor --
Q The order's been entered since December.
MR. DRESCHER: I object. It's really not relevant. We're here for plan confirmation. Why he hasn't paid the employees before is not relevant to any issue in the case.
THE COURT: I'll sustain the objection.
Q So what do you personally get out of the debtor being in bankruptcy? Because you could have paid these at any time. What's -- what do you gain --
MR. DRESCHER: Your Honor --
Q -- by the debtor's confirmation?
MR. DRESCHER: -- I'm objecting. This is why I'm a little over the top. Because counsel for the United States government keeps slipping in these facts that are not in evidence and that are not relevant. When she says "you could have paid this amount at any time," where did that come from? How do -- how is there any evidence that he could have paid it at any time? This is just her saying things, and that's why it's so frustrating dealing with the United States government in this case. Let's just -- look, feasibility, it's a low bar. He's -- he has testified over and over and over again that he is basically in charge of the money. If he's -- if he's got to

use that money for administrative expense purposes, priority claims, employees, he will use it. In fact, he's even committed to advancing the 25,000 from Mr. Albert and the 45,000 to the employees ahead of the effective date.

So that leaves me and that leaves my North Carolina colleague who may agree to another treatment, if we want. We have not yet filed fee applications. That money is not there.

But I just don't understand why we keep digging and digging and digging when something's already been pretty clearly established. And I know Your Honor has a busy docket. It was really my hope to get through this in a hurry.

THE COURT: Ms. Stevens.

MS. STEVENS: Was that an objection to my question or --

MR. DRESCHER: Yes, it was.

MS. STEVENS: Okay.

MR. DRESCHER: It was an objection to her statement that you could have paid these at any time.

THE COURT: Okay. So, if you would, rephrase the question. I will sustain the objection and ask you to rephrase the question.

BY MS. STEVENS:

Q Mr. Bellamy, if the bankruptcy -- if the case is not confirmed, could NC Gas continue with its litigation that's proceeding in the District Court?

MR. DRESCHER: I object, Your Honor. It's hypothetical. It's speculative. It does not address any of the issues before, Your Honor, which are feasibility and good faith. I object as to relevance and hypothetical.

THE COURT: I'll overrule the objection. The question is, would you continue the litigation even if the bankruptcy case weren't able to be confirmed today, I believe, is the question?

A I -- I -- I don't know. I'd have to talk to counsel, Ms. Stevens. I don't know. Right now, I'm just trying to take care of my responsibilities. I have three parcels of land that I also own down there that create a, you know, a problem for me to be able to access and deal with them. All of that's a part of our economic development case, our argument down there. So I don't really know how to -- I'm not an attorney, so I don't really know. I'd have to talk to counsel about that.

Q So there is a benefit to you for the debtor to be in bankruptcy and have their plan confirmed?

A Yes, ma'am, I think so. I mean, I -- I -- every time I come here, it's -- I -- I'm just trying to be honest. I know it didn't work out the way everybody wanted. I tried to do the right thing, and I got some wrong outcomes. But I think people are doing the wrong thing under the excuse of trying to get the right outcome, and I don't think that's right.

Q So, again, just to be clear, you are committing the

$45,000.
A Yes, ma’am.
Q And you’re committing the $25,000.
A Yes, ma’am.
Q Is there any other commitment beyond that?
A I’m going to complete everything that I need to complete.
Q What does that mean to you?
A I didn’t understand your question. I’m committing to pay all of the legal bills that are required for me to pay. I’m --
Q So, are you --
A That’s what I’m going to do.
Q Are you agreeing here today that you will pay the remainder of the administrative expenses?
A Yes, ma’am.
Q Beyond the $25,000 to Mr. Albert?
A Yes, ma’am.
Q Are you agreeing to pay the amount -- the monies to the IRS?
A Oh, yes. Yes, ma’am.
Q And you’re agreeing to pay the litigation and any proceeds after that that go to the paying -- repaying, I guess, yourself, you’ll then commit to the creditors?
A Yes, ma’am. I’m -- I’m not -- I just want to pay the people that did things that should be paid. That’s all I’m trying to do.

Q So, I'm sorry, just to -- Veltrust does not have a relationship to the debtor, correct?
A No.
Q And so as we stay [sic] here today, even though you said you will personally make -- I don't even know what you just said. Will -- personally, you'll make sure that this gets done, you have not committed any of your personal funds at this time.
A No, not yet.
Q MS. STEVENS: Okay. That's all the questions I have, Your Honor. Thank you.
THE COURT: Thank you.
Mr. Grams?
MR. GRAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GRAMS:
Q Good morning, Mr. Bellamy.
A Good morning.
Q I guess, afternoon. Good afternoon.
A Good afternoon.
Q I'm the attorney for the Atlantic League. I have a couple questions for you today.
First, Ms. Stevens just asked you, towards the end of her questioning, if you were going to pay several -- make several payments beyond the 45,000 that you've committed today

that you've outlined in the plan.

A Um-hum.

Q And you said you're agreeing to make those payments, correct?

A Um-hum, yes.

Q How will you make those payments?

A Can you be more clear? What do you mean?

Q I'm not sure I can be any clearer. How will you make those payments?

A I'm -- we're -- I'll pay them.

Q With what funds? From what sources?

A As we discussed before, various investments. I have other businesses. I have other income. I will pay the -- I will pay it. I don't know how else to answer that. I don't know that I can be more clear, if we're being honest.

Q Well, you're saying "I will pay it."

A Right.

Q But my question is from what sources? What --

A And I was just giving you a list of several sources.

Q Other accounts, other businesses?

A Yeah.

Q But you can't be anymore specific.

A My personal income. Yeah, no, that -- I think that was clear.

Q I don't think it's clear at all because you're not giving

me any information. You're not answering the question.

MR. DRESCHER: Your Honor, I object.

A I'm answering the questions for the best of my ability. I don't --

MR. DRESCHER: Move to strike. Let -- let counsel continue to ask questions.

THE COURT: Just ask questions, Mr. Grams.

MR. GRAMS: Thank you.

BY MR. GRAMS:

Q Now, you recall Mr. Drescher asked you when he was questioning you why you filed this bankruptcy.

A Yeah.

Q Your answer was because you were being sued in North Carolina, you didn't have really time to respond. So you filed this to pause those proceedings. You -- that -- that was your testimony?

A Okay.

Q Is that correct?

A Yeah.

Q Okay, I just want to make sure I'm summarizing your testimony accurately.

A I just -- you use different words, and I think your intent's the same, but that --

Q Okay.

A I didn't think that I used exact --

Q Yeah, I'm not trying to trick you.
A Okay.
Q I just wanted to make sure that --
A I -- okay.
Q Okay. But you've since filed a counterclaim against the City, and you filed a third party complaint against my client and the President personally, correct?
A Yes.
Q So you no longer need those proceedings to be stayed.
A Say what?
Q So, you said that you filed to pause the North Carolina proceedings. But you, and I say "you" as the debtor, have now filed all of these claims against the City, and against the Atlantic League, and against Mr. White personally, correct?
A Yes, accurate.
Q Okay. So the intent that you had when you filed the bankruptcy case is no longer present, because you no longer need to pause those North Carolina proceedings because you're actively suing parties in that case.

MR. DRESCHER: Your Honor, object on so many grounds. The first of which is that it -- it disregards Your Honor's multiple orders lifting the automatic stay to allow those matters to proceed in the non-bankruptcy forum, first of all.

Second of all, I'm not really even sure I understand the question. I think the question is a little unintelligible.

Third of all, I think he's actually asking for a legal conclusion from a lay witness. And I think on that basis also, it's an objectionable question.

I really don't understand, Your Honor, why we haven't gotten to closing statements. Talk about is the bank statement good enough, all right? Is the -- is the litigation too speculative? Can we get past today and move on with what's actually going to put some money in creditors' pockets? I don't understand why we're rehashing and rehashing and rehashing things that are really -- that are really not germane. So, those are my basis for objecting.

THE COURT: Thank you.

MR. DRESCHER: And, of course, I generally object that he's asking questions for an improper purpose because he's not asking questions in order to optimize his return as a creditor, but simply to gain an advantage in the litigation pending both in Maryland and North Carolina. That's not a proper purpose for objecting to confirmation, and I would ask Your Honor that this questioning be terminated.

THE COURT: All right. I'm going to overrule the objection. I think that it is a fair question at confirmation to say, "Gee, if your original basis for filing bankruptcy no longer exists or does it still exist?" But I think -- because things happen during the course of a bankruptcy, and I don't think it's an improper question when we're here at confirmation

trying to decide if confirmation is going to be successful and if all of the elements of 1129 have been met to say, "Do some of the reasons, or all of the reasons, or none of the reasons that you filed in the first instance still exist?"

MR. DRESCHER: Of course, Your Honor, I would never disagree with that comment. The problem is that, for example, the debtor filed a motion to assume the City agreements. That was objected to, and that was going to go forward, but then Your Honor entered an order staying those proceedings pending disposition of the North Carolina litigation, which, because I asked for it, I thought it was an appropriate order.

So that's still out there, and that is still a reason for us to continue with bankruptcy jurisdiction. But you can't ask that of a lay witness. It's not fair. That's the real basis for my objection.

THE COURT: I don't think -- well, I don't think he's asking for the legal basis. I think he's asking in Mr. Bellamy's mind as the owner of the debtor, do the reasons that you filed for bankruptcy still exist today? I think -- is that a fair assessment of your question.

MR. GRAMS: Yes, I'm trying to figure out why we're here.

THE COURT: Yes. So, if -- I will overrule. If he can answer that question, he can answer it. If he can't -- but it's only based on his knowledge.

THE WITNESS: Okay, thank you, Your Honor, for clarifying. I think that I would like creditors to be paid. The only way I can do that -- the business isn't operating. We could be operating, but it -- we should be operating by assess -- by the assessment of the document, we should still be in there operating right now, but we're not. So now I owe people, I'd like to pay them. I have ground that I need to develop. I'm trying to be as responsible as I can. And I think that I need this plan in order to do that.

BY MR. GRAMS:

Q Does NC Gas House Gang own that ground?

A No, NC Gas --

Q No.

A -- House does not own that.

Q Thank you. Now you testified that Robert Ambrosi is not related to the bankruptcy. There were no deals between -- that affected Mr. Ambrosi.

A Correct.

Q Isn't Mr. Ambrosi a manager of Gastonia Airline APL LLC?

A The ground.

Q Yeah. And --

A Yeah.

Q And didn't that entity file a $1.45 million claim in the bankruptcy case?

A I'm not following you.

Q Are you aware that Gastonia Airline APL, LLC filed a $1.45 million claim in this bankruptcy?
A I don’t recall, but that might be -- that might be correct.
Q So it’s your testimony still that Mr. Ambrosi didn’t have any deals that are related to the debtor?
A The debtor is NC Gas House Gang. Uh, yeah, if that’s the case, that -- that could be the case.
Q It could be the case that he --
A I don’t remember all of the creditors that are on the list. So if Gas -- if Gastonia Airline is on the list, then, yeah, they’re on the list.
Q You don’t remember a $1.5 million claim?
A I don’t remember right now.
Q Okay. Is there any agreement between Veltrust and NC Gas House Gang? I mean agreement, contract?
A No.
Q Nothing?
A (No verbal response).
Q Is there any personal guarantee in writing that you’ve committed funds?
A No.
Q I asked you earlier just generally where these funds will pay from -- will come from, and you said your other accounts or other businesses.

A Um-hum.
Q Can you name one other account or one other business that will fund this plan?
A It could come from Velocity Capital. I don’t know. I haven’t -- I mean, what -- what -- what I’m trying to get across, I guess, is that we funded the money or I funded money. I’m prepared to send the payments that we discussed. I realize the litigation could go on a long time. Things change during bankruptcy. I am still working. I am still trying to, you know, generate dollars and take care of any creditors that I may have, and deal with our -- deal with my responsibilities. So that -- I don’t -- I don’t -- maybe that’s not the right legal way to say it. I’m just trying to answer your question.
Q Okay. And what about future legal fees for the Gastonia litigation?
A Same thing. Same thing.
Q Same thing?
A My answer is the same. You know, I don’t know how much more we’re talking about. You know, if you tell me this is going to be a hundred million dollars, then I would tell you, I don’t know how I’m going to do that right now. If this is going to be another couple hundred thousand dollars, I can do that. If it’s $300,000, I could do that. I could -- you know, I can do that. It’s not all happening on one day. It’s not like I have to pay $300,000 today, and if I don’t, then you

know, the whole thing turns into a pumpkin. So there are fees that are happening over time. I'm working. I'm trying to, you know, earn as much money as I can to take care of my responsibilities and deal with this case. So, step one is take care of the employees, take care of the IRS, take care of the attorney's fees.

Step two, what -- you know, how much more will the case be? I haven't -- the federal judge hasn't ruled in North Carolina yet. It's unfortunate because I'm not in the property, you know, I can't generate any revenue from the activity to help deal with that. I'm going to have to pay for it from other sources. And -- and -- and some of them, I have an idea. Other opportunities may come. I'm trying to be as honest as I can.

Q If step one is to pay the employees, why haven't they been paid?

A I'm paying them, but --

MR. DRESCHER: I -- I already filed an objection. That's already been sustained.

THE COURT: Sustained.

Q And I'm -- I'm not sure you've answered. You said maybe Velocity Capital would come up some money.

A I -- you just -- I felt the pressure to give you a name because I have other companies. I have other entities.

Q Well, we're here on whether your plan is feasible.

A Okay. And right now, what was just told to me is that I needed to make sure I have this much money. I have this much money. Now you're asking me to tell you with a guarantee how much money I'm going to have to make and how much money I'm going to have to pay for a number that I don't even know what it is yet. If I have a working idea, I think I have enough money to cover that.

Q But you understand --

A What else would you like me to say?

Q Do you understand that there are going to be ongoing expenses?

A I'm clear on that.

Q Okay. But you can't tell me how they're going to be funded.

A I just told you.

Q No, you said "maybe."

A No, what I said was that I would be taking it from various different sources. What else would you like me to say, Counselor?

Q I asked you if you could name those sources, and you didn't.

A And I gave you a name, but there are several other names. It depends. As was stated earlier, things change in bankruptcy court. The time period is elapsing. New revenue comes in. New businesses get created. Different things happen. I don't

know how to answer that. And I'm not trying to be defensive. I'm just trying to answer your question.

Q But what if those funds aren't available?

A What if I die tomorrow? Same problem.

Q Okay.

A I can't -- I can't speak to that. I can only tell you what my plan is based on the reasonable practical reality. And right now, there's money in the bank. I'm going to send money. They just asked me to, you know, make a personal liability -- a personal guarantee. I agreed to do that. What else would you like me to say?

Q But there's no guarantee, period, that those funds will be available.

A There's no guarantee that if I drive out of this parking lot that I'm not going to get killed in a car accident. I don't know what kind of guarantee you're asking me to give you.

Q I'm --

MR. DRESCHER: Your Honor, I'm objecting. I'm also objecting because case after case after case after case in bankruptcy court jurisprudence says that feasibility does not require a guarantee. And yet, all these creditor -- creditor lawyers are saying, "well, can you guarantee that it's going to get paid?" He's answered, he can't guarantee it's going to get paid. I think we should move on, so I object.

THE COURT: I'll sustain the objection. I think

we've been through it a couple of times now.

MR. GRAMS: Thank you, Your Honor. And that's all that I have.

THE COURT: Thank you. Redirect?

Oh, I'm sorry. Mr. Albert?

MR. ALBERT: Oh, no, no, no, I just --

THE COURT: You have remained so quiet throughout the entire case that I almost overlooked you.

MR. ALBERT: No, that's quite all right, Judge. I wasn't planning to ask any questions, but I was enjoying -- I was enjoying it so much, the colloquial among your --

(Laughter)

MR. ALBERT: Among counsel at the bar. But I just --

THE COURT: I'm sure Mr. Bellamy would not say the same.

MR. ALBERT: If I may, just clarify something.

CROSS-EXAMINATION

BY MR. ALBERT:

Q You've presented a document that's been admitted into evidence, TD Bank, Veltrust LLC.

A Yes, sir.

Q You are the manager of that company.

A Yes, sir.

Q You can control that account.

A Yes, I do.

Q If you want to write a check on that account today, you can do that.
A Yes, sir.
Q All right. And no one can stop you.
A No, sir.
Q All right. Second of all, you have committed, since we have employees, that you're going to now send $45,000 that represents the employee claims to your attorney to hold, and he'll have it on the effective date to pay --
A Sure.
Q -- those --
A Yes, sir.
Q -- those claims. You've also committed today to come up with another $25,000 to send to your counsel to hold on behalf of the Subchapter V Trustee's fees.
A Yes, sir.
Q And that can be paid once this Court, if the Court is so inclined, approves that --
A Yes, sir.
Q -- fee application. As to the rest of the money, and Mr. Drescher, I understand, as your counsel is expecting to be paid, but he's not expecting the same arrangement to be made now as to these other two parties, is that correct?
A Yes, sir.
Q All right. But you do have right now $198,000 in your

account.
A Yes, sir.
Q Excuse me. When I say “your account,” the Veltrust account.
A Yes, sir.
MR. ALBERT: Thank you, Mr. Bellamy.
THE COURT: All right. Thank you, Mr. Bellamy.
Oh, I’m sorry. Do you want redirect?
MR. DRESCHER: No, I -- I think we’ve covered everything.
THE COURT: Okay. Thank you, Mr. Bellamy. You’re off the stand.
MR. BELLAMY: Thank you, Your Honor.
THE COURT: Any additional witnesses?
MR. DRESCHER: Your Honor, I have no other witnesses, and I have no other exhibits.
THE COURT: Okay. Any defense witnesses, or objecting parties’ witnesses, or anything like that, or are we ready for argument?
MR. PETERSON: At the risk of speaking for everybody at this table, at least from the City, we are ready for argument. I think that’s the same for everybody.
MR. GRAMS: That goes for the League, as well.
THE COURT: Okay.
MS. STEVENS: Your Honor, we’re ready for argument.

I do want to let the Court be aware that I have a confirmation hearing in front of Judge Ruark at 1 o'clock. If I can just step out and let them know -- there's no objection by the U.S. Trustee. So if we run to that, if I need to step out --

THE COURT: Okay.

MS. STEVENS: -- I just want, Your Honor, to know if I can be excused.

THE COURT: That's -- that's fine. You're -- feel free to just exit and head down the hallway.

MS. STEVENS: Great; thank you.

THE COURT: All right. Mr. Drescher?

MR. DRESCHER: Thank you, Your Honor. So we're here in a Subchapter V confirmation hearing, and so that tends to bring in both Sections 1129(a) and Section 1191.

This is not a consensual plan. Ballots have been submitted opposing the plan by the tally that was filed earlier this week, or actually last week. So, we are going to have to look at different subsections of Section 1191, and I will get there.

All right. But first, we need to work through 1129(a), and I'd like to just take a minute to go through those one at a time. 1129(a)(1) requires that the plan complies with the applicable provisions of this title. The plan classifies creditors appropriately. There's been no objection regarding the sum, substance, format, and other provisions of the plan.

So I would ask that, Your Honor, find that Section 1129(a)(1) is satisfied with respect to the plan that's currently before Your Honor.

Similarly, Section 1129(a)(2) requires that the proponent of the plan complies with the applicable provisions of this title. The debtor has filed operating reports. The debtor has fairly aggressively moved forward with this case by filing appropriate adversary proceedings and motions on a timely basis.

And, therefore I would ask that Your Honor find that the proponent of the plan, the debtor, complies with the applicable provisions of this title.

Your Honor, I would love a glass of water if that's available?

THE COURT: I don't know if we --

MR. DRESCHER: I don't know if we have -- we've got water over there.

(Pause/Off-the-record colloquy)

MR. DRESCHER: (3), the plan has been proposed in good faith, and not by any means forbidden by law.

Your Honor, the plan is submitted to provide a framework for paying creditors, both by a cash infusion from Mr. Bellamy, as has been discussed in depth during the hearing today, and by litigation, which I will discuss a little bit further.

And, therefore, I would ask that Your Honor find that the plan has been proposed in good faith by the debtor.

All right, (4). It deals with payments made to be made by the proponent requiring disclosure, as subject to the approval of the Court as reasonable. I believe that that is satisfied inherently within the terms of the plan, and I would ask Your Honor to so find.

(5), you know, the City filed an objection saying that we have not satisfied 1129(a)(5), and I respectfully disagree with that. Mr. Bellamy testified that he is the owner, and is really the sole interested person in NC Gas House Gang right now; that he will continue to serve in that capacity after a confirmation; that he is not expecting compensation, nor is anybody else expecting confirmation [sic].

And in light of that testimony, I believe that the debtor has satisfied Section 1129(a)(5). And I would ask Your Honor to so find.

Section 1129(a)(6) deals with governmental regulatory commissions and the rates of the debtor. The debtor believes that that is not relevant or pertinent to this case or this plan and asks the Court to so find.

Number seven, with -- 1129(a)(7), with respect to each impaired class of claims or interest, the holder has accepted the plan or will receive what they would get under Chapter 7. This is commonly referred to as the best interest

of creditors test. The testimony was that the debtor really does not have any hard assets right now. That's been disclosed in the plan. Mr. Bellamy testified that the contents of the plan were true and accurate. Nobody has contested that. Really, under a Chapter 7, creditors would get zero. And certainly under this plan, creditors -- Mr. Bellamy is going to pay the employees; he's going to pay the Chapter 11 administrative expenses; and is committed to paying the taxes.

So, I believe that creditors will fare better under Chapter 11 and confirmation of this plan than they would under Chapter 7. Therefore, 1129(a)(7) is satisfied and I would ask the Court to so find.

Section 1129(a)(8) requires that impaired classes accept the plan. We don't have that here. So we're going to have to go to 1191, which I will get to after I complete my presentation regarding 1129(a).

With respect to 1129(a)(9), that deals with priority claims. And Mr. Bellamy testified that the employees will be paid on the effective date. The Subchapter V Trustee will be paid on the effective date. And the attorneys, predominantly my firm and the North Carolina counsel, will be paid upon entry of an order allowing their claims as Chapter 11 administrative expenses.

With regard to the taxes, Section 1129(a)(9) permits a series of payments to be made. Really, we're looking at

about four and a quarter years now. Mr. Bellamy testified that he is in a position to make those payments. And I would also note that administrative claims are fees of the Subchapter V Trustee, which is about $25,000, plus the 5,000 that's already been received.

And then the administrative -- or the priority claim of the employees is 45,000. The priority claim of the taxing authority, the IRS, is 77,000. We take the seventy-seven, and the forty-five, and the twenty-five, we are well within the $200,000 that's being held in the bank account for Veltrust.

But because Mr. Bellamy has committed to paying the taxes, and certainly there are funds in the Veltrust account to pay the taxes, and Mr. Bellamy has testified credibly that he controls all of that money, we believe Section 1129(a)(9) is satisfied, and I would ask the Court to so find.

Section 1129(a)(10) is not relevant in Subchapter V cases.

So that gets us on to Section 1129(a)(11). And I'm going to spend a minute reading the entire section; it's not that long. "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

So that -- then we've got the question of what does

that really mean, and how have the Courts interpreted that. Courts have held, and I'm going to cite to Applied Safety, 200 B.R. 576, Bankruptcy Eastern District of Pennsylvania, 1996, which is of particular interest in this case because it deals with both what feasibility means, and it deals with whether reliance upon litigation is per se insufficient to find that a plan is feasible. And there are some long sections there. One thing they said is that the essence of the feasibility requirement is that the debtor's plan "should be reasonably likely of succeeding on its own terms without the need for further reorganization on the debtor's part. However, it is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous."

And there's a reason for that. You know, it -- in Chapter 13 cases, trustees almost never oppose feasibility, and the judges in our state almost never deny confirmation in Chapter 13 cases on feasibility because the idea is, well, let -- let the -- let the debtor get a -- give him a chance -- give him a chance to fail. That hasn't held true quite as much in Chapter 11 cases, but the language that has just been cited by the Applied Safety court is similar. I've never seen so many people upset about having $200,000 in the bank that you're going to use to pay creditors. That's what we have here.

Mr. Bellamy testified over and over again consistently that he intends that -- that that money is his to

control. He has access to the money. The same as if he had gotten the line of credit. That money is his to control, and that he intends to use it for paying priority claims.

Frankly, Your Honor, that's enough. That's enough to clear the low threshold required for a finding of feasibility. Again, it's not -- it is not necessary for plan success to be guaranteed. Over and over and over again, we heard cross-examining attorneys ask, "Well, is this guaranteed? Is this guaranteed? Is that guaranteed?" It doesn't have to be guaranteed. Just -- and, in fact, if you look at the language of the statute, it says that confirmation is not likely to be followed by liquidation or the need for further reorganization.

And, Your Honor, there is not one shred of evidence in the record that would say that the debtor is likely to require further financial reorganization. Not -- you know, creditors had plenty of opportunities to bring evidence. They didn't bring any.

We brought evidence. We have a $200,000 bank statement, and we have the exhaustive testimony of Mr. Bellamy that he wants to see this through. He doesn't feel that the debtor was properly treated, that the failure of the $4 million sale to go through was a severe disruption in the debtor's business organization. He testified -- and, wow, I was kind of stunned that the creditors didn't pick up on this. He testified that every fact inside the amended complaint was true

and correct. He was not -- he was not challenged on that by anybody in cross-examination, even though he opened that door pretty wide.

But he’s got this amended complaint. And Zawyer and the League, they filed motions to dismiss. And, Your Honor, very thoughtfully denied those motions. Debtor states plausible claims showing that there was collusion between the League, the City, and Zawyer to defeat that $4 million sale, and to install Zawyer in the debtor’s stead. That’s -- that is established record before Your Honor.

So we then get to the whole question of whether or not a case based upon litigation claims can be confirmed. And the U.S. Trustee filed a nice string cite of cases that say, well, litigation is inherently speculative, and you can’t confirm a plan based upon litigation. Then in a footnote, the U.S. Trustee talked about all of these cases that were dismissed because they were relying upon litigation.

But in none of those cases was a lawsuit actually filed and was the Court expressing an opinion that the litigation should go forward, and that they stated a plausible claim.

In fact, to the contrary, the Applied Safety court said, “We conclude that the Plan nevertheless meets the minimal requirement of presenting a workable scheme of organization with a reasonable chance of success. Specifically, the

debtor’s claim against Breed appears to have a substantial potential to succeed if and when such a case comes to trial.”

So we already have that here, Your Honor. Yes, it’s going to be the debtor’s burdens at trial to sustain the facts that were presented in the amended complaint against the League and against Zawyer. But it’s just -- it’s a -- it’s a preponderance of the evidence standard. It’s a 51 percent standard. And we’ve already gotten past the motions to dismiss.

So under the circumstances, there is a reasonable chance that the debtor is going to prevail against the League and against Zawyer, and create a substantial multi-million dollar fund for payment of creditors. That’s a lot of ways to say that the debtor believes that it has satisfied the feasibility requirement imposed by Section 1129(a)(11) and asks that, Your Honor, so find.

Section 1129(a)(12) doesn’t really apply. Typically, it deals with U.S. Trustee’s fees. But any -- but to the extent that it does apply, any such fees, for example, the filing fee of the case has been satisfied, and the debtor would ask that the Court so find.

Section 1129(a)(13) is not applicable here because the debtor has never had a retiree benefit plan of the type contemplated by that section.

Section 1129(a)(14) is not applicable because this is

not an individual debtor that would have a domestic support obligation.

Section 1129(a)(15) is not applicable in Subchapter V cases.

Section 1129(a)(16), it just says that “All transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.” Candidly, Your Honor, in the 40 years I’ve been doing all this, this subsection has never come up in a case that I’ve had anything to do with, and I would ask that Your Honor either find that it’s not applicable or that that provision has been satisfied.

This takes us to 1191. All right, so 1191 really deals with substituting a fair and equitable standard for creditors agreeing to vote in favor of your plan under 1129(a)(8). That’s really what 1191 does. There are no secured claims in the case, so any provisions regarding secured claims aren’t pertinent.

In order to get by the 1129(a)(8) requirement, we need to show that, first of all, that the plan does not discriminate unfairly. And there’s been no allegation that the plan does that.

And it also needs to show that the plan provides that

either all disposable income be paid over to the plan for the purposes of the plan, or that the value of the property to be distributed has a value of what the net disposable income is going to be over the next three to five years.

Mr. Bellamy testified there's no net disposable income in this case, so that requirement is satisfied because zero is being paid to impaired classes unless the litigation succeeds. This section was not brought up. Nobody filed an opposition to confirmation based upon a failure of the debtor to be able to satisfy that provision.

And, therefore, I would ask that, Your Honor, find that the debtor has satisfied that provision based upon the testimony of Mr. Bellamy.

Your Honor, this is really an easy case. Because all we're really trying to do now is get past confirmation so that we can have our Maryland litigation move forward. The North Carolina litigation is moving forward. I'll report to Your Honor that there hasn't been any activity since June on the docket in that case. The district court will rule when the district court rules.

But the debtor's motions -- motion to assume the City agreements remains in place, remains stayed pending disposition of the North Carolina litigation.

So, between Your Honor's order staying that litigation or staying those motions, and Your Honor's

motion [sic] denying the motions to dismiss the Maryland litigation, it -- the debtor is ready to move forward.

You know, we've put off filing a Rule 26(f) report, and request for a status conference in the Maryland litigation because we wanted to make sure that we got past today. If we get past today, we're going to ask for the 26(f) status conference or pretrial, and we'll set a discovery deadline, and ask for a trial date, and move forward with that litigation. That's the -- that's the plan.

We're not asking the Court to make a crazy, wild ruling here. We're just saying, look, Mr. Bellamy, he's willing to pay for the privilege of controlling the litigation. That's really what's going on. He's willing to pay for that privilege. If we can -- and let's look at some of the alternatives to confirmation. I mean, there's really -- there's really three:

There's -- one is dismissal of the case, in which case the Chapter V lawsuit against the League probably goes away. Creditors won't get anything from there.

There's conversion of the case, in which case there's no fund available to pay employees, taxes, and the Subchapter V Trustee or the Chapter 11 attorneys.

Or, I guess, the third alternative is a different kind of plan. But no other plan really makes sense in the context of where we are.

The debtor claims that there was wrongdoing pre-bankruptcy. We filed a lawsuit in Maryland asking for vindication of those rights, avoidance of the transfer or, in the alternative, entry of a money judgment of $4 million. Your Honor said, yeah, you got a plausible claim. We got to resolve those factual disputes. So we just want to get there.

And confirmation of this plan is the best vehicle for getting there; for getting the employees paid; for getting the Subchapter V Trustee paid; and for vindicating all the rights that are available and that are at issue in North Carolina and in Maryland.

Your Honor, Section 1129(a), as required, is satisfied. Section 1191 is satisfied. And so I would ask that Your Honor confirm the debtor’s third amended plan of reorganization.

Thank you, Your Honor.

THE COURT: Thank you.

Ms. Stevens, do you -- Ms. Bellman, could you send a note to Jennifer?

MS. STEVENS: I sent -- I just sent her an email, too.

THE COURT: Oh, okay.

MS. STEVENS: So, I’m hoping she’ll get a -- but if I could --

THE COURT: You are welcome to go first, if you all

don't mind. That way she can get -- we have competing confirmation hearings today.

MS. STEVENS: I'll be quick. Thank you, Your Honor.

So, as stated in the United States Trustee's limit objections, we have concerns about feasibility and the source of funding. The Court heard the testimony on these issues today, and it's for the Court to decide whether debtor met its burden for confirmation.

If the Court does decide that -- to confirm the plan, I would request that the representations that were made on the record here today, that the employee and the Subchapter V Trustee funds, will be placed into escrow upon entry of the confirmation, and the other representations that Mr. Bellamy will personally guarantee the payment of the other administrative expenses and taxes be added to the order.

That's all I have, Your Honor. Thank you.

THE COURT: Thank you.

Mr. -- it's not -- Mr. -- not Mr. Peterson?

MR. FAJGENBAUM: Thank you, Your Honor. Philip Fajgenbaum on behalf of the City.

Your Honor, I think debtor's counsel represent earlier that this is a relatively straightforward confirmation. From our perspective, it is. There are three glaring issues, however.

As Your Honor knows, this plan is based on sources of

funding from either the recoveries of litigation or from funds from this third party that we received the bank statement for today.

The problems with this plan, we think, are briefed and argued at length in the pleadings, so I'll try to keep it fairly brief. But the three primary issues go down to feasibility; good faith, which inherently requires an evaluation of whether there's a proper bankruptcy purpose to be served here; as well as there being the plan's compliance with Title 11. Specifically with respect to the City, Your Honor, I would note its compliance with Section 365 of the Code, and I will get to that shortly.

I'd like to start with feasibility. Mr. Drescher noted earlier that none of the cases cited -- I think he said specifically with respect to the Trustee -- involved plans in which funding was based on future litigation, litigation that had not already begun. Your Honor, our objection cites several cases, in fact, where litigation had begun prepetition. And, in fact, we have additional cases that we have found leading up to this hearing. By way of example, Your Honor, in our pleadings, In Re Burford, that's 1991 Westlaw 237820. In that case, the court held, "The debtor's proposed plan of reorganization does not meet the feasibility requirement of 11 U.S.C. 1129(a)(11), and that implementation of the terms of this plan is dependent almost entirely on speculative recovery

from various lawsuits currently pending."

Similarly, Your Honor, In Re Rey, 2006 Westlaw 2457435. In that case, Your Honor, the court had a similar circumstance where there was pending litigation. The plan was to be funded based on that pending litigation, as well as, Your Honor, there was evidence presented as of a line of credit and an indication of a commitment to fund that line of credit. In that case, the court said that that was not sufficient -- I'm sorry, Your Honor, I'm confusing my cases. In that case -- I'm actually referring to In Re Shefa, LLC, Your Honor, and that's actually, my apologies, 535 BR 165. In that case, the court said that a non-binding letter of intent or expression of interest is insufficient to prove that a plan is feasible and for the debtor to meet its burden of persuasion there.

All that to say, Your Honor, we don't believe that this plan is feasible. The testimony that was presented as to this source of funding, you know, I'd like to discuss briefly what we heard from Mr. Bellamy on that point. We heard a lot about him saying that we don't know why he wouldn't pay it himself. A lot about what he'd like to do. A lot about what his plan is. You know, a lot about this is his belief. But there's no contract. There's no writing. There's nothing binding.

When asked about where his sources of paying for his personal guarantee that he's discussed today, that's still not

even clear. Is he talking about personally guaranteeing just the employee wages? Or is he talking about personally guaranteeing all of the priority claims in this case? I don't think we know.

And although many questions were asked about it, and we heard that it would come from his other sources of income, he named one, and that was maybe. But most -- what most clearly shows that there is nothing binding on him to make any payments should his entity not follow through with its proposed commitment is the fact that he repeatedly said, "Well, if I die, what happens?" There's no claim against his estate. There's nothing binding here. If I drive off, what happens? That's a good point. What happens? No one's going to be paid.

So with respect to this proposed payment from -- and I'd like to be clear, it's not from Mr. Bellamy. It's from this third party that's funded by an insider, not Mr. Bellamy. There's nothing that was presented today that is -- that satisfies the burden to present concrete evidence of a binding commitment to pay these parties.

As far as the North Carolina litigation goes, Your Honor, as I mentioned, there are several cases in which litigation was then pending at the time of confirmation, plenty of cases that said, hey, that is insufficient to meet your burden of showing that the plan is feasible. The burden is higher there. The burden is to show that you're reasonably

likely to succeed. That's what every case says. And no, it's not a guarantee, but it's reasonably likely to succeeded. And we heard nothing today that suggested that their litigation against us -- and I won't speak on behalf of the League, but I didn't hear anything about the League's litigation being reasonably likely to succeed.

Simply put, Your Honor, what's being proposed today is highly speculative and is requiring the parties to hope for something to happen in the future that plays out for them. In any event, it's just simply not a feasible plan that's being proposed. We have not received any evidence sufficient to meet their burden. And for that reason alone, we think the plan should be denied.

As far as good faith goes, Your Honor, as Your Honor knows, good faith requires a look into whether or not the plan serves a bankruptcy purpose. The bankruptcy purpose in this case, it's hard to know. When asked why the debtor filed this case, he testified to stop the North Carolina litigation. When asked what would happen if this case was gone, he chose not to answer. There's currently no bankruptcy purpose. There's no reorganization. There's no liquidation. You know, what we heard today was that Mr. Bellamy, through various entities, purports to have the ability to pay everybody, and he wants to pay everybody. And he's not getting sued by anybody. In fact, he's suing them.

So it leads to the question of why are we here? The stay serves no purpose at this time. And apparently, according to Mr. Bellamy, through his entities, he can pay everybody and he wants to pay everybody. So if this case were to be dismissed today, nobody's going to sue them. They don't need protection of the stay. They can complete their lawsuit against these entities. And apparently, Mr. Bellamy can pay these unsecured creditors with his own sources through various sources.

We simply don't think that this plan was proposed in good faith. We think it was proposed in an effort to cause further delay.

And I think that that goes to my last point, Your Honor, about compliance with the Code. As Your Honor knows, Section 365 deals with assumption and rejection of contracts, leases specifically. And a lot of this, as far as the City goes, has pertained to the assumption and rejection of the contracts with the City. As Your Honor knows from the pleadings, and, again, I'll try to be brief because it has been briefed over and over again, the City maintains that those contracts have terminated. The debtor and debtor's counsel testified as to the cure periods. And I know that they don't agree with that, Your Honor. But what they cannot agree -- what they cannot disagree with is 365's requirement that a executory contract or lease be assumed or rejected by the

earlier of 120 days after the petition date or the date of confirmation of a plan.

Assuming, Your Honor, for argument's sake, that you were to confirm today's plan, under 365, this agreement with the City, were it still in place, would be deemed rejected automatically. That is under the Code. Yet what the plan proposes is to not assume the agreements, but to reserve the right to do so at a later time. That's what the plan says.

The Bankruptcy Code 365 -- I believe it is -- I left my code on the table, but I believe it is (d) -- (d)(4)(A) says, Your Honor, and I'll quote, "Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected" -- *shall be deemed rejected* -- "and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of: the date that is 210 [sic] days after the date of the order for relief; or the date of the entry of an order confirming a plan."

So, Your Honor, what we have today is, Your Honor's -- they're -- the debtor is not proposing to assume this lease agreement today. In fact, they talked about Your Honor's order staying their motion to assume.

The debtor has present no evidence of an ability to assume the lease, nor could they, because there's simply no

basis to suggest that.

Instead, they've asked to kick the can down the road, but the Code makes clear that you have to do it by the earlier of one of two timelines.

Now, I understand their argument, Your Honor, and their motion to assume that, "hey, we filed the motion within the 120 days, and that stayed it." Your Honor, just the fact that you stayed it on that first prong doesn't mean that it prevents the second prong from occurring.

In the typical case, 120 days does typically arise earlier than the date of confirmation. But in this case, for whatever reason, confirmation is now arising first. And there's no filing a motion to assume that tolls that. Right now, what we have is the proposal to confirm the plan today while reserving the right to assume later. The Code simply does not contemplate that. It does not allow that. For that reason, this code [sic] does not comply with Title 11, and for other reasons, as well. But principally with respect to the City, it does not comply with 365(d) and, therefore, cannot be confirmed on that basis either.

I think that, as stated, Your Honor, at the outset of this, the debtor has the burden of proving that it's met the requirements for confirmation. Its burden is by a preponderance of the evidence. With respect to the feasibility requirement in connection with litigation funding, the

requirement is that you show a -- that you're reasonably likely to prevail, and for a good reason. The debtor has not produced any evidence they're reasonably likely to prevail. They have not provided concrete evidence of a firm commitment that's legally binding on anybody to make any payment.

Instead, this morning we were ambushed with a document of some LLC that was created a week ago saying, "Here's some money. And take my word, I'll pay you later." Your Honor, I offer to the Court that that is not -- that is not what was -- what's necessary for them to meet their burden. And, therefore, we ask the Court deny confirmation.

THE COURT: Thank you.

MR. GRAMS: Thank you, Your Honor.

Again, I would just first start by joining in the objection and the argument raised by the City of Gastonia. Our points are fairly similar, so I'll do my best not to repeat the points just made by my co-counsel.

But we do agree that the plan is not feasible under bankruptcy law. Primarily the -- the source of funding that the debtor is seemingly relying on the most is the litigation, and it's just not proper for a plan to be funded by litigation.

We really didn't get into the facts and the merits of the adversary proceeding. And that was intentional, Your Honor, even though Mr. Drescher argued that he had opened the door by asking whether Mr. Bellamy agreed with the facts pled

in the complaint. Your Honor issued an order from the bench limiting the questions as to feasibility, not wanting to get into the adversary proceeding, not wanting to engage in discovery, so to speak.

So the debtor can't necessarily use the adversary proceeding as a sword and a shield in this context. He can't say, "Oh, well, they could have asked any question about the adversary or about the complaint, but they didn't" when Your Honor said, let's focus on feasibility.

So, to that extent, Your Honor, we would ask you to disregard that point that Mr. Drescher made in his argument. We did not intend to get into discovery here today. We're just -- we just wanted to focus on whether this plan is feasible and it's not, Your Honor.

I think it's important to focus on the purpose of what Chapter 11 is. It's to return a business to a viable state. And if there's -- there's got to be a viable business in place that's worthy of protection and rehabilitation. And there's nothing in the record that would support that that's present here.

And I think that goes to the lack of good faith in proposing this plan. Mr. Bellamy testified as to his original intent in filing the bankruptcy, but he couldn't really talk about why -- what his goal is in continuing with the bankruptcy litigation. I think maybe it's to pursue the adversary

proceeding; I'm not sure.

But to the extent he intends to pay the creditors, I would point out, as Your Honor could see by the League's amended claim that was filed last week, the League is actually paying several of the creditors of the debtor, including the employee creditors who Your Honor issued an order back in December of last year approving the payment of those employees. The League has now paid those employees. As you can see by the amended claim, there's an itemization of who has been paid by the League since the filing of its original claim. And Your Honor can refer to that. I believe we've paid -- I think there were five listed on the motion to pay the prepetition wages filed by the debtor. I am certain that four out of those five were paid. I'm not sure if the fifth has been paid or not. So I want to be clear, but four out of those five employees have been paid by the League.

The litigation is not a proper source to fund this plan because it's just too uncertain. And Your Honor has granted an order denying our motions to dismiss, both filed by the league and then by Zawyer. But that just indicates that there's been a plausible claim that's been pled. It's not a finding on the merits. It's not a finding of the likelihood of success.

Your Honor is familiar with the arguments raised in those pleadings. We incorporated our motion to dismiss in our

objection, so I will defer to that. Your Honor can determine, you know, the weight that she decides to give that.

But I still think even the fact that it's litigation, it's not proper to fund a plan by any litigation, particularly when the litigation is not likely to succeed.

The League and Mr. White personally have been sued in North Carolina. They've also filed a motion to strike that complaint that hasn't been ruled on. So we think that that avenue is unlikely to succeed, as well.

I do think it's important to point to a case. It's the matter of Golden Ocala Partnership, it's 50 B.R. 552, it's a case out of the Middle District of Florida. But that case, they ruled that the ongoing litigation was not the proper source of funding for a plan. And, in fact, it said -- the court said "The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. If there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its" -- and I apologize if I botch this French -- "raison d'etre."

There's no good faith here because there's no business that's going to come out of the other end of this. And that, I think, has to be something that the debtor has to be able to show in order to show that its plan is proposed in

good faith.

So I don’t think they’ve met that burden. I don’t think they’ve shown that their plan is feasible for all the reasons that co-counsel indicated.

Mr. Bellamy was not able to really commit to anything, other than what he’s put on the table here today. I think it’s the $45,000. All the rest is speculative. There’s really nothing that the Court can look at and say, “this is what’s going to fund this plan.”

And, again, I would reiterate, the League is paying these creditors, Your Honor. They’ve paid several. They -- they’ve paid, I think it’s $1.7 million worth of claims.

So, to the extent that the debtor intends -- or its goal is to accomplish the payment of the creditors, that’s being accomplished outside of the bankruptcy plan.

And that may have an impact on -- assuming the litigation against the League is successful, which, again, it’s just assuming that, we certainly don’t think it will be, the proceeds that would be realized by that in order to pay the creditors may have already been paid to the creditors. So there may be no need even for that adversary proceeding in order to accomplish that if that truly is the debtor’s goal.

So, again, the plan is not feasible. The plan is not proposed to good faith. And we’d request that it be denied. And we’d request that Your Honor issue an order denying the

debtor leave to file another amended plan, and dismiss this bankruptcy.

THE COURT: Thank you.

MR. REDD: If I could, Your Honor. Justin Redd on behalf of Zawyer Sports, LLC.

I just want to put on the record the joinder in City's objections and argument, as well as the League's objections and argument. We previously joined the U.S. Trustee's objection on paper at ECF 194, I think it is. But I want to put on the record our joinder in today's objections, as well.

THE COURT: Thank you.

MR. REDD: Thank you.

THE COURT: Mr. Albert?

MR. ALBERT: Thank you, Judge.

You know, when I come before you, I always think about to say, "Well, Mr. Albert, as the Sub V Trustee, what would you do?" But then I turn it back to you and I say, "Well, Judge, I think that's your job."

But I do, on the other hand, always have an opinion, and I hope that I can offer it up here. I have heard, you know, the arguments of the creditors today. And I do recognize that some courts don't like just possibilities cutting it regarding litigation. I understand that in some instances, it really goes to the feasibility issue. And I understand this is

not, as well, a traditional Sub V.

This is purely a litigation case at this point. The way I look at it -- and I come from this from the Justice Department. I, you know, was in the Justice Department for many years, and I would always be asked to submit a report as to perhaps compromising a case. And we would look at the two words “litigation hazard.” What is the litigation hazard? And we’d come up with a percentage, and we would monetize that -- that two words. And in that respect, we could say a case is worth X.

This case here, the debtor is suing, I think, in excess of $4 million. This is not a bipolar case where it’s either one or the other. This is litigation. Litigation, so many times, get settled, and there’s a chance then -- more than a chance that money will come into the case. I like the fact that the creditors are -- been paying off some of the other creditors. That’s terrific. But right now, as far as I know, there are creditors in this case that are owed money.

Since the Court -- the costs are being borne by a third party, it seems to me this is a no brainer. The only ones that are really opposing -- although I do respect the U.S. Trustee’s point. But it’s the creditors that have something to lose. They’re in litigation. I don’t hear from other creditors in this case saying “this is not confirmable.”

The litigation has already survived in this Court,

rightfully so, a motion to dismiss. The case is based on facts. If the facts, as alleged by plaintiff, then there appears to be something there. I would urge the Court to not write off this case at this point, and consider confirmation, but only a recommendation. That's the Judge's job.

THE COURT: I recognize that. Thank you, Mr. Albert.

Mr. Drescher, you get the last word.

MR. DRESCHER: Thank you, Your Honor. Ever so briefly.

The debtor has already filed motions to assume the City agreements. They did that timely. Your Honor wisely entered an order staying that because we need a complete record in North Carolina before we can dispose of this. The City wants to shortchange that process. But we have satisfied every requirement relative to the motion to assume the City agreements.

The mere fact that -- that I say in the plan -- I probably could have done it a little more artfully, I say, "We reserve the right to assume its agreements with the City and the League. We reserve the right to proceed with -- to continue to assume those agreements."

The Ocala case, that case really rested on the fact that the debtor had no bona fide creditors, and that's why the judge denied confirmation.

To say that, well, you know, if there's no -- there's

no business that's going to survive a Chapter 11, then there should not be a Chapter 11. Well, Section 1129(a)(11) specifically says that you can liquidate under Chapter 11, right? It says unless such liquidation is contemplated in the plan of reorganization. So that phrase by itself refutes the idea that there has to be a reorganizing debtor that comes out of this.

Your Honor, like I said, this is a simple case. We want to be able to go forward with our litigation. You know, if the League wants to pay creditors, that's great, but they're not going to pay all the creditors. They're going to pay the creditors they need. They're going to have a hyper preference, right? Because why should they pay -- they're not going to pay David Woody's $100,000 claim, for example. They're just not going to. They're going to pay the creditors that they need to move forward. But you know what? That's just neither here nor there. That's not before the Court.

What's before the Court is a plan that has a reasonable likelihood of success. And, therefore, we respectfully request that Your Honor confirm the plan.

Thank you.

THE COURT: Thank you.

It will probably come as no shock to anybody in the courtroom that I'm going to sit on this for a couple of days. I think that I could have my thoughts together and a ruling for

you all by Friday.

I recognize we're going in to a holiday weekend. I would make it a virtual hearing. And my thought would be to do it at 9 o'clock in the morning. So if people have long weekend plans, they're good to go. Does that work for everybody?

MR. DRESCHER: That would be great for the debtor. Thank you, Your Honor.

THE COURT: Okay.

MR. GAFFEY: That's acceptable to us, Your Honor.

THE COURT: Thank you.

MR. GRAMS: That works for the League.

THE COURT: Great. Then -- thank you, Mr. Gaffey.

Then is 9 o'clock -- see, I always do this. And then I asked the boss. I do it to her every single hearing. But 9 o'clock works. Great.

So I'll see everybody on the screen then at 9 o'clock. We will use our -- if you go to our website, it requires a registration process, and we'll use what we refer to as the morning docket sign-in, okay?

UNIDENTIFIED ATTORNEY: Thank you, Your Honor.

THE COURT: Thank you, all.

COURTROOM DEPUTY: All rise. Court is in a brief recess.

(Whereupon, at 1:28 p.m., the hearing was adjourned.)

CERTIFICATE OF TRANSCRIBER

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Karen Hartmann, AAERT CET 475 Date: October 7, 2024
TRANSCRIPTS PLUS, INC.