**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 23-18766-LSS |
| | ) | |
| NC GAS HOUSE GANG LLC, | ) | |
| | ) | 6500 Cherrywood Lane |
| | ) | Greenbelt, Maryland 20770 |
| | ) | |
| | ) | December 14, 2023 |
| Debtor. | ) | 10:10 a.m. |

TRANSCRIPT OF (19) MOTION TO COMPEL FILED BY CREDITOR CITY OF GASTONIA, A NORTH CAROLINA MUNICIPAL CORPORATION; (24) OPPOSITION FILED BY DEBTOR NC GAS HOUSE GANG LLC; (48) OPPOSITION FILED BY DEBTOR NC GAS HOUSE GANG LLC; (51) EXHIBIT/WITNESS LIST FILED BY CREDITOR CITY OF GASTONIA, A NORTH CAROLINA MUNICIPAL CORPORATION
BEFORE THE HONORABLE LORI S. SIMPSON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For NC Gas House Gang LLC: | Law Office of Ronald J. Drescher<br>By: RONALD J. DRESCHER, ESQ.<br>10999 Red Run Boulevard, PMB 224<br>Suite 205<br>Owings Mills, MD 21117 |
| For Marc E. Albert, Subchapter V Trustee: | Stinson LLP<br>By: MARC E. ALBERT, ESQ.<br>1775 Pennsylvania Ave., NW<br>Suite 800<br>Washington, DC 20006 |
| Operator: | Gloria Bellman, Courtroom Deputy<br>to the Honorable Lori S. Simpson |
| TRANSCRIPTION SERVICE: | TRANSCRIPTS PLUS, INC.<br>435 Riverview Circle<br>New Hope, Pennsylvania 18938<br>Telephone: 215-862-1115<br>e-mail CourtTranscripts@aol.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Appearances:
(Continued)

| | |
|---|---|
| For City of Gastonia, a North Carolina Municipal Corporation: | Whiteford Taylor & Preston, L.L.P.<br>By: DENNIS J. SHAFFER, ESQ.<br>7 St Paul Street, Suite 1900<br>Baltimore, MD 21202 |
| | Parker Poe Adams & Bernstein LLP<br>By: ASHLEY A. EDWARDS, ESQ.<br>620 South Tryon Street<br>Suite 800<br>Charlotte, NC 28202 |

**INDEX**


| THE CITY OF GASTONIA'S WITNESSES | PAGE |
|---|---|
| RICHARD WHITE | |
| Direct Examination by Ms. Edwards | 19 |
| Cross-Examination by Mr. Drescher | 59 |
| Redirect Examination by Ms. Edwards | 67 |
| LLOYD ASHLEY SMITH | |
| Direct Examination by Ms. Edwards | 70 |
| Cross-Examination by Mr. Drescher | 98 |
| JOHN PHILIP BOMBARDIER | |
| Direct Examination by Ms. Edwards | 106 |
| Cross-Examination by Mr. Drescher | 116 |
| Redirect Examination by Ms. Edwards | 119 |
| **DEBTOR'S WITNESSES** | |
| VERONICA JEON | |
| Direct Examination by Mr. Drescher | 121 |
| Cross-Examination by Ms. Edwards | 126 |
| DAVID WOODY | |
| Direct Examination by Mr. Drescher | 130 |
| BRANDON BELLAMY | |
| Direct Examination by Mr. Drescher | 134 |
| Cross-Examination by Ms. Edwards | 162 |
| **SUMMATIONS** | |
| By Ms. Edwards | 164 |
| By Mr. Drescher | 172 |
| Response by Ms. Edwards | 181 |

| DEBTOR'S EXHIBITS | | ID | EVID |
|---|---|---|---|
| 1 | Certificate of liability insurance | 81 | -- |
| 2 | Calendar of events | 145 | 146 |
| 3 | Letter (Marriott to Bellamy 9/18/23) | 98 | 146 |
| 4 | Letter (League to Debtor 12/2/23) | 156 | 157 |
| 5 | Letter (White to BCG Sports 10/30/23) | 60 | 67 |

**INDEX**



| CITY OF GASTONIA'S EXHIBITS | ID | EVID |
|---|---|---|
| G-1 Affidavit (Bombardier) | 106 | 104 |
| G-1(3) Exclusive Use Area Lease Agreement | 76 | 78/104 |
| G-1(3)(A) Use and Operating Agreement | 77 | 104 |
| G-2 Affidavit (Smith) | 87 | 104 |
| G-3 Certificate of Insurance (7/17/23) | 82 | 104 |
| G-4 Certificate of Insurance (12/8/23) | 82 | 104 |
| G-5 Amended and restated bylaws Atlantic League | 23 | 67 |
| G-6 Atlantic League Affiliation Agreement | 25 | 67 |
| G-7 Creditor Notice of Default of Amended Secured Promissory Note | 39 | 67 |
| G-8 Notice of Default (8/29/2023) | 39 | 67 |
| G-9 Atlantic League Meeting Minutes (11/13/23) | 46 | 67 |
| G-10 Confirmation of Termination | 50 | 67 |
| G-11 Email (David Martin 10/5/22) | 26 | 27 |

**(TECHNICAL DIFFICULTIES IN THE COURTROOM'S FTR SYSTEM RESULTING IN INAUDIBLES INTERMITTENTLY THROUGHOUT THE TRANSCRIPT)**

COURTROOM DEPUTY: The United States Bankruptcy Court for the District of Maryland is now in session. The Honorable Lori S. Simpson presiding.

Please be seated and come to order. On the 10 o'clock docket, the case of NC Gas House Gang LLC, Case Number 23-18766.

Will the parties come to the podium and identify yourself and your client for the record?

MS. EDWARDS: Good morning, Your Honor. Thank you for having me. Ashley Edwards from Parker Poe Adams & Bernstein in Charlotte, North Carolina on behalf of the City of Gastonia.

MR. SHAFFER: Good morning, Your Honor. Dennis Shaffer of Whiteford Taylor Preston on behalf of the City of Gastonia.

THE COURT: Good morning to both of you, and welcome to Greenbelt.

MR. DRESCHER: Good morning, Your Honor. I don't recognize the courtroom without all the plastic.

THE COURT: We have it on standby, you know, in case there's an outbreak, or people feel particularly nervous, so -- but it looks a lot better this way.

MR. DRESCHER: It does.

THE COURT: It doesn't look like a fortress.

MR. DRESCHER: Ronald Drescher appearing on behalf of the debtor, NC Gas House Gang LLC.

THE COURT: Good morning.

MR. DRESCHER: Yes, Your Honor.

MR. ALBERT: Good morning, Judge. Marc Albert, the Subchapter V Trustee.

THE COURT: Good morning.

MR. ALBERT: Good morning.

THE COURT: All right. We are then here on the emergency motion to compel immediate rejection of executory agreements, or in the alternative to modify the stay. So I'm happy to hear opening from you first.

MS. EDWARDS: Yes, Your Honor. First of all, thank you for having us today.

THE COURT: Sure. Can I ask you to do one favor? If you would speak from the podium? It makes Ms. Bellman's job a lot easier when she's deciphering who spoke about what.

MS. EDWARDS: Thank you, Your Honor; I’m sorry. Our local practice, you can see that coming into play.

THE COURT: It's a technology issue for us, not a -- that's the issue.

MS. EDWARDS: That's great. Well, thank you, Your Honor, for hearing us today. I understand that this is emergency relief, and we will show you today why that that

emergency is justified.

I represent the City of Gastonia, and we are here on the motion to compel rejection of executory contracts, the lease agreement and operating agreement, as you'll hear today, or in the alternative motion for relief from stay.

Your Honor was able to get a preview of these arguments in the emergency hearing last Friday. And to the extent possible, we really have tried to limit -- we understand your time is valuable. We have tried to put everything that we can in front of you in advance of this hearing. We filed affidavits of Ash Smith, who's here today to -- for me for direct, and for cross, and for Flip Bombardier -- Bombardier -- I’m sorry. And we -- again, we have them both here today.

We also filed all of the exhibits into evidence yesterday. I think we have one, kind of, that might be trailing, but otherwise we got everything on file around lunch yesterday, and I have sent an email to opposing counsel and spoke with him this morning. I don't believe that there's any issues with those. So when we open, I would like to admit those into evidence.

We're here today because this is an emergency. This is an emergency for the City of Gastonia. This property that is at issue is the City's property. You have seen in the pleadings, and you will hear today, that this was $35 million or more for the City of Gastonia. The City of Gastonia is

outside Charlotte. It's not a large city. This was a major undertaking. Is a major undertaking. It's in a FUSE -- this new FUSE District. They're very excited about this, as they should be. And it was built in reliance upon this team and the Atlantic League coming with the concept that because this league has many gains, that it would help to revitalize this area of Town. And so the City purchased certain parcels, and this is the dream. Suffice it to say, this is the jewel of Gastonia. This is incredibly important to Gastonia. It was a beautiful stadium built for this purpose just a few years ago.

And as you'll hear today, and as you've seen in the evidence, this is not how the debtor has treated this property. It's been used and abused by the debtor. It's been completely not maintained; various defaults over the years. And, again, this is the City's property. This is the taxpayers' property. So you'll hear about those issues and the ongoing issues like that.

You'll also -- Your Honor, they have not complied to provide insurance pursuant to your order. When we spoke on -- when we had the hearing on Friday, Your Honor immediately keyed into the issues of why that's important, and what could happen -- and we won't reiterate those, but what could happen if there wasn't appropriate workers' comp insurance, umbrella insurance on this property.

As we said, and you'll hear again today, the keys are

available. You helped clarify, of course, not for events, but the maintenance should be ongoing. Every single day that we are here, that this property is not back with the City, it's in danger. The toilets are flooding. You will see the pictures. It's horrible. Maintenance is a major issue.

This insurance is a major issue. I was just passed a document that looks nothing like the required document -- what insurance should be like the Court ordered, that it must comply with operating agreement and lease agreement, which is pretty clear.

So they have failed to comply with your order requiring the insurance, and that's a major issue. Again, that doesn't -- that won't harm the debtor. The only one harmed here is our City, and that's very, very dangerous.

And lastly, at this point, there is no baseball in 2024. The Atlantic League has terminated, you'll hear that today. I have the President, Mr. Rick White from the Atlantic League, we'll call him. In fact, we'll call him first because he has to take a flight later this afternoon. But you'll hear from him how drastic a remedy it is to terminate; how many opportunities were given before that. And then when it's termination, there's no argument that it can continue on.

The City of Gastonia needs to have baseball in 2024 in this facility. Again, this entire economic development plan, which you've seen in the exhibits, is related to

revitalization, bringing people down to the center of Gastonia. And the reason that Atlantic League baseball does this is because there's so many games. It gets people down and in that area.

It is so harmful. The damages, you will hear, are monetary. The damages are -- to our City are reputational. It's the energy. It’s -- there's so many harms only to our City. And at this point, there's no possibility of 2024 baseball with this debtor.

And the City needs to fix this. We need to figure out what to do to get someone else in there. So this is an emergency. And the basis for that emergency is that if we can't figure out how to have a new team, of which I believe there is a potential new team to come in, and that needs to be done by January 1st. So today is the day, unfortunately, that we must have this decided, which with and -- I understand this, I've been in bankruptcy for a long time, I'm a former law clerk. This is unusual relief on the 14th day. I completely understand that. And I don't generally ever ask for that. But in this case, when all the harm goes to the City, and the possibility of how great that harm could be versus the outrageous chance -- I don't even believe there could be a chance this, you know, that possibly the debtor could have baseball in 2024. We have to weigh in favor of the City today. And we would ask Your Honor to grant our motion and grant the

relief from stay.

We'll reserve more arguments for closing, but we'll introduce evidence when you'd like us to.

THE COURT: Thank you.

Mr. Drescher?

MR. DRESCHER: Thank you, Your Honor. Ronald Drescher on behalf of the debtor.

Your Honor, we're here -- we're dealing with a contract. And that makes it fairly simple and straightforward. It's the exclusive use and operational agreements. And there are provisions, like in most contracts, about what constitutes a default, and how defaults can be cured, and the time period you have for defaults to be cured. And this contract definitely provides that failure to maintain the property; failure to maintain insurance; failure to pay adequate financial consideration as required under the arrangement between the parties; and failure to be part of a sanctioning association are events of default. Really, that's not in dispute.

And, Your Honor, we're really not going to dispute that there are defaults under this contract. There are. It's obvious. There is -- there is certainly an insurance default. And there is arguably a maintenance default, although we have at least one witness who will testify that the City's complaints don't tell the whole picture, and that the stadium

is really in great shape.

Of course, there are financial defaults. I mean, we're in bankruptcy. There's always financial defaults.

And then the issue of the League termination. We have filed a motion to assume that arrangement.

We also filed last night an adversary proceeding. I mean, from a pure economic standpoint, if this termination is allowed to stand, this alleged termination on -- on one day, the debtor has an asset that it values at $4 million: the stadium and membership rights in the league. And then the very next day, it has no asset. So a $4 million asset to pay creditors and maintain operations or zero dollars in one day, within 30 days before the petition date. So it's a pretty plain vanilla fraudulent conveyance or preference action.

And there's no question that the League was acting to collect money owed to it. And I'm not here to argue the preference case. That's not before Your Honor today. But I wish we had had a little bit more time to develop the belief that the so-called termination of the League agreement is curable. It is not effective and it is curable.

So the contract says you've got 90 days to cure all of these defaults. And it specifically mentions, for example, the unbranding by a sanctioning association as an event of default. But there's only one item that is not subject to the 90-day notice and cure period. That is the immediate

termination upon the filing of a bankruptcy case. That's it. That's the only item in the contract that is not subject to the 90-day termination notice.

So the City knows that if the team gets unbranded, it would have to find somebody else. The City could have negotiated a shorter cure period for that default. It didn't.

So then the question is, well, all right, there's an emergency because we need baseball in 2024. So when did that emergency start? Did we begin to lose the 90-day cure notice on September 1st? Is that when we need to shrink that 90-day notice period? Did it begin on October 1st? Is that when the cure period begins to shrink? November 1st? Is that when? When does it begin to shrink? The answer, Your Honor, it doesn't shrink. It's 90 days, and it's 90 days whether it's the day before opening day, September 1st, or December 1st. It's 90 days, that's what the contract says.

And what the City is trying to do in this hearing, it is trying to get out of a bad deal. It really wasn't a bad deal, but they feel like it's a bad deal now. They feel like, well, wait, no, no, no, 90 days doesn't work. We can't give them 90 days because we need baseball in 2024. But it's 90 days, that's what the contract says.

So these are all defaults that can be cured within the 90 days. Ninety days runs February 13.

Now in our opposition, we recognize that insurance is

a really critical issue, and we're going to have testimony about why we're having so many problems getting insurance. But we've committed to having full insurance in conformity with the contract by Christmas, which is way in advance than February 13th when we're really entitled to be able to cure.

So we're not going to keep the City held up at that point, first of all. As far as money goes, Mr. Woody's here. He's going to testify that he's holding close to a million dollars for use in moving forward with this reorganization.

Mr. Bellamy is going to testify that he recently had a proposal for at least another $650,000. And there are other investors, people who are interested in being part of baseball in Gastonia.

The maintenance issues, I read through the exhibits, they talked about the stadium needs a cleaning. Okay, the stadium needs a cleaning. We can get a cleaning service out there. I mean, the maintenance issues they talk about, maybe would be $10,000 to fix on the high side. You can't derail a whole reorganization, and you can't radically shrink a 90-day cure period because we need to clean the stadium.

I mean, I'm not saying that that's not a legitimate concern by the City, it is a legitimate concern. We all want a beautiful stadium, but it's not something that the Court should be micromanaging at this point. This is something that the businesspeople, the operations people should get together,

should walk the stadium, should look through all the items, should take notes about all the things that need to be repaired, and then report back, and put it out for bid with contractors to clean up. That's what should be happening. You shouldn't be running into Your Honor to resolve basic, kind of, cosmetic maintenance issues. Running toilet?

And then there's the League termination issue. What's kind of interesting about all of this is, first of all, the notice of the meeting which can be given on 24 hours' notice was given on a Sunday. Now, I don't know that that's appropriate under Pennsylvania law, I wish we had had more time to really look into that issue, but that's an issue.

The next issue is, well, all right, so there's this vote on November 13 that is to terminate the membership. But there's no written notice of that so that the team can take whatever steps are needed to move -- and really, the written notice has to happen, and it's a concrete date from which things can happen.

For example, the bylaws of the League provide for an appeal. It doesn't say what the appeal period is. And, frankly, it's not the greatest appeal term that you would want, but it is a right to appeal and bring forward new evidence. So when does that appeal period begin to run? A good argument is that it begins to run from the date that written notice is sent. Well, written notice was sent, and we've got evidence of

that, it's in our evidence, and it's in the City's evidence, that that notice wasn't sent until December 2nd; the petition date was December 1st.

So I wish we had had a little bit more time, and we will because we have filed the motion to assume. This is all going to get played out in that litigation. And even if we lose the motion to assume, and it is terminated, I believe that the forfeiture -- and the letter and the bylaws are pretty clear, that once that membership is terminated, the membership right is forfeited from the debtor to the League, and that looks an awful lot like a transfer.

So, Your Honor, this is really an easy case. I get why the City is concerned. The City has a right to be concerned, there are defaults. But the City doesn't have the right to -- just because it doesn't like its deal, to radically reduce the 90 day cure period that was bargain for. You know, Mr. Bellamy will testify why he negotiated for the 90-day period; that he invested millions of dollars in reliance on the 90-day cure period. So that's an important and really the critical provision before Your Honor today.

And I would ask that Your Honor deny the motion, or condition the relief on the debtor, you know, performing milestones on a concrete basis. We're not looking to hold up the City indefinitely. We're not looking to damage the City. We want to enhance this asset for the benefit of the estate and

creditors. There’s over a million dollars worth of the trade creditors in this case, we want those people to get paid.

So we're willing to live with a set of milestones to address the various alleged defaults. And we hope that Your Honor will afford us the opportunity to do that.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Drescher.

All right. Ms. Edwards, do you want to call first your first witness?

MS. EDWARDS: Yes, please. May I please call Rick White of the Atlantic League?

THE COURT: All right. Mr. White?

MS. EDWARDS: And would you like me to go there again?

THE COURT: If you could.

MS. EDWARDS: Oh, absolutely.

THE COURT: That would be great.

MS. EDWARDS: Happy to do it.

THE COURT: That works better for you, right, Ms. Bellman? Okay.

Yes, if you can approach the witness stand there.

MR. WHITE: Where?

COURTROOM DEPUTY: If you could go -- so the mic can pick you up.

MR. WHITE: Okay.

COURTROOM DEPUTY: Thank you. Please remain standing and raise your right hand.

RICHARD WHITE, GASTONIA'S WITNESS, SWORN

COURTROOM DEPUTY: Thank you. Please be seated. Please state your full name and address for the record.

THE WITNESS: My name is Richard E. White. My address is 440 East 56th Street, that's in New York City, 10022.

COURTROOM DEPUTY: Thank you.

THE COURT: Your witness.

MS. EDWARDS: And, Your Honor, before we get started, may I please approach and give the witness the exhibit binder?

THE COURT: Certainly.

MS. EDWARDS: Thank you.

COURTROOM DEPUTY: Do you have an exhibit binder?

THE WITNESS: Yes.

MR. DRESCHER: I think there's one over here.

THE COURT: Great.

MS. EDWARDS: All right. We printed -- printed a lot, just in case.

THE COURT: Thank you. Our courtrooms are inconsistent. Some have the ability to have electronic exhibits and some don't, and so I'm still at the paper stage.

MS. EDWARDS: That works perfectly.

DIRECT EXAMINATION

BY MS. EDWARDS:

Q Mr. White, can you please tell us your position in your career?

A I'm the President of the Atlantic League.

Q Excellent. And are you familiar with the members of the League in this capacity?

A Yes.

Q Okay. And are you responsible for insurance compliance, and legal rules, regulations, membership requirements? Is that your responsibility?

A Yes, it is.

Q Okay. And more specifically, you're familiar with the League's bylaws and membership agreements.

A I am.

Q Okay. And the debtor is a party to those bylaws and memberships, is that right?

A Yes.

Q Okay. To back up a second, maybe not all of us are as familiar with baseball as you are. Can you explain what the Atlantic League is? What type of baseball is the Atlantic League?

A The Atlantic League is a professional baseball league. It operates independently as a freestanding league, as opposed to what are called player development leagues who have specific

affiliations with Major League Baseball teams. There are 120 of those teams. They are directly affiliated with Major League Baseball.

The Atlantic League, on the other hand, operates outside of that realm of control or specific loyalty to a Major League Baseball organization. We're not the only one, but we are among Major League Baseball partner leagues, which is their designation of independence from the PDL affiliated system.

That means we are free to acquire the services of baseball players; pay them. And then when the market dictates, transfer their contracts and, therefore, their services to other professional leagues, whether it's Major League Baseball organizations, or their affiliates, or international leagues, or other leagues such as ours that operate in North America.

Q Excellent. This is a fairly high level of baseball, is that correct?

A Absent Major League Baseball, it's probably the highest level of professional baseball.

Q And do you have players go to the MLB routinely?

A Over our 25-year history, we've sent more than 1,400 players to big league organizations. Of those, more than 250 have played Major League Baseball. Last year, we had 18 of our alumni playing on Major League Baseball rosters.

Q So there's MLB at the top, and then, my understanding,

like you just said, there's 120 affiliated when they're specifically affiliated with certain teams, and then next would come these independent professional teams, of which the Atlantic League is one of them, is that correct?

A That's correct.

Q And are -- these professional independent leagues, are there others? Are they regional? Do they overlap?

A Generally, partner leagues are aggregated in regional territories. In our case, we run up and down the Mid-Atlantic coast from New York through North Carolina. We have a team as far west as Lexington, Kentucky.

Moving west, there is another league called the Frontier League. They play a much shorter schedule. They have an inferior quality of play. They range with the territory that's a bit more scattered with more teams from Canada down through New England, and then as far west as Illinois, so they're much more scattered.

Then in the Midwest, there is, yet again, another called the American Association. They are generally in the Midwest. They have one team in Canada, one team as far south as Texas.

And then in the Pacific Northwest, there is a pioneer league that has its operations ranging from California up through Washington.

All of those leagues have hierarchies of talent. We

tend -- we are the best quality player driven league of the four. Then from there it goes, American Association, Frontier League, Pioneer League. Our players are older, more fully developed, longer tenure as professionals. We had in the league last year, one drafted college free agent. Everybody else had professional experience. Usually in triple A, or Major League Baseball, before they joined us. The other leagues can't match that.

Q And it sounds like they're also maybe in different regions. Are there any other independent professional leagues that cover your same footprint?

A There's some overlap with the Frontier League. There's modest overlap with the Appalachian League. But they're different leagues.

Q Understood. And besides those independent leagues, is there any other type of baseball that we're missing? You know, as described with the MLB, affiliated teams, the independent leagues, is there any other type we're missing?

A Yes. There's what we'd call scholastic baseball, right? So anywhere from middle school, high school, community college, four-year college and university, they have their spring schedules that they play. Many of the players in college baseball play in what are called summer leagues. These are not professional ball players. These are college students. They play usually during the summer months with a contracted

schedule. It's usually a very short schedule. It's usually 40 to 50 games total, meaning 20 to 25 home openings in the jurisdiction where they play.

Q Okay, that's great. Well, let's start looking at some of these exhibits and get those authenticated. If you could please turn, and if everyone could please turn to page -- tab -- what's tabbed as 5? It's marked as G-5, for Gastonia 5, in our exhibits. Let me know when you're there.

(Pause)

Q Oh, great. Do you recognize this document?

A Yes.

Q What is it?

A Those are the amended and restated bylaws of the Atlantic League.

Q And can you please flip through? Is this a full and correct copy?

A Yes.

Q And are you familiar with this document?

A I am.

Q Okay. In looking to this, what do you know as the membership requirements for various teams to join the Atlantic League? Sorry.

A In combination with this document, allegiance to, or honor of, an affiliation agreement, which is designated on a club-by-club basis and the official rules and regulations of the

League. And then those three documents stemming from this require teams generally to operate in good faith; to follow our laws, including the covenants here in the bylaws; and to generally engage in fair play.

Q Excellent. And does this also govern the termination procedures? And I can get you to that page if you need help.

(Pause)

A Are you looking for Page 16?

Q Yes. And, you know, for expediency purposes, is this a true and an accurate representation of what terminate -- how to terminate a team under this agreement, under these bylaws?

A Yes.

Q Okay. And we will visit this later on in more depth, but has the League ever terminated a team prior to this termination?

A No.

Q All right. And then you heard Mr. Drescher reference the appeal options, and if you would look at, I believe, Page 12 -- sorry, sorry, Page 11 in the bylaws, can you please read that Section 2 titled “Appeal”? It's only one sentence, can you please read that into the record for the Court?

A Section 2, “Appeal. On appeal from a decision of the League President, Board Chair, and Board of Directors, the Board may grant a re-hearing only upon the presentation of absolutely new evidence. Otherwise, the findings of the Board

shall be final and under no circumstance shall be reconsidered, reopened, or inquired into by the League or any subsequent board.”

Q Thank you. And then just to authenticate the next one, and then we'll start moving in. If you’ll please turn to Tab 6, do you recognize -- that’s G-6. Do you recognize this document?

A Yes.

Q What is it?

A This is the Atlantic League club affiliation agreement that I mentioned earlier.

Q Okay. And is this a true and correct copy of that?

A Yes, it is.

Q Okay. And are you familiar with this?

A I am.

Q Okay. Can you please tell us when you believe the debtor started to have financial difficulties of which the Atlantic League was aware?

A In 2022, probably midway through the season.

Q And how did you become aware of these difficulties?

A How would you -- do you want me to refer to the organization as the debtor for my answer?

Q Oh, sure. The debtor, yes.

A The debtor had failed on a number of occasions to make timely payments on their League membership promissory note.

And they were late on their payments to -- for the lease and operating agreement with the City.
Q So you became aware of that in 2022. Do you -- do you have an idea of month or just sometime --
A June/July.
Q Okay. June and July of 2022. What happened next? What was your next involvement?
A I contacted the club, and contacted Brandon and asked about that. He acknowledged it. Nothing beyond that happened.
Q That's great.
MS. EDWARDS: I actually have one more exhibit. Let’s mark it just -- pursuant to our subpoena. We’ll mark this has G-11.
Your Honor, may I approach?
THE COURT: You may approach.
Q Mr. White, do you recognize this document?
A Yes, I do.
Q And what is it?
A This is an email that was sent to me by the former general manager of the team in the fall of 2022.
Q And did you produce this in response to our subpoena for communications with the debtor?
A Yes.
Q And is this a true and correct copy of that?
A Yes.

Q And is this an email from the debtor? From an agent of the debtor.

A From an employee of the debtor, yes.

Q Yes. So that's Mr. David Martin and he's listed as Chief -- Chief Operating Officer. And is it on -- let's see when the date was. On October 5th, 2022, he was the Chief Operating Officer, is that correct?

A Yes.

MR. DRESCHER: Your Honor, I'm going to object to any further discussion on this document and move to strike. It's a hearsay document and David Martin is not here for cross-examination.

MS. EDWARDS: Your Honor, I would move this in as an opposing party’s statement, and that's under Rule 801(d)(2).

THE COURT: Your client -- I'm going to overrule the objection. I mean, this is a statement of an officer of the entity and you certainly can refute it when you have Mr. Bellamy testified, but I think it comes in as a statement of party opponent.

MR. DRESCHER: Thank you, Your Honor.

THE COURT: Thank you.

MS. EDWARDS: Thank you, Your Honor.

THE COURT: So just so the records clear, G-11 will be admitted into evidence.

(Exhibit G-11 in evidence)

MS. EDWARDS: Thank you, Your Honor.

BY MS. EDWARDS:

Q And Mr. White, this will be admitted into evidence. So there's no reason to go through all of what's admitted, but can you describe, kind of, what were the concerns at this time of Mr. David Martin?

A David was concerned about the financial efficacy of the club. He was concerned that the manager of North Carolina Gas House Gang LLC did not have the financial means with which to meet their financial obligations. He mentioned the food and beverage company that was operating at the ballpark under a contract to -- could do better, and how they had not generated revenue sufficient to -- or consistent with their expectations. He expressed concern about the bookkeeping practices of the organization.

He indicated that the City of Gastonia was becoming increasingly frustrated and agitated by the practices of the organization. He made reference to poor merchandise sales, and how they weren't doing much to generate incremental revenue, and started talking about some of the reasons for that.

Finally, he expressed frustration with his relationship with Brandon, who is his direct report supervisor, just because they hadn't had discussions, as I understand it, prior to that.

Q And did this, coming from the COO, give the League

concern?
A Yes.
Q Okay. So that's in October 5th of 2022. What happened after that? Then we're headed into the next season, right? After October 2022, we're gearing up for 2023?
A Right. And, again, there's a parallel to the period of time we're engaged in now. Typically our teams, during this period of time, are not simply going on hiatus because they're not playing baseball. It's actually arguably more busy at this time of the year than during the frequency of pattern when you're having a week on and a week off and you’re managing games. This is the time of year teams are actively selling sponsorships, actively and aggressively selling advertising, planning events, specifically baseball events, but other ancillary events, and most of all selling tickets. Ticket schedules are produced, people are looking specifically for group sales. This isn't a period when you're generally selling too many single tickets, you might have a handful, but compared to group sales, this is when you're generating that. And it's also the period when you are dealing with active sales for, not just groups, but also hospitality around the event. So somebody might have a group coming to a game, they schedule a game for next July. And then, of course, you're trying to say, would you like to engage in food and beverage and have a picnic as opposed to simply attend the game? So they're selling add-

ons to the core premise of tickets.
Q That's great. So you would say -- is it the -- is the period from October? When does this very busy ramping-up period begin? What is that period, would you say?
A Well, from the moment you have the last out of your local last game until the next April, you are actively selling.
Q And I -- you know, I heard you say tickets, and events, and group tickets, and things like that. How many -- of your other members, how many people are employed and working on preparing for a successful season?
A On the sales function, you might have, in any of our clubs, a minimum of four or five specifically charged with sales responsibilities, but really it's all hands on deck. So amongst a typical team set up where you have 18 to 25 people working in the front office, these aren't seasonals or part-timers, and it's not contract, you usually have everybody geared toward selling tickets, advertising, and sponsorship, and so forth, Whether it's marketing campaigns, advertising campaigns, social campaigns, picking up the phone and dialing for dollars is what we call it, making sales calls, active engagement with potential sponsor leads and so forth. That's happening at this time of the year with great frequency. Without it, you fail.
Q Understood. So about 15 to 25 full-time people. If you want to have a successful next season, they're busy today

making those calls, making those sales, and generating the funds, is that right?

A Correct.

Q Okay, that makes sense. Well, thank you for that, that was -- that's very helpful to me. Is it fair to say that these efforts begin in October through April?

A Most better teams, as they start to close out the second half of our season, are actively starting to make preparations. Now the League is usually involved in some of that because we have to organize a schedule. So until there's a schedule, they can't sell tickets. But they're thinking about their campaigns, they're starting to refresh their relationships with folks they might not have called on during the season. They're starting to pick up the phone and talk to their season ticket holders and so forth.

Q Okay; understood. So you get this email in October of 2022 about the concerns about the 2023 season. I mean, we just don't know. So what happened then going into the 2023 season? Or tell us about the 2023 season about any concerns the Atlantic League had or what was happening then?

A Well, we already knew that, compared to other teams in our league, they had a very spare front office staff. They never staffed up to the same level that most of our teams staff up to.

Second, this isn't something that we overreacted to.

On occasion, I spoke with Brandon about this and asked how things were going. I would speak with Veronica Jeon after they dismissed Mr. Martin -- or they reduced his responsibilities and replaced him with Veronica Jeon.

We were mindful of it. We would ask about it, and we would try to monitor as best we could how they were doing getting ready for the 2023 season.

Q Okay. So then when did it become more severe? Or did it become more severe, these financial concerns and your concerns with the debtor?

A As we went into our season, which starts in April, we began hearing from the City and from various product and service providers who were concerned about the Gastonia team paying their bills.

Q And can you give an example of some of these -- are they vendors, employees, like who?

A I might hear from the City Manager saying that he got a call from somebody who had used to power -- had power washed one of the concourses, they hadn't been paid. They had complained to the City Manager. He wanted me to be aware of it.

Specifically this last year, I remember one of the requirements the League imposed on its clubs, which was to install, maintain, and operate countdown clocks. I received a call from the vendor to the Gastonia club, who was also selling

a similar -- well, the same product to six of our other clubs saying, “these people won't pay us.” That led to a frantic call from Veronica Jeon saying, “What do I do? What do I do? I don't know how to get this thing done. We can't pay them.”

We would hear from the bus company, specifically the bus company which had a $75,000 past due payment saying, “We're not sure we can service them this year.” This is the same bus company that deals with one of our teams -- one of our to the north and services our High Point club.

So that’s -- before the season started, we started to hear these sorts of things.

Q And I imagine as the season progressed, you heard more. But at a certain point during the 2023 season, did the Atlantic League do anything about these debts of the debtor?

A Well, now my touch points with Brandon became a little different. Once we got going in the season, I would call Brandon periodically, expressly talking about these issues with creditors, and he would acknowledge them. Behind the scenes, I report to the chairman, followed by an executive committee of two additional board members who represent the 10-person board for most of our activities. We began to talk seriously about this, and to begin to prepare for the possibility that the club might not be able to pay its bills.

Q And can you give a time period on that? What month are we talking about?

A May.

Q May, okay. So, May of 2023 --

A Right.

Q -- you're having to seriously figure out what to do.

A Right. I began to informally ask Brandon to help us understand the depth of the issue, and I began to ask him for his accounts payable. It was necessary for us to evaluate just how much indebtedness there was because we can tell pretty clearly when a club is going to run into problems because we pretty well can figure out what they're going to do in attendance based on past performance, and it's not that hard to create a forecast to see whether or not you're going to be able to pay your bills.

Q And so did you ever have to step in and pay any of the debts of the debtor? Or did you choose to do that?

A Moving from May into June, we began to develop a very specific understanding amongst the Executive Committee. First, one of our owners who had had reason to re -- to -- to purchase a home in the Charlotte area visited with Brandon during June. He had several conversations with Brandon during June, speaking about the level of debt and suggesting that maybe Brandon wasn't the best qualified person to try to work his way out of this challenge. His specific suggestion was that Brandon consider a transaction.

Further, this is a man who's very dedicated to the

League, and he agreed that should the time or challenge arise, he would underwrite certain expenses for the Gastonia club. By this point, we were very concerned about their ability to operate. Happily, we did that because we began to hear that the players were considering a work action. That ultimately manifest itself in July when the players, out of frustration with the ball club, determined they were not going to take the field on a Friday night during a road game -- a road trip to our Waldorf Maryland club, and refused to dress and take the field.

We ultimately, not the Gastonia club, not the Southern Maryland club, but the League ultimately had to address those players prior to the time and assure them that we would take over compensating them so that we would get past the irregularities they had endured up until that time during the season.

Q So they were not being paid, and they were saying they would not play in Maryland. And what would that look like for the League to have players just refuse to play and not take the field?

A Well, it's a disaster. That's the business we're in. I'm not saying they didn't get paid. What I'm saying is they had payment irregularities.

Q Okay.

A So instead of being paid with a direct deposit under the

auspices of a payroll company, the team discontinued that practice and began issuing handwritten checks to the players. They would not necessarily pay them on the day that the payment was due. Usually they would wait until a road trip, and then when the team would go on the trip, they would disperse payment because it's more difficult to deposit a check when you're on the road if you're a ball player. Many of these are international players, they aren't adept with U.S. banking practices. Many of them don't have the ability to do deposits through mobile devices and so forth.

By this time, checks had been bouncing with some true frequency, not only with players, but also with full-time front office personnel.

Additionally, with professional baseball players, they have a thing called per diem, and so they get a cash disbursement when they go on the road so that they have the ability to purchase meals on the road. The practices there became highly irregular. Usually players get those per diem disbursements when they go on the road, but literally when they're getting on the bus. In Gastonia, this had ceased happening. They would get them spread out over the days of the road trip. They would get them only when they arrived at the location, if they got it, and so forth.

So the players had just had enough, and that's when they decided to walk out and that's why we had to step in and

say, “We will pay you from this point forward.”

Q And what did that look like, step in, if they're about to take the -- I mean, I'm just curious. Like, if they were about to take the field, like, did you call? Like, how did you say, “I will pay you”?

A With -- we had a revolt on our hands. I don't think Brandon or anybody on his team that didn't travel with this team fully understands what was going on. The players -- typically a player gets into town, they drop their bags at their hotel, they drop their laundry at the -- or their duffels at the ballpark, they go into the clubhouse, they start to undress and prepare for that evening's game. Now, this is hours before a game starts.

In this case, the players did not start to prepare for the game. They just started hanging around the clubhouse. Some went out on the field in uniform to stretching and prepare for what would be that evening's game, but this is two or three hours beforehand. They returned to a clubhouse that ultimately became chaos.

The visiting team would not allow the home team general manager to enter the clubhouse. The manager who had traveled separately to the game, which had been authorized, that sometimes happens, was desperately trying to call the team back in Gastonia saying, “What's going on? This is what's happening. What do I do?” He was unclear on what to do.

The home team general manager -- again, this is in Waldorf, it's not in Gastonia -- was frantically calling her owner saying, “What do I do?” No one had an adequate response.

Finally at 5:30 on the night of a 6:35 game, she calls me desperate to try to figure out what to do. I called one of those members that I talked about before, the gentleman who said he would fund operations, who is on our Executive Committee, that's Bill Shipley, who I've described before. I said, “Bill, it's happening. I need your authorization to go ahead and commit to this,” and he gave it to me.

We finally were able to get the general manager into their clubhouse, and to get the team assembled in their clubhouse, and on a mobile device turned onto a speaker phone, I informed the team that we were going to pay them from that point forward through the conclusion of the year.

Q So this is around July, the League or, kind of, an executive member had to step up to pay the players, otherwise there would not have been baseball --
A Correct.
Q -- after July.
A Correct.
Q It would have ended.
A It was July 21st.
Q And do you believe if you had not stepped up, baseball would have ended July, 2023 for the debtor?

A Yes.
Q Okay. So just kind of keeping with payments and that line of questions. If you'll look at Tab 7, is this the note that you were somewhat referencing as far as debts the debtor had to execute to -- to get into the League, is that right? And is this a notice of default on the top.
A Yes, I think I referred to it as the membership promissory note. Are we --
Q Yes, sir.
A Yeah.
Q And is this a true and correct copy?
A Insofar, as I can tell, yes.
Q And is this kept in the League's records?
A Only as a courtesy. This is actually an activity, independent of the League office.
Q Okay, understood. Was it your understanding that there was then a default, and that note was called in default on -- in or around September of 2023?
A Technically, yes.
Q Okay, excellent, that's it then. And then if you'll turn to Tab 8, there's a August 29th, 2023 letter to the debtor, and this is from you. Do you recognize this?
A Yes.
Q And what is it?
A This is a letter advising the debtor that, per previous

discussions and previous communication, we were aware of these following notations, and that technically the club was in default of our bylaws.

Q And you list the defaults there -- in there, and that will be admitted so we don't need to go through those. But -- and then did you give a time to try to ask -- again, I understand that this other person related to the League was paying the players at this point. So here in August, someone else is paying the players -- did you -- it looks like here, did you give them time to try to cure, to kind of get back up to speed and -- in the League, if you look at your letter?

A Yes, we did.

Q And --

A The first -- I'm sorry.

Q No, no. Please, go ahead.

A Counsel, we sent -- we were having series of conversations, for obvious reasons, through, as I discussed before, May, June, July with the debtor. We were asking for information. We were promised information; that was never sent to us.

So in June, we sent a letter similar to this. In July, we sent another letter similar to this. So we were exercising restraint the entire time.

By August 29, the League, with funds provided from Bill Shipley, the owner I discussed earlier -- the Executive

Committee member I discussed earlier, had also made a payment to the team's bus company, and was now paying all of the debtor's team's employees, players, coaches, trainer, general manager, and so forth.

Q And from -- from -- was it your understanding that Mr. Shipley was paying all of the debts of the debtor just to make it through the 2023 season? Was that the intent?

A We indicated we would pay the essential bills so that we could get them through the season.

Q And when does the season end?

A In the case of the Gastonia club, it was October 1st of this year. They reached the final championship series. They happened to lose on the last day of the championship.

Q So for them, although you had these big issues in May and June, you had someone step in, what, July, August, September? All three months of paying all the debts to make sure you could make it through the season?

A From that July 21st date, we were taking an active role paying the team's bills.

Q Okay. So we see -- you've kind of testified about a variety of letters, chances. Were you ever provided this information that you're requesting about accounting and getting a deeper understanding from the debtor in this time period?

A We repeatedly asked for information. The one thing that was a constant, and I'm sure it was mentioned in this letter,

was accounts payable. And there were promises that we would receive it. And a pattern developed, “Yep, yep. I'll take care of it. I'll get it to you tomorrow. Okay, I'll get it to you next week. I'll take care of it. I'll call Veronica, she'll send it to you.” We never received it. It ultimately got to the point of where Brandon was saying to us, “I'm not going to give this to you. I feel as if you're working against my interest.”

Q But for the most part, the Atlantic League then paid the constituents of Gastonia and the players for the debtor.

A Those that were critical to complete the season and all the employees, yes.

Q Were there some that you didn't pay, or were told not to pay, or did you -- did they pay across the board?

A Oh, sure. There were quite a few that we knew of that we did not pay. I mean, scores that we heard from where there was unpaid bills.

Q Okay. So after these notices, then can you tell me about -- did you call a meeting? Let's talk about the termination. You testified earlier that you've actually never terminated a team previously. Tell me about termination. Do you take it seriously? Like, what would you say the buildup was towards the termination?

A Well, this was certainly a part of the build. My obligation is to report to the board of directors of the

League, and vis-a-vis the Executive Committee, I was having daily conversations regarding the circumstances in Gastonia. It seemed like on a daily basis, two things were occurring: One, we would hear from another creditor. We kept a running tally of those creditors we would hear from, and we just kept putting them on a piece of paper. We didn't go out and invite them to do this; we were hearing from them.

Second, it became clear to us that, based on conversations with Brandon, where at one point he said, I've got to throw a Hail Mary to see if I can't get out of this, to conversations with creditors, to conversations with others in the League, meaning members. Generally the temperature was rising, and we were getting alarmed by whether or not this club could survive.

Q Would it be prudent for the Atlantic League, or any league for that matter, to terminate during the season? You know, if -- could you have terminated prior to October 1, or would that have caused mayhem in the schedule and disrupted the Atlantic League?

A Without Bill Shipley, this team would have fallen into inactivity during the season, which would have been disastrous for our League. It isn't just the damage to our reputation, which would have been considerable. It would be the fact that we could not provide a team to play against for one-tenth of the schedule. So now, all of a sudden, you would have nine

other teams, similar to the issue that we were facing on July 21st, who would have to refund all of their ticket revenues and would have to give a pro rata refund to those sponsors and advertisers who came forward and said, “I didn't get my money's worth because you didn't play 63 games.” We would have had --

Q So I imagine, you would have had the members --

A It would have gone further.

Q -- almost revolting.

A We -- we would have League broadcast media partners who we would have to give pro rata returns to, and we would have to deal with 27 men on a roster who would have nowhere to play.

Q Right.

A It would have been a disaster.

Q Okay, understood. Okay, so then that’s -- I guess that completely makes sense to me through October 1st. What happens then between October 1st and this -- the board meeting, the termination on November 13th?

A We had had a board meeting in August, in late August, where Brandon had made a statement to the board, and had talked about his view of what was going on. At that time, Brandon said, “I have the funds to pay off the promissory note,” it was a million-dollar note. “I'm this far away from having the investors I need to get through the remainder of the season and into the start of next year and I have a plan.”

Q Did he offer to pay back, you know, Mr. Shipley, who had stepped in and paid the players? I mean, was that part of it?
A He thanked Mr. Shipley in that meeting. He thanked the Chairman of the League. But he didn't offer to pay them back at that point. He said he had the funds to pay off the promissory note, but he never said, “I'm going to pay you tomorrow, or I'm going to pay you tonight.” He just said he had the funds.
Q So perhaps you may have considered termination in August, but you were promised, you know, a million dollar-plus, plus other investors, in August, and so that didn't happen then. Do you have meetings every month? Was there a September meeting then and an October meeting?
A No. We -- our next board meeting took place -- I think it's October 13th.
Q Okay.
A October 13th. At that point, the relationship with the League and the team had taken a pretty bitter turn. Brandon was openly criticizing the League and our efforts to get them through the season, and was saying that he wouldn't give us information because he didn't think that we would keep that information confidential.

His employees, former and present, were openly talking to City representatives, media, and others. So there was a public story out there that was embarrassing. Certain

former employees actually went on TV to complain. The League was obviously aware of this, and all of our teams were aware of it because they -- we were all reading the same stuff.

So when we got to that first meeting on October 13th, it was for the purpose of discussing very clearly the future of the team.

Q And then it looks like you then met on November 13th. If you will turn to Tab 9 in the binder, do you recognize this document?

A Yes, I do.

Q What is it?

A These are the minutes which capture the events of November 13th. There's a typo there, there's an error, November 13th was actually a Monday, not a Friday. But this was on a Monday. Again, the meeting took place via Zoom, and these are the minutes that reflected the outcome of the meeting.

Q And are these, if you'd glance, is this a true and correct copy of those minutes?

A Yes.

Q Okay. And what was the purpose of this meeting?

A Well, the specific call for the meeting was to consider the matter of terminating the membership of NC Gas House Gang LLC.

Q Understood. And did all of the necessary parties attend this meeting?

A Yes.

Q And did the debtor attend pursuant to the bylaws, or what happened there?

A He did. And as the minutes accurately record, he made a statement. And then he was asked to recuse himself per the bylaws because he's, you know, a conflicted party or interested party, and wasn't going to participate in the discussion of a motion to terminate his membership.

Q Understood. But he was -- he was a participant on the call and then recused himself for the vote?

A Yes.

Q Okay, understood. And, you know, I can see here -- so there was a vote. And was that done consistently with your bylaws?

A Yes it was.

Q And what was the result of that vote?

A The directors unanimously voted to terminate the membership of NC Gas House Gang LLC.

Q And did you need a unanimous vote?

A No.

Q And then did the debtor appeal this, or has the debtor appealed this?

A I wasn't party to a -- there were two calls that took place subsequent to this. I called Brandon to advise him of the decision of the board. It was a polite professional short

call.

Shortly afterwards, he called Bill Shipley. He expressed his misgivings. I don't know that he used the word "appeal." I wasn't a party to the conversation, but he certainly expressed his opinion to Bill, and as Bill described it, he was unhappy, he was confused, but he clearly understood what had happened and that it was over.

Q So all parties understood that as of November 13th, it was terminated immediately.

A Yes.

Q And then did -- if it was terminated immediately, what did the Atlantic League do after November 13th to remove the Honey Hunters from the League?

A Well, they had been removed as of the moment the vote took place. They were no longer members. So we, consequent to that, began to quietly communicate those things we felt were necessary. This matter has never been in front of our League throughout its 25-year history. This was a horrible consequence for all the parties involved. The debtors won. But the League had a huge blow, a huge blow to its reputation. We have relationships with Major League Baseball. We have relationships with the 30 Major League Baseball teams. We have relationships with the KBO, the Nipon League, the Chinese Professional Baseball League, the Italian Professional Baseball League, Mexican leagues. Our credibility was incredibly

damaged by that because we have transferred players and developed reciprocal relationships with all of those leagues. Our standing, in terms of the view of the professional baseball community, was incredibly damaged, so was the reputation of the Gastonia Honey Hunters.

And so we elected not to ignore it or to deny it, but not to publicize it. No good would have come of us publicizing that. We had to advise the City we represent; that was an awful phone call.

Q Right.

A We then said -- and, again, this was final. This had been going on for well over a year. This was the culmination of a series of special meetings to address this issue. We had heard the same theme over and over, “I have the money, I have the money, I have the money. And any day now I'm going to pay you.” And ultimately the members said, “No, we don't believe you anymore because you've told us that for months.” I don't think the debtor understood the finality of this. There is no recourse. You cannot appeal if you're not a member. You cannot appeal when you lose the privilege of operating in our League. You cannot appeal when the League has said they will pay your debts.

Q Right.

A You can't appeal because it's over. So we began to advise those people within our community, not just our team owners,

directors, but also our team senior operators, that regrettably, Gastonia would no longer be a part of our League. We had to advise those people who aid us in terms of what we do to communicate our League, whether it's our website providers, our social media providers, and so forth, that we would no longer reference Gastonia. We removed them, and immediately took steps to remove reference to the Gastonia Honey Hunters from our League.

Q Is this taking them off the banner? Is it -- that their name --

A Well, it takes them off the website in terms of the header.

Q Right.

A It doesn't mitigate the statistics of their players over past years. It doesn't ignore the history that happened. We're not wiping the history. We're saying there is no longer a Gastonia Honey Hunters team in the League.

Q And all of these actions happened after November 13th?

A Yes.

Q Okay, understood. And if you look on Tab 10, this is the letter that was originally referenced. It's a pretty short letter. Do you recognize this?

A Yes.

Q What is it?

A This is a letter to the City Manager of Gastonia, advising

him that, technically, the NC Gas House Gang LLC was no longer a member of our League.

Q And can you just read that first sentence into the record, please?

A This is to Michael Peoples, the City Manager of the City of Gastonia. "Dear Michael: This correspondence confirms that the Atlantic League Board of Directors, in accordance with Article 10, Section 11, Paragraph G of the Atlantic League Amended and Restated Bylaws (League Bylaws) unanimously voted to formally terminate the Atlantic League membership of NC Gas House Gang LLC on Monday, November 13, 2023."

Q So if this says that it was terminated on Monday, November 13th, 2023, you know, is there a reason for -- that this took a little bit to get sent?

A Sure. We have a very small League office. We have one full-time employee, that's me. We have three part-time -- four part-time employees, the League administrator, supervisor of umpires, and then two people in public relations and communications. Following this, I had to be on the west coast for Major League Baseball meetings, which took literally an entire week. I had to travel to two other locations on behalf of the League talking about future expansion or future ownership in our League. I just didn't have time to get it done until then. I operate out of a home office. Our home office is literally in an apartment that's being refurbished

right now, so it was just a matter of expediency. Nothing more, nothing less.
Q Understood. I think you heard the debtor say in opening that they would propose to kind of reinstate this membership.
A Um-hum.
Q Is that possible? I know you're not an attorney, I just mean from the League's perspective.
A The disposition of the Board is that no reinstatement is going to be possible. There's no confidence in NC Gas House Gang LLC.
Q Okay. End even if it was -- a hypothetical. I understood, I got your position. Understood, but just because the City sits on the sidelines on this, you know, what would it even take to cure any defaults? And I mean, you referenced a lot in this testimony, but monetary, reputation, what hurdle would you have to jump over to be made whole here?
A You're talking about what hurdle --
Q The League.
A -- would the League need to --
Q Right.
A Given the context and the way you asked the question, it would have to be -- not a workout, but full compensation of all the creditors for services rendered. It would have to be a complete reorganization of the Honey Hunters' front office team. It would have to be meeting its obligations to the City.

And I'm not talking specifically about the matters here today, but I'm talking about paying its bills. They already owe the City another $50,000 on a November 1st bill that hasn't been paid. It would be not just a pledge, but actual substantial steps to show that they could legitimately and viably run a professional baseball team up to an Atlantic League standard.

Q So that was a hypothetical question, but this -- this debtor is terminated with no appeal rights, is that correct?

A Correct.

Q Okay. So one thing, you know, the -- I think in the opening, debtor's counsel referenced, you know, that there might have been some sort of offer that maybe went from 3 million to zero or something like that. Tell me about that. You know, was this to the League? Like, it -- what happened there?

A I'm sorry, Counsel. I don't understand your question.

Q So was there -- was there ever an offer to purchase from the debtor?

A Again, I -- the -- the way you asked the question, I'm confused.

Q Absolutely.

A But there were offers -- offers to purchase, but not from the debtor.

Q The team? Did anyone -- this $3 million concept, did -- was $3 million ever brought in front of the League to be in

Gastonia and play baseball.

A In 2022, knowing that there were issues in Gastonia, I contacted and subsequently heard from sports business brokers who advised me of interest with a Native American casino in the western part of the Carolinas to -- who had interest in purchasing or investing in the team; I advised Mr. Bellamy of that.

Later that year, I introduced Mr. Bellamy to an owner of two affiliated teams who had interest in purchasing the team. Neither of those went much of anywhere.

In either late June or early July, I shared with Mr. Bellamy that I could deliver to him a bona fide offer of $2.5 million to purchase the team, pay all of its debts. Included in that transaction would be the real estate that the League had negotiated to -- for the owner from the City of Gastonia as part of the agreement.

In July, we introduced Mr. Bellamy to Zawyer Sports and Entertainments, an owner of six minor league hockey teams and one minor league baseball team. That was a $3 million offer for the membership only. So the team, but not the real estate.

Around Labor Day of this past year, we heard from an event planner/caterer who had done work for the team, to whom the team still owes money, and he was interested, he said, in investing in the club. We had a series of conversations. I

told him that because of the timing, it was going to be difficult to do anything that than (inaudible - audio fading) in the people we had already delivered to Mr. Bellamy to purchase the club. He had those conversations. Subsequently, he went with a group of two others to make an offer to Mr. Bellamy to purchase the club. I believe this is where opposing counsel gets a $4 million number because, by their own admission, they wanted to create something that would get our attention so they could be in the conversation to get ahead of Zawyer Sports and Entertainment for lack of a better name, I think the name of the group was BCG Sports and Entertainment.

They spoke with the Executive Committee. When the Executive Committee advised them of the amount of indebtedness on behalf of the team, they immediately rescinded their offer and said that they would -- there's no possible way they would pay $4 million for that, but that they wanted to have a competitive offer. So they reframed their offer to $3 million, which is our membership fee. That is the fee that NC Gas House Gang LLC committed to; that was the fee in High Point; that was the fee in virtually any of our areas, that's our membership.

The entire dialogue there was about paying off creditors and then running the team.

Q And do you believe that these various offers in the summer could have paid off the creditors?

A I can't accurately answer that question. However, I

believe that currently -- the current indebtedness of the club is well over $3 million.

Q So now it's over $3 million. But maybe in the summer, it was fairly close to pay off the --

A In the summer, it was a lower number.

Q Okay, understood. And, you know, we've got -- we will get the City up here to talk about the damage to Gastonia. But if you were able to figure something out for membership in Gastonia, is it still $3 million? What might need to happen for that membership fee?

A We have an offer of $3 million. We've signed a letter of intent to proceed with the company at a $3 million purchase price. But the understanding is up and until we exhaust the $3 million, by paying off creditors, nothing is going to go to the League.

Q Wow. So you're saying that if this new -- if this moves forward and there's a new team, that the League is -- I mean, the League has already paid for most all of the debts for the debtor since July, but -- or someone in the League affiliated. But are you saying that the League would take on those debts of the debtor pay or to as much as --

A Yes.

Q Okay, understood. And so then dropping back to obtain -- last questions and then I'll let you get down. To obtain membership into the League, can you just quickly describe that

process? How long does it take? Do you have any vetting? What's -- what do you do there?

A We go through a process, and the process is pretty straightforward. We have what anywhere else would be called an application, we happen to call it an application for a control interest transfer. It asks for really high line information regarding the entity that's going to be purchasing a membership, the principals associated with the entity, the amount of equity each of those principals may have in either the membership or the -- the entity purchasing the membership. And then if the equity of any entity is more than five percent, we run background checks on them. We ask for a substantiation of assets. In some cases, we ask for a letter of credit to help -- help us. And then we also conduct a criminal background search. The process is one, to get to that point, that takes between 30 and 60 days.

Then we interview -- we have interviews with the proposed leader of the entity. So whoever will be the manager of that entity.

Q And -- so that sounds like a fairly long process. And then when would a new owner want or need to be in -- know that it is through the process to begin preparing for fall -- I mean, sorry, for the spring -- spring baseball?

A Ideally you're doing that 18 months ahead of time. So if we were talking about 2024, and we have a new team coming on

board in 2024 in Hagerstown, they got started 18 months ago. That's the ideal circumstance.

Q Understood. And I think actually in this case, I believe, it was a year earlier. Anyway, so suffice it to say that you would need -- any new team would need to be up and going yesterday or as soon as possible.

A Yes.

Q Okay.

MS. EDWARDS: That's all I have for now, Your Honor. I reserve the right after cross, if possible.

THE COURT: Yes

MS. EDWARDS: Thank you, Mr. White.

THE COURT: Before you start your cross, do you need a break or anything before?

THE WITNESS: As long as you don't mind me drinking water, Your Honor, I’m cool.

THE COURT: No, that’s what it's there for. All right.

Mr. Drescher, your witness.

MR. DRESCHER: Thank you, Your Honor.

I was asked once who I favored. Did that I favor Bobby Fischer or do I favor Garry Kasparov. And I said, well, Bobby Fischer is kind of like Sandy Koufax. Garry Kasparov is kind of like Bob Gibson. And only I feel a true baseball person would understand that.

(Laughter)

MR. DRESCHER: I just throw that out for you.

CROSS-EXAMINATION

BY MR. DRESCHER:

Q First of all, thank you for your testimony. Very helpful to understanding everything that's going on. All right. Talking about a sale of the membership interest at this time, whoever owns it, my understanding from listening to your testimony is that the League is committed to paying off the payables of NC Gas Gang House LLC receives as part of its (inaudible - audio fading), am I understanding that correct?

A Generally, yes.

Q Okay. And how much of a purchase price -- as I understand it, you don't have the accounts payable listing. Do you have the accounts payables? Do you have the receivable?

A No.

Q Okay. And is that something that you would want and need in order to fulfill the commitment to pay those payables?

A Yes.

Q Okay. We just filed a motion (inaudible - audio fading). Is that enough time to get done what you need to get done in the event of a sale (inaudible - audio fading)?

A No; that's too much time. What we have now is a running list that was developed over the last number of months based on those companies that have approached us; those individuals that

have approached us; those entities that have been forwarded to us by the City or by others that are just interested in the -- in the outcome of baseball in Gastonia.

Q As a mechanical issue, would the League be interested, in the event of a sale (inaudible - audio fading) to make -- to coordinate with the debtor to make (indiscernible - audio low) into the estate so that the debtor can then pay its payables? Kind of one -- one-stop shopping, so to speak. Is that something that the League would be amendable to?

A We presented that opportunity to the debtor on numerous occasions. He never agreed to do that. At this stage, the League would not be amenable to it because we don't have confidence that there would be full restoration of invoices and bills by the debtor.

Q Even if it was under the control and auspices of Bankruptcy Court?

A Even if it was under the auspices of the Bankruptcy Court.

Q All right. I'd like you to take a look at -- there's a little stack of papers on the corner of the witness stand, right? And I'd like you to look at the last one that's been marked in the Exhibit 5.

A Um-hum.

Q All right. Sir, do you recognize this document?

A I do.

Q And was this a letter that you sent to BCG Sports and

Entertainment?
A Yes, sir.
Q All right. Now, my understanding in this letter -- the letter is dated October 30th of this year, is that correct?
A Yes, sir.
Q Okay. So would it be fair to say that this is a letter under which the League conditioned its review of the BCG offer?
A Not fully, but partially, yes.
Q All right. And is it fair to say -- let's look at the numbered paragraphs at the bottom on the first and the second page of this document. Is it fair to say that the League required BCG to provide contact information, full name, nickname, office and mobile phone numbers, postal addresses, email address for all entities or persons with greater than percent percent proposed equity in the team, must be provided to the league on a before noon Tuesday, October 31, 2023, was that -- is that a -- is that a correct (inaudible - audio fading)?
A Yes, sir.
Q All right. Why did it require such a fast turnaround?
A Because we were in the midst of determining whether or not we were going to terminate the membership of NC Gas House Gang and we needed to contact folks who were making the offer.
Q All right. So, I mean, if we look at the bylaws, right? The whole point of this was -- of the termination was because

it was a failure or refusal to pay -- to pay its obligation, is that a fair summary of the reason the League took action (inaudible - audio fading)?
A Counselor, would you please just rephrase the question? Because you talked about “its” as opposed to NC Gas House Gang LLC.
Q Certainly.
A Thank you.
Q You testified that after this period of struggle with the debtor, that the League took action to terminate the debtor's interest under the provision of the bylaws that refers to paying debts and obligations on a current basis.
A Yes.
Q Right? Okay. So, at this time -- all right. So you needed to know the next day who they were talking to in order to -- in order to help the debtor fulfill that obligation.
A We were asking this group to tell us who we were talking to.
Q Okay. So then we look at Number 2, there's an application accompanied by a $15,000 administrative fee that had to be paid no later than 5 p.m., Wednesday, November 1st. That's two days to come up with the $15,000 to move forward (inaudible - audio fading)?
A Yes.
Q Okay. And then if we look at Number 3, you are asking BCG

for any persons or entities with greater than five percent equity in the team, verifiable documented evidence of financial wherewithal to purchase an Atlantic League membership, an establish, capitalize and successfully operate a professional baseball team, including sufficient reserve funds to create and implement the business plan below received by the League office no later than at 5 o'clock p.m., Wednesday, November 1st, 2023. That was -- that was two days after you sent the letter, correct?

A Yes, sir.

Q All right. And that was -- that was the League’s requirement.

A Yes.

Q It was required, okay. The League then required a fully executed purchase and sale agreement between BCG and NC Gas House Gang received by the League office no later than noon on November 3rd, 2023. Is that -- is that correct? Was that the time frame that that was -- the League was (inaudible - audio fading)?

A Yes.

Q Okay. As -- Number 5, as part of the aforementioned fully executed purchase and sale agreement, provision to the League of a full list of team open accounts payable with the BCG warrant that cash proceeds will be directed to fully repay all verifiable open and past due invoices prior to the distribution

of any payments to NC Gas House Gang LLC. All right, so my understanding is that this provision, you're requiring the buyer to pay all of the debts, and you want that accounts receivable list as part of that deal, it that correct?
A It is correct.
Q Then we look at Number 6, payment of the remaining balance as per the amended secured promissory note dated May 4th, 2021, between BKK Sports LLC and NC Gas House Gang LLC on a before 5 o'clock p.m., Thursday, November 2nd, 2023. Such payments shall offset the transaction cash payments as outlined in the purchase and sale agreement. This is the second page, Number 6. Is that correct? Was that what you were requiring?
A Yes.
Q All right. How much was that payoff to BKK Sports at that time.
A $1,073,000 or so.
Q Okay. So before you would even consider the purchase offer, at this point, the buyer had to pay a $15,000 application fee in two days, and pay off a promissory note of over a million dollars before you would even consider their League membership application, am I right?
A Yes.
Q Okay. Number 7, payment of the attached ALPB invoice dated October 6th, 2023 covering employee and vendor payments made by the League to NC Gas House Gang LLC and attached hereto

on a before 5 p.m., Thursday, November 2nd, 2023. How much was that?

A I would estimate $45,000.

Q Okay. So the League was requiring that that $45,000 be paid before they would consider BGC's application, am I understanding that correctly?

A Yes.

Q Okay. Remittance of all unpaid Gastonia Honey Hunters' past, present, full- and part-time employee compensation, including players, including expense reimbursements, bonuses, and other earned considerations on a before 5 o'clock p.m., Thursday, November 2nd, 2023. All right, how much -- how much was that at the time?

A I'm sorry, Counselor, I thought you asked me that question before.

Q No, no. This is a different --

A That's the one that responded $45,000.

Q Right, 45,000 was Item Number 7. I'm talking about Item Number 8, is that the same 45,000?

A I'm sorry. Let me re -- let me readdress Number 7.

Q Please -- oh, please do.

A Number 7 is $350,000.

Q Okay. And then Number 8, is that the 45,000?

A Yes.

Q So we're up to -- 300, plus 45, plus 15 -- is 360,000,

plus 1.1 million. We're about 1.4, $1.5 million that needs to be paid before you'll even consider their application, am I understanding that correctly?

A Yes.

Q Okay. Comprehensive business operating plan, including establishment of a management organization capable of successfully executing all facets of a professional baseball team activities, including as per the application, no later than Thursday, November 2nd. So you were requiring that (inaudible - audio fading), as well, before you even consider the application.

A Correct.

Q Okay.

MR. DRESCHER: Your Honor, I don't have any further questions.

THE COURT: All right. Redirect?

MS. EDWARDS: Just one, Your Honor. Just by way of housekeeping, if I could please move the exhibits into evidence, I didn't want to forget to do that.

THE COURT: Let's see. We referenced --

MS. EDWARDS: G-5 through G-11.

THE COURT: Yes. Any objections?

MR. DRESCHER: No objection, Your Honor. But while I'm standing, may I ask that Item Number -- Debtor's 5 be admitted?

MS. EDWARDS: No objections.

THE COURT: Okay. All right. The City's Exhibits G-10 through --

MS. EDWARDS: G-5 through G-11.

THE COURT: G-5 through G-11 will be admitted into evidence.

(City of Gastonia's Exhibits G-5 through G-11 in evidence)

THE COURT: Debtor's Exhibit 5 will be admitted into evidence.

(Debtor's Exhibit 5 in evidence)

MS. EDWARDS: Really just one last question.

REDIRECT EXAMINATION

BY MS. EDWARDS:

Q Would the League, at this point after termination, ever reinstate the debtor to try to run a sale process.

A After our experience with all of those that we delivered to Mr. Bellamy in the past, and going through that experience, the answer is no.

MS. EDWARDS: No further questions, Your Honor.

THE COURT: Thank you for your testimony.

I'm sorry, Mr. Alpert, did you have questions of the -- of Mr. White?

MR. ALBERT: No, Judge.

THE COURT: Okay. Thank you. I didn't want to exclude you.

You are excused from the stand. Thank you for your testimony.

MS. EDWARDS: Can Mr. White be excused from the hearing?

MR. WHITE: If I may please.

MS. EDWARDS: He has a flight somehow to catch sometime --

THE COURT: Okay. I have no problem with that. You are certainly excused from the balance of the hearing.

MR. WHITE: Thank you, Your Honor.

MS. EDWARDS: All right. Your Honor, the City would like to call Ash Smith, the City attorney, please.

THE COURT: Okay. While Mr. Smith is taking the stand, are we going to want to take a lunch break? Go right through? How do you all prefer to do this?

MR. DRESCHER: Well, Your Honor, what does your afternoon look like?

THE COURT: So -- but my afternoon looks a little crazy. I have -- in theory, I have a 3 o'clock hearing, which it's possible if things run long, I might be able to do something about that. I don't -- I don't know if this juncture.

I need about 15 minutes sometime between the hour of 12 and 1 to make an appearance at a court event. I just have to go in and say hello, and do that, and then I can be back.

But I also don't want to starve the parties to death. It's not unusual for me to sit here and not eat, but I don't -- and we don't have a café anymore. So that means you would have to go out into Greenbelt to try to find something, and I'm just going to apologize in advance for that.

(Laughter)

MR. DRESCHER: Your Honor, I know that counsel and witnesses have flights to catch. To accommodate them, I'd like to get through this as quickly as possible.

THE COURT: Great. Then that's what we will do.

MS. EDWARDS: I agree, Your Honor. I do have a 7 p.m. flight, if possible. And I also, just by way of -- I think -- we didn't have an affidavit for Mr. White because he's not from the City. So we tried to -- like, we have affidavits now.

THE COURT: Right.

MS. EDWARDS: So I think that will truncate some of the --

MR. DRESCHER: Your Honor, I don't oppose admission of either -- of the two affidavits that have been presented.

THE COURT: That would be of Mr. Bombardier --

MR. DRESCHER: That’s correct.

THE COURT: -- and Mr. Smith.

MR. DRESCHER: That's correct.

THE COURT: And then --

MS. EDWARDS: Thank you; I appreciate that.

MR. DRESCHER: Sure; of course.

MS. EDWARDS: And then maybe I -- I move those into evidence, and I will quickly go through these.

THE COURT: Okay, all right. That sounds great.

LLOYD ASHLEY SMITH, GASTONIA'S WITNESS, SWORN

COURTROOM DEPUTY: Thank you. Please be seated. And state your full name and address for the record.

THE WITNESS: Lloyd Ashley Smith, 181 South South Street, Gastonia, North Carolina 28052.

COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MS. EDWARDS:

Q Hi, Mr. Smith. What is your position with the City?

A I'm the -- I'm the City attorney.

Q And what are you generally responsible for in that -- in that position?

A Legal advice and counsel to the City Council, the City Manager Department heads.

Q Thank you. And can you please -- in this action specifically, please describe the City's property.

A So, the FUSE Stadium is a multipurpose, athletic, and events stadium on West Franklin Boulevard in Gastonia. And it has a tax value of approximately $7,469,000. And we spent about $26 million in bonds constructing it, and then additional

costs from the City to do other improvements in it and around it.

Q And, again, we have the affidavit, but is that referred to as the FUSE District?

A Yes, it is, the FUSE District.

Q And can you quickly describe what was -- when did this idea of the FUSE District start and what is it?

A Sure. So the property was very dilapidated. There was a flop house motel on it, and then there was an old Sears building that had been out of business for 15, 20 years, which was deteriorating. And so the City acquired about 15, 16 acres, starting in 2016 through 2018; we put all the property together. Then we went through a planning process under North Carolina's urban redevelopment law to come up with a plan. We hired the Development Finance Institute at the University of North Carolina to help us articulate a plan for the Franklin Urban Sports and Entertainment District. And then we began to solicit, you know, partners to participate in the project.

Q And how much, in general, has the City put into this FUSE District?

A Well, there's the $26 million in bonds, and then probably another ten to $14 million in other costs and improvements, so probably $40 million.

Q And so the City owes on these bonds, is that right?

A The bonds have been being paid for three years now, so

there's 17 years to go.
Q Okay. So there's a debt service from the City --
A Yes.
Q -- related to this infrastructure?
A It decreases every year, but this year, it was about $1.9 million.
Q Okay. And, you know, I'm sure the Court knows, but who funds this area and the -- who purchased the stadium?
A Well, the taxpayers of the City of Gastonia did.
Q Okay. And is this a big deal for Gastonia?
A Yes, it's a very big deal, a very big project. And getting, you know, rid of the hotel and the blighted property was a big deal. And, of course, it has spurred redevelopment all around the district.
Q So it has spurred this redevelopment?
A Yes.
Q And what was the concept of putting a baseball team in here about?
A Well, you know, the concept was to bring people to the downtown for entertainment, to, you know, buy food, to buy beverages, and then hopefully they would also continue to, you know, spend money in the area after the game. And the positive buzz, of course, attracts, you know, surrounding businesses. There's a brewery under development across the street. And, you know, there's the spinoff effect, the economic development

effect.
Q Are the constituents of Gastonia -- were they excited about? What's the feeling towards -- I guess, first, let's do the district. What's the feeling towards the district?
A There was a lot of positive buzz, you know, originally when we first, you know, opened the stadium, and a lot of excitement about how, you know, the economic development was going to help bring jobs and just lift up that area that had previously been very blighted.
Q And how was -- how was the feeling towards the baseball team? What's been the trajectory of that?
A Well, of course, you know, it was a very big deal. The opening new season, a lot of positive buzz, a lot of media coverage. You know, it was a little difficult because of COVID at the beginning, but, you know, it picked up, and there was a lot of excitement.
Q And is one of the reasons that -- I think Mr. White testified about how many games the Atlantic League has. Is the number of games a driver for activity?
A Absolutely. Originally, we had a college wooden bat team at another park called Sims Legion Park, they played 25 games a season. The Atlantic League fields, you know, 63, 70 games a season. So that's a lot more activity, a lot more economic activity. And then, of course, there was an obligation under the agreements to try to program approximately 200 other events

at the stadium.
Q Understood. And, again, we’ve moved your affidavit into evidence. But in the operating agreement --
MS. EDWARDS: Do you want me to go ahead and authenticate it?
THE COURT: The operating agreement?
MS. EDWARDS: The lease and --
THE COURT: Yes, please.
MS. EDWARDS: Okay.
THE COURT: That's G-1?
MS. EDWARDS: That's going to be -- yeah.
BY MS. EDWARDS:
Q So --
MS. EDWARDS: Actually, it's G-2. Or, sorry, no, it's in G-1.
Q It's G-1. And if you'll turn, Mr. Smith, it's two -- it's three behind -- it's Exhibit 3 to the first affidavit. So go to Tab Exhibit 3, and I think --
A Okay, behind Tab 3, I'm looking at G-3. Is that the exhibit you want me to look at or is it a different tab?
Q Yeah, that should do it. Is it the Exclusive Use --
A No, this -- this booklet up here, G-3, is a certificate of liability insurance.
Q Okay, yeah, right. I mean, I’m sorry. That is the G-3 tab.

A Right.
Q I'm looking at Tab 1?
A Tab 1 --
Q Go to Tab 1.
A Okay. At Tab 1, I have --
Q Flip's affidavit.
A -- the affidavit of Bombardier.
Q Yes, sir.
A Yes.
Q And then --

MR. DRESCHER: Excuse me, if I may, Your Honor. I'm still not there.

THE COURT: I'm not there either.

MR. DRESCHER: And I would just suggest -- it appears that all of these pages are our court date-stamped at the top. That might be an easier way for us to follow that.

MS. EDWARDS: So -- and I apologize about that. If you look at the top, it -- Exclusive Use Area Lease agreement is what I -- it's right after the pictures. So if you go and you're looking at that first affidavit --

THE COURT: I have that as --

MS. EDWARDS: -- and there's a series --

THE COURT: -- as ECF Docket 49-5.

MS. EDWARDS: Yes, ma'am.

THE COURT: Are we there? I think Mr. Smith is

there.

MS. EDWARDS: 49-5. Is Exclusive Use Area Lease agreement?

MR. DRESCHER: And I'm -- excuse me. And, Your Honor, we're looking at a document that says Page 1 of 79?

MS. EDWARDS: Yes, sir.

THE COURT: Yes.

MR. DRESCHER: That's where we are.

MS. EDWARDS: That's right.

THE COURT: I'm there.

MS. EDWARDS: Okay.

BY MS. EDWARDS:

Q I just want to authenticate this so we can get it in.

A Sure.

Q I'm still trying to truncate.

A Yes.

Q Do you recognize this document?

A I do.

Q And what is it?

A This is the Exclusive Use Area Lease Agreement between the City of Gastonia and NC Gas House Gang LLC.

Q Understood. And if you'd flip to maybe -- to Page 13 of that document, titled Use and Operating Agreement, do you recognize that document?

A I do.

Q Okay. And will you -- and you're familiar with those documents?

A I helped draft them and negotiate them, yes.

Q As the City attorney, you helped draft and negotiate those.

A Yes.

Q And are these full and correct copies of those?

A Yes. This -- at page 49-5 is the Use and Operating Agreement between the City and NC Gas House Gang LLC.

Q Okay. And the documents, which are voluminous, behind that, and, again, the 49-5 for the Operating Agreement, are those the appropriate exhibits to that operating agreement? You can see that, you know, Exhibit A to Use and Operating Agreement --

A Yes. These are all the exhibits to that agreement.

Q All right. And that's a true and correct copy of lease agreement and operating agreement?

A It is.

MS. EDWARDS: Your Honor, before I forget, if I could please move that into evidence.

THE COURT: All right. So Exhibit 1, other than the affidavit -- well, the affidavit has already been admitted of Mr. Bombardier?

MS. EDWARDS: Yes, I believe so, but I just wanted to authenticate these two -- the contracts.

THE COURT: So the Exclusive Use Area Lease Agreement and the Use and Operating Agreement.

MS. EDWARDS: Yes, please.

THE COURT: Okay. Those will be admitted into evidence.

(City of Gastonia Exhibits G-1(3) and G-1(3)(A) in evidence)

MS. EDWARDS: Thank you, Your Honor.

THE COURT: Thank you.

MR. DRESCHER: No objection, Your Honor.

THE COURT: Thank you.

MS. EDWARDS: I didn't think --

THE COURT: I saw you nodding, yes, Mr. Drescher, so I kind of took that as a --

MR. DRESCHER: But I understand there's a record and the recording --

THE COURT: Yes.

MS. EDWARDS: Yes, I think --

MR. DRESCHER: -- I may as well make it audible.

THE COURT: Yes; thank you.

MS. EDWARDS: I believe these were also attached to Mr. Drescher's document. So these are the operative documents.

And, again, because they're admitted into evidence, we can -- they say what they say, and we would hope that the Court would have some time to look at these documents.

BY MS. EDWARDS:

Q But you just described a different -- different types of teams. And so in this FUSE District, what was the concept for the new stadium and what type of team you wanted?
A Well, we wanted to have a professional baseball team because we knew that they would have more games. We thought that they would attract, you know, a more diverse and bigger fan base, and that there would be just more money spent at those types of games than previously.
Q So -- and the documents say what they say, but they say a "professional baseball league." And based on what Mr. White said, a MLB-affiliated and the (inaudible - audio fading) partner league (inaudible - audio fading). Is that the (inaudible - audio fading) level of baseball that is possible in Gastonia?
A It is because we are within 35 miles of the Charlotte Knights, as well as the Hickory Crawdads, which are, you know, affiliated with Major League Baseball. And so geographically, we are excluded from having one of those types of teams.
Q Understood. And that's also in these documents, that 35-degree radius, so we'll move through that. But suffice it to say that the Atlantic League is -- is that the only option for this level of baseball while the Charlotte Knights are still there?
A You know, I wasn't familiar with a lot of the other leagues that Mr. White, you know, described. But from our

standpoint, you know, they were -- they were the only, you know, game in town when we were -- you know, construction was underway and we were getting ready to do something with this stadium.

Q And how long did it take to negotiate these documents?

A At least six months, yeah.

Q Okay. And I think they are dated, you know -- what are they, 2020 prior to a -- summer of 2020. June 2020 prior to a 2021 season.

A Um-hum.

Q Okay.

MS. EDWARDS: Just to kind of keep everybody moving, given the Court's times constraints and -- Mr. Drescher, if possible, we were just handed up, and I think the Court was, too, a new insurance. So instead of talking about the prior insurance versus the insurance that was submitted to the Court on Monday, should we just go ahead and talk about what you've provided?

MR. DRESCHER: I don't see why not.

MS. EDWARDS: Okay. I agree. I think that that truncates everything.

BY MS. EDWARDS:

Q And so, Mr. Smith, if you can look at the debtor's --

THE COURT: And, Ms. Edwards, just so you know, I don't want you to rush, or Mr. Drescher to rush. We have all

the time that we need to hear the case properly. So I don't want you to feel -- other than my going and putting my face in, I just want to make sure you know, we have plenty of time. We can work with our other matter. We'll get that figured out. We'll get that sorted out. So I don't want you to feel rushed, or have Mr. Drescher feel rushed on behalf of the debtor, okay?

MS. EDWARDS: I appreciate that. I really appreciate that.

BY MS. EDWARDS:

Q So let's -- if you could please take this as what's the debtor's exhibit, and I guess the debtor will mark it. But we just were handed this a few moments ago. And then turn to -- in the -- in our exhibits, can you please turn to Tab 3, which is G-3?

A Yes, ma'am.

THE COURT: Mr. Drescher, am I correct that this certificate of liability insurance, we have marked as Debtor’s 1?

MR. DRESCHER: Yes, Your Honor.

MS. EDWARDS: Okay.

THE COURT: Okay. So I think we can refer to it as that.

MS. EDWARDS: Wonderful.

THE COURT: I think that will help and then -- yes, I wrote on it, yes.

BY MS. EDWARDS:
Q Mr. Smith, just to authenticate the next two to get them in, behind Tab 3, do you recognize that one?
A It's a certificate of insurance provided by Marsh McLennan Agency on behalf of NC Gas House Gang LLC.
Q And do you recognize it?
A Yes.
Q And is it a true and accurate copy?
A Yes.
Q And is it dated July 17th, 2023?
A Yes.
Q Okay. We will come back to that. Just real quick, will you please flip to Tab 4? Do you recognize that?
A I do.
Q And what is it? So this is a certificate of insurance that was dated December 8th, 2023 that was recently provided from Relation Insurance Services of North Carolina. The insured is NC Gas House Gang LLC, and the certificate holder is VSJ Incorporated.
Q And is this a full and correct copy?
A It is.
Q Okay. Well, let's leave 4 alone for now. If you could please look at Tab 3, which we will call the July, 2023 dated COI.
A Yes.

Q And then if you will look at the 12/12/23 COI, the Debtor’s 1.
A Okay.
Q So let's look at the differences here. If you're walking down -- so we see on each occurrence, it's $5 million (inaudible - audio fading) -- we don't need to, kind of, go through each of these. But what about the damages to rented premises? What does the debtor’s exhibit say and what does the prior COI say?
A All right. Well, the first thing that I noticed is that, you know, there's -- on the original, the G-3, we had the excess liability coverage, the umbrella checked, and that's not checked on this one. I'm sorry. Could you repeat the question, though, that you asked me?
Q Sure. We'll start there. That's fine. So on this one, is there -- on the new one, let's call it the new COI, is there any umbrella coverage that you see?
A It's not checked.
Q And is that a requirement? And if we need to look back, we can, it's Section 8.1. Is that a requirement of the operating agreement?
A Yes, it is.
Q Okay. And just specifically, do you recall how much umbrella insurance is required under that document?
A I believe it's 10 million. It could be 5 million, though.

Q Umbrella/excess liability with limits --
A Yeah.
Q -- of at least $10 million per occurrence in the aggregate --
A Yeah.
Q -- is that correct?
A Yes.
Q And does it also require workers' compensation --
A Absolutely.
Q -- to protect team’s permanent and temporary employees?
A Yes.
Q Does this have workers' compensation?
A I don't see that indicated in the columns.
Q And then let's compare it to the prior COI, which was acceptable to the City. Did that have workers' compensation?
A I believe so, yes.
Q And so those $1 million coming down for disease, disease policy limit, accident -- accident, it looks like there's at least $1 million in workers' compensation.
A Yes.
Q Okay. So it's required by the operating agreement, and they previously had it, and then the umbrella liability, also required to be $10 million, was in the prior acceptable policy, but is not in the one we received this morning, is that correct?

A That is correct.
Q And was it your understanding that the Court's order was that insurance must comply with our operating agreement?
A Yes.
Q And when -- let's keep going on this, kind of, new policy. When does this new policy expire?
A It says -- it’s dated 12/12/23, and this new policy says it expires to January 4th, 2024.
Q Okay.
A The prior policy was March 24th, 2024.
Q So the prior policy was for a year?
A Correct.
Q But this one looks like less than a month?
A Correct.
Q Okay. And with the prior policy, there's details about that coverage. Do we have anything on this with the exclusions?
A Well --
Q With the new COI.
A The new COI, I'm not seeing a notation for liquor liability, which does appear on the original COI.
Q Oh, thank you, Mr. Smith. And is liquor liability important?
A Yes. When you're serving alcohol at a stadium to two to 5,000 people, it's very important.

Q So beyond the 10 million for umbrella, lack of workers' comp, there's also no liquor liability. Is there also -- let me make sure -- so then if you, let me see I think there's one more --

A There's some -- also some difference between the additional insured language on the original certificate labeled G-3 as opposed to the one here, which merely says the City of Gastonia is listed as an additional insured with respect to general liability as required by the written contract.

Q And if you'll flip to 4, which I know has now expired because it was only for a -- four days' insurance policy, this is the one we got late Friday night in an attempt to have the events, if you'll go to the third page with the exclusions --

A Yes.

Q -- did you have concerns about those exclusions?

A Well, yeah, they're -- I mean, you know, you have an exclusion for, you know, bodily injury. You had an exclusion for new entities. I'm not really sure what that means, but I would want to read that. You know, you had exclusion of certified acts of terrorism. You had exclusion for products other than the food and beverage. You had an assault and battery exclusion. You had an exclusion for climbing, rebounding, and interactive games and devices. There's a children's area at the park. An expanded definition of bodily injury. Then absolute exclusion for liquor and other related

liability, that's a huge red flag. Special events, “blanket endorsement,” I'm not sure what that means.

And then -- yeah, so a lot of the things that you use the stadium for seem to be excluded by these exclusions, these endorsements.

Q And is it understood to find insurance acceptable to the City, you would need to see all of the exclusions on an insurance policy.

A We would want to read them, yes.

Q Understood. So do you believe that this, this one we got this morning, is adequate insurance pursuant to the 8.1 of the Operating Agreement?

A No.

Q Okay. And then what risks are there? What risks are there, the fact that there's no workers comp? There’s no --

A Well, I mean, you know, these are professional athletes, as has been described and, you know, injury is definitely possible in any athletic event. So, you know, without workers’ comp, that could be, you know, a very large liability for a player who, you know, injures, you know, any part of their body. Their shoulder or they get hit in the head by a ball, you know, that could be dramatic. Brain injury, so, you know, that's a huge -- that's a huge problem.

Q And at this time, this was in the last year, you have the keys available, such that the debtor is supposed to be

maintaining the property. Aren't there employees that are also on the facilities, you know, that are entitled to workers' comp, should they slip on a --
A Sure. Any of the front office staff, you know, janitorial staff, groundskeepers, people who are working on the field, all of those people would have to be covered by workers' comp.
Q So, any injuries in your stadium, there's no insurance for that?
A It doesn't appear to have workers' comp on this certificate.
Q And if there's the failure of the debtor to have insurance for -- I mean, it's a requirement here, but to the extent they have already failed to have that, who would pay if someone was injured? Where's the damage?
A Well, you know, I don't know who would pay, but we probably would get sued since we're the property owner. I would bet we would.
Q Understood. So, is this a deep concern?
A Very much so.
Q And is this one of the reasons that you instructed our firm to emergency file for this relief last week?
A Yes.
Q Understood. And how did we learn that -- so this policy, what we're calling the original policy, runs through March of 2024. How did you learn that it wasn't in place?

A You know, just -- there was a pattern of, you know, bills not being paid for a long time now. And then we were notified by the League that the membership had been terminated. So, at some point this month, I asked our employee who is responsible for maintaining all the certificates of insurance as part of her job, to contact the insurance company and make sure that their coverage was still in effect. And when she contacted them, they confirmed on the phone that it was not, that it had been canceled, but they would not provide the date that it had been canceled.
Q Okay. And did you ever ask, or did anyone ever, you know, if you're aware, asked about previously to see if this was in effect?
A The City Manager emailed the -- directly emailed a member of the insurance company in September asking if the coverage was still in effect, and they never responded to his email.
Q So, they would not provide proof of insurance back from September?
A There was no response to the City Manager's email.
Q So, we don't know when?
A No, we do not.
Q And as of now, we still do not have compliant insurance, is that correct?
A No, we do not.
Q Okay. Moving to Tab 2, your affidavit. You testified on

your oath that all of that was true and correct. Do you recognize Exhibit 1 as the FUSE District Development, kind of, plan?

A Yes, that was a -- kind of a solicitation that we sent out --

MR. DRESCHER: Excuse me, Your Honor. I'm sorry, I apologize. I'm not sure where we are. You said back to Exhibit 1. What --

MS. EDWARDS: His affidavit, which is Tab 2, Exhibit 1, Tab 2, and then just went to the first exhibit to Mr. Smith's affidavit.

MR. DRESCHER: Thank you very much.

MS. EDWARDS: I’m sorry, I’m moving --

MR. DRESCHER: I apologize, Your Honor.

BY MS. EDWARDS:

Q Is this the FUSE District Development plan?

A It is a solicitation that encompasses almost all of the plan, yes.

Q And do you recognize the document?

A I do.

Q And is it true and correct?

A It is.

Q And is the concept of this as you described (inaudible - audio fading) what this district (inaudible - audio fading)?

A Yes.

Q And that goes with your prior testimony about how important this area is to the City?
A Absolutely.
Q Okay. And then going to the next Exhibit 2 to your affidavit. This is a letter dated November 15th from Mr. Peterson at Parker Poe (inaudible - audio fading).
A Yes, it is.
Q And we don't need to go through (inaudible - audio fading). But does this letter -- and was this done -- you recognize it as a true and correct copy?
A It is, yes.
Q And was this letter -- did you instruct this letter to be written regarding various defaults?
A I did. I did the first draft of it, and then Mr. Peterson polished it up substantially, which is what people who clerked for you one day grow up to do.
Q That's good to know. So that illustrates for the Court the various defaults as of November 15th under our two agreements.
A Yes.
Q And then after November 13th, has the signage at the field changed? And what's changed since November 13th?
A You know, no signage has really changed.
Q Okay.
A Your Honor, we’re kind of, you know, waiting to see what

we need to do in terms of changing the signage. But nothing's -- nothing's really changed in terms of the signage at the facility.

Q And following this default letter, did you instruct our firm to file a TRO in the State Court?

A A preliminary injunction.

Q Preliminary injunction; we'll start there.

A We filed a lawsuit, and then we sought a preliminary injunction that had originally been scheduled for last Wednesday, I think.

Q So the concept was to take this to North Carolina State Court and have the contracts terminated?

A Yes.

Q Understood. And then turning to Exhibit 3.

A Yes.

Q What is Exhibit 3 of your affidavit?

A So these are some photographs that I took on my personal cell phone during my tour of the facility this Monday.

Q Okay. And what do we have here? What are some of these pictures of?

A Well, the first picture is inside one of the coolers, or freezers. It appears to be some hamburger patties that were, you know, left out without ever being cooked. There's a packet of hot dogs underneath them.

You know, the next two pictures are trays of what was

food, I presume, at some point. They were still in the cooler, mold is growing on them.

This picture, you know, there's a tinfoil wrapped hot dog in the concession stand that was, you know, left there at whatever the last event was, and not thrown away.

And then this is some sort of device for putting food in, probably to keep it hot. There's a lot of, you know, food spattered on the bottom.

And then there's a picture of water on the floor in one of the restaurants, specifically in one of the handicap --

MR. DRESCHER: Excuse me, Your Honor.

MS. EDWARDS: It’s --

MR. DRESCHER: I'm not on the same page. Again, I would just ask for the --

MS. EDWARDS: So this is Mr. Smith’s.

MR. DRESCHER: Aha, this is Mr. Smith’s.

MS. EDWARDS: So if you go -- yeah, back, it’s right there.

MR. DRESCHER: Thank you, Counsel.

MS. EDWARDS: No problem.

BY MS. EDWARDS:

Q Okay. So I think that's all the various pictures. And you took these pictures, right?

A I took them with my phone, yes.

Q And these are true and correct?

A They are.

Q And I'll talk to Mr. Bombardier more about the history of maintenance, but you were out there on Monday. And just to clarify, is this equipment, the City's equipment?

A Yes. Most everything in the kitchen is City equipment. I think, you know, the debtor and one of their vendors may have brought in some kitchen equipment, but most of it is ours.

Q Okay. And the last few questions I have for you, what would happen if there's no baseball in 2024? What would happen to the City?

A Well, I mean, you know, obviously there's, you know, a lot of jobs that won't be out there, you know, earning incomes and paying taxes.

And in addition, you know, we have at least four properties surrounding the ballpark that are in various stages of development. We have a piece of City property that we are proposing a $50 million, you know, apartment building on with LMG. They are the same developer that developed the Trenton Mill, which is right across the street from the ballpark's parking area. That is all on hold until the issue of whether there's baseball is sorted out next season.

Directly across Franklin Boulevard is a former YMCA building that has just been acquired by a group called Highline Partners. They are planning a $50 million residential and commercial development on that property. It's a large

property.

And then across the street on -- is the Dirty Bull. It's a brewery that's currently underway. That's about a $1 million investment.

And then there is another part of the Coca-Cola building that is proposed for residential office, that's about a $1 million investment. And nothing's going on with that right now.

Q And I know you're involved in all of this economic development. Do you have concerns that there's no baseball in the stadium that some of this development could be thwarted or damaged?

A Yes, very much so.

Q Okay. And do you believe that the constituents share this concern?

A Yes.

Q And I said last point, but this is the last point. What has happened in the media and with the constituents of Gastonia? Understand that this Court is in Maryland, and we know how much this is in the media, but if you could explain.

MR. DRESCHER: Your Honor, I'm going to object. This is just hearsay. She’s asking what's going on in the media.

THE COURT: I don't think she's asking for the substance --

MS. EDWARDS: Correct.

THE COURT: -- of what's being said is just. It’s just is there or is there not media coverage of this particular event? And I don't think that's hearsay. That would be based on his knowledge.

MR. DRESCHER: Thank you, Your Honor.

MS. EDWARDS: Thank you, Your Honor.

BY MS. EDWARDS:

Q Is there media coverage on this?

A Yes, there's been media coverage, you know, by established print and broadcast media in the Charlotte television market. And there's been extensive coverage on social media and Twitter by people who have varying aspirations to being journalists.

Q How long has -- is this media towards the debtor positive or negative?

A It's extremely negative.

Q And when did this media begin?

A It really began in July of 2023, yes.

Q Okay. And so does this media loop on local news coverage?

A Yes.

Q Can you probably watch it once an hour?

A Yeah. Google it.

Q So suffice it to say that reputationally, is this all over our area?

A Yes, very much so.

Q And how does that impact the City?

A You know, it's -- it's very problematic when you own an asset, and everyone knows you own an asset, and you use public money to build it, and then all of these people are not getting paid for products and services that they are rendering on the site of your property. And that it's under contract and managed by someone else, it just gives the City an incredible black eye. And it is chilling further economic, you know, investment around the stadium, which is going to continue to impact the local economy.

Q That makes sense. And last question, you know, in these agreements, it said there was a 90-day cure period. Do you believe, to the extent you -- we were able to move forward the State Court, you could get those agreements terminated in North Carolina?

MR. DRESCHER: Your Honor, I object to that. That's speculation.

MS. EDWARDS: That's fine.

THE COURT: Sustained.

MS. EDWARDS: That's fine. I’m sorry, Your Honor. I'll reserve my right, but otherwise I am done.

THE COURT: Of course, for redirect, yes.

Can we take about a 10 minute break? I need to confer with Ms. Bellman about what I'm going to do for this afternoon. So I need about 10 minutes to do that. And so we can talk to the parties real quick.

MR. DRESCHER: Perfect. Thank you.

(Recess 12:36 p.m./Reconvene 12:44 p.m.)

COURTROOM DEPUTY: All rise. The United States Bankruptcy Court for the District of Maryland now resumes its regular session. The Honorable Lori S. Simpson presiding.

Please be seated and come to order recalling the case of NC Gas House Gang LLC, Case Number 23-18766.

THE COURT: Your witness, Mr. Drescher.

MR. DRESCHER: Thank you, Your Honor. (Inaudible - audio fading).

CROSS-EXAMINATION

BY MR. DRESCHER:

Q I'd like you -- well, let's start -- let's start with a single page document (inaudible - audio fading) witness stand that's been marked as Number 3.

A Yes, sir.

Q All right. Have you ever seen that -- this document before?

A I have not.

Q Okay. Now, are you familiar with the Velocity Companies?

A I am.

Q Who is the Velocity Companies?

A It's basically Mr. Bellamy's company.

Q All right. Does the Velocity Companies have some sort of arrangement or deal to develop a Marriott Hotel in the stadium

premises?
A Well, according to this, they may. A contingent franchise agreement, perhaps.
Q So you're not familiar with the discussions with Marriott as part of FUSE Stadium?
A The City Manager has told me that he understood that there were discussions between Marriott and Mr. Bellamy, but I don't have the personal knowledge.
Q All right. Very good.
MR. DRESCHER: I won't then ask to admit it at this time, Your Honor.
Q All right. Let's go back to the binder, Exhibit 1, Tab 1. And the page that I'm looking at is document 49-5, Page 51 of 79.
A 49-5, Page 51 --
Q Of 79 on the top. On the bottom, it's Bates stamped agreements 0-0-0 (inaudible - audio fading).
A Yes, sir.
Q All right. Now, this is -- this is the default provisions of the Use and Occupancy Agreement between the City and the debtor, is that correct?
A The Use and Operating Agreement, yes, sir.
Q Okay. And Team Defaults, I can only imagine you saw this paragraph a thousand times when you were preparing this document, is that about right?

A I don't recall the exact number.
Q Okay. And is it fair that Section 11.3, it lays out the team defaults?
A Yes.
Q Right? And for example, if we look at 11.3A, “The failure of the team to pay any of its monetary obligations to the City when due.” That's a -- that’s a specified event of default, correct?
A Correct.
Q All right. Then we go to “B, The failure of the team to substantially perform, substantially observe any of the obligations covenants or agreements within 30 days after notice from the City (inaudible - audio fading).” All right?
A Correct.
Q Okay. Then we go to number C, the Occurrence of an Act of Bankruptcy.
A Yes.
Q All right. And then we go down to D, Abandonment of Premises by Team.
A Yes.
Q All right. E, Failure to Maintain Locations (inaudible - audio fading), is that correct?
A That's correct.
Q (Inaudible - audio fading) good standing by a sanctioned association of the team, (inaudible - audio fading).

A Yes, that's correct.
Q Right? And then H, the Transfer of the (inaudible - audio fading). All right. So, (inaudible - audio fading) correct?
A Yes, sir.
Q And that's what gave rise to you instructing of counsel's firm to send the notice of default (inaudible - audio fading).
A Yes, sir.
Q Then we go down -- drop down to section 11.4, which is City's remedies. And it says that (inaudible - audio fading), all right, but -- but not if it's under section 11.3C above, we jump -- jump upstairs, that's the occurrence of an act of bankruptcy.
A Yes, sir.
Q Right? Okay. So, an act of bankruptcy, you don't have to send the 90-day notice.
A Yes, sir.
Q Okay. So, then B, "Seek another professional amateur baseball team to conduct (inaudible - audio fading) scheduled home games." Right? "The City may, in its own name, for its own account," All right, "institutes of action against (inaudible - audio fading) necessary and desirable." (inaudible - audio fading) "may exclude team from possession of premises (inaudible - audio fading)," is that correct? (Inaudible - audio fading).
A Yes, D, is exclude the team from possession of the

premises and reenter the same.
Q Okay. So, we're talking about the termination remedy. That's what you (inaudible - audio fading), and that's why we're here, is that right?
A Yes.
Q All right. So, section 11.5 talks about termination, is that right?
A It does.
Q All right. So, we're not talking about the occurrence of the City default on the bottom of Page 51 of 79. But a team default, as described in section 11.3, which was that team default section that's (inaudible - audio fading), right? That's what we're talking about.
A Okay.
Q Right? Okay. So, then if we jump to the next page, team's right of possession is terminated after the expiration of a period of 90 days from the date such finding and notice is delivered.
A That's what it says.
Q Okay. So, we already, looked and the act of bankruptcy is the only default provision that's excluded from the 90-day termination, isn’t that right?
A Based on the plain language.
Q Okay. Has the City received offers to put a new Atlantic League team in the stadium?

A You know, we -- we've explored potential teams with the Atlantic League, and we hope to, you know, have someone playing baseball, on which (inaudible - audio fading) it’s very important for economic development that there be a team this year.
Q So, you heard Mr. White's testimony that it's an 18-month ramp up to actually have a team in place. Were you -- did you hear that testimony?
A I heard Mr. White's testimony.
Q All right. But now (inaudible - audio fading).
A Yeah.
Q Right?
A There’s not a lot of time.
Q So, even if you lift the stay right now, you're not going to get your 18 months.
A We’re not going to get 18 months, but it is possible to have someone up and playing.
Q What's your basis that it's possible to have somebody up and playing? What's your -- what’s your experience with that?
A Well, I just -- I believe that if you find the right person with the right experience, that they would be able to come up and field a team for next season.
Q But you haven't identified that person as of -- as of this hearing date, is that correct?
A We have not identified a person, no.

MR. DRESCHER: No other questions, Your Honor.

THE COURT: Redirect?

MS. EDWARDS: No, Your Honor.

THE COURT: All right. Thank you, Mr. Smith, for your testimony. Is Mr. -- I understand he's your, your client. Is he staying throughout the hearing? He doesn't have a plane or anything.

MR. SMITH: Yeah.

MS. EDWARDS: Yes, ma'am.

THE COURT: Okay.

MS. EDWARDS: And, Your Honor, as another housekeeping, may I please move G-1 and G-2 into evidence in their entirety?

THE COURT: Any objections, Mr. Drescher, to G-1 and G-2?

MR. DRESCHER: No objections, Your Honor.

THE COURT: All right.

MS. EDWARDS: And -- sorry, and G-3 and G-4, which are the other insurance policies.

MR. DRESCHER: No objection.

THE COURT: Okay. Exhibits G-1 through 4 will be into evidence.

(City of Gastonia Exhibits G-1 through G-4 in evidence)

MS. EDWARDS: Yes, Your Honor, may I please call Philip Bombardier?

THE COURT: Yes, you may. Is it Bombardier?

MR. BOMBARDIER: (Indiscernible - not at microphone).

THE COURT: Bombardier.

MS. EDWARDS: Oh.

THE COURT: Okay. Which would you prefer?

MR. BOMBARDIER: (Indiscernible - not at microphone).

THE COURT: Okay. That’s what -- and no relation to the fast train company.

MR. BOMBARDIER: Actually, ma’am, yes, correct.

THE COURT: I spent many years driving one of those, so --

COURTROOM DEPUTY: If I could just get closer to the mic so I could pick up the response; thank you. And remain standing and raise your right hand. Thank you.

JOHN PHILIP BOMBARDIER, GASTONIA’S WITNESS, SWORN

COURTROOM DEPUTY: Thank you. Please be seated and state your name and address for the record. And if you can spell it for the transcriber in the event it's needed.

THE WITNESS: My name is John Philip Bombardier. I live at 4038 Woodleigh Drive in Rock Hill, South Carolina.

COURTROOM DEPUTY: And the spelling of the last name?

THE WITNESS: B-O-M-B-A-R-D-I-E-R.

THE COURT: Thank you. Your witness.

MS. EDWARDS: Thank you.

DIRECT EXAMINATION

BY MS. EDWARDS:

Q I’m sorry, Mr. Bombardier. I know that my pronunciation of your last name is a butchering of both the north and the south, So I apologize for that. Can you please state your position with the City?

A I am a special projects -- project advisor for the City on a part-time basis.

Q And what was your role prior to that?

A Prior to that, I've been with the City of Gastonia for going on 38 years. Everything from staff engineer to interim City Manager.

Q So over those 38 years, you've had many roles?

A Correct. Yes, ma'am.

Q Including City Manager at one point. And will you please, in the exhibit binder, look behind Tab 1. Is that your affidavit?

A Yes.

Q Okay. And in your most recent years, have you overseen the maintenance of the stadium?

A Yes, I've been involved with this project since its inception.

Q And Mr. Smith spoke about this, but can you describe with a little more particularity what all is the City's property in this -- in and around the stadium? Or mainly in the stadium?

A The entire facility itself is owned by the City. The major equipment is owned by the City, that includes kitchen equipment, field equipment. Other than the out parcels, everything is owned by the City of Gastonia.
Q Thank you. And Mr. Smith authenticated both the lease and operating agreement. Are you familiar with those documents, as well?
A In general, yes.
Q Are you familiar with maintenance requirements under those documents?
A Yes.
Q Do you recall, kind of, the general, what is the standard?
A General wording is that facility is to be maintained to a usual and customary standard of similar facilities.
Q I think that -- and the comparable facilities. And have you been to other comparable facilities?
A Yes, I have.
Q And is this stadium kept in the same manner?
A No, absolutely not. And certainly I want to disagree with the comment earlier that the stadium is in great shape and that the items needing attention are purely cosmetic. That's just the tip of the iceberg. It goes much deeper than that.
Q And if you flip in -- and, again, we're not going to go through your affidavit, there’s -- this is introduced into evidence. But the first 1(A), again, after Tab 1, so Tab 1,

Exhibit 1(A), is this an email that you sent to David Martin, September 13th, 2022?

A Yes.

Q And what are you, kind of, expressing here?

A An ongoing concern. We have been consistently talking with the team about their lack of maintenance really from opening day. And this is just one of many attempts to bring to their attention the lack of routine, preventive type maintenance issues.

Q And so you'll see then the next one that would be a memorandum. Did you then write the (inaudible - audio fading) the debtor that are in your -- in your affidavit?

A Yes.

Q Okay. And generally we see this one September 12th, 2022. But what have been some of the concerns and issues that have happened here?

A Again, just simple lack of maintenance items, preventive maintenance per our agreement. Annual service agreements are required by the team to -- whether it be annually, quarterly, biannually, to maintain the equipment, to maintain the facility, its components. We reference many things in there. We can get into as much specific -- specifics as you would like, but just any and all items related to basic facility maintenance.

Q So just by way of example for the Court, what about

utilities? Like, what are some of the issues you have with utilities or utilities being turned on?

A Big -- big item with several toilets in the facility, they have been off for months. They have not been routinely maintained. Some require just the flushing mechanisms to be switched out. Again, part of routine maintenance. Some are as simple as changing the little battery that -- the actuator eye flushes the toilet automatically. Several have been bagged for months. Several are sitting empty with no water in them. That creates another problem with fumes coming up through the sewer system. Some of these toilet stalls are ADA handicap compliant that are lock shut and/or bagged. But, again, an ongoing issue we have talked with the team on numerous occasions on as far as moving that forward and fixing them.

Q And how has that (inaudible - audio fading)?

A From my opinion, very -- lack of response. Continually, “We'll look at it. We'll address it,” but it never seems to occur that that level of maintenance is undertaken by the team.

Q And does the debtor have the appropriate maintenance (inaudible - audio fading)?

A In my opinion, no.

Q What would you expect if it were to be at the level of comparable facilities?

A I think from a City perspective, we would certainly expect full-time personnel that are dedicated to regular maintenance,

preventative maintenance, regularly checking items and/or fixing them. Easily for a facility that size, I'm going to say three to five people.

Q And how many people do you believe are dedicated to maintenance for cleaning?

A I know one gentleman, Brian Fisher, is dedicated to that. Another gentleman, Craig, I do not know if he is full-time or not, but two people that are typically regularly at the stadium.

Q And when you've spoken with them about the lack and failure of maintenance, how have they responded?

A They will tell me directly that they don't get sufficient funds to maintain the facility. We, the City, are typically called on a regular basis to come out and help, see if we can troubleshoot what's going on.

Most recently, and I think this is still a fact, the heat is out in the lower level locker rooms. The service contract company that services the HVAC, it is my understanding they would not come out for lack of payment. City crews, we did have our crews come out to try to troubleshoot. It appears that just one of the control boards needs replacing, but that sits inactive as we sit here today.

Two of the three walk-in coolers that were earlier referenced are now out of service. We did advise the team on October 30th that one of those two was giving some funny

readings on the temperature gauge, and should be addressed, again, by the appropriate service company. When we went out this past Monday, that cooler is completely out of service and at room temperature.

Q And whose cooler is this? Who owns the cooler?

A The City. That's -- again, the major equipment in the kitchen was furnished by the City.

Q And what about the gas? Has anything ever happened with the gas?

A Are you talking about the gas service?

Q Yes, sir.

A Yes, the gas company has come out to cut off the gas service. It has been cut off. That directly impacts the operation of the backup generator for the facility. And also, when it was cut off, it caused one of the components of the generator itself to break and the City replaced that.

Q So during this period, has the City -- again, it’s the City's property, has the City been replacing things and fixing as -- as -- if the debtor fails to maintain or do so?

A Very much so. This -- from day one, and I think the team would agree, we have been very active trying to collectively address issues out there and participate when we can. Again, to protect the City's investment in our asset.

Q So has the City already been damaged by the debtor's failure to maintain your property?

A In my opinion, absolutely. A facility that is not maintained, especially the equipment, not service, not preventative maintenance, your life expectancy of those components is compromised, and just diminishes the investment we have put in. At some point in time, a lot of that will have to be redone.

Q Understood. So these -- and, again, these are in your affidavits, various memos. So starting in the fall of 2022, and since -- through Monday, these have been persistent maintenance issues.

A I would, again, go back to these have been persistent issues since we turned the facility over to the team in February of 2021. There were several items during that first year that are typically under warranty by your contractors and equipment suppliers who built the facility. But basic maintenance needs and requirements have been ongoing. I think if you went back in the record, you could find a lot more conversations, emails that we talk about basic maintenance needs by the team.

Q So in general, how has the debtor treated the City and the taxpayers’ property?

A I'm sorry. Ask me that again.

Q How has the debtor treated your property, the City's property?

A I would say, for lack of a better word, neglect.

Q Neglect. And do you think that the public -- how is this perceived, have you heard, media or in the public?
A We -- yes, I think it's perceived the same way I perceive it. When I go into whether it's a sports facility, or whether it's a courthouse structure, a public building, those that aren't maintained, you see you -- you form an impression of. So, yes, I think, in general, the public sees the same thing I do. When you see trash laying around, when you go into the bathrooms, and you see the bodily fluids on the floor, yes, you form a perception that it's not kept up to a standard, at least that I would expect and then that I think is comparable or should be comparable to other facilities.
Q And do you think that -- so do you believe the debtor has failed in this regard to live up to the agreement?
A Absolutely, yes.
Q Okay. And you feel like you've given plenty of notices regarding that failure?
A Absolutely. And I think pictures are worth a thousand words. It’s a bad cliche, but -- and again, those pictures, some are cosmetic, but that's not the base of what is needed out there. Cosmetic, agreed, those could be and should have been easily taken care of over the past two and a half, three years, and have not.
But these others go deeper than that. They really involve the equipment basic -- again, I hate to keep saying

"preventive maintenance" and "service agreements" with outside agencies to have those in place, but they're not there.

Q So do you believe the debtor's failure to maintain has caused -- how much money do you think these damages, long term, to this equipment has cost? And I know that's hard to present value the life of those items, but --

A I don't know a dollar figure. I can give you a great example. The kitchen equipment, a substantial investment by the City, and that -- that typically should last you 10 to 15 years with proper maintenance. If you go out there today, and you see rust on the grill, the flat cooktop that has not been properly cleaned or oiled. Again, all that just does is shorten its life span. And at some point, that will have to be replaced sooner than it should have been.

Q Understood. And that that would take a mathematician to figure all that out. But -- and then lastly, from your perspective, what was the hope for this baseball, and what would happen if we don't have baseball in 2024?

A Well, I think the facility itself is just -- just the jewel of our sports facilities in Gastonia. I think I heard earlier to spur economic development, again, was its intent. But, again, that -- the benefit of what our citizens can come to, can enjoy, I think it's tremendously important, not just for baseball, but all the ancillary events that -- from a City perspective that we expected to be occurring there at a high

level, at a quality level has just not materialized.
Q And speaking of that, what was the expectation on, besides baseball, at these events, I know that was in the agreements?
A This is a multipurpose facility. We can do soccer there. We can do football there. We can do rugby there. Part of the amenities in our agreement with the team was to provide its half a billion dollar stage structure, mobile stage structure for concerts. We continually -- the City invests in the facility. We have just broken ground on a restroom expansion in center field to expand capacity. So, again, you could have larger events, such as concerts, that get those 8,000 attendees there. So, the expectations are extremely high to have those type of events there that further goes back to economic growth around the facility. And then, again, just the public participating in that, and make -- it's a quality of life component, in my opinion, that just adds to Gastonia.
Q Okay, that makes sense to me. And then I know in the agreements, there was a certain expected number of special events that the debtor was to hold. Has the debtor held -- besides the baseball, these other concerts, and parties, and things like that, has the debtor been holding these activities with the frequency the City expected?
A From my perspective, absolutely not.
Q Okay. And why do you believe that those have not been

held? Is it a lack of employees or -- or -- do you have an idea why that might not be happening?

A I really don't know the answer to that. From -- from -- whether it's lack of advertising, soliciting, events there, I really don't know the basis for that.

Q Understood. And so just to circle back, what would happen, in your opinion, for the City of Gastonia if there's no baseball in 2024?

A I think it -- again, it goes back to economic development. It either slows down or stops that. The stadium sits there. A vacant facility deteriorates quicker than one that is utilized and properly maintained. But, again, the public perception of it failing, I think, is a big component of that.

Q Understood.

MS. EDWARDS: That's all I have for now. Thank you.

THE COURT: All right; thank you.

Mr. Drescher?

MR. DRESCHER: Thank you, Your Honor. I delivered bread when I was in high school, and (inaudible - audio fading).

CROSS-EXAMINATION

BY MR. DRESCHER:

Q All right. I'd like to direct you to the short stack of documents that should be in front of you.

A Is that this?

Q Yeah, it’s (inaudible - audio fading). It's a three-page or it's a two page, three-sided -- of printing -- I think you've got it.
A Yes.
Q All right. So this purports to be a calendar of events for the stadium, does it not?
A Yes.
Q Okay. And based upon this, it looks like there were -- there are about 12 events scheduled for January of 2024, is that about right?
A Yes, correct.
Q Okay. And then it looks like there's about 15 events scheduled for February of 2024, is that correct?
A Yes.
Q And then it looks like there's about another 10 or so events scheduled for March, is that correct?
A Correct.
Q And then it looks as if there's about almost 20 events scheduled for April.
A Correct.
Q All right. And -- and then in May, 2024, it looks like there's five -- seven -- at least another 10 events scheduled.
A Correct.
Q And that includes college baseball championships? Car -- conference --

A Carolina Conference --
Q Right.
A Conference Carolinas, yes, sir.
Q I think that's college, right?
A Correct.
Q Okay. And then we go through, of course, it's early to be planning June events, would you agree?
A I would suggest, depending on the type of events, some are booked months and months in advance.
Q Well, especially if there's baseball. Baseball would take priority.
A Yes.
Q Right?
A Yes.
Q Okay.
A Yes, if you were fielding a team, baseball would take priority.
Q Okay. So you testified that in April of 2022, you sent out that notice of defects on the stadium, maintenance defects, right?
A Yes.
Q Why didn’t the City send the 90-day notice then?
A For --
Q For --
A For what, lack of --

Q For notice of termination due to the maintenance default, why didn’t they send it then?

A I think you're asking me a legal question. I can certainly say from a maintenance standpoint, we have been continually requesting a higher level of maintenance from the team.

Q And also, a year later, you performed the review in April. And did the City declare a default in April?

A Again, my role is more from the day-to-day boots on the ground, working with the team to address maintenance-related, facility-related issues.

Q Thank you very much.

MR. DRESCHER: I have no further questions, Your Honor.

THE COURT: Thank you. Redirect?

MS. EDWARDS: Only one, Your Honor.

REDIRECT EXAMINATION

BY MS. EDWARDS:

Q Mr. Bombardier, on this schedule, of the -- I think they mentioned 12 January events, are seven of those events a soccer practice?

A Yes.

Q And when you look at this, do you see soccer practices and Gaston College soccer -- softball games for the majority of these, quote-unquote, “events”?

A Yes.
Q And are these the type of economy-driving events the City anticipated for this stadium?
A I would consider them minor events.
Q Understood.

MS. EDWARDS: That's all. Thank you.

THE COURT: Thank you. You're free to step down. Thank you for your testimony.

MS. EDWARDS: And, Your Honor, that's all we're going to call for now. I believe Mr. Bellamy is also the debtor's witness, so we'll wait.

THE COURT: Okay. All right; thank you.

Mr. Drescher?

MR. DRESCHER: I'd like to call Veronica Jeon.

THE COURT: Okay. Ms. Jeon?

VERONICA JEON, DEBTOR’S WITNESS, SWORN

COURTROOM DEPUTY: Thank you. Please be seated and state your full name and address for the record.

THE WITNESS: Veronica Jeon. My temporary address is 44-1 Barclay Downs Drive, Townhouse 511, Charlotte, North Carolina, 28209.

COURTROOM DEPUTY: Thank you. And can you give the spelling of your last name?

THE WITNESS: J-E-O-N.

COURTROOM DEPUTY: Thank you.

THE COURT: Your witness.

MR. DRESCHER: Thank you, Your Honor.

DIRECT EXAMINATION

Q Ms. Jeon, what's -- what's your role with NC Gas House Gang LLC?

A I currently do not serve in an official role with NC Gas House Gang. I did serve as the Chief Marketing Officer at -- in a portion of 2022. I currently serve as the Chief Operating Officer of the Momentous Group.

Q Okay. So who is the Momentous Group?

A Momentous Group is an entity that helps manage the NC Gas House Gang and two other legally separate entities.

Q And what's your role?

A I'm the Chief Operating Officer.

Q Okay. So on a day-to-day basis, are you involved with the baseball facility?

A I oversee. So we have a operations team made up of Brian Fisher and Craig Lehr that does the day-to-day maintenance. I mean, day-to-day operate -- facility operations. Prior to the departure of Mr. David Martin, who served as the Chief Operating Officer of NC Gas House Gang, or also known as Gastonia Honey Hunters. Since he started out in the inaugural season as a Chief Operating Officer, being a liaison with the City, with the facility issues, he has continued that role in some capacity during his tenure with the organization.

Q Was that Mr. Martin continues in that facility, is that you said?
A Yes. Mr. Martin was working with Mr. Brian Fisher to oversee the facility. And then I did -- I do meet with them on a regular basis to discuss things that need to be addressed.
Q Are you involved in the debtor's efforts to procure insurance in conformance with the City contract?
A Yes, I am.
Q What have you been doing in that regard?
A I have been talking to -- I believe it was around six or seven brokers or agents. We have been trying to procure a permanent annual policy. I am hearing that because it's the end of the year, and a lot of organizations are renewing their insurance January 1st, this is a really busy time for the insurance industry, so there has been backlogs and delays.
Q Have you been outright denied coverage by anyone?
A Yes.
Q Okay. Who -- but have you been approved by anyone?
A Yes.
Q Okay. So who approved you? What insurance company?
A It's USLI. They are the carrier that approved us for that interim while our agent works to get permanent coverage.
Q All right. When do you expect to get permanent coverage?
A Last time I heard from our agent, which was yesterday, because I do speak with them three to four times a day every

day, because I know this is a urgent matter, he -- our -- our next deadline to meet is by Christmas.

MS. EDWARDS: Object; hearsay.

THE COURT: I'll overrule it. I'll let her -- she's basically saying what effort she's doing to get insurance.

Q Do you expect that the full coverage is going to be in place by Christmas?

A Yes.

Q All right. What's the cost of the premium?

A The -- so for the permanent annual?

Q Yes.

A I do not know off the top of my head. We are re -- because we are no longer, at least for now, servicing baseball, that will reduce our premium significantly.

Q So, where's the money coming from for that coverage?

A I believe it's already been procured by Mr. Bellamy.

Q All right. When was the last time you were in the stadium?

A I was last at the stadium mid-November.

Q All right. So you heard the testimony of Mr. Bombardier, right --

Q Yes.

Q -- regarding the current state. Do you agree with his (inaudible - audio fading) current state of the stadium?

A Not in its entirety.

Q Okay. Could you tell me, what you agree with and what you disagree with?

A Sure. There are definitely toilet issues that need to be addressed, which we were planning on doing during the off season. We did get experts in to see what the issues were. Because when those issues were brought up to us, we did change some of the flush valves. We did change some of the batteries. And some of the toilets that the flush valves were changed by our staff, I was -- it was reported up to me that a couple months later, it went bad again. So, as I communicated to the City Manager, I said, hey, you know, I would like to really find out what the core root causes before we invest a significant amount to address these toilets. I will get it done during the off season. So that was my current plans before the termination and everything else happened.

Q All right.

A And as a matter of fact, our plan was -- and I -- as I communicated to Brian Fisher, our facilities manager, I actually have a contact that manages the facilities for an NFL stadium that has local presence in Charlotte. And my plan was to get them under contract so that we can continue to maintain the facility.

Q You heard his testimony about the state of the equipment, particularly the kitchen. Do you -- have you observed the state of the equipment?

A I have. I have personally been in the kitchen in November. So prior to -- and actually, I believe -- even effective now, we do have a agreement with the food and beverage partner. And it is the food and beverage partner’s responsibility to keep it clean and so on and so forth.

At the end of the season, we were supposed to have a final walkthrough, but because of scheduling issues and other occurrences, we were not able to have the final walkthrough. I will say that -- so, yes.

Q All right. Do you believe that that the (inaudible - audio fading) default?

A Yes, absolutely. I mean, we saw over last year -- I believe off the top of my head, last year, we saw over 180,000 people at the ballpark in one year. And yes, having 66, 67 home games, having more than, I believe it was 300 events, regardless of whether they're soccer -- soccer tournament -- soccer practices or softball, you know, games it’s still -- it’s traffic in the ballpark. And, absolutely, it needs extra TLC. However, I do not think that it is as severe or dilapidated as it is being portrayed.

Q All right. So, have you been fielding questions from people who are interested in what's going on down at the stadium?

A Absolutely.

Q And what have you been hearing from the media?

A So, I fielded all of the questions from the media back in July. And there were -- there were concerns that, I believe, were a little exaggerated. But even after the first media storm, yes, we did have certain people being vocal on social media. However, at the same time, I did have as many people coming up to me saying, “Hey, how can we support? What can we do? We want you here. We appreciate you here. How can we do -- what can we do to help?”

MR. DRESCHER: Thank you. Your Honor, I have no further questions.

THE COURT: All right. Ms. Edwards?

MS. EDWARDS: Yes, I do.

CROSS-EXAMINATION

BY MS. EDWARDS:

Q Good afternoon, Ms. Jeon.

A Good afternoon.

Q When did you start trying to obtain insurance coverage?

A I believe it was November.

Q Do you remember when in November?

A No, I do not.

Q Okay. And when -- the prior policy expired March of 2024, what happened there? Why was it canceled?

A It was canceled due to payment.

Q And how long did you fail to pay for that insurance?

A I do not know off the top of my head. However, our

premium was actually financed. So, I do not have that information off the top of my head.

Q Understood. A few months or --

A No, it -- I do not believe they go a few months without payments.

Q And did you notify the City when the insurance was canceled?

A No, I did not.

Q And did you understand that, pursuant to the agreements, you were obligated to inform the city?

A No, I did not.

Q Are you familiar with the agreements?

A I am familiar with the agreements. However, I did not, at that time, know that I was obligated to notify the City.

Q Okay. And when was the insurance canceled?

A I believe it was maybe end of October. And, once again, I tried to find this information prior to this hearing. However, I am in email jail, so my Momentous organization’s Office 365 was illegally hijacked about three weeks ago. So I have no access to emails right now.

Q Okay. So your testimony -- that -- that's fine. It is what it is. So the insurance -- and we did not know this. In fact, this came up Friday and we had no idea. So the insurance ended in October, and no one from the City was notified about that at all.

A Correct. I did not know I was obligated to notify the City. At the same time, I was also on medical leave.
Q Okay. So you were on leave from your position.
A Yes, I had major surgery on October 13th of 2023.
Q I'm sorry about that. And was there anyone filling your role as communicator with the City during that time frame?
A Yes, my Chief of Staff at the time was the liaison. I was in constant communication with my Chief of Staff, but that was more on the day-to-day needs.
Q Okay. And you mentioned the insurance you're trying to get will have a lower premium because it's not for baseball.
A Correct. With an understanding that once we figure out baseball, that baseball will be added.
Q But at this point, the debtor is not trying to get a policy that would be accepted by the City. It’s just trying to get one that's doesn't cover baseball in the baseball stadium.
A No. The COI would be the exact same as the one that you have on file for Marsh McLennan. The coverages will be exactly the same under the new policy.
Q Okay.
A However, what I am understanding -- and, once again, I'm not an insurance agent. But what I am understanding is that because we don't have -- currently have a professional baseball team under our management, that this risk is rated -- it's less risk is what I'm being told. So that the risk -- the premium

would be lower.
Q Okay. And the policy that was provided to us today, we already went over it, to expires January 4. There's no umbrella policy at all, meeting the $10 million minimum.
A You’re correct. And our agent has been working on getting the umbrella policy. As a matter of fact, I just -- I texted him this morning to see the status. I was expecting to have it yesterday.
Q But as of now, there's -- there's no umbrella.
A Not -- as of -- correct.
Q Okay. And what about the liquor -- covering liquor and events?
A Correct. We're not serving any events as at this time we do not have keys to the ballpark, and we will -- we are not hosting any events until we get the permanent policy in place.
Q But are you seeking a policy that covers liquor events --
A Absolutely. We are seeking a policy that is -- with the same coverages as the previous policy.
Q And so what about workers’ compensation?
A Workers’ compensation is currently not in effect. However, I do have a bindable quote.
Q Okay. So there's no workers’ comp. So right now there's no umbrella, no workers’ comp, and no liquor coverage. And you're -- you're hopeful for these things.
A I am confident that they will be in place by Christmas.

MS. EDWARDS: That's all I have. Thank you.

THE COURT: Any redirect.

MR. DRESCHER: Nothing further, Your Honor.

THE COURT: Thank you, Ms. Jeon. You can step down.

MR. DRESCHER: Your Honor, I'd like to call David Woody.

THE COURT: All right. Mr. Woody, if you would approach the stand.

DAVID WOODY, DEBTOR’S WITNESS, SWORN

COURTROOM DEPUTY: Thank you. Please be seated and state your full name and address for the record.

THE WITNESS: My name is David Woody. And my address is 10721 Wayfarer Road, Germantown, Maryland.

COURTROOM DEPUTY: Thank you.

THE COURT: Your witness.

DIRECT EXAMINATION

BY MR. DRESCHER:

Q Mr. Woody, what do you do for a living?

A Well, I’m --

Q I know, it’s a trick question.

A I'm really hard of hearing. So you just -- can you speak in the microphone so that I can hear you better?

Q Sure. Mr. Woody, what do you do for a living?

A When did I what?

THE COURT: What do you do for a living? What is

your job?

THE WITNESS: I'm a lawyer. A hard of hearing lawyer.

(Laughter)

Q And are you -- are you involved -- how are you involved in the NC Gas House Gang matter?

A I was originally counsel for Brandon Bellamy when he was negotiating his contract with the City. I did not negotiate the contracts, but I reviewed every document and was involved in all the decisions that Brandon made in connection with his acquisition of the baseball team.

Then I also prepared a private placement memorandum for him for $6 million, 150 pages. And he attempted to find capital in that local area, but he was unsuccessful.

I also was involved with negotiations in connection with the acquisition of the seller note of around a million seven. I was dealing with Brandon's partner, Arc Trust, which is a real estate development firm out of New Jersey that has projects all throughout the country and has worked with Brandon on numerous projects, amounting to approximately $250 million.

So Arc and Brandon have an excellent relationship. And Arc, at Brandon's request, said that it would pay off -- it would buy the note. It did not want to pay off the note, it wanted to buy the note so that it would -- Brandon would still be obligated to him -- to Arc as opposed to just --

MS. EDWARDS: Objection; hearsay, Your Honor.
THE COURT: Sustained.
MR. DRESCHER: All right.
BY MR. DRESCHER:
Q So did Arc deposit any money with you to help with this engagement?
A No.
Q Are you holding any money in your escrow accounts in connection with this engagement?
A So Arc Trust sent me $900,000, which I put into my escrow account, to start negotiations with the seller note holder. And I began those negotiations with the seller. He showed an indication that he wanted to -- that he was willing to sell the note, and we were in the process of negotiating when the team terminated the membership.
In addition to putting up the $900,000, a requirement was that Brandon also raise an additional $650,000 to pay the accounts payable. I was involved in the negotiations with an investor that was brought to Brandon who was interested in putting up $500,000 for a 5 percent interest in the Gas House Gang and the stadium entertainment. He eventually came back and said that he really wanted a portion --
MS. EDWARDS: Objection; hearsay.
THE COURT: Sustained. I don't know how we -- you can't testify as to what somebody told you that's not here and

available for cross-examination.

BY MR. DRESCHER:

Q So is it your belief that investors are still at the ready to finance the operations and the rehabilitation of NC Gas House Gang?

A Well, I was entering into an operating agreement with this one particular investor for $650,000 and was about a week away from closing that deal when the membership was terminated.

Q Are you --

A At which time, that investor walked away.

Q Are you still holding on to the almost nine hundred or so thousand dollars that you referenced before?

A I have approximately 800,000 left because the trust company that -- Arc Trust agreed to loan Brandon out of that money approximately $100,000 for legal and other costs. So I have 800,000-plus left.

MR. DRESCHER: Okay. Your Honor, I have no further questions.

THE COURT: Thank you.

MS. EDWARDS: I have none, Your Honor; thank you.

THE COURT: All right. Thank you, Mr. Woody. You are free to step down.

MR. WOODY: Thank you.

MR. DRESCHER: Your Honor, I would like to call Mr. Brandon Bellamy.

THE COURT: All right. Mr. Bellamy, would you approach the stand?

BRANDON BELLAMY, DEBTOR'S WITNESS, SWORN

THE CLERK: Thank you. Please be seated and state your name and address for the record.

THE WITNESS: I'm Brandon Bellamy. My address is 18403 Garner Lane, Accokeek, Maryland, 20607.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. DRESCHER:

Q Thank you. Mr. Bellamy, what do you do for a living?

A Get in trouble. I'm joking. I am a real estate entrepreneur. I have a commercial estate company. We focus on community development. We often go into blighted, dis-invested areas and generate or create economic development through multifamily, retail, hospitality and office.

Q Could you just tell the Court about a couple of recent projects that you -- that you spearheaded?

A Sure. We just finished about a $50 million project, which was a redevelopment of a blighted shopping center in the area of the county that we happen to be in right now that was suffering from a food desert. We were able to bring a high quality grocer back to the area. We were able to develop and lease out about 65,000 square feet, and that store happens to be one of the most successful store openings of -- it's

actually a Giant -- local Giant in their history. So the community is really excited about that, and they -- I think they were very appreciative that we were able to bring that to the table.

We also are under development and construction of about $250 million of mixed use project, County office building, parking garage, 200 units of multifamily, local participation from lots of businesses that were already here but needed an opportunity -- a platform to step up. So local grocers, also restaurateur, and also hopefully very soon another hotel.

So -- we also have -- we have various projects, several hundred units of multifamily, affordable housing. We're in a project -- we're in the process right now of developing a really cool project that will allow for youth who are graduating from foster care to have some cool housing. So we're doing lots of stuff like that, affordable housing and community development stuff.

Q All right. So how did you get involved with the City of Gastonia?

A You know, there was a relationship that I had with a gentleman that I used to work for in his hardware store when I was really, really young. And he and I became great friends, and he had pursued the opportunity of minor league teams locally; it didn't work for him. But he and a friend of his

introduced me to this opportunity at a groundbreaking for a project that I had. And he was telling me that, you know, they had been pursuing opportunities for minor league teams, but this particular one, they were having trouble, different groups kept passing on it, but there was a component of real estate development that sort of probably makes it work. They were having trouble finding investors for that, but he told me to go take a look at it.

Q And this was the Gastonia?

A Yes.

Q What became FUSE.

A Yes, exactly. The FUSE District was sort of established. He asked me to go take a look at the community to see how I would feel about it. So I flew into Gastonia and just started walking around talking to people and just to get a feel for the area.

Q When was that?

A Basically, December, November of 2019. That's when he first told me about it.

Q Okay. So what was the -- what was the first dollars that you personally invested in this project?

A Well, lots of travel back and forth. Legal. And starting to do that -- analyzing what we thought could happen. I never owned a team before, so I was curious about it. I really wanted to understand the macro economics of the market because

the first read was that Gastonia was being perceived as not necessarily a great place. In the Charlotte Metro area, people had a perception of Gastonia, and I wanted to find out if that was actually true. I found out it wasn't. The people are amazing. I fell in love with them. I understand because I've developed in places where there can be a lot of unconscious bias about a place. There can be an issue of the perception of lack of safety, and sometimes that doesn't translate into private investment. So when I got there, I was like, no, this is actually cool. People are just not -- they're overlooking it. So I thought it was really cool that the City decided to create a FUSE district because they knew in order to get economic development, they were going to have to be much more aggressive. And so that's how -- how I got introduced to it.
Q Can you explain really what a FUSE district is?
A Yeah. Oddly, there is a -- there was a redevelopment of a textile mill in downtown Gastonia on a side of Gastonia that hadn't gotten any development. And it was developed into a multi-family, and it's called Loray Mill. And people were really surprised that that project happened, and that was, like, maybe 15 years ago. I think the City saw that as an opportunity to maybe generate more momentum. So they created the Franklin Urban Sports and Entertainment District, and the idea was to bridge the new project at Loray Mill Apartments to downtown Gastonia and really create a live, work, and play

business district.

Q All right. And so what are you, in particular, going to accomplish (inaudible - audio fading).

A When I met the City, the council members, the mayor at the time, just various people, it was really all about creating economic development. And I'm used to that, I understand that. And to create a live, work, and play district, the thought process was going to be that they wanted to create pedestrian traffic. But that was going to have to be many different types of events. So they wanted to do baseball, but really they were focused on pedestrian traffic, however it could happen. So that could be concerts, it could be events, it could be new stores, it could be all these different things that they were thinking about. But they knew that this was kind of a springboard -- a possible springboard for those activities.

Q All right. I'd like you to take a look in the small stack of papers at the document that's been marked as Number 3, which is the (inaudible - audio fading). Let me know when you have it.

A Got it.

Q All right. Have you seen this before?

A I have.

Q Are you the Brandon Bellamy that is referred to in this letter?

A I am.

Q Can you explain what this letter is?
A Well, this economic development agreement with the City is broad. It requires that we bring entertainment and events. It requires that we have a baseball team, but it also requires that we develop the three parcels of land that we were given in order to do this deal. And we have a timeline by which we're supposed to deliver, or at least start the project. We've always thought that at least one of the parcels made sense for hospitality. The City actually sent us a Marriott representative. We started working with them, and they came to us and said, “Hey, you know what? We love what you're doing here, and we think that, you know, this could possibly be a Springhill Suites location” --
MS. EDWARDS: Hearsay. Your Honor, objection; hearsay.
THE WITNESS: Should I --
MR. DRESCHER: Your Honor, I --
THE WITNESS: Sorry. I didn’t know, I’m sorry.
MR. DRESCHER: I think -- I think it's a worthwhile testimony. This is --
THE WITNESS: Oh, I don't have to speak about them.
MR. DRESCHER: This is an expedited hearing.
THE COURT: Just hold on. One second, Mr. Bellamy.
THE WITNESS: Yes, Your Honor.
THE COURT: Let me hear from both of the parties.

I will overrule it, but you can't go too far, saying what they said.

THE WITNESS: Okay.

THE COURT: You can tell me what you do --

THE WITNESS: Okay.

THE COURT: -- and what you think, and what you know.

THE WITNESS: Yes, Your Honor.

THE COURT: Okay?

MR. DRESCHER: Thank you, Your Honor.

A We worked with Marriott. They offered a flag that I thought would be successful, but not necessarily the flag that I think matches what the City is trying to accomplish by creating a vibrant downtown that brings in young people and has the live, work, and play energy that I think they're looking for. I was able to work with them and get an approval for an Aloft. We were able to pay the franchise fee, and they're looking to have this hotel built.

Q All right. Could you describe what the -- where the hotel would be to the stadium?

A Yeah, interestingly about this deal is that the parcels that we own are actually inside the boundaries of the stadium. That's unusual because when you see these type of deals in other markets, you'll see that a lot of times the parcels are outside the stadium. So the parcels here are described as parcels A, B, and C.

I'll start in reverse. Parcel C is actually the parking lot of the stadium. So we have that. We have lenders who have mortgages on those parcels.

The other parcel is actually the berm in the stadium. Inside the stadium, where this hotel will go, is currently being used as a berm.

THE COURT: As a what?

THE WITNESS: As a berm. It's a hilly area --

THE COURT: Thank you.

THE WITNESS: -- where people are sitting inside the stadium.

THE COURT: Thank you.

Q Oh, okay.

A The other parcel is parcel A, which is currently being used as the kids' area inside of the stadium, running all the way to the sidewalk. So the development of these buildings are zero lot line. They're literally immediately adjacent to everything in the stadium, which is going to be an interesting development and construction project because it's surgical. You know, you're going to have -- you have very narrow parcels. You have easements that have to be tied into them. You have a lot of complex issues to execute this. And that's also in the agreement that I'm supposed to execute.

Q Do you have a vision for how the stadium and the hotel and the other parcels can (inaudible - audio fading)?

A Absolutely. And I think that was always the intention. You know, I think it's a small deal in a challenging market, and you need probably the real estate to make it all work. Our thought process has been multifamily, which is proven to be successful, I think, there as the market continues to grow, will make sense with the appropriate parking. But the hotel, I think, is essential.

Our event side of this business -- we've gotten a lot of opportunity, but there was no hotel of the style, size and capacity that could host larger conferences and larger events. And so I think it will be a really big boost to get that here. You have a lot of travel with baseball. So having a hotel, you know, immediately adjacent, I think is very, very important. We're talking about the generation of a lot of property tax. We're talking about the generation of a lot of sales tax.

And I think the parcel in the front, at some point, by doing the southern portion or the rear portion of the property first, and doing the property closer to Franklin Boulevard last, will drive some appreciation. And I think you can get some additional high quality retail that will match that.

Interestingly enough, when we committed to the area, we didn't have a lot of the other projects that are coming on. I think there's about $250 million of private investment that is going into the area, largely because we made the investment

in the team and kicked everything off. Kudos to the City because they've been laboring in these venues a long time. But I would say that I do believe that we played an instrumental role in catalyzing what's happening right now.
Q How much actual cash did you either personally invest or arrange for investments into this project?
A Several million dollars.
Q All right. Let’s not bury the League. In March of 2020, COVID shuts down it all.
A Yeah.
Q How did that impact your development?
A Immensely. Immensely. When we were introduced to the Atlantic League, they -- four different groups passed, including owners in the Atlantic League, who know way more about these types of deals than I did.

And then COVID happens while we're negotiating these arrangements. No one knows how much impact it's going to have. It's huge. Companies, even right now, today are experiencing real setbacks from COVID. It's not a simple excuse to say, “Oh, well, it was COVID and things didn't work out.” No, it's been massive.

So we didn't actually know we were going to play. The League wasn't sure. We had about nine months to create an entire organization to meet the timeline that the City required. The City financed the stadium. The community was

not happy about their dollars being used that way. The Atlantic League made a deal with the City, and the Atlantic League was not able to produce a team.

When I met the City, they didn't have a team. I've been in public hearings where council members have said in the open, we appreciate what you did because --

MS. EDWARDS: Objection, Your Honor.

THE COURT: Sustained.

THE WITNESS: Oh, I'm -- jeez, I'm sorry.

MR. DRESCHER: It's hearsay, but -- but --

THE COURT: It's hearsay.

THE WITNESS: I'm sorry. I'm just --

MR. DRESCHER: That's all right.

THE WITNESS: Yeah, I'm just -- this is only my opportunity to communicate.

BY MR. DRESCHER:

Q Okay.

A So long story short, the City was in a difficult situation. They needed a team. They were going to open a stadium that was supposed to have a team, and there was not going to be a team at all. So the same level that I'm hearing today that a team has to play in 2024, that's exactly what I was told in 2021. A team has to play. Okay. I spent my money. I launched -- I think Mr. White testified earlier today that it takes 18 months to launch a team. We had to do it in

nine. Immense impact. I don't even know how the depth of the severity of COVID because I never run a team before. They told me the best day you're ever going to have is opening day and every other day is going to get worse, and minor league teams lose money. So you’re going to have to use that real estate to cover yourself, and it's going to be a bumpy long road. Okay. So how much impact did it really have, you know? I don't know, but we wrote a lot of checks.

Q Would you say that may -- that all of the subsequent cash flow challenges that you had were due to COVID?

A Absolutely.

Q How did COVID -- what were the mechanics of why COVID disrupted this development?

A In a lot of markets, they weren't having any activity where people could come together. In North Carolina, people could still come together. We actually launched, but that doesn't mean that most people came out. We don't know. It's severe. If that was going to be our best shot, we don't even know. The entertainment industry was completely shut down. So you're not really getting the types of talent moving around. No one's doing that. So if you launch in nine months, you don't know who's going to come out. People don't come out. You're carrying more losses forward than you normally would. When we roll into the next season -- so we don't even count our year one as an operating year one. We count our year two as

our operating year one because the impact of COVID's all over the place. We're spending more money than we would normally, and we're trying to launch. So we're hiring consultants. No one has any answers. So it was very, very severe, and it was hard to find capital. It's -- how are you raising capital in a business that brings people together when there's a global pandemic? So it was very difficult.

Q All right. So I'd like you to take a look --

MR. DRESCHER: Well, first of all, Your Honor, I'd like to move to admit Debtor’s Number 3 into evidence, the Marriott page.

THE COURT: Any objections?

MS. EDWARDS: That’s fine, Your Honor.

THE COURT: Okay. Debtor’s Exhibit 3 will be admitted into evidence.

(Debtor’s Exhibit 3 in evidence)

BY MR. DRESCHER:

Q All right. I’d like you to take a look at the table at Debtor’s Exhibit 2, two-page three-sided copy --

A Yeah.

Q All right. Have you seen this document before?

A Yes.

Q All right. This purports to be a calendar of events for the stadium, am I right?

A Yes.

Q All right. Who prepared this document?
A This is from our team on the ground led by Veronica Jeon.
Q Okay. Have you reviewed this document before?
A I have seen it, yes.
Q All right. Are the contents of this document true and accurate, to the best of your knowledge?
A I believe they are.

MR. DRESCHER: Your Honor, I'd move to admit document Number 2 into evidence.

MS. EDWARDS: That's fine, Your Honor.

THE COURT: Okay. Exhibit 2 will be admitted into evidence.

(Debtor’s Exhibit 2 in evidence)

BY MR. DRESCHER:
Q Okay. So could you kind of describe how the efforts that went into kind of create this (inaudible - audio fading)
A Working it out, yes. So we've always looked at the business model as baseball. If we could get baseball to break even, then we could be profitable by bringing other events through the hospitality side, business conferences, corporate retreats, weddings, and that has a sizable profit margin if you can get that book of business working. And then the sports entertainment side, which allows you to bring festivals and concerts and events like that. It would be great if the promoters were coming and they were bringing it. But we found

a challenge in those two verticals initially because COVID wasn't allowing one of them to move. We were communicating to the community and the market that the hospitality side could happen because a lot of people weren't aware that the stadium was a multi-purpose facility. They weren't sure that you could use it the way that you could to have events and host and things of that nature.

So we started that line of business in 2022. So we didn't have any runway for it, so literally we had to go out and get one event at a time, one event at a time to build that book of business. And that's what we did in 2022.

The goal was in 2023 to launch more concerts. We had some cash flow challenges, so that became a problem, but we were able to launch a few of them so we could figure out how it works and be able to go out and get investors that want to invest in that because that's where the profit was. So if you blend those three businesses together, the baseball, even if it loses with the hospitality side and with the concert and promotion side, you can get a working concern. And if we could just get that stadium to break even, and then execute the real estate development, we would have generated the economic development that the City was looking for, created the gravity that I think a stadium like that can generate, and still push forward and move a team forward.

Q You talked about the cash flow problems.

A Yeah.

Q That it's been an ongoing theme.

A Yeah.

Q Right? What efforts did you make to deal with the cash flow problems?

A Well, certainly, you know, putting in dollars that we had. We've gone out, closed on lines of credit, use those. We actually -- as we invested in the other verticals, the hospitality side and the concert side, we anticipated closing another line of credit earlier this year.

Q For how much?

A We thought we could get about a million dollars. The problem was that interest rates moved. I'm in a real estate development space, so the business is taking your cash, you do deals, you refinance that, you put your cash back. What we did not realize was that the interest rates were going to double. We were at 4 percent on deals that had plenty of value. Interest rates moved to 9 percent, and it eradicated the value that we'd be able to grab to use for a line of credit as security, and that created a hiccup. And I feel bad about that because the last thing I would ever want to do is disappoint the citizens of Gastonia. I definitely don't want to not pay my vendors and the people that are working for me.

So we were scrambling to do everything we could to do that. We got investors to come in on the entertainment side,

and right as we were about to get some of these deals closed out, we had a hiccup. That issue in July that Mr. White spoke about with the team, it created a hiccup and it created a downstream, sort of a domino effect. And we weren't able to get in front of it, and that's just the honest truth.

Q You heard Mr. White's testimony about the handwritten checks to the players. What's your response to that?

A I mean, the reality is, is when you're running short on cash flow, you're doing everything you can to get as much dollars as you can as fast as you can. So we didn't handwrite any checks. They were paper-printed checks. The players wanted direct deposit. We were scrambling to get as much dollars as we could. If you're doing a direct deposit, you got to move that money, like, on a Wednesday, right? We -- it might have been Thursday by the time we could get all the dollar. So the players were paid, but they were upset. They were just upset in general about how they were being paid, not that they hadn't been paid. And it had been trouble. We -- you know, we had had checks bouncing all around. We were trying to cover bills. It was -- it's been really rough. But that comes with business, right?

If you have it -- every story that's being discussed is all about, “Okay, you didn't do what you said. You didn't do what you said.” No, we had a cash flow problem. And when you have a cash flow problem, there's a downstream effect of

what happens. So if we enumerate all of that, that's great. But we're also not enumerating all the things we did right. We did a lot of things right.

Q So, okay, you've gotten to the million dollar or maybe multi-million dollar question, Brandon.

A Yeah.

Q How are you going to solve the cash flow problem now?

A As I said to the League at the time, I said, I don't want to sell, but I'm willing to do what's necessary for the betterment of Gastonia. If there's the right kind of deal, I would make a deal.

So I had to run a parallel track. Track number one was I'm still obligated to do everything that I'm supposed to do here. Let me raise capital. I said we need to play till the end of the season because obviously our cash flow was tight. If we can get to the end of the season, we would do what all these businesses do in the off season: figure things out. Pay some bills, catch up on AP, find new money. That's what you do. They all do that. So I said, if we can get to the end of the season -- we went to the championship. Anecdotally, we were the worst team in the League when we launched. The next year, we were statistically the best team in the League. And last -- this last season, we went to the championship. People keep saying you don't know nothing about baseball, but we figured that part of it out. We need to

figure all the rest of the components out at the same time.

So we were able to secure capital for some of the debtedness [sic] that was owed to the League. We had investors ready to post for AP. We were just selling interest in a team because borrowing was difficult, right? We just talked about interest rates have doubled. So I got to sell down my interest. We had people that were interested in doing that. They put up money. Money was wired in. We were ready. The timing just caught us. And when the League terminated us, what's an investor buying into at that moment? I said that to the League.

I also said to the league, the City is going to have to file a default when you terminate me. I have this Marriott right here, they're ready to go. I have to sign this franchise agreement and I have a timeline to deliver this hotel. How am I going to navigate that when the City has to default me? It's going to be difficult. Everyone knows that this deal was going to need parking. The City knows. We're in very regular communication.

Q All right. I'd like you to take a look at Exhibit 5, which I think has already been admitted into evidence. This is the letter from the entity (inaudible - audio fading) dated (indiscernible - audio low).

A Yeah.

Q Let me know when you have it.

A I have it.
Q All right. Have you seen this letter before?
A Yeah.
Q So could you give us a little bit of the background about how BCG Sports and Entertainment LLC became interested in purchasing the team?
A Yeah, let me back up. So as Mr. White mentioned, they realized that we were having cash flow issues. They suggested that we sell. I said I'm open to that.
MS. EDWARDS: Objection; hearsay.
THE WITNESS: He did testify to that earlier, though.
MR. DRESCHER: Your Honor, it's hard to say, well, Mr. White, who testified, shouldn't be quoted by somebody who was rebutting the testimony.
THE COURT: I tend to agree with you, Mr. Drescher, and I will overrule it, but you can't go --
THE WITNESS: Too far.
THE COURT: -- too far.
THE WITNESS: Yes, Your Honor.
THE COURT: Okay? Try to keep it to what you know and what you do.
A The Atlantic League brought me a buyer. Suggested that I'd make a deal with the buyer. The buyer made an offer that was basically an offer that didn't work for me. I explained why it wasn't economically okay. But -- because I was

concerned about how this would all play out, I said, you know what, maybe this is a time to exit. I said, but because I do not know if this buyer is going to close or not, I'm going to have to continue to run a parallel program so that I'm able to play and meet my obligations because I got lenders on the real estate, I got commitments from large corporations on the real estate, I have to act like I'm the only one that's going to come through. The same way I came through in 2021 when I launched the team.

So I worked with the buyer. The buyer had a very short timeline. The League told me we want -- I can't say that. Hold on. I'm learning. I'm learning. So the buyer had a short timeline. We did everything we could to meet it. In my opinion, the critical component of making that deal was an asset purchase agreement that we had negotiated and was ready to move forward on. The buyer decided that we weren't moving fast enough for him and he walked away from the deal.

Q All right. Now that wasn't BCG, the buyer at the time.

A No, this is a completely different buyer.

Q All right. I just wanted to clarify.

A So that was -- but that's the buyer.

Q He’s gone?

A There was a local group that also came to us and said, “Hey, we want to get in this deal.” I said, don't really want to sell, but what I can tell you is the Atlantic League doesn't

have to sell to you. They don't have to let you in. If you want to be in this deal, you got to get in front of the guy that they really like. And the only way you can do that is if we come to terms with me because I have the opportunity to help make that happen right now. They said, okay, we negotiated a price and terms in an LOI.

Q Is this BCG?

A That's BCG.

Q All right; thank you.

A I introduced them to the league, as I was instructed to do, with a signed LOI. First meeting, these are the things that came out of it that the League said that the buyer, who's a private buyer with a private seller, had to comply with. Which I think these terms are 100 percent ridiculous, especially knowing that this was a closing that was three and a half weeks away. Their suggestion was that they were supposed to sign a contract in five days and pay almost $1.3 million at the exact time they signed the contract, even though they didn't have to go to closing till November 21st, which is what was listed here. I think that was a complete way to tank my deal, given the fact that the offer that they wrote to me in an LOI was a million dollars higher than the buyer that they brought me in the first place.

Q So after your buyer saw this letter dated October 30, 2023, what happened?

A He rescinded his LOI, suggested that he'd have to resize the price based on risk.

MS. EDWARDS: Objection, Your Honor.

THE WITNESS: Oh, I can't say that. Damn.

THE COURT: You can't say that.

(Laughter)

THE WITNESS: The LOI -- sorry.

A The LOI was rescinded after these terms were put forth by the League who didn't have anything to do with the purchase contract.

Q So you continued to try to find a qualified buyer?

A Sure.

Q What efforts have you made to do that?

A We've been talking to a bunch of different people because people do want to help. The challenge is that they know that we were terminated, which I don't agree with the termination. And they know that, you know, the City is trying to exit us out without our cure period. They know that. So they're standing in the wings to see what's going to happen. And I don't have answers to those questions.

Q I'd like to direct your attention to Item Number 4 on our stack.

A Yeah. Got it.

Q Okay. Have you seen the document?

A Yeah.

Q All right. And what's your understanding of what this document is?

A This is official notification from the League that our membership was terminated. Forfeited.

MR. DRESCHER: Your Honor, I would like to move Number 4 into evidence, if it hasn't already been done.

MS. EDWARDS: That's fine, Your Honor. I think it's also G something, as well.

THE COURT: Okay. Debtor’s Exhibit 4 will be moved -- admitted into evidence.

(Debtor’s Exhibit 4 in evidence)

MR. DRESCHER: Actually, I think the document that you’ll find in your binder is the notice from the League to the City. This is the notice to the team.

MS. EDWARDS: Oh, which makes sense. Okay. Understood.

MR. DRESCHER: All right.

BY MR. DRESCHER:

Q Where do you see this whole situation going if the Court allows you to pursue -- continue (inaudible - audio fading)?

A We -- we filed a reorganization because we want to reorganize. And I wouldn't have filed it if I had a cure period, I could have worked through it differently. But I didn't get an opportunity to get the cure period, even though the document says that I have it, and I made my business

decisions on that.

I realized the League's position. I don't agree. I do not agree. I heard what they said. I don't agree.

There's also the opportunity that we could have gone to another League. The City had the opportunity to make different decisions. They may not want to do that, but they could do it. I could present a whole different option. I never got a chance to put the plan together. I have investors that want to come in. Lots of people want to help. I need the time to put the plan together. I haven't even had a chance to apply, even though I've had conversations with other leagues. The City could decide that it doesn't want anything other than the Atlantic League, but that's not what the document says.

The document also says I had 30 days to get notice, and then I had 90 days to cure. I would have done that. The same way I figured out a way to launch the team. Things haven't been going great, but that's the story of entrepreneurship. You've got to survive the tough moments to make it out, in my opinion.

So I already have an investor that came in for $900,000 or so, commitments for six fifty. And the suggestion is that I'm somehow just not delivering as if I'm sitting on my hands, as if this was some easy problem, like I don't care about the creditors. It's not true. That's why I'm filing a reorganization.

I also have an investor right now who will bring capital for the events. That’s -- and we can get enough of David to that effect. He's ready to go. But I can't answer his questions because I don't know whether or not I'm going to get to submit a plan, which would be part of the plan.

Q I'd like to have you look at the City's binder. Let's see -- let’s see how quickly I can get you to my page.

A Sure.

Q I'm in Tab 1.

A Okay.

Q I'm about halfway in. It says on the top, Doc 49-5, Page 21 of 79.

THE COURT: Page what of 79?

MR. DRESCHER: 21 of 79.

THE COURT: Thank you.

MR. DRESCHER: On the lower right-hand corner, it's got Bates agreements 0-0-0-0 (inaudible - audio fading).

A Oh, man, hold on. That was a lot of numbers, man. Can you say that again? Where are we?

MR. DRESCHER: Your Honor, can I approach the witness to help direct -- direct him?

THE COURT: You may approach.

THE WITNESS: Help me out. I'm stressed up. I'm stressed out over here.

(Pause)

MR. DRESCHER: Forgive me, Your Honor. I have forgotten what --

THE COURT: I heard you say 21 of 79.

MS. EDWARDS: Of 79.

MR. DRESCHER: So, yes, we're just going to write 51 on this.

THE WITNESS: 51.

MR. DRESCHER: And just go back 30 pages.

THE WITNESS: Okay; got it. I'm fine.

MR. DRESCHER: Okay.

THE WITNESS: Okay, I got it.

BY MR. DRESCHER:

Q Okay. So, do you see up on the -- this is the -- the use and occupancy.

A Yes.

Q And were you involved in negotiating this document?

A Yes.

Q All right. So, we've got here -- the second paragraph is L-L-L, open parens, L-L-L, Sanctioning Association. Could you just go ahead and read that into the record?

A Yeah. It says, "Sanctioning Association, or Atlantic League, means the Atlantic League of Professional Baseball Clubs Inc., its entities or affiliates, and any other baseball association that Team certifies to City's responsible satisfaction is a comparable baseball association that

sanctions professional baseball teams."

Q And is it your understanding that this is the section of the agreement that governs who can play in the stadium?

A Yeah.

Q All right. And what's your understanding of what that means?

A My understanding is that it could be the Atlantic League or any other association that the City would be okay with. This is important because leagues go out of business. There has to be an opportunity for me at the time of this negotiation to meet the balance of my obligations in this broad complex economic development agreement if something happens I can't control, like the League goes out of business, or maybe there's an opportunity to get another team, or any other type of thing that could happen. It can't just be that I'm shut down, I'm in default, and I have no ability to cure it, and neither of us can fix it.

MR. DRESCHER: Your Honor, I have no further questions.

THE COURT: All right.

MS. EDWARDS: I only have two, Your Honor.

THE COURT: Okay.

THE WITNESS: Come on.

(Laughter)

CROSS-EXAMINATION

BY MS. EDWARDS:
Q Good afternoon, Mr. Bellamy.
A Good afternoon.
Q So in this letter from Marriott, I see that it's addressed to Brandon Bellamy, Chief Executive Officer of the Velocities Company.
A Yeah.
Q So when you're speaking of the Aloft, or the Marriott, or anything, those funds would go to the Velocity Companies, is that right?
A What do you mean by “funds”?
Q It wouldn't come to the debtor. Is this through the Velocity Company or through the debtor? The --
A You mean the franchise agreement?
Q Any agreement with Marriott.
A It won't be to NC Gas House, okay?
Q Okay. Okay. So it -- it’s related because it’s -- I understand the property situation, but this is not with the debtor, this franchise.
A No.
Q Okay. Understood. And then the only other question is on that first offer, you -- you’ve kind of said that it didn't work, but I think we understood that it would pay the creditors. So what was it in the first offer that didn't work for you?

A Oh, you mean from the first offer? No, so -- so the first offer was $3 million. A million dollars to pay the note; a million dollars to pay creditors potentially; and a million dollars to do -- no, to pay AP, and a million dollars to pay whatever else was left if the -- if -- if the venture was profitable.

Q So when would the three million have come in?

A I don't know. It's an excellent question.

Q Okay. Understood.

MS. EDWARDS: That's all I have. Thank you.

THE COURT: Thank you. Any redirect?

MR. DRESCHER: No redirect, Your Honor.

THE COURT: Thank you, Mr. Bellamy. You're excused from the stand.

MR. BELLAMY: Thank you.

THE COURT: Mr. Drescher, any more witnesses or evidence at this juncture?

MR. DRESCHER: No, Your Honor. We rest.

THE COURT: Okay. And any rebuttal evidence?

MS. EDWARDS: No, Your Honor. We're ready to close when you're ready.

THE COURT: Okay. Do you all need a few minutes to get your thoughts together? Would you like to take a brief -- just -- I mean, we're talking five, 10 minutes, a brief, you know, trip down the hall kind of thing?

MR. DRESCHER: I'd like to see what's going on down that hall.

THE COURT: Okay.

MR. DRESCHER: Thank you, Your Honor.

THE COURT: All right. We'll be back in about 10 minutes.

MR. DRESCHER: Thank you.

(Recess 2:19 p.m./Reconvene 2:32 p.m.)

COURTROOM DEPUTY: The United States Bankruptcy Court for the District of Maryland now resumes its regular session. The Honorable Lori S. Simpson presiding.

Please be seated and come to order. Recalling the case of NC Gas House Gang LLC, Case Number 23-18766.

THE COURT: All right, we are ready for closing.

MS. EDWARDS: Well, thank you, Your Honor, again for coming on an emergency basis and hearing us all day on this matter.

You've heard all the evidence today through the various witnesses and the previously submitted affidavits.

I'd like to start first just with the insurance. We learned -- or on behalf of the City, I can say we learned for the first time today from Ms. Jeon that the insurance actually ended in October. Again, we, as you found out last Friday, we didn't know that. We thought it ended on December 5th.

So -- and you're also aware in the operating

agreement, they are required to tell us if insurance is ever terminated. Insurance terminated. We were not told about that.

They have been trying to obtain the insurance conceivably since October. And that has not come to fruition. The Court's order was very clear, the order entered on December 8th. The debtor -- they must immediately obtain commercial general liability insurance and umbrella/excess liability insurance that satisfies all of the requirements under the Use and Operating Agreement and Exclusive Use Area Lease Agreement, including, without limitation, naming the City of Gastonia as an additional insured. It would be impossible for the debtor to prevail in opposing the City of Gastonia's request for stay relief. And as such, the City of Gastonia would be entitled to relief from an automatic stay without further notice for a hearing.

We have also gone through -- we had the insurance that was provided for, I guess, last Friday. And we've compared it to what is acceptable. We've compared it to the COI, which was previously in place. We have also walked through the operating agreement about what's required: $10 million on the umbrella coverage, workers' compensation. The debtor knows and has admitted to you that this policy that they brought forth today does not comply. It does not comply. The best we've heard, that they hope to have it by Christmas.

So by my math, even if everybody's working hard, which it's around the holidays, we'll see, that's 10 days. So what they've been trying for since October, they now purport that they could maybe get in 10 days.

And this, again, goes back to -- so the debtor has failed to comply with your Court order. They had failed as of Monday at 5 p.m. That has not changed. They are not in compliance with the Court order.

They are not in compliance with the agreements. Again, the operating -- if you look at 365(d)(3), one of the obligations of a debtor in possession is after the petition date, you must comply with the executory contracts before those are assumed or rejected. And there's evidence -- I mean, there's lots of statutory history on that, some of which I recited to you last Friday. But one of the concepts there is you can't have these landlords or the opposing side on an executory contract be an unwilling creditor in this case that could be damaged by the debtor's actions post petition. And I think that's exactly what we have here. And I think the Court understood that, just how dangerous this could be, and their continuing noncompliance. So every single day, they remain in noncompliance.

Furthermore, you heard them say, “I think we could cure in 30 days, you know, or give us 90 days.” You know, on the insurance piece, they didn't tell us, but it's been since

October. And there's been no cure. So just on the insurance piece, they absolutely have not complied with your order. And I have no faith that this will come -- that they will be able to put insurance in place by Christmas. And I think that that's our first and foremost concern here, is the insurance.

Secondly, I think we need to move to, okay, so you're here on the 14th day, this is, you are requesting emergency relief. And why is that? And I think the reason is, well, first, the insurance. But secondly, there is no possible reorganization here. We've heard the debtor say, we heard Mr. White say, it's terminated with the Atlantic League. It's terminated. And there might be a, you know, "what if this" and "what if that," but I don't think that Mr. Bellamy disputed that it is, in fact, terminated.

And Your Honor can look at the agreements. You can look at what is required under the bylaws, which he signed and no one contests, that an appeal would only be upon new information. And they have -- they can consider an appeal or not concern an appeal. So, you know, there's no appeal rights here that's off the table. It is, in fact, terminated.

Then one thing I wanted to show Your Honor, and I hope I did today, is that there's no comparable lead. Right? I know that that's another pie in the sky idea that, "well, what if there could be someone else?" Well, certainly Mr. Drescher went through what is allowed under our agreement. It

says Atlantic League or sanctioning authority, but it must be a professional team and it must be of the same caliber. So that's why we spent some time today talking about there's MLB, then there's the affiliated teams, the 120, and then there's these partners, which is a partner with the MLB, these independent leagues of which Mr. White -- these are five regional independent teams. Those are affiliated with the MLB and they are professional players.

These other college leagues, summer leagues, all of those other ones are non-professional. They would not meet what you're looking for. And I think you also got to hear that today on why, right? Those other leagues don't have full seasons. They -- the idea of this FUSE District is to drive people there; active. It has to be the full season. It has to be the Atlantic League caliber. You know, that's what it needs to be. There's, kind of, no other option there.

So on that point, it's terminated. There's no opportunity to cure, to fix. It's done. That's not something the City did, but that's what we're left with. So there's no baseball, right? Even the insurance companies are saying, we don't have to insure you because you don't have baseball. So, that, I don't believe can be undone.

And the other issue with that is if this is a, kind of, what the debtor's trying for, the City doesn't have time. Like, we -- we can't go through this exercise. And it is pie

in the sky. And I hope that's what today showed, like how long it would take; what would the options be? I loved Mr. Bellamy's candor, but they're all hopes and dreams, right? They're all, “Well, maybe this, maybe that, if we were able to do that.” And, unfortunately, the only one that bears the risk of that is the City, right? We are the ones that are greatly, greatly damaged by this.

Furthermore, what you heard from Mr. Bombardier and Mr. Smith is the treatment of this facility. Now, I will say, we've had a wonderful working relationship, but I found the pleadings very condescending to the City to say that this was just cosmetic maintenance and a small town. This is the jewel of Gastonia. Like, I hope that came across to you just how important this District is; how important this stadium is; what it looks like. Sure, because it have a lot of events? Of course. And that's why in the agreements, it has to be maintained comparable to other facilities. This is not. They have not employed the right people to maintain it. There is damage constantly to the City's property. Again, the taxpayers' property.

And while we didn't spend that much time going through all the damages to this stadium, I hope Your Honor has the opportunity to look through those affidavits, and look at those pictures, and look at the details of what harm has already been caused by this debtor.

And lastly, I think you have the damage of no baseball in 2024. As we said today, we have no insurance, and we also have no baseball team today. So you know this is all abuzz in the media. That was also out there. This is reputationally important for the City. And baseball to drive this district, to drive these other economic interested parties, that is very, very important to the City. And that's one of the reasons why we're here today, most importantly, because timing is one of the most important issues to us. Well, one, obviously still no insurance, but we cannot wait months and months. We can't wait until February 14. Can you imagine? There's going to be no -- all of these promises, which have been coming on for years, or months, whatever it is, that's all we have today. We have nothing. Nothing solid.

Even when we heard about the $800,000 that's potentially -- or that was in escrow, that was for the specific purpose of paying -- buying a note, which I do a lot of note purchase agreements. If you're a note purchase agreement, you then get the right to demand payment again, right? So you're not just extinguishing debt, you're purchasing a note so that that person would pay you back. It's a red herring. It’s -- that does not matter. That would not call -- there -- that's not paying creditors. That's extinguishing -- that's purchasing one note. It almost seems irrelevant at this point.

But the lack of baseball in 2024, the damage would be

so severe to the City. It would be absolutely gutted, not just from the monetary damages but, again, the reputation and all the things like that.

So where are we left with the law? That leaves us -- again, topics have been talked on which are in the pleadings -- are in our pleadings, so I won’t belabor them. 365(d)(3), debtor in possession must actively comply with the agreement until there is (inaudible - audio fading). They have not in any way. They didn't even tell us the insurance was canceled, right? They are not actively complying with the agreements.

We have told you that the keys are already and available to allow (inaudible - audio fading) so the facility can be maintained. It's not being maintained at all. Nothing's happening right now. I think Mr. Bombardier here testified that the gas (inaudible - audio fading). So there's -- today, there's no maintenance. Today, there's no insurance. Active 365(d)(3) defaults today.

Then, I think that if you look at 365(d)(2), the Court can't compel the rejection of these agreements early for cause. And I hope that what we have shown you today is cause. That it is your discretion to reject them early, and that's in the pleading.

And then lastly, you know, we know and love 365(d) -- I'm sorry, 362(d), relief from stay. That's for cause. The

lack of insurance in every case, every district, I do know this, they always say, what is the most significant factor or a significant factor, we all know, that's like pretty much always the adequate protection that is required. Otherwise, for cause, you grant relief from stay. And if that's all Your Honor (inaudible - audio fading) today, we are fine. The 90 days that was referenced about the cure, we don't -- we believe that our preliminary injunction would be successful for these same reasons: for the damages, for the cause. I don't think that that -- we are not concerned about the issue. We think that's another red herring. We will take that back to State Court and be fine to go forward there. But I think absolutely, at a minimum, should be entitled to the legal standard of 362(d) today.

And with that, Your Honor, we would just really ask that the Court grant this motion. This is incredibly important to the City. The timing (inaudible - audio fading) to do this would allow for them to figure out a next team, to make those people of Gastonia whole, and to figure out the situation whereby you are just (inaudible - audio fading) I do believe able to have this come 2024. Allowing this case to go forward, unfortunately, would result that (inaudible - audio fading).

THE COURT: Thank you, Ms. Edwards.

MR. DRESCHER: Thank you, Your Honor. Ronald Drescher on behalf of the debtor.

So there's four defaults, four areas of defaults that have been alleged. One, the first one, the one that's, you know, that is generating the most attention is the insurance issue. There's no question, this debtor is not in conformity with its insurance obligations under the contract. It's just not. But it has insurance. It has general liability insurance. The City is named an additional insured. And -- and so that should be enough to support giving the debtor time to get the full insurance package that it's required to get under the agreement.

Now, we committed to doing that by Christmas, which should work. I mean, it's only 10 days. That should be enough time. It shouldn’t interfere with business operations at the stadium. There's nothing -- nothing's planned, nothing's going to go forward until this insurance is in place, not only per Your Honor's order, but through prudent business practices.

Yes, it's true, no maintenance is happening right now at the stadium because we want to get the insurance piece of it behind us as part of doing the maintenance on the property.

So, we believe that we've addressed the insurance default. We have 90 days, we're willing to cure it after 25 days -- actually no, it's more than that. It's 40 days, halfway through, because -- because the notice of -- the notice of default (inaudible - audio fading). We’re saying (inaudible - audio fading).

Regarding the maintenance: There's a little dispute regarding the maintenance. Yes, there are pictures, but it's not pictures of everything. Ms. Jeon testified that she thinks that the stadium is in good shape, that she was there in November. That yes, it needs some TLC and it needs some work, definitely does. That's not in dispute.

Even if the defaults were to the extent that Mr. Bombardier testified to, we would still have 90 days to cure those defaults, and we should be afforded those 90 days.

And, Your Honor, I don't want to penalize the City for working with the debtor. The City did work with the debtor, Mr. Bombardier issued a report in April of 2022, citing some problems with the maintenance, and then he issued a report in April of 2023, issuing a notice of (inaudible - audio fading). And those reports are worthy of due regard, but the City didn’t declare the default at that time. So that does call into question of what was really the nature of those defaults, and that (inaudible - audio fading) if it wasn't so bad that the City wouldn't issue that 90-day notice of default. It didn't do it in either ‘22 or April of ‘23. It's an important issue, but I think that absence does kind of give us a peek into what's really going on there, which is concern over the stadium (inaudible - audio fading).

All right, then there's the money issue. Well, I can't remember the last time I had a debtor client that

(inaudible - audio fading) monetary default as of the petition date. And that’s -- that's what we see over and over and over again.

So that can also be cured. Would it be easy? I don't know. But Mr. Woody testified that he's holding $800,000. And even though it was initially for the purpose of buying the notes, it's been used for other purposes since then. And the business partner has not demanded the return of that money, or at least there’s no evidence of that. So it's continuing to be used for the benefit of the debtor and its creditors (inaudible - audio fading).

This brings us to the termination issue. The termination issue is a problem, but there's enough smoke here, Your Honor, to make it look like (inaudible - audio fading) day in court on this issue. First of all, there is no doubt that the League attempted to chase BCG away by having that onerous draconian letter following the receipt of its LOI regarding (inaudible - audio fading). To say that you’ve got to pay $1.4 million before we will even consider your application, that's absurd, that's nonsensical. And any smart businessperson would withdraw their LOI upon seeing how the League was intended to deal with it.

So that was a form of adherence with the debtor's attempts to get out of the financial obligations problem that they were in under the League’s bylaws and to the League not

cooperating with the debtor, quite the opposite. The league interfered with the debtor's ability to (inaudible - audio fading). And I would urge Your Honor to consider that, regarding the ability of the debtor to cure the debranding by the League.

There's also kind of weird technical problems with the termination. Maybe because, as Mr. White testified, they had never done it before, so that maybe they just didn't do it right in this case. First of all, they didn't send written notice until after the petition date of the termination. I mean, that's -- that's a problem. The written notice was necessary. Mr. White's testimony that there are no appeal rights because they've been denied, they've been removed as members, that makes no sense. The bylaws specifically state, you have appeal rights. Now, yes, you've got to come up with a whole new evidence, but you still have appeal rights. To say that, well, the board is going to (inaudible - audio fading) don't have appeal rights is absurd and nonsensical. They have to have those appeal rights because it's relative to actions taken by the board.

The League sent notice on a Sunday for -- you know, they were entitled to give 24 hours' notice. But on a Sunday? We need to really take a deeper look into Pennsylvania law to determine whether that was really appropriate. That may have been inadequate notice under applicable law of the

Commonwealth. And if that's the case, then the action by the board could conceivably be set aside.

Plus, there's the pure economic impact of the forfeiture to the League. It's a garden variety transfer. One day, the debtor has this asset that it can sell for millions of dollars, and then the next day, that asset is gone, and the debtor is hopelessly insolvent. Well, that looks like -- a lot like a preference or a fraudulent conveyance. And the debtor has filed its complaint seeking to set that aside and recover that for the benefit of the estate.

I'm a little bit concerned by Mr. White's testimony today. He doesn't trust these processes to pay creditors if the consideration for a sale of the membership interest is appropriate. He doesn't trust the debtor to disperse money to creditors. That's a little offensive. We're set up for that. We're set up to take care of creditors. The Court and -- well, Mr. Albert’s not here, the trustee, U.S. Trustee, there are so many ways to protect creditors in connection with (inaudible - audio fading). But that -- to say that we don't trust that the creditors are going to pay, it's -- it’s not the creditors (inaudible - audio fading).

And, in fact, if it looks like a sale should be (inaudible - audio fading), then it's so much the better for the debtor to be able to cooperate and (inaudible - audio fading).

Now Mr. Smith testified that they've got nobody waiting in the wings. Nobody's waiting in the wings. Mr. White testified that it takes 18 months to gear up. So if there's nobody waiting in the wings, and it takes 18 months to gear up, then how is the City being irreparably harmed by not having baseball in 2024? It really looks like the best option for baseball in Gastonia in 2024 is NC Gas House Gang LLC. I understand that's not a great option based upon a lot of the testimony that we've had today, but really it's the best option to deal with the concerns of the City.

And even Mr. White, during his testimony, talked about the -- the litany of things that would be needed in order for the League to reconsider NC Gas House Gang as a member of the League. That's a blueprint for us. We can take a look at that and see if we can deliver that.

So, Your Honor, 14 days in, it's too fast. It's just too fast to have a plenary showing, everything we're going to do in this reorganization. And, you know, back in the summer of 2020, I spoke at an event called Bankruptcy (inaudible - audio fading) obviously it was a Zoom (inaudible - audio fading), and I spoke to a thousand people. They all wanted to know when is the tsunami of bankruptcy cases coming. And as we know, that tsunami hasn't come, and it hasn't come for a lot of reasons that we could go on and on about.

But the impact of COVID -- on account of the impact

of COVID, on the economy and players in the economy continues to have a huge impact on every sector of our economy. And certainly the entertainment sector, where people are sitting in closed quarters next to each other, even though permitted, it's going to have a chilling effect on attendance at a baseball park. And it's going to have a terrible effect on the cash flow capacities of companies that are involved in the entertainment space.

So, Your Honor, I believe we're going to be able to get past all these (inaudible - audio fading) areas of the law. I'm not going to (inaudible - audio fading). And, you know, Mr. Woody testified that he received nearly a million dollars in his escrow account for the benefit of this entity. And the testimony was that there was at least another $650,000 earmarked for a cash infusion. There's no reason to believe that more (inaudible - audio fading).

I think Mr. Bellamy’s testimony is very credible, and he showed that he's got a history of raising money when it's needed.

So, Your Honor, I -- plus there's the provision of sanctioning authority. It's not just the Atlantic League, and Mr. Bellamy explained why it can't be just the Atlantic League. The Atlantic League could go out of business, and then where are you? And still have this document.

Mr. Bellamy relied on -- the debtor relied on the 90-

day period (inaudible - audio fading) the City could easily and drafted that document, have said which elements of default (inaudible - audio fading) to cure it. I mean, it makes me wonder, well, when do you lose your nine days? When during the year? You have your 90 days starting in January, but don't after? Do you have the 90 days starting in April, but you don't afterwards? Do you lose your 90 days because the events of default happened in November? There's nothing in the agreement saying that, oh, you get 90 days to cure for these circumstances, but you don't get any time to cure under these circumstances. That's not in the agreement. You have 90 days to cure under all circumstances. We have not been afforded that time.

And for those reasons, and the testimony that suggests that there definitely is a business solution to this problem, I would request that Your Honor, first of all, Your Honor, enter an order granting us relief from Your Honor's prior order regarding the insurance coverage. You know, I was in on that call, and I know that we were all focusing on insurance, as we should have been. But I believe the testimony showed that Your Honor's well-reasoned, very short period of time to give us that compliance window probably needed to be expanded in light of the reality that it's toward the end of the year, and it's a fairly complex policy to write.

So I would ask Your Honor for relief from that, to

change it to Christmas as the deadline for the debtor to deliver conforming insurance, and otherwise, deny the motion for relief from the automatic stay, and to impose early rejection of the applicable City agreements.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Drescher.

Any last word?

MS. EDWARDS: Just a very few points, Your Honor.

I just wanted to clarify one thing he said about the -- Mr. Drescher said about the 18 months. Mr. White testified that they have identified another team, and they are in that process. And I think he testified that about 2.5 or some -- 2.5 or $3 million would, in fact, go to pay the constituents of Gastonia.

So I guess the point being that there is a prospect for 2024 baseball outside of this debtor. I think also on the appeal portion, Mr. White certainly is qualified to testify that they will not reinstate, and that they've gone through that. So I think that's also a closed door.

And certainly on the impact of COVID, we understand that, that's a real concern. Except for there was no other teams terminated with the Atlantic League, nor has the Atlantic League ever terminated a team. So certainly all were struggling with this, but it was the worst year.

You also heard that -- Mr. Drescher say that Mr.

Bellamy is very capable of raising money, and yet over the past two years, that's what's happened here, right? Like, people did have to step in and pay his players, and things like that. So I don't know that there is that ability to raise money when you're up against the wall, because that's been happening, and that's when other people have stepped in.

And lastly, I would oppose any -- until Christmas on the insurance. I just don't think that complies with the Court order. I also think that's just a pie in the sky hope that it comes before Christmas. If they've been working on getting insurance since October, I don't believe that that protects the City enough.

That's it.

THE COURT: Thank you.

I will not rule today. I will do a virtual ruling. Let’s see if you all can check your calendars for next Tuesday. I think that is the 19th of December.

(Pause)

MR. DRESCHER: Thank you, Your Honor. I'm clear all day.

THE COURT: Okay.

MS. EDWARDS: Same, Your Honor.

THE COURT: Okay. Then why don't we say a 10 o'clock virtual ruling? That will give me time to go through all of the exhibits again. And does that -- well, I’d better check

with the boss here. Okay. We're good? Okay.

So we'll do a virtual ruling at 10 o'clock. We have a standard morning docket, not a Chapter 13 docket, but a standard morning docket, Zoom login, and you all can use that. Ms. Bellman will put it all on the docket so we have it.

And I thank everybody for their presentations, and I'll see you next Tuesday.

MR. DRESCHER: Thank you, Your Honor.

MS. EDWARDS: Thank you, Your Honor.

THE COURT: Thank you. I hope you enjoyed your brief visit to Greenville.

(Whereupon, at 3:04 p.m. the hearing was adjourned.)

CERTIFICATE OF TRANSCRIBER

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Karen Hartmann, AAERT CET 475 Date: January 24, 2024

TRANSCRIPTS PLUS, INC.