**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 23-18766-LSS |
| | ) | |
| NC GAS HOUSE GANG LLC, | ) | |
| | ) | 6500 Cherrywood Lane |
| | ) | Greenbelt, Maryland 20770 |
| | ) | |
| | ) | February 12, 2024 |
| Debtor. | ) | 10:10 a.m. |

TRANSCRIPT OF HEARING (DOC 79) MOTION TO DISMISS CASE FILED BY US TRUSTEE - GREENBELT; (DOC 89) OPPOSITION ON BEHALF OF NC GAS HOUSE GANG LLC
BEFORE THE HONORABLE LORI S. SIMPSON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For NC Gas House Gang LLC: | Law Office of Ronald J. Drescher<br>By: RONALD J. DRESCHER, ESQ.<br>10999 Red Run Boulevard, PMB 224<br>Suite 205<br>Owings Mills, MD 21117 |
| For Marc E. Albert, Subchapter V Trustee: | Stinson LLP<br>By: MARC E. ALBERT, ESQ.<br>1775 Pennsylvania Ave., NW<br>Suite 800<br>Washington, DC 20006 |
| Operator: | Gloria Bellman, Courtroom Deputy to the Honorable Lori S. Simpson |
| TRANSCRIPTION SERVICE: | TRANSCRIPTS PLUS, INC.<br>435 Riverview Circle<br>New Hope, Pennsylvania 18938<br>Telephone: 215-862-1115<br>e-mail CourtTranscripts@aol.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Appearances:
(Continued)

| | |
|---|---|
| For the U.S. Trustee's Office: | U.S. Trustee's Office<br>By: LISA Y. STEVENS, ESQ.<br>6305 Ivy Lane, Suite 600<br>Greenbelt, MD 20770 |

# INDEX


| **WITNESSES** | **PAGE** |
|---|---|
| JENNIFER JACOBS | |
| Direct Examination by Ms. Stevens | 12 |
| Cross-Examination by Mr. Drescher | 32 |
| Redirect Examination by Ms. Stevens | 37 |
| BRANDON BELLAMY | |
| Direct Examination by Ms. Stevens | 38 |

| **EXHIBITS** | | **ID** | **EVID** |
|---|---|---|---|
| 1 | Initial email from J. Jacobs (12/4/23) | 14 | 15 |
| 2 | Receipt and certification (12/11/23) | 14 | 15 |
| 3 | Court Order (Re: Insurance) | 16 | 16 |
| 6 | Certificate of insurance | 17 | 23 |
| 7 | Certificate of insurance (1/23/24) | 22 | 23 |
| 10 | Email from J. Jacobs (12/12/23) | 18 | -- |
| 14 | Email from J. Jacobs (1/4/24) | 19 | -- |
| 15 | Email from J. Jacobs (1/23/24) | 21 | -- |
| 16 | Email (Relation insurance 12/29/23) | 43 | -- |
| 18 | Monthly Operating Report (December) | 30 | -- |
| 20 | Email exchange (J. Jacobs and Spisak) | 27 | 29 |
| 21 | Email exchange (UST and counsel for broker) | 31 | 31 |

COURTROOM DEPUTY: The United States Bankruptcy Court for the District of Maryland is now in session. The Honorable Lori S. Simpson presiding. Please be seated and come to order.

On the 10 o’clock docket, the case of NC Gas House Gang LLC, Case Number 23-18766.

Counsel, please come to the podium and identify yourself and your client for the record.

MS. STEVENS: Good morning, Your Honor. Lisa Stevens on behalf of the United States Trustee. With me today, I have Ms. Jennifer Jacobs, who's one of the analysts in our office.

THE COURT: Good morning to both of you.

MR. DRESCHER: Good morning, Your Honor. Ronald Drescher appearing on behalf of the debtor, NC Gas House Gang, LLC. With me at the table is Brandon Bellamy, the managing member of the debtor.

THE COURT: Good morning to both of you.

MR. BELLAMY: Good morning.

MR. ALBERT: Good morning. Marc Albert, Subchapter 5 Trustee.

THE COURT: Good morning.

All right. We are here on the United States Trustee’s motion to dismiss or convert.

So, I'm happy to hear opening, Ms. Stevens, unless the parties have talked or done -- reached some sort of other

resolution.

MS. STEVENS: Well, the parties have talked, but we have not reached a resolution. So I'll just go ahead with my opening then.

THE COURT: Thank you.

MS. STEVENS: So, again, we are here today on the United States Trustee's motion to dismiss the case for failure of the debtor to maintain the appropriate insurance.

The facts, for the most part, are not in dispute. The debtor has struggled with the insurance issue throughout this case. When the United States Trustee filed the instant motion to dismiss on January 8th, 2024, the debtor did not have insurance. To this day, the debtor does not have insurance. The debtor's failure to maintain insurance in its name violates the U.S. Trustee Guidelines, the Bankruptcy Code, and this Court's December 8th order.

Instead, the debtor has presented a certificate of insurance dated January 23 of 2024 in the name of a third party, Momentous Group, naming the debtor as an additional insured "as required by written contract." This raises concerns.

First, the United States Trustee takes the position that the debtor is required to be the name insured. This is consistent with the Court's December 8th order. The Court has no jurisdiction over this non-debtor third party who can

presumably cancel or change the policy at-will, and this puts the debtor's creditors at risk and the estate.

Second, even if the Court were to consider such coverage in the name of a non-debtor party, the Court must understand the, quote, “as required by written contract.”

And, lastly, there must be documented proof of premium payment, which we did not have until Friday, February 9th, when our office received an email at 6 p.m. from counsel for the insurance broker that the initial down payment on the premium had occurred late that afternoon.

At this time, we are prepared to move forward with our evidence.

THE COURT: Thank you.

MS. STEVENS: Thank you.

MR. DRESCHER: Good morning, Your Honor. Ronald Drescher on behalf of the debtor.

The treatment of insurance in Chapter 11 is very confusing, and especially in this case, because there's at least four different standards for how the debtor should have insurance in this case:

One is Your Honor's December 8th order and the agreement with the City. That has some very specific requirements for the debtor's -- for the debtor’s insurance obligations. That's not relevant today.

The second is behind the scenes Guidelines of the

United States Trustee’s Office that, candidly, Your Honor, are inconsistent with the published Guidelines that we're going to talk about. So the United States’s kind of hidden back room Guidelines are not relevant here today.

The third standard for insurance is the published Guidelines that the United States Trustee sends to debtors at the commencement of the case that describes the insurance that they need. That's relevant in this case. That's going to be Exhibit 1 of the United States Trustee's presentation, and we'll look at that during the case.

The fourth standard, and the one -- and the only one that is directly relevant to today is the standard imposed under Section 1112 of the Bankruptcy Code. And that section states that that cause to dismiss or convert the case can be found if the debtor fails to maintain appropriate insurance coverage that poses a risk to the estate and the public. And that, Your Honor, is the most relevant guideline regarding insurance. And it's the U.S. Trustee's burden to establish that cause and every aspect.

And really, Your Honor, there are two main considerations regarding that subsection of 1112:

The first is appropriate insurance coverage. And then the second is that poses a risk to the estate and to the public.

So, I want to talk a little bit briefly about the

second part, the risk.

On January 8th of this year, the City of Gastonia sent a termination notice to the debtor. And the City of Gastonia said your documents are terminated because of the bankruptcy clause in our agreements. And now that the Court lifted the automatic stay, we're free to look to North Carolina law and say, well, North Carolina law says we can terminate these contracts because of your bankruptcy filing and, therefore we're terminating them. That happened on January 8th. We're going to look at that letter today and we're going to try to parse it a little bit.

So we don't think that that -- we don’t think that that was effective. We don't think that North Carolina law, trumps Section 365(e)(1), which specifically says that you can’t terminate an executory contract or unexpired lease due to an ipso facto clause. It specifically says that. And the debtor believes that that subsection remained effective even though Your Honor lifted the automatic stay to allow the City to move forward with its non-bankruptcy remedies. So that's one reason why we don't think that the lease is terminated.

The other reason why we don't think the lease is terminated --

THE COURT: Well, I'm confused, Mr. Drescher. Why are we here on the lease?

MR. DRESCHER: I'll get to that very quickly.

THE COURT: Okay. Because I thought we were here on a motion to convert or dismiss at -- I've docketed the --

MR. DRESCHER: Correct.

THE COURT: -- motions to vacate for a later day.

MR. DRESCHER: Correct. It's directly relevant to this matter, Your Honor.

THE COURT: Okay.

MR. DRESCHER: And I'll get there, and I appreciate Your Honor's concern.

So the second reason why we don't think that it was effective is because we think it was beyond the scope of Your Honor's order. We thought that Your Honor intended that the City move forward in a non-bankruptcy forum and obtain an order terminating the agreements. That's what we think.

But if those -- if that lease is terminated, there's no risk to the estate assets because the estate really has no assets. And there's no risk to the public because the estate doesn't have anything.

So we believe that it's the United States Trustee's burden to prove that that lease has not been terminated, and that there really are assets, that the failure to insure would pose a risk to the assets and to the public. Because if there's no lease, the motion -- I mean, the debtor's got bigger problems if there are no -- if there's no lease. But for the

purpose of today, it's the United States Trustee’s burden to prove that the lease is still alive and that, therefore, there's a possibility of risk to the public and the estate. If the lease is terminated, there's no risk to the public or the estate.

And that's why we think that the U.S. Trustee needs to prove that the lease has not been terminated in order to sustain this motion. Regard -- so, that's the -- the risk to the public and the estate.

As far as the appropriate goes, the Guidelines that were published that is in Exhibit 1 does not require that the insurance be in the debtor's name. It just says that you need to produce a certificate of insurance that name -- with the named insured. That's what it says. It does not say that it needs to be in the name of the debtor.

And second of all, it's good coverage. It's coverage that, we believe, is in conformity with the agreement -- with the City agreements. It provides substantial liability coverage, workers’ compensation coverage, excess umbrella coverage. Really, way more coverage than is, I believe, required under the section of Section 1112 to find cause. So there's plenty of coverage and the debtor is insured. The debtor's assets are insured. There’s substantial insurance.

So we do believe that as a threshold matter, if the U.S. Trustee can't prove that there are assets in the estate

that are at risk for the lack of insurance, then it -- then it can't sustain its burdens in this case.

And that's why I believe Your Honor should -- I believe Your Honor should find that the -- that the lease has not terminated, but then find that we have appropriate insurance, and deny the motion.

Thank you, Your Honor.

THE COURT: Thank you.

All right. Do you want to -- Mr. Albert, I don't want to foreclose your opportunity to be heard in anyway.

MR. ALBERT: Of course, Judge, I would like to reserve any remarks until the conclusion of the evidence.

THE COURT: Thank you.

All right, Ms. Stevens, if you'd like to call your first witness.

MS. STEVENS: Yes, I'd like to call Jennifer Jacobs.

THE COURT: All right. Ms. Jacobs.

MR. DRESCHER: Your Honor, I'm happy to have Ms. Jacobs testify. I'm not sure she has any relevant evidence to help the Court.

THE COURT: I couldn't possibly know that until I hear what she has to say.

MR. DRESCHER: I would just ask the United States Trustee to make some sort of offer of proof of what she's going to testify to.

MS. STEVENS: If you want -- do you want me to do that, Your Honor?

THE COURT: I --

MS. STEVENS: I mean, it's your courtroom.

THE COURT: Well, I'd kind of like to hear, and then you can raise your objections as needed based on the questions. I would like to hear from the witness and see what she has to say.

MR. DRESCHER: Thank you, Your Honor.

COURTROOM DEPUTY: Ma'am, please stand and raise your right hand.

JENNIFER JACOBS, U.S. TRUSTEE'S WITNESS, SWORN

COURTROOM DEPUTY: Thank you. Please be seated and state your name and address for the record.

THE WITNESS: Jennifer Jacobs. My business address is 6305 Ivy Lane, Suite 600, Greenbelt, Maryland.

COURTROOM DEPUTY: Thank you.

THE COURT: Your witness.

MS. STEVENS: Thank you.

DIRECT EXAMINATION

BY MS. STEVENS:

Q And, Ms. Jacobs, where do you currently work?

A Office of the U.S. Trustee.

Q And what is your position?

A Analyst.

Q And how long have you worked at the U.S. Trustee's Program as an analyst?
A Almost 15 years.
Q And what is your educational background?
A I have a bachelor of science in accounting and an MBA.
Q And are you familiar with the case NC Gas House Gang?
A I am.
Q And how are you familiar with this case?
A I was assigned to the case. So I conducted the initial debtor interviews; reviewed documents that we have received to date; and the first MOR that was filed.
Q All right. And as part of your normal duties when a case is first filed, do you send a standard email to counsel?
A I do.
Q And what does this email typically contain?
A It contains a copy of the Guidelines, the authorized depositories, a copy of the monthly operating report that they need to file, along with a list of documents that I need prior to the IDI so that I can review the background of the debtor.
Q And did you send a copy of this initial email with these Guidelines in this case?
A I did.
Q If you could, could you please look at Exhibit 1?
A Um-hum.

Q And are you familiar with this document?
A I am.
Q And what is this document?
A This is the initial email that I sent to debtor's counsel outlining the requests, as well as the documents for them to use.
Q So this is an email dated December 4th where you sent to counsel with a copy of the United States Trustee's Guidelines, correct?
A Correct.
Q And how does the United States Trustee ensure that the debtor representative, not just counsel, has received a copy of these Guidelines?
A We require them to sign a receipt and certification that they've received the Guidelines.
Q And did that occur in this case?
A That did.
Q And is that what's that Exhibit 2?
A It is.
Q And is this a true and accurate copy of the receipt of Guidelines that was signed by Mr. Bellamy on December 11th, 2023?
A It is.
Q And I'm sorry, if we could go back to Exhibit 1. Attached to your email -- there were a couple attachments, but for

purposes of this hearing, I just attached the Guidelines. And the -- are the U.S. Trustee Guidelines what's attached to Exhibit 1?

A It is.

Q And is that a true and accurate copy of the Guidelines that were provided?

A It is.

MS. STEVENS: I would like to move Exhibit 1 into evidence.

MR. DRESCHER: No objection, Your Honor.

THE COURT: Exhibit 1 will be admitted into evidence.

(Trustee’s Exhibit 1 in evidence)

MS. STEVENS: And, again, with respect to Exhibit 2, I'd like to move that into evidence, as well.

THE COURT: Any objections on Exhibit 2?

MR. DRESCHER: No objections.

THE COURT: All right. Exhibit 2 will be admitted into evidence.

(Trustee’s Exhibit 2 in evidence)

BY MS. STEVENS:

Q Pursuant to the U.S. Trustee Guidelines, is the debtor required to maintain insurance throughout the pendency of the case?

A They are.

Q And where is that in the U.S. Trustee Guidelines?

A In the Guidelines, it's on Page 3 of 10.

Q And that's the internal page numbers on the Guidelines, correct?

A That is correct.

Q And when did the initial debtor interview -- or I'm going to maybe refer to as IDI -- occur in this case?

A It occurred on two days, December 11th and December 18th.

Q And during the meeting that you held on December 11th, did you speak with the debtor about insurance?

A I did; we spent a lot of time talking about it.

Q And why did you speak with the debtor about insurance?

A Because there was a Court Order that had been issued the prior week with a deadline of December 11th at 5 o'clock that insurance had to be produced. So we knew the debtor did not have insurance at that time.

Q And if you could look at Exhibit 3, is this a copy of the order that you're referring to?

A It is.

MS. STEVENS: Again, Your Honor, I would move Exhibit 3 -- it doesn't need to -- I mean, you can take judicial -- I just was making it easier for everyone to have it here.

THE COURT: Any objection?

MR. DRESCHER: Your Honor, there's no objection.

THE COURT: Okay. Exhibit 3 will be admitted into evidence.

(Trustee’s Exhibit 3 in evidence)

MS. STEVENS: Thank you.

BY MS. STEVENS:

Q So why did you -- why did the U.S. Trustee's Office need to conduct the IDI on two different dates?

A Because we had not received any of the documents that we had requested prior to the IDI, and then I got a few during the IDI but obviously I didn't have time to review them while we were talking. And plus, the debtor had the pressing need to get insurance by 5 o’clock that day. So we conducted as much as we could, and then agreed to continue it to December 18th to finish it up.

Q And I would like to refer you to Exhibit 6. So after the meeting -- after the initial debtor interview on December 11th, insurance was a hot topic because it needed to be provided by 5 o’clock that day. On December 12th, it's my understanding that you were provided with a copy of the certificate of insurance that's attached as Exhibit 6, is that --

A That is correct.

Q And is this a true and accurate copy of the certificate of insurance that was provided to you on December 12th?

A Yes, it is.

Q And pursuant to the certificate of insurance, who is the name insured?

A NC Gas House Gang LLC.

Q And what is the term of this policy?
A It was from December 8th, 2023 to January 4th, 2024.
Q And what is the coverage that's listed here?
A Just general liability insurance.
Q And just referring back to the Court's order of December 8th, again, I want to direct your attention to Exhibit 3, Page 3, the first paragraph, the debtor was required to have general liability insurance and umbrella excess liability insurance, correct?
A Correct.
Q And did this policy comply with the Court's order?
A It did not.
Q And did this policy comply with what the U.S. Trustee requested?
A It did not.
Q Can you explain how it did not comply?
A As for the Court's order, it didn't list any excess liability. And for our purposes, it didn't list personal property and workers' compensation insurance.
Q In addition, was the U.S. Trustee a notice party on this policy?
A We were not.
Q Ms. Jacobs, if you could take a look at Exhibit 10, are you familiar with this document?
A I am.

Q And is this an email that you sent on December 12th, 2023?
A Yes, it is.
Q And in this email, you were seeking certain documents, and one of them was agreements with related parties. Why were you seeking to understand the agreement with Momentous Group, LLC?
A Well, we understood there was a relationship there, and we needed to better understand what that relationship was at this point in time, so we wanted to see the agreement.
Q Okay. And did you -- did the U.S. Trustee's Office -- did the debtor ever provide the U.S. Trustee's Office with a copy of the agreement with Momentous Group?
A They did not.
Q So I'm going to -- so during the month of December, I think it's fair to say that there was various correspondence with the debtor about insurance, and the issues came to a head, and -- on January 4th when the term of the policy was to expire, is that a fair statement of what occurred?
A It is.
Q And on January 4th, our office conducted the meeting of creditors. And afterwards, you sent a follow-up email and correspondence, is that correct?
A I did.
Q If you could look at Exhibit 14, is this a copy of the email that you sent?

A It is.
Q And on January 4th, had you -- had our office received a certificate of insurance --
A We --
Q -- extending the general liability insurance that was due to expire on that date?
A No, we had not.
Q And, again, in this email here, we also tried to get a copy of this agreement with Momentous Group, is that correct?
A We did.
Q So were the U.S. Trustee’s concerns about the debtor's lack of insurance well-grounded?
MR. DRESCHER: I -- Your Honor, I -- I object. I mean, she's asking the ultimate legal conclusion. It's not a factual question.
THE COURT: I'm going to overrule it. I'll give her a little bit of leeway. I'm still free to decide whatever I want to decide --
MR. DRESCHER: Yes, of course.
THE COURT: -- but she can tell me what the basis for her actions and conclusions were.
MR. DRESCHER: Thank you.
THE WITNESS: Could you repeat the question?
BY MS. STEVENS:
Q So were the U.S. Trustee’s concerns about the debtor's

lack of insurance well-grounded on January 4th?
A Yes, because there was no insurance after that point.
Q Okay. So as of January 4th, the certificate of insurance that had been provided that had just general liability only had terminated by the terms of its contract. And still to that day, we never received workers' compensation, personal property, or the excess umbrella coverage, correct?
A Correct.
Q So what did our office do at that time?
A We filed a motion to dismiss or convert.
Q On January 22nd -- and that was on January 8th?
A January 8th; sorry.
Q So on January 22nd, the debtor filed a response to the motion stating, quote, that, “The debtor has, in fact, obtained all required coverage.” Prior to this response, had the debtor provided proof of coverage to our office?
A They had not.
Q What, if anything, did our office do in response to the debtor's assertion?
A We reached out to them requesting a copy of a certificate of insurance, the declarations, and proof of payment.
Q And if you’ll -- again, if you look at Exhibit 15, we'll start with the back of the email. And this is consistent with your testimony that, you know, I think we were thrilled that the debtor had the right insurance, but we wanted to see some

proof of it.
A Um-hum.
Q And this was on January 23rd.
A Correct.
Q Did we receive a copy of the certificate of insurance?
A We did, but not until the 24th -- the -- the 24th.
Q Okay.
A I’m sorry.
Q And if you could, please look at Exhibit 7. And what is Exhibit 7?
A This is a certificate of insurance dated January 23rd.
Q And did you notice anything unusual about the certificate of insurance?
A Yes, I did.
Q And what was that?
A The insured was not the debtor.
Q Who was the name insured?
A Momentous Group, LLC.
Q And is the debtor included on this coverage somewhere or referenced in this certificate of insurance?
A Yes, they were listed down below. And it stated, “City of Gastonia and NC Gas House Gang LLC are included as additional insured, as required by written contract.”
Q And what was the date of the certificate of insurance?
A January 23rd.

MS. STEVENS: Your Honor, I would move a copy of Exhibit 7 into evidence.

MR. DRESCHER: No objection, Your Honor.

THE COURT: Exhibit 7 will be admitted into evidence.

(Trustee’s Exhibit 7 in evidence)

MS. STEVENS: And I'm sorry, just to do a little bit of cleanup. I would move to -- move to admit Exhibit 6.

THE COURT: Any objections, Mr. Drescher?

MR. DRESCHER: Yes, Your Honor. It's not relevant. It’s -- it doesn't -- it doesn’t help the trier of fact determine whether or not there's a risk to the estate, or the assets, or the public, and it doesn't reflect whether or not the debtor, as this hearing, has appropriate insurance, so it’s not relevant.

MS. STEVENS: That may be true that the Court is called to refer to Exhibit 7, since that's the new policy term, but Exhibit 6 has been used by the debtor in its attachment. So it has -- I mean, it's authenticated it, this is -- the Court can take whatever information from it it wants. Just that this is a true and accurate copy of the certificate of insurance.

THE COURT: I'll allow it. So Exhibit 6 will be admitted into evidence.

(Trustee’s Exhibits 6 in evidence)

Q So, Ms. Jacobs, just referring you back to Exhibit 15,

when a copy of the certificate of insurance that is Exhibit 7 was provided to our office with a different named insured, did your office inquire about why this had changed?
A We did. We contacted counsel.
Q And if you could look at Exhibit 15, the first page, what was counsel's response to why the named insured was no longer NC Gas House Gang, but rather Momentous Group?
A He stated, “I don't know the answer to that. Obviously, I would prefer that the name of insurance be the debtor, but NC Gas House Gang LLC is listed as additional insured. So that, at least, gets us the coverage we need.”
Q Did you find that answer -- did that answer your question as to why the name insured had been changed?
A It did not.
Q Okay. And what did you do in light of that response?
A I reached out to the producer on the certificate of insurance, the individual, Millie Wood, I believe, was a name at the top of that insurance certificate.
Q So you reached out to Millie Wood. Do you remember when that was?
A That was on December -- excuse me, January 25th.
Q And when you spoke to Ms. Woods [sic], what did she -- did she direct you to someone else that was the primary contact?
A She did. She said it would be better to talk with Mr. Spisak.

Q And did you speak with Mr. Spisak?
A I did. I spoke with him on January 26.
Q And what did you learn from your conversation with Mr. Spisak?
A In our discussion, my understanding -- well, because I asked about this written contract --

MR. DRESCHER: Your Honor, we're really in the hearsay area. I only have a relevance problem, a continuing relevance problem.

THE COURT: I will sustain the objection as to hearsay. You can't say what this individual told you.

THE WITNESS: Okay.

THE COURT: Okay.

MS. STEVENS: But she can explain her understanding that there was a contract that's referenced in the certificate of insurance. And can she testify that she asked for a copy of that contract?

THE COURT: She can testify as to what she did.

MS. STEVENS: Okay.

BY MS. STEVENS:
Q Did --

THE WITNESS: Okay.

Q Ms. Jacobs, in the certificate of insurance, it says that, “The City of Gastonia and NC Gas House Gang are included as additional insured, as required by written contract.” Did you

ask Mr. Spisak for a copy of the written contract that is referenced in the certificate of insurance?
A I did.
Q All right. And, Ms. Jacobs, did you get a copy of the written contract?
A I did, on January 29th.
MS. STEVENS: I would like to enter a new exhibit that's not been provided in the binders, and it's because Ms. Jeon is not here, so I want to make sure that a copy of the contract that we received is entered into evidence. So this is just an email with Mr. Spisak transmitting the (inaudible - not at microphone). And may I approach the bench?
THE COURT: You may.
MR. DRESCHER: Your Honor, I'm going to object to this, it’s -- I respect the desire to show background, but we haven't seen a -- we haven't heard anything from Ms. Jacobs regarding risk to the estate, or risk to the public as of today, and we need to get there at some point. We're not even close.
THE COURT: I agree with you, Mr. Drescher, but I'm going to allow the United States Trustee to conduct her direct examination and put -- lay out her case as she sees fit. I don't want to short-circuit that for either of you.
MR. DRESCHER: All right. Then, Your Honor, for the sake of Ms. Stevens' presentation, and to not waste more of the

Court's time, I have a standing relevance objection.

THE COURT: Fair enough.

MR. DRESCHER: Thank you, Your Honor.

MS. STEVENS: I would like to mark this as Exhibit -- I prefiled exhibits to 19, so I'm going to mark this as Exhibit 20.

THE COURT: Okay.

MS. STEVENS: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MS. STEVENS:

Q Ms. Jacobs, I just handed you Exhibit 20. Are you familiar with this document?

A I am.

Q And what is this document?

A It's an email exchange between myself and Mr. Spisak about the agreement he sent to me on the 29th.

Q And this is the agreement that Mr. Spisak had been provided by Momentous or the debtor in placing the insurance that was referenced on the certificate of insurance.

A Correct.

Q And this is a true and accurate copy of what was provided to you?

A Yes, it is.

Q And if you'll look to the last page of the document where it's signed, and it's signed by Mr. Bellamy, is that correct?

A Correct.

MS. STEVENS: Your Honor, I would move this exhibit into evidence.

MR. DRESCHER: Object, Your Honor, it's not relevant.

THE COURT: I'm going to overrule the objection because I think that the debtor's insurance throughout the case is relevant. It's -- when you have a motion to convert or dismiss premised on the failure to maintain insurance, it necessarily includes the length of the case.

MR. DRESCHER: Well, understood and agreed, but this document is simply allegedly a written agreement between Momentous and NC Gas House Gang. That doesn't really go into the issue of insurance directly.

THE COURT: Again, Mr. Drescher, I understand your objection, but I still think it's premature. We don't know yet.

MR. DRESCHER: Fair enough.

THE COURT: I mean, if it turns out you may have an objection at the end of the day when Ms. Stevens concludes her case that says, you know, this is no longer relevant. I will admit it now subject to the possibility that I un-admit it later. How's that?

MR. DRESCHER: Thank you, Your Honor.

THE COURT: Okay?

MR. DRESCHER: I appreciate it. And I didn’t --

MS. STEVENS: And, Your Honor, the reason --

MR. DRESCHER: I didn’t -- I'm sorry. I apologize. I didn't think that my standing objection pertained to admission of documents, and that's the only reason I --

THE COURT: Right. Right, I agree with you.

MR. DRESCHER: Thank you, Your Honor.

THE COURT: I think that's -- that’s the wiser course of action.

MR. DRESCHER: Thank you, Your Honor.

MS. STEVENS: And, again, Your Honor, we are bringing this -- this is referencing the certificate of insurance that they're stating provides them with coverage. So we think it's important for Your Honor to know what the contract was, and what the obligations of the parties are because I think that defines the scope of what the insurance is.

THE COURT: So that's -- the Court is admitting Exhibit 20.

(Trustee’s Exhibit 20 in evidence)

MS. STEVENS: Thank you, Your Honor.

BY MS. STEVENS:

Q Ms. Jacobs, you testified earlier that as part of your duties as an analyst with the U.S. Trustee's Office, you review the monthly operating reports each month that are filed by the debtors, is that correct?

A That's correct.

Q And in this case, did you review the monthly operating report that the debtor filed for the month of December?
A I did.
Q And I believe there's the amended version that was filed as attached as Exhibit 18 -- or not attached, but it's Exhibit 18.
A Um-hum.
Q And is this a true and accurate copy of the monthly operating report?
A It is.
Q And is there any information in the December monthly operating report that shows that the debtor paid for insurance in the month of December?
A No. In fact, they made no disbursements at all during the month.
Q And, Ms. Jacobs, in your 15 years with the U.S. Trustee's Office, do you recall a time where a certificate of insurance where the debtor was not a named insured?
A I do not recall that.
Q And then, as part of our office's investigation or follow-up about the certificate of insurance, we had asked for whether the premium had been paid. And did we receive information on whether the premium had been paid?
A We did, on February 9th.

MS. STEVENS: I'd like to enter another exhibit --

A It was the deposit.

MS. STEVENS: May I approach the witness, Your Honor?

THE COURT: You may.

MS. STEVENS: And this is being filed as Exhibit 21.

Q Ms. Jacobs, are you familiar with Exhibit 21?

A I am.

Q And what is Exhibit 21?

A It's an email exchange between our office and counsel for the insurance broker.

Q And is this a true and accurate copy of the email exchange?

A Yes.

MS. STEVENS: I would like to enter this exhibit into evidence, Your Honor.

THE COURT: Let Mr. Drescher have a minute to review it.

MR. DRESCHER: Your Honor, I have no objection.

THE COURT: Okay. Exhibit 21 will be admitted into evidence.

(Trustee’s Exhibit 21 in evidence)

Q And, Ms. Jacobs, if you look at Exhibit 21, our office received an email of February 2nd from Ms. Jensen where she explains that the -- that there is a premium policy -- there's a premium financing on this policy, correct?

A Correct.

Q And at that time had the policy -- had the premium -- the down payment on the premium been paid on February 2nd? As of February 2nd.
A No on February 2nd. And it's several policies --
Q Okay.
A -- I believe.
Q And we received information that -- this email is dated 6:10 of Friday, February 9th, correct?
A Correct.
Q And Ms. Jensen then at that time confirmed that late that afternoon, the down payment on the premium financing had occurred?
A That is correct.

MS. STEVENS: I have no further questions, Your Honor, for this witness.

MR. DRESCHER: Yes, thank you, Your Honor.

THE COURT: Any questions then for Ms. Jacobs?

MR. DRESCHER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DRESCHER:
Q Good morning.
A Good morning.
Q Good morning. So, let's look to Exhibit 1; it’s been a couple of minutes. And these are -- this is an email with a copy of the U.S. Trustee Guidelines.

A Correct.
Q And this was information sent to me on behalf of my client and the estate.
A Correct, um-hum.
Q So let's turn to Page 3 of 10 here under the ECF stamp of Page 5 of 12. All right. And -- and there are three short paragraphs under the heading "Insurance," is that correct?
A That is correct.
Q So -- and then the middle -- and the middle section says, "All documents provided as evidence of insurance must clearly state the policy expiration date." So I'm going to jump back and forth with you on Exhibit 7. All right?
A Okay.
Q Does Exhibit 7, which is the policy, does it have the expiration dates?
A It does.
Q All right. Now then back on Exhibit 1, it says “The types and amounts of coverage.”
A It does.
Q All right. So I noticed that this document does not have the location, is that correct, or am I missing something? Is the location of the premises here?
A It is not listed on here.
Q It is not. Would -- is it possible there are multiple locations, and that's why it's not listed?

A It's possible, but usually that would be included in the declarations.

Q Then it talks about -- it talks about the named insured, right, which seems to be the big controversy here, is that right?

A It is.

Q Okay. So why doesn't that say the debtor instead of the named insured?

MS. STEVENS: Objection, Your Honor. I mean, I don't know if Ms. Jacobs -- she didn't write these Guidelines, so you're asking her to interpret. I mean, I think the Court can read and interpret what this says.

THE COURT: I'll over rule it. If she knows. And if you don't know, you say you don't.

THE WITNESS: It's because we --

THE COURT: I know she's not the author.

THE WITNESS: We -- we expect to see the debtor's name -- listen, we -- I guess, we didn't expect to have to be so specific, that the debtor's name wouldn't be the named insured.

THE COURT: Okay.

THE WITNESS: And we will look -- well --

MR. DRESCHER: All right.

BY MR. DRESCHER:

Q And does it show the insurer? Does it show the name of

the insurance company?
A Yes.
Q And does it show the name, address, and telephone number of the local agent?
A It does.
Q Do you know the primary location of the debtor’s operations?
A I believe it's on 800 -- off the top of my head, I can't.
Q It's the stadium, right? It's the stadium in Gastonia.
A Right.
Q Right? So is the debtor in possession as -- not the debtor in possession, but is the debtor in possession of the stadium right now.
MS. STEVENS: Objection. If Ms. Jacobs knows.
THE COURT: I’ll -- I'll overrule. If you know.
THE WITNESS: Yeah, I’m --
THE COURT: If you don't know, you don't know.
THE WITNESS: I don’t know.
BY MR. DRESCHER:
Q So, you're not testifying today that -- that there's risk to the stadium, are you?
A I'm looking at risk to the estate.
Q All right. So what's in the estate?
MS. STEVENS: Objection. As long as you know what's in the estate.

THE COURT: If you know.
A There --
THE COURT: If you don't know, you --
A I -- I can't say for everything.
Q I understand that. All right.
A But I --
Q Is --
A Well, I will say one thing. At the time of the IDI, there were five employees. And so workers' compensation insurance would be required. And so that would -- I mean, those -- those aren't assets, but those are insurable people to protect the assets of the estate, to the extent there are some. There are still amendments to the schedules to be filed, so we haven't seen everything.
Q So do you believe there are employees now?
A Based on this MOR that was filed --
Q Right.
A -- it said zero by the end of the month, but we did not follow-up on that.
Q Okay. So how about -- so -- but you're not concerned -- you're not testifying that there's risk to the public at this point, are you?
A A person walking into a company typically expects them to be insured. And if they tripped and fell, they would expect to be able to -- to file a claim against that company.

Q Okay.
A So in that regard, but --
Q Where's the location that the customer would walk into in this case?
A Wherever the debtor is operating at the present time.
Q Could you identify any of those places?
A No, I can't.

MR. DRESCHER: Your Honor, I have no further questions.

THE COURT: Thank you.

Any redirect, Ms. Stevens?

MS. STEVENS: Just briefly.

REDIRECT EXAMINATION

BY MS. STEVENS:

Q Ms. Jacobs, I would just like to go back to Exhibit 1, the Guidelines.
A Um-hum.
Q And the paragraph that Mr. Drescher was referring to, it doesn't say certificate -- the second paragraph, the first two words are “all documents” provided. So, again, isn't the -- the best understanding of what the policies cover are the policies themselves, and not just the certificate of insurance?
A Definitely, because it can have exclusions in it, etc., plus list the locations.
Q And, Ms. Jacobs, have we received a copy of the policies?

A No, we have not.

MS. STEVENS: No further questions, Your Honor.

THE COURT: Thank you.

Mr. Albert, again, I don't want to foreclose your --

MR. ALBERT: Thank you. And, no, Judge, no questions.

THE COURT: Okay. You are off the stand, Ms. Jacobs.

MS. JACOBS: Thank you.

THE COURT: Thank you for your testimony.

MS. STEVENS: Your Honor, seeing as though Ms. Jeon is not here, I would like to call Mr. Bellamy to the witness stand.

THE COURT: All right. Mr. Bellamy.

BRANDON BELLAMY, U.S. TRUSTEE'S WITNESS, SWORN

COURTROOM DEPUTY: Thank you. Please be seated. And state your full name and address for the record.

THE WITNESS: Brandon Bellamy, 18403 Garner Lane, Accokeek, Maryland, 20607.

COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MS. STEVENS:

Q Good morning, Mr. Bellamy.

A Good morning.

Q What is your relationship to the debtor?

A Manager.

Q Okay. And what is your relationship to Momentous Group?
A Manager.
Q And what is your relationship to Momentous Hospitality Group?
A The same.
Q You're the manager of that. And your relationship with Momentous SE LLC?
A It's the same.
Q Okay. So is it fair to say that you wear a lot of different hats?
A Yes, owning all the entities and managing them, yes, ma’am.
Q Okay. And Ms. Jeon, what is her relationship to NC Gas House Gang?
A She doesn't have one.
Q Okay. Who was your -- who was NC Gas House Gang's primary contact in placing insurance?
A Well, Veronica Jeon through Momentous Group.
Q So you're telling me that Ms. Jeon, who has no relationship to NC Gas House Gang, was placing insurance for NC Gas House Gang on behalf of Momentous?
A Yes.
Q What authority does Ms. Jeon have to place insurance for the debtor?
A Well, we have an agreement with the Momentous Group,

Momentous Hospitality, and they manage our stadium and efforts relationship to that. So, NC Gas House Gang, because of that relationship with Momentous, has been operating that way for -- since the beginning.

Q Okay. So -- I'm sorry, do you have Exhibit 20 up there? It’s a loose one (inaudible - audio fading) I don't know. It should have a sticker that says Exhibit 20.

A I’m just looking for it right now.

MS. JACOB: I think I put them both back.

A I’m sorry, just one second. Yes, ma’am.

Q Okay. So on Exhibit 20, if you’ll look at this, is this the agreement that you're -- you're referencing when you say Momentous can act on behalf of NC Gas House Gang?

A Uh --

Q This relationship that you're talking about here today?

A It -- it could be, yes.

Q Well, is it? I mean, I'm not asking you to guess. Is this a -- like, could you look at Exhibit 20? Are you familiar with this document? You signed it four times.

A Yes, ma’am.

Q It's dated, I guess, January 3rd of 2023.

A Yes, ma’am.

Q Is this a true and accurate copy of the agreement between NC Gas House Gang, Momentous Group, Momentous Hospitality, and Momentous SE?

A Yes.

Q And, Mr. Bellamy, how many times did my office ask for a copy of this agreement?

A Well, we need to clarify. So, the office ask for our existing agreement, which I haven't been able to produce. This is an agreement that was created January, 2024. So the agreement that you're asking for that we've been looking for has -- it's -- it's locked up in a -- in a -- so there's a -- our email system One Drive has been unavailable to us because of a vendor's been holding the documents.

The Trustee Office [sic] asked us for the original agreement between Momentous Group and NC Gas House Gang. We -- we don't have that. We haven't been able to produce it. It's in the drive.

This document was created from a previous draft of those documents as an -- it's an -- it’s iterative, right? So, in order to produce a new agreement for the insurance company so that they would know that there was a relationship between them, we didn't have the original, which we're still looking for, and so that's what this document represents.

Q So, am I understanding you correctly, that this document that you're looking at right now was created in January of 2024?

A Yes, ma’am.

Q Okay. So you signed this in January of 2024?

A Yes, ma'am.
Q Why is it dated January of 2023?
A That was a typo.
Q Okay. So you, on behalf of NC Gas House Gang, and you, on behalf of Momentous Group, and Momentous Hospitality, and Momentous SE entered into a post petition contract, is that correct? Meaning a contract executed after the filing of the bankruptcy case?
A Yes, ma'am.
Q And why did you create this document, or why was this document created?
A Well, the original document that we're looking for that we haven't been able to find isn't available. So in order to communicate that there is a relationship, the only thing I could do was look at a previous draft and create it so that everyone -- so we could memorialize that this has been the agreement the entire time.
Q But how do you know that this is the agreement? If you didn't have it, you're just working from an old draft. How do you know what was the final agreement?
A Well, I know that because I'm the one that executed the final agreement. And I know that there's some differences in the final, but I was able to find this one, and I needed to produce something so that we could communicate the relationship.

Q Okay. Isn't it true that you created this document so that the insurance company would insure NC Gas House as an additional insured?
A No.
Q Okay. I'd like for you to look at Exhibit 29.
A Yes ma’am.
MR. DRESCHER: Exhibit 29?
MS. STEVENS: I mean -- I'm sorry. I'm looking at December 29th.
BY MS. STEVENS:
Q Exhibit 16. I'm sorry, sir.
A No problem. Yes, ma’am.
Q So, again, so this is an email from relation -- a representative of Relation Insurance asking that -- in order for them to underwrite the policy, they need to see a copy of the agreement with the City. Did you know that Relation Insurance wanted to see a copy of the agreement with the City in order to underwrite the policy?
A I wasn't involved in that day-to-day hand --
Q But --
A -- you know, operations of chasing this down.
Q But you abdicated -- the debtor abdicated this role to Ms. Jeon, and wasn't she doing that?
A Yes, ma’am.
Q So you don't know what she did on your behalf?

A Not every detail.
Q Do you have any reason to believe -- so Ms. Jeon, on December 29th, sent a copy of the City's Use and Operating Agreement to Mr. Spisak. Do you have any reason to believe that this email doesn't reflect their understanding that that (inaudible - audio fading) to underwrite the policy?
A No, that would make sense. I think the idea would be to try to make sure that all the coverages match the agreement, so --
Q Okay. And in order for them to underwrite the policy with NC Gas, you just testified that they needed to understand that there was this relationship between Momentous and NC Gas, is that correct?
A Yes, ma'am.
Q And so you created the agreement in January, 2024 to -- in order for the insurance company to extend additional insurance coverage to the debtor, is that correct?
A No. There was already an agreement in place between the two entities, and so we memorialized it with this document. We didn't create a new agreement. We created a document to communicate an agreement that was already in place because the original agreement, we haven't been able to get our hands on it.
Q Did you articulate that --
A I think those are two different things.

Q -- caveat to the insurance company?

A I don't know.

Q Why don't you know?

A I didn't speak directly with them, and I -- I wouldn't see why that would be important.

Q Well, aren't you the debtor representative? Aren't -- shouldn't you know what's being spoken on your behalf and placing insurance that's been the key of this case?

MR. DRESCHER: Your Honor, I objection. We are so far from risk to the public and risk to the assets of the estate, we're just exploring what happened regarding the Momentous Group. And while it might be interesting and even a little bit, kind of like, “Why is this happening?” although I believe Mr. Bellamy has explained it, it's not moving us further to cause. It's not moving us further to showing that the COI is inappropriate. It's not moving us further toward showing there's a risk to the estate. And it's not moving us further to showing that there's a risk to the public.

Those are the U.S. Trustee's burdens. This is not an opportunity for the U.S. Trustee to ask questions about the relationship between Momentous and NC Gas House Gang. There's a 341 for that purpose. They can do a 2004 exam for that purpose. This is not the correct opportunity for them to go off on this fishing expedition when, really, what we're trying to find out is, is there a risk to the public? Is there a risk

to the assets of the estate?

And I would ask that Your Honor direct the U.S. Trustee towards that, which is the only relevant inquiry for this hearing.

Thank you, Your Honor.

THE COURT: Ms. Stevens?

MS. STEVENS: Your Honor, I think -- not I think. I know that the certificate of insurance that the debtor produced to the Court and to everyone here to explain that there is an additional insured has to be based on a relationship between the parties, and they state that's by written contract. We have every right to explain and get the information about that written contract.

This is the first that I'm learning that the debtor representative has recreated and signed an agreement post petition without the Court's understanding. I don't even know if the insurance company understood that this was a recreated document as they're extending coverage.

So there could be -- whether the coverage is even permissible -- and I think that what he just said explained goes into other causes under 1112. Like, this sounds like gross mismanagement, that he doesn't even know what the debtor is placing in insurance.

This line of questioning is not where I thought we were going, but this is where this has led to.

MR. DRESCHER: There was a motion filed. The motion cited one ground to dismiss or convert. That was lack of appropriate insurance that poses a risk to the estate and the public.

I believe, Your Honor, and obviously, of course, you know, proceedings need to move as counsel have planned them, but I believe that we need to have the threshold inquiry as to whether or not there are even assets of the estate right now that are at risk.

THE COURT: Well, Mr. Drescher, if there are no assets of the estate and no operations, why are we in a Chapter 11?

MR. DRESCHER: Your Honor, we believe there are assets. We believe that there can be operations. But we didn't file a motion to dismiss or convert on those basis. It's the U.S. Trustee that filed that motion, so the U.S. Trustee needs to prove it.

THE COURT: My concern, Mr. Drescher, and it may not be appropriate for today, but we have a document that was created, by Mr. Bellamy's testimony, in January of 2024 with a date of January, 2023, that says Momentous Group has agreed to do the insurance requirements for the debtor. If that were the case, we would have had insurance in December. If Momentous Group was the party responsible for getting insurance and -- you know, I think you need an opportunity to defend on that

issue. But I think we are getting very close to an area of gross mismanagement, which may need to be addressed.

I think what I want to do is just take a brief recess for a minute.

And I'll remind you, you're still under oath. And then I'll be back out.

MR. DRESCHER: Thank you, Your Honor.

MS. STEVENS: Thank you, Your Honor.

COURTROOM DEPUTY: All rise. Court will be in recess.

(Recess 11:11 a.m./Reconvene 11:19 a.m.)

COURTROOM DEPUTY: All rise. The United States Bankruptcy Court for the District of Maryland now resumes its regular session. The Honorable Lori Simpson presiding. Please be seated and come to order.

Recalling the case of NC Gas House Gang LLC, Case Number 23-18766.

THE COURT: In light of the recent testimony by Mr. Bellamy, and so as not to catch the parties off guard, the Court has some very serious concerns about the current management of the debtor.

The Court is going to continue this hearing to allow the parties to address, if they so deem appropriate, issues of gross mismanagement or something else. But now that it's been brought to the Court's attention that documents were created in

a fashion that would allow for misinterpretation, I can't let the hearing continue until the debtor has had a fair opportunity to address those issues. And it may be that the United States Trustee wants to file an amended pleading; I don't know.

But in light of the testimony today, the Court is going to continue the hearing. I would ordinarily set it in when everything else is set in for next week, but I don't think it's enough time, unless the parties can have today to think about it, and if they want it all set in, then you would have to have to file things very quickly.

MS. STEVENS: Your Honor, I will be at the Cleveland Clinic next -- the 20th, so I will not be able to be here, and I don't think there's anyone in my office that would want to cover this issue.

THE COURT: Right. Okay, then let's address it at a separate date. What I would ask, Ms. Stevens, is to the extent -- well, I'll let you decide what you want to do. And once documents are filed, the Court will set in a new hearing date on the motion to convert or dismiss.

Thank you.

MR. DRESCHER: Thank you, Your Honor.

MS. STEVENS: Thank you, Your Honor.

COURTROOM DEPUTY: All rise. Court is adjourned.

(Whereupon, at 11:21 a.m., the hearing was adjourned.)

<u>CERTIFICATE OF TRANSCRIBER</u>

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Karen Hartmann, AAERT CET 475  Date: February 12, 2024
TRANSCRIPTS PLUS, INC.